# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Edward Shultz, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | No: 13-cv-3641 |
| *-vs-* | ) | |
| | ) | *(Judge Feinerman)* |
| Thomas Dart, Sheriff of Cook | ) | |
| County, Cook County, Illinois, | ) | *(Magistrate Judge Brown)* |
| Correctional Officer Dominguez, | ) | |
| and Sergeant Villanova | ) | |
| | ) | |
| *Defendants.* | ) | |

## DECLARATION OF EDWARD SHULTZ

The undersigned, under penalties of perjury as provided by law, certifies that the following statements are true:

1. My name is Edward Shultz. I am the plaintiff in this action.

2. I was an inmate at the Cook County Jail from April 17, 2013 until May 8, 2013. Throughout my incarceration, I was housed in Division 2 Dorm 2, W House.

3. In the morning of May 8, 2013 I went before a judge at the Bridgeview courthouse, plead guilty to an unlawful use of a weapon charge, and was sentenced to time served. The judge ordered me released on my case.

4. Although I did not want to return to the jail, I was required to wait for a bus to transport me back to the jail.

5.  I returned to the jail's RCDC and escorted to my former living unit in Division 2. I had no desire to return to Division 2 to collect whatever incidental personal property that was stored in my dorm.

6.  At my deposition, I testified there was no officer present in the dorm from the time I returned from court until after my attack on May 8, 2013.

7.  Following my attack, I initiated a telephone call at approximately 20:33:57 that lasted until 20:36:35. During this time I was standing at one of the telephones depicted in the picture below. No officer was standing in the doorway of my living unit. The picture below accurately reflects the location of the dorm's telephones and the doorway to the dorm:



8.  After my telephone call terminated, I eventually left the dorm and ventured to the officer's desk located in the hallway. The picture below is an accurate depiction of the hallway where the officer's desk was location in May 2013.



9.  During my incarceration at the jail, the dorm officer would sit at this desk when on duty. The officer's desk contains computers, telephones, and log books maintained by the dorm officer. As reflected in the photograph, there were four chairs located at this desk in May 2013, one for each dorm officer.

Executed on November 2, 2015.

Edward Shultz

# Exhibit 2

| Division 2 | Divisional Procedures | Effective Date 01 December 2005 |
|---|---|---|
| | Dormitory Classification | Date Revised June 2011 |
| | | Related General Orders 0.00 |
| | | Page 1 of 2 |

## ALL DORMS ARE MINIMUM CLASSIFICATION UNLESS OTHERWISE STATED.

| DORM ONE | | |
|---|---|---|
| TIER | CLASSIFCATION | NUMBER OF BEDS |
| A | 40+ General Population (Minimum Classification) | 48 |
| B | General Population (Minimum Classification) | 48 |
| C | General Population (Minimum Classification) | 48 |
| D | General Population (Minimum Classification) | 48 |
| E | General Population (Minimum Classification) | 48 |
| F | General Population (Minimum Classification) | 48 |
| G | General Population (Minimum Classification) | 48 |
| H | General Population (Minimum Classification) | 48 |
| DORM 2 | | |
| TIER | CLASSIFCATION | NUMBER OF BEDS |
| M | Medical (Minimum/Medium Classification) | 48 |
| N | Medical (Minimum/Medium Classification) | 48 |
| O | Intermediate Psych (Minimum/Medium Classification) | 48 |
| P | Intermediate Psych (Minimum/Medium Classification) | 40 |
| R | Intermediate Psych (Minimum/Medium Classification) | 48 |
| S | High Functioning Psych (Minimum/Medium Classification) | 40 |
| T | High Functioning Psych (Minimum/Medium Classification) | 48 |
| U | High Functioning Psych Overflow (Minimum/Medium Classification) | 40 |
| V | Medical Overflow (Minimum/Medium Classification) | 48 |
| W | High Functioning Psych (Minimum/Medium Classification) | 40 |
| DORM 3 | | |
| TIER | CLASSIFCATION | NUMBER OF BEDS |
| AA | General Population (Minimum Classification) | 40 |
| BB | General Population (Minimum Classification) | 48 |
| CC | General Population (Minimum Classification) | 48 |
| DD | General Population (Minimum Classification) | 48 |
| EE | General Population (Minimum Classification) | 48 |
| FF | General Population (Minimum Classification) | 48 |
| GG | General Population (Minimum Classification) | 48 |
| HH | General Population (Minimum Classification) | 48 |
| JJ | General Population (Minimum Classification) | 48 |

| Division 2 | Divisional Procedures | Effective Date<br>01 December 2005 |
|---|---|---|
| | | Date Revised<br>June 2011 |
| | Dormitory Classification | Related General Orders<br>0.00 |
| | | Page 2 of 2 |

| DORM 4 | | |
|---|---|---|
| **TIER** | **CLASSIFCATION** | **NUMBER OF BEDS** |
| LL | Classification Observation Staging (Minimum/Medium Classification) | 50 |
| LU | Classification Observation Staging (Minimum/Medium Classification) | 50 |
| NL | Classification Observation Staging (Minimum/Medium Classification) | 50 |
| NU | Classification Observation Staging (Minimum/Medium Classification) | 50 |
| OL | Central Kitchen Workers (Minimum Classification/Bail $7500 or Less) | 48 |
| OU | Central Kitchen Workers (Minimum Classification/Bail $7500 or Less) | 48 |
| PL | Central Kitchen Workers (Minimum Classification/Bail $7500 or Less) | 40 |
| PU | Central Kitchen Workers (Minimum Classification/Bail $7500 or Less) | 40 |
| RL | Central Kitchen Workers (Minimum Classification/Bail $7500 or Less) | 37 |
| RU | Central Kitchen Workers (Minimum Classification/Bail $7500 or Less) | 37 |
| QL | Central Kitchen Workers (Minimum Classification/Bail $7500 or Less) | 50 |
| QU | Central Kitchen Workers (Minimum Classification/Bail $7500 or Less) | 50 |
| | | |
| | **DIVISION THREE** | |
| **TIER** | **CLASSIFCATION** | **NUMBER OF BEDS** |
| A1 | In-Take (Minimum/Medium Classification) | 56 |
| B1 | Gang Free (Minimum Classification) | 57 |
| A2 | Gang Free (Minimum Classification) | 60 |
| B2 | Gang Free (Minimum Classification) | 60 |
| A3 | Gang Free (Minimum Classification) | 60 |
| B3 | Gang Free (Minimum Classification) | 60 |

Division Two / Three – Commander                                    Date:

Division Two / Three – Superintendent                              Date:

# Exhibit 3



# Exhibit 4

| Site | City | Wireless | DialedII | Dest Zone | Start Time | End Time | Dur( s) | Acct # | PIN | Prep aid | First Name | Last Name | Call Type | Call Status | Term Call | BillReason | Priv | War r | Intl | 3Wa y | VB | Amo unt | Taxe s & Fees | Prom o Call | Test Call | Language | Pror t Debi t ct | Dmt Dgit 3 | Test 2Con nect | RCF | Troo ting Num ber I | Shiv ed I | Note I |
|------|------|----------|----------|-----------|------------|----------|---------|--------|-----|----------|------------|-----------|-----------|-------------|-----------|-----------|------|-------|------|-------|-----|--------|--------------|-------------|-----------|----------|------------------|------------|----------------|-----|-------------------|-----------|--------|
| Division 2 Dorm 2 W-RT | 1 | N | 2195377 935 | Intrastate Interstate | 05/07/20 13 17:21:16 | 05/07/20 13 17:23:02 | 346 | 6696 12 | 2013 0417 206 | 3839 2890 6781 | EDWAR D | SHULTZ | Prepaid Calling Card | complete | Caller Hang-up | | | | Y | X | 0.00 | 0.00 | | | English | N | | | | | | |
| Division 2 Dorm 2 W-CTR | 1 | Y | 2195815 154 | Intrastate Interstate | 05/07/20 13 19:58:40 | 05/07/20 13 20:01:00 | 140 | 6696 12 | 2013 0417 206 | 3839 2890 6781 | EDWAR D | SHULTZ | Prepaid Calling Card | complete | Caller Hang up | | | | | X | 0.00 | 0.00 | | | English | N | | | | | | |
| Division 2 Dorm 2 W-LFT | 1 | N | 2199929 206 | Intrastate Interstate | 05/08/20 13 20:33:57 | 05/08/20 13 20:36:35 | 158 | 6696 12 | 2013 0417 206 | | EDWAR D | SHULTZ | Person Call | complete | Caller Hang-up | | | | | X | 0.00 | 0.00 | | | English | N | | | | | | |

Summary

Attempts: 20   Complete: 20   Incomplete: 0   Duration(Secs): 4991   Duration(Mins): 83.18   Average Call Length(Secs): 249   Total Debit Minutes: 0   Total Debit Complete Calls: 0   Total Debit Incomplete Calls: 0   Total Debit Charges(Excluding Taxes & Fees): $0.00

Report Generated on: 08/01/2014 11:43:33 Central T...

Page 3

# Exhibit 5

# Transcript of the Testimony of
# **JASON STANISZEWSKI**

**Date:** October 15, 2013

**Case:** BERL MCKINNIE vs. THOMAS DART, ET AL

**TOOMEY REPORTING**
Phone: 312-853-0648
Fax: 312-853-9705
Email: toomeyrep@sbcglobal.net
Internet: http://www.toomeyreporting.com/

**JASON STANISZEWSKI**
**October 15, 2013**

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

```
BERL Mc KINNIE,              )
                            )
          Plaintiff,         )
                            )
     -vs-                    )   No. 13 C 1372
                            )
THOMAS DART, SHERIFF OF      )
COOK COUNTY and              )
COOK COUNTY, ILLINOIS,       )
                            )
          Defendants.        )
```

Deposition of OFFICER JASON J. STANISZEWSKI, taken before ROBBIN M. OCHENKOWSKI, C.S.R., and Notary Public, pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, at 3026 South California Avenue, in the city of Chicago, Illinois, at 1:10 P.m. on the 15th day of October, A.D., 2013.

There were present at the taking of this deposition the following counsel:

**JASON STANISZEWSKI**
**October 15, 2013**

Page 2

1       PRESENT:

2               THOMAS G. MORRISSEY, LTD., by
                MR. THOMAS G. MORRISSEY
3               10249 South Western Avenue
                Chicago, Illinois 60643
4               (773) 238-4235
                tgmlaw@ameritech.net
5
                    on behalf of the Plaintiffs;
6
                ASSISTANT STATE'S ATTORNEY
7               CIVIL ACTIONS BUREAU
                by MR. MICHAEL J. SORICH
8               500 Richard J. Daley Center
                Chicago Illinois 60602
9               (312) 603-5170
                Michael.Sorich@cookcountyil.com
10
                    on behalf of the Defendants;
11
                ASSISTANT GENERAL COUNSEL
12              LEGAL AND LABOR AFFAIRS by
                MR. GEORGE J. VOURNAZOS
13              3026 South California Avenue
                Building 1, Room 202
14              Chicago, Illinois 60608
                (312) 674-4316
15              George.Vournazos@cookcountyil.gov
16                  on behalf of the Defendants.
17

18

19                      - - - - -

20

21

22

23

24

**JASON STANISZEWSKI**
**October 15, 2013**

Page 3

1                            I N D E X

2   EXAMINATION BY                                    PAGE

3   Mr. Morrissey                                       4
    Mr. Sorich                                         24
4

5

6                           EXHIBITS

7

8

9

10

11

12

13

14

15

16

17

18

19

20        (No exhibits were marked or referred to.)

21

22

23                        - - - - -

24

**JASON STANISZEWSKI**
**October 15, 2013**

Page 4

1              (Witness first duly sworn.)

2              OFFICER JASON J. STANISZEWSKI,

3    called as a witness herein, having been first duly

4    sworn, was examined upon oral interrogatories and

5    testified as follows:

6                         EXAMINATION

7                    by Mr. Morrissey:

8       MR. MORRISSEY:  This is the deposition of

9    Officer Jason Staniszewski taken pursuant to notice and

10   continued to today's date.

11          Q   Will you state your full name for the

12   record?

13      **A   Jason John Staniszewski.**

14      Q   And spell your last name, please?

15      **A   S-t-a-n-i-s-z-e-w-s-k-i.**

16      Q   How long have you been with the Cook County

17   Sheriff?

18      **A   A little over about 13 and a half years.**

19      Q   In the years 2012 and 2013, were you a tier

20   officer in Division 2, Dorm 2V?

21      **A   Yes.**

22      Q   For how long a period of time were you in the --

23   assigned to Dorm 2 and V Tier?

24      **A   I had a 90-day assignment.**

**JASON STANISZEWSKI**
**October 15, 2013**

Page 5

1    Q   During what period of time were you assigned to

2    the V Dorm?

3    **A   7:00 to 3:00 Saturday through Wednesday.**

4    Q   I meant was that in 2012 or 2013?

5    **A   I don't know exactly what dates.**

6    Q   Would it have been in December of 2000 -- I'm

7    sorry -- November of 2012 do you think you were assigned

8    to the V?

9    **A   It's possible.  Without looking at a logbook to**

10   **see the dates, I couldn't tell you for sure.**

11   Q   On the 7:00 to 3:00 shift, was there another

12   tier officer at that time in the V Dorm?

13   **A   Another tier officer for the same tier?**

14   Q   Yes.

15   **A   No.**

16       **There's one officer per tier per shift.**

17   Q   And they're dorm-type arrangements, correct?

18   **A   I'm sorry.**

19   Q   They're dorm-type arrangements?

20   **A   Yes, it's a dorm setting.**

21   Q   On the third floor of Division 2, Dorm 2, there

22   are four dorms, correct --

23   **A   Yes.**

24   Q   -- on the third floor?

**JASON STANISZEWSKI**
**October 15, 2013**

Page 6

1          And the officer's desk is outside the actual

2     tier, correct?

3     **A    Yes.**

4     Q    So you sit out in the hall, correct?

5     **A    Yes.  Well, yes, you sit out in the hall.**

6     Q    In between November and April of 2013,

7     approximately how many detainees were housed in the

8     V Dorm?

9     **A    Can you repeat those dates?**

10    Q    Between, let's say, November of 2012 through

11    April of 2013, approximately how many detainees would

12    the V Dorm house?

13    **A    I would say 48.**

14         **That division has been filled to capacity.**

15    Q    And on the third floor of Division 2, Dorm 2, is

16    that considered a medical floor?

17    **A    The whole building is psyche/medical.  They**

18    **classify them high-functioning psyche.  So there's**

19    **different classifications that are all thrown in**

20    **together.**

21    Q    Do you know if the V Dorm is also considered a

22    psyche dorm?

23    **A    It could be psyche.  It could be medical.**

24         **The actual name of what they classify it, I**

**JASON STANISZEWSKI**
**October 15, 2013**

Page 7

1  **don't recall.**

2      Q    As a correctional officer, have you received any

3  specific training to deal with inmates that have psyche

4  problems?

5      **A    Yes.**

6      Q    Have you received any specific training as a

7  correctional officer to deal with inmates that have a

8  physical disability?

9      **A    A physical disability, can you be more specific?**

10     Q    Well, let's say a wheelchair-bound detainee or

11  somebody who is an amputee.

12     **A    Like how to treat them?**

13         **I don't know how to treat.  I'm not trained to**

14  **treat them.**

15     Q    Let me go back here.

16         Since Division 2, Dorm 2 is considered either a

17  psyche or a medical division, as a correctional officer

18  assigned to that building, were you given more training

19  than a tier officer assigned to, let's say, a

20  nonmedical, nonpsyche division?

21     **A    We receive psyche training.**

22     Q    Did you understand my question?

23         Because you're assigned -- you were assigned to

24  a psyche division, did you receive more training,

**JASON STANISZEWSKI**
**October 15, 2013**

Page 8

1   psychological training --

2       **A    Yes.**

3       Q    -- than a tier officer that wasn't assigned to

4   that type of dorm?

5       **A    Yes.**

6       Q    In regards to physical illnesses or disabilities

7   of a detainee, were you given more training because you

8   were assigned to Dorm 2, Division 2 than a tier officer

9   that was assigned to, let's say, Division 11, which was

10  perhaps not a division where -- considered a medical

11  division?

12      **A    Physical, to their physical condition?**

13      Q    Yes.

14      **A    It's possible that it might be in there, but in**

15  **terms of dealing with detainees who have physical**

16  **limitations, if I see that they have a limitation, then**

17  **I know that I would know how to deal with it, but if I**

18  **don't see that they have one, then --**

19      Q    Well, my question is -- let me be more specific.

20          Have you --

21          Because you were assigned to Division 2,

22  Dorm 2, were you given more training than other

23  correctional officers to deal with the

24  American Disclosure Act, people with disabilities?

**JASON STANISZEWSKI**
**October 15, 2013**

Page 9

1        Do you understand the question?

2   **A   It could have been in the training, yes.**

3        **I can't -- I can't say --**

4        **Yes, what was included in the training I**

5   **received, it can be included within the training, yes,**

6   **it's possible.**

7   Q   Have you ever worked in the M and N tiers in

8   Division 2, Dorm 2?

9   **A   Yes.**

10  Q   And you're aware that those are considered

11  equipped for handicapped people?

12  **A   Correct.**

13  Q   By that what do you understand that to mean?

14  **A   They have stuff in the washrooms, they have a**

15  **ramp for wheelchairs, they have a metal pole attached to**

16  **the wall in there for them to assist them with the**

17  **showers.**

18  Q   In the last year and a half, have you worked

19  in -- either in the M or N Tiers?

20  **A   I don't think so.**

21  Q   So you don't have any knowledge whether or not

22  those bars in the M and N Tiers were present or not

23  during that period of time?

24  **A   Well, I've been doing sanitation.**

**JASON STANISZEWSKI**
**October 15, 2013**

Page 10

1      **I recall it being unattached because they tried**
2  **making a shank.**
3      Q   So you recall the bars around the toilet at
4  times being unattached, correct?
5      MR. SORICH:  Objection.  That misstates his
6  testimony.
7      MR. MORRISSEY:  Q  Because you worked -- you worked
8  in sanitation, correct?
9      MR. SORICH:  Objection.  It misstates his testimony.
10      You can answer.
11      MR. MORRISSEY:  Well, he can answer.
12      THE WITNESS:  A  Can you repeat that?
13      MR. MORRISSEY:  Q  Sure.
14      What is a sanitation officer?
15      **A   Somebody who cleans the division.**
16      Q   Does that mean that you supervise inmates that
17  clean the division?
18      **A   Yes.**
19      Q   So the sanitation officer physically doesn't
20  generally clean up after a division, correct?
21      **A   I'm sorry?**
22      Q   Well, strike that.
23      For what period of time did you work as a
24  sanitation officer in Division 2, Dorm 2?

**JASON STANISZEWSKI**
**October 15, 2013**

Page 11

1      **A   I don't recall the dates.**

2          **I didn't work in Dorm 2.**

3      Q   But you mentioned that in the last year and a

4   half you've been physically present in the M and N

5   laboratories or washrooms?

6      **A   No.**

7          **I've seen the pole.**

8      Q   Where did you see the pole?

9      **A   In the security area.**

10     Q   And where is the security area located?

11     **A   The supply room.**

12     Q   And that's in Building 2 or Dorm 2?

13     **A   It's in the office of Dorm 2.**

14     Q   And the pole that you're referring to usually is

15   affixed to either the toilet or the shower area?

16     **A   It's affixed to the wall somewhere in the**

17   **washroom.**

18     Q   And because you've been in that room, you know

19   that that pole belongs in the washroom, I believe, in

20   the M or N Tier?

21     **A   Right.**

22     Q   Other than that, you don't have personal

23   knowledge of whether or not the bars were attached in

24   the M and N Tiers during the years 2012 --

**JASON STANISZEWSKI**
**October 15, 2013**

Page 12

1      **A    No.**

2      Q    -- and 2013?

3           Do you know whether or not at times there are

4    detainees in the V Dorm in the last year and a half who

5    are amputees?

6      **A    In the last year and a half, I would say no.**

7      Q    Do you know -- To be specific here, do you know

8    Berl McKinnie?

9      **A    I do recall him.**

10     Q    Okay.

11     **A    I don't know him personally.**

12     Q    Do you recall having any contact with

13   Berl McKinnie?

14     **A    Every day I was there, he was -- from what I**

15   **remember, he was on the tier.**

16     Q    Can you describe Mr. McKinnie for me?

17     **A    The way he looks?**

18     Q    What he looks like.

19     **A    Black guy in jail wearing -- with DOC uniforms.**

20     Q    Other than the fact that he was

21   African-American, do you recall anything else about him?

22     **A    I'm sorry.  I can't hear you.**

23     Q    Other than the fact that he was

24   African-American, do you recall any other attributes of

**JASON STANISZEWSKI**
**October 15, 2013**

Page 13

1    Mr. McKinnie, physical attributes?

2       **A    No.**

3       Q    Do you recall whether he was tall or short?

4       **A    About my height, which to me is average.**

5       Q    How tall are you?

6       **A    Five-nine.**

7       Q    Do you recall whether he was stocky built like

8    yourself?

9       **A    Yes.**

10      Q    So he was heavyset?

11      **A    From what I remember.**

12         **It's been a while.**

13      Q    Approximately how much do you weigh?

14      **A    Two-fifty.**

15      Q    Not to be personal here, but do you recall how

16   old he was?

17      **A    No.**

18      Q    Do you recall what color hair he had, whether he

19   had any hair?

20      **A    No, I don't remember.**

21      Q    Do you recall whether he had any facial --

22      **A    No.**

23      Q    -- hair?

24         Do you recall whether or not he had lost a

**JASON STANISZEWSKI**
**October 15, 2013**

```
                                                  Page 14
 1   portion of his right leg?

 2        A    No.

 3        Q    Do you recall whether he was using a prosthesis?

 4        A    No.

 5        Q    If Mr. --

 6             Do you know whether or not anybody was assigned

 7   to the V unit during the time that you were a tier

 8   officer who had a prosthesis?

 9        A    No.

10        Q    You don't recall?

11        A    No.

12        Q    Do you know whether or not --

13             Strike that.

14             Do you know who assigns inmates to specific

15   tiers?

16        A    Classification.

17        Q    And that's not within Division 2, correct?

18        A    That's correct.

19        Q    Is there an elevator in Dorm 2?

20        A    No.

21        Q    The time you were a tier officer in the V Dorm,

22   were inmates receiving their food on the first floor?

23        A    On my shift?

24        Q    Yes.
```

**JASON STANISZEWSKI**
**October 15, 2013**

Page 15

1     **A     No.**

2     Q     Do you know whether or not at times they had to

3     go down to the first floor to go to the dispensary?

4     **A     At times, yes.**

5     Q     Do you know whether or not they had to go down

6     to the first floor to get their clothes and bed linen?

7     **A     Yes.**

8     Q     Do you know whether they had to go to the first

9     floor to go to court?

10    **A     Yes.**

11    Q     And is there a staircase?

12    **A     There is.**

13    Q     Is the staircase set up for people with

14    disabilities to go up and down, kind of a chair facility

15    to assist a person to go from the first floor to the

16    third floor?

17    **A     During that time?**

18    Q     Yes.

19    **A     No.**

20    Q     Currently is there any type of elevator or lift

21    for inmates who are disabled?

22    **A     I don't work in that division anymore so I don't**

23    **know.**

24    Q     Do you know if there were showers in the V Dorm?

**JASON STANISZEWSKI**
**October 15, 2013**

Page 16

1    **A    There was.**

2    Q    Do you know if there was a shower chair, a

3    specific ADA accessible shower chair for individuals

4    with a disability in the V Dorm?

5    **A    I don't recall one.**

6    Q    Do you know if the toilets were set up for under

7    the guidelines of the ADA?

8    **A    I don't think so.**

9    Q    Do you have a general knowledge of what an ADA

10   toilet looks like?

11   **A    No, I don't.**

12   Q    Have you ever gone into a restaurant, a modern

13   restaurant, McDonald's, ever gone into a toilet area

14   that's equipped for a handicapped person?

15   MR. SORICH:  I'm going to object because it calls

16   for complete speculation --

17   MR. MORRISSEY:  All right.

18   MR. SORICH:  -- as to whether or not it conforms

19   with the ADA guidelines.

20   MR. MORRISSEY:  Q  But you're not -- you're not

21   aware of any type of elevated toilet seat for a

22   handicapped person in the V Dorm?

23   **A    Elevated toilets?**

24   Q    Yes.

**JASON STANISZEWSKI**
**October 15, 2013**

Page 17

1    **A    Are you asking if I seen one there?**

2    Q    Right.

3    **A    No, I didn't.**

4    Q    And there's no grab rails around any toilet in

5    the V section for a handicapped person?

6    **A    I don't think so.**

7    Q    Is there any type of grab bar in the shower area

8    for a handicapped person?

9    **A    I would say, from what I remember, no.**

10   Q    And, again, there's no handicap accessible chair

11   that's available in the V shower as far as you recall?

12   **A    As far as I recall, no.**

13   Q    To the best of your recollection during the

14   period of time that you were in the V Dorm, do you

15   recall any specific contact with Mr. McKinnie?

16   **A    I had contact with everybody.**

17   Q    Did anything jump out to you in regards to any

18   contact that you recall specifically with a guy named

19   Berl McKinnie?

20   **A    Yeah.  He asked me -- He claims he was**

21   **handicapped, and he said that he wanted -- that he**

22   **shouldn't be there.**

23   **       So I notified my supervisor, I made**

24   **notification in my logbook that I did it, and that's**

**JASON STANISZEWSKI**
**October 15, 2013**

Page 18

1    what I'm required to do.

2        Q    Did you look at any documents before coming in

3    here today for the deposition?

4        **A    No.**

5        Q    Do you recall making an entry in regards to

6    Mr. McKinnie's statement that he was handicapped?

7        **A    I logged everything.**

8            **There was a lot of issues with the dorm so I**

9    **made sure I logged everything.**

10       Q    What issues do you recall being present in the

11   V Dorm?

12       **A    Just guys saying they wanted to get medication,**

13   **or anytime somebody says they have a -- their stomach**

14   **hurts or they have a headache, I write it in the book,**

15   **notify my supervisor, notify medical staff because one**

16   **thing can lead to another.  So as tier officers, we're**

17   **required to document even if it's the slightest**

18   **complaint.**

19       Q    Was your supervisor Sergeant Brown?

20       **A    She is.**

21           **I had more than one supervisor.**

22       Q    All right.  What's Sergeant Brown's first name?

23       **A    I think it's Andrea.**

24       Q    Did you have any other sergeants during the time

**JASON STANISZEWSKI**
**October 15, 2013**

Page 19

1    that you were in the V Dorm?

2       **A    Yes, we've had several supervisors.**

3       Q    Who else do you recall?

4       **A    Sergeant Biagi.**

5       Q    How do you spell that?

6       **A    B-i-a-g-i.**

7           **Sergeant Martinez, Sergeant Brazelton**

8    **(phonetic), Sergeant Leahy, Sergeant Milton,**

9    **Lieutenant McNamara.**

10          **There could be more.  We've had several**

11   **supervisors.**

12      Q    These were all supervisors on the 7:00 to 3:00

13   shift when you were assigned to the V Dorm between

14   November of 2012 and April of 2013?

15      **A    They very well can be, yes.**

16          **There's sergeants, supervisors in different**

17   **buildings on any given day.**

18      Q    Was there a Superintendent Martinez?

19      **A    Yes.**

20      Q    What is Superintendent Martinez' first name?

21      **A    Sal.  I heard people call him Sal.  I don't know**

22   **what his full name is.**

23      Q    Is he still with the Cook County Department of

24   Corrections?

**JASON STANISZEWSKI**
**October 15, 2013**

Page 20

1    **A   Yes.**

2    Q   Do you recall --

3        You recall making a notation in the tier log

4    that Mr. McKinnie was complaining that he did not belong

5    on this tier because he was handicapped, correct?

6    **A   Yes.**

7    Q   Did he tell you that he was an amputee?

8    **A   He may have.**

9    **But what he told me, I wrote down what he said;**

10    **that he shouldn't be on a tier because he's handicapped,**

11    **and I write it in the book, and I notify the supervisor**

12    **whenever I get a response, that's what I write in the**

13    **book, to file a determination whether he's moved or not.**

14    Q   Did you make --

15    Did he say that he had difficulty going up and

16    down the stairs?

17    **A   He could have.**

18    Q   Did you observe Mr. McKinnie walk at that time

19    when he made this complaint?

20    **A   Sure.**

21    **He looked like any other person.  There was**

22    **nothing that stood out.  He just looked another guy in**

23    **the jail, you know.**

24    Q   You didn't ask to look at his prosthesis or

**JASON STANISZEWSKI**
**October 15, 2013**

```
                                                    Page 21
 1   anything?

 2       A    No.

 3       Q    That wasn't something that you as a nonmedical

 4   person were required to do, right?

 5       A    No.  I'm not -- I can't --

 6            If he asks something, I'd do what he asks.

 7   Then after that, if it becomes a medical issue, someone

 8   has to make that decision.

 9       Q    So whether or not Mr. McKinnie had difficulty

10   going up and down the stairs was a medical decision,

11   correct, that was --

12       A    Correct.

13            He's claiming he has a handicap so, if he wants

14   to be assigned somewhere else, the medical people make

15   that decision.

16       Q    Do you know which supervisor you referred him

17   to?

18       A    No, I don't remember.

19       Q    Do you recall any response the supervisor made?

20       A    From what I remember, he never got moved.

21       Q    Do you recall Mr. McKinnie complaining more than

22   once in regards to not being on the medical floor?

23       A    It's possible he could have, yes.

24       Q    Anything else that you can recall in regards to
```

**JASON STANISZEWSKI**
**October 15, 2013**

Page 22

1    Mr. McKinnie?

2        **A    He was helpful, just a regular guy on a tier**

3    **that wasn't there to cause trouble.**

4        Q    But other than that, nothing else stands out to

5    you --

6        **A    No, nothing.**

7        Q    -- in regards to Mr. McKinnie?

8             You made these notations in your tier logs?

9        **A    Either the tier book or the medical book.**

10       Q    Did you maintain any in the medical book also?

11       **A    Yes.**

12       Q    Does that book have any other name other than

13   medical book?

14       **A    Tier or the medical log.**

15       MR. MORRISSEY:  I don't know if that's been turned

16   over or not, but we're going to make a request.

17       MR. SORICH:  Put it in writing.

18       MR. MORRISSEY:  I think you turned over --

19            Did you turn over some tier logs?

20       MR. SORICH:  They were available for inspection from

21   your co-counsel.

22       MR. MORRISSEY:  Is this when we went down to the

23   jail about a week or two ago?

24       MR. VOURNAZOS:  Yes.

**JASON STANISZEWSKI**
**October 15, 2013**

Page 23

1    MR. MORRISSEY:  Q  To your knowledge does the third

2    floor of Division 2, Dorm 2 have any features to

3    accommodate a person who has problems walking?

4    **A    Anything like attached?  Are you referring to**

5    **something attached somewhere?**

6    Q    I mean physically on the third floor of this

7    Division 2, Dorm 2 that makes it suitable for a person

8    who's an amputee to --

9    **A    Well, there were canes in the hallway.  Guys had**

10   **canes on the floor.**

11   **They just -- They couldn't have them on the**

12   **tier.  So anytime they left the tier, they'd grab their**

13   **cane, and then they'd be on their way.**

14   Q    So the sheriff used the third floor for people

15   that needed canes and crutches, correct?

16   MR. SORICH:  Objection.  That misstates his

17   testimony.

18   MR. MORRISSEY:  Well, I'm --

19   MR. SORICH:  You can answer.

20   MR. MORRISSEY:  Q  In addition to canes, were there

21   also crutches there maintained in the security office on

22   the third floor for detainees?

23   **A    I would say I don't think so.  I think it was**

24   **primarily canes, I think.**

**JASON STANISZEWSKI**
**October 15, 2013**

Page 24

1    Q    As a tier officer, did you know a detainee by

2    the name of Whisby (phonetic)?

3    **A    Doesn't sound familiar.**

4    Q    How about a detainee by the name of Blossom

5    (phonetic)?

6    **A    I'm sorry?**

7    Q    Blossom.

8    **A    It doesn't sound familiar.**

9    Q    Are you aware that other -- that --

10        Strike that.

11        Are you aware in 2012 or 2013 that other

12   detainees housed on the third floor of Division 2,

13   Dorm 2 complained about being injured as a result of

14   falling?

15   **A    Am I aware of that?**

16   Q    Yes.

17   **A    No, I'm not aware of that.**

18   MR. MORRISSEY:  I have nothing further.

19                    EXAMINATION

20                    by Mr. Sorich:

21   MR. SORICH:  Q  You said that Mr. McKinnie looked

22   like any other person.

23        Do you remember when you testified to that?

24   **A    Yes.**

**JASON STANISZEWSKI**
**October 15, 2013**

Page 25

1    Q   So did he have a limp at all?

2    **A   No, I don't recall him having a limp.**

3    Q   And there was a conversation that you remember

4  with Mr. McKinnie that he asked you to be moved.

5        Do you remember when you talked about that with

6  the attorney?

7    **A   Yes.**

8    Q   Do you recall when that conversation occurred?

9    **A   It could have been throughout -- anytime**

10  **throughout the day.**

11    Q   Specifically, either from November of 2012

12  through April of 2013, do you remember at all when that

13  conversation occurred?

14    **A   No.**

15        **The only way is we'd have to check the logbook**

16  **to see, but I don't recall specifically.**

17    Q   And he indicated to you that he was handicapped.

18        Did he tell you that he was an amputee?

19    **A   He may have.**

20        **But they could tell me anything, and I would**

21  **report it, and then it gets logged and -- regardless of**

22  **whatever they tell me.**

23    Q   And you testified that you saw a pole from

24  Dorm 2 when you were working as a sanitation officer,

**JASON STANISZEWSKI**
**October 15, 2013**

Page 26

1  right?

2      **A   Correct.**

3      Q   Was that one occasion?

4      **A   Yes, that was one occasion.**

5      Q   And do you know the circumstances around where

6  that pole came from?

7      **A   It was either M or N, one or the two.**

8      Q   And, specifically, I believe you testified that

9  some detainees were trying to make a shank out of it.

10          Do you know --

11     MR. MORRISSEY:  I object.  He didn't say that he was

12  trying to make a shank out of it.

13     MR. SORICH:  Q  Well, you referenced a shank in your

14  testimony, correct?

15     **A   Correct.**

16     Q   So what information did you have about this pole

17  that you saw in the supply room?

18     **A   Well, it was -- you could tell it was removed**

19  **from the wall, and in the jail setting, usually when**

20  **metal is removed from its required place or whatever**

21  **it's an attached to, that's usually the reason behind as**

22  **far as to make a weapon.**

23     MR. SORICH:  All right.  Thank you.

24          I don't have nothing else.

**JASON STANISZEWSKI**
**October 15, 2013**

Page 27

1      MR. MORRISSEY:  Okay.  Nothing further.

2      MR. SORICH:  Waive signature.

3           We're all set.

4

5

6                    - - - - -

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**JASON STANISZEWSKI**
**October 15, 2013**

Page 28

1  STATE OF ILLINOIS  )
                     ) ss:
2  COUNTY OF C O O K  )

3

4

5

6          The within and foregoing deposition of the

7  aforementioned witness was taken before ROBBIN M.

8  OCHENKOWSKI, C.S.R., and Notary Public, at the place,

9  date and time aforementioned.

10         There were present during the taking of the

11  deposition the previously named counsel.

12         The said witness was first duly sworn and was

13  then examined upon oral interrogatories; the questions

14  and answers were taken down in shorthand by the

15  undersigned, acting as stenographer and Notary Public;

16  and the within and foregoing is a true, accurate and

17  complete record of all of the questions asked of and

18  answers made by the aforementioned witness, at the time

19  and place hereinabove referred to.

20         The undersigned is not interested in the within

21  case, nor of kin or counsel to any of the parties.

22

23

24

**TOOMEY REPORTING**
**312-853-0648**

**JASON STANISZEWSKI**
**October 15, 2013**

Page 29

1          Witness my official signature and seal as

2    Notary Public in and for Cook County, Illinois, on this

3    18th day of November, A.D., 2013.

4

5

6                          _____

                           ROBBIN M. OCHENKOWSKI, C.S.R.
7                          Notary Public
                           License No. 084-002522
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**JASON STANISZEWSKI**
**October 15, 2013**

Page 1

**A**

accessible 16:3 17:10
accommod... 23:3
accurate 28:16
act 8:24
acting 28:15
actions 2:7
actual 6:1,24
ada 16:3,7,9 16:19
addition 23:20
affairs 2:12
affixed 11:15 11:16
aforementi... 28:7,9,18
africaname... 12:21,24
ago 22:23
american 8:24
ameritech 2:4
amputee 7:11 20:7 23:8 25:18
amputees 12:5
andrea 18:23
answer 10:10 10:11 23:19
answers 28:14,18
anybody 14:6
anymore 15:22
anytime 18:13 23:12 25:9
approxima...

**B**

back 7:15

6:7,11
13:13
april 6:6,11 19:14 25:12
area 11:9,10 11:15 16:13 17:7
arrangeme... 5:17,19
asked 17:20 25:4 28:17
asking 17:1
asks 21:6,6
assigned 4:23 5:1,7 7:18 7:19,23,23 8:3,8,9,21 14:6 19:13 21:14
assignment 4:24
assigns 14:14
assist 9:16 15:15
assistant 2:6 2:11
attached 9:15 11:23 23:4 23:5 26:21
attorney 2:6 25:6
attributes 12:24 13:1
available 17:11 22:20
avenue 1:19 2:3,13
average 13:4
aware 9:10 16:21 24:9 24:11,15,17

bar 17:7
bars 9:22 10:3 11:23
bed 15:6
behalf 2:5,10 2:16
believe 11:19 26:8
belong 20:4
belongs 11:19
berl 1:5 12:8 12:13 17:19
best 17:13
biagi 19:4,6
black 12:19
blossom 24:4 24:7
book 18:14 20:11,13 22:9,9,10 22:12,13
brazelton 19:7
brown 18:19
browns 18:22
building 2:13 6:17 7:18 11:12
buildings 19:17
built 13:7
bureau 2:7

**C**

c 1:7,16 28:2 28:8 29:6
california 1:19 2:13
call 19:21
called 4:3
calls 16:15
cane 23:13
canes 23:9,10

23:15,20,24
cant 9:3,3 12:22 21:5
capacity 6:14
case 28:21
cause 22:3
center 2:8
chair 15:14 16:2,3 17:10
check 25:15
chicago 1:20 2:3,8,14
circumstan... 26:5
city 1:20
civil 1:17 2:7
claiming 21:13
claims 17:20
classification 14:16
classificati... 6:19
classify 6:18 6:24
clean 10:17 10:20
cleans 10:15
clothes 15:6
cocounsel 22:21
color 13:18
com 2:9
coming 18:2
complained 24:13
complaining 20:4 21:21
complaint 18:18 20:19
complete 16:16 28:17
condition

8:12
conforms 16:18
considered 6:16,21 7:16 8:10 9:10
contact 12:12 17:15,16,18 17:10
continued 4:10
conversation 25:3,8,13
cook 1:9,9 4:16 19:23 29:2
cookcountyil 2:9,15
correct 5:17 5:22 6:2,4 9:12 10:4,8 10:20 14:17 14:18 20:5 21:11,12 23:15 26:2 26:14,15
correctional 7:2,7,17 8:23
corrections 19:24
couldnt 5:10 23:11
counsel 1:23 2:11 28:11 28:21
county 1:9,9 4:16 19:23 28:2 29:2
court 1:1 15:9
courts 1:18
crutches 23:15,21

currently 15:20

**D**

d 1:21 3:1 29:3
daley 2:8
dart 1:8
date 4:10 28:9
dates 5:5,10 6:9 11:1
day 1:21 12:14 19:17 25:10 29:3
deal 7:3,7 8:17,23
dealing 8:15
december 5:6
decision 21:8 21:10,15
defendants 1:10 2:10 2:16
department 19:23
deposition 1:15,23 4:8 18:3 28:6 28:11
depositions 1:19
describe 12:16
desk 6:1
detainee 7:10 8:7 24:1,4
detainees 6:7 6:11 8:15 12:4 23:22 24:12 26:9
determinat... 20:13
didnt 11:2

**JASON STANISZEWSKI**
**October 15, 2013**

17:3 20:24
26:11
**different**
6:19 19:16
**difficulty**
20:15 21:9
**disabilities**
8:6,24
15:14
**disability** 7:8
7:9 16:4
**disabled**
15:21
**disclosure**
8:24
**dispensary**
15:3
**district** 1:1,1
1:18
**division** 1:2
4:20 5:21
6:14,15
7:16,17,20
7:24 8:8,9
8:10,11,21
9:8 10:15
10:17,20,24
14:17 15:22
23:2,7
24:12
**doc** 12:19
**document**
18:17
**documents**
18:2
**doesnt** 10:19
24:3,8
**doing** 9:24
**dont** 5:5 7:1
7:13 8:18
9:20,21
11:1,22
12:11 13:20
14:10 15:22

15:22 16:5
16:8,11
17:6 19:21
21:18 22:15
23:23 25:2
25:16 26:24
**dorm** 4:20,23
5:2,12,20
5:21 6:8,12
6:15,21,22
7:16 8:4,8
8:22 9:8
10:24 11:2
11:12,13
12:4 14:19
14:21 15:24
16:4,22
17:14 18:8
18:11 19:1
19:13 23:2
23:7 24:13
25:24
**dorms** 5:22
**dormtype**
5:17,19
**duly** 4:1,3
28:12

___

**E**

e 3:1
**eastern** 1:2
**either** 7:16
9:19 11:15
22:9 25:11
26:7
**elevated**
16:21,23
**elevator**
14:19 15:20
**entry** 18:5
**equipped**
9:11 16:14
**everybody**
17:16

**exactly** 5:5
**examination**
3:2 4:6
24:19
**examined** 4:4
28:13
**exhibits** 3:6
3:20

___

**F**

**facial** 13:21
**facility** 15:14
**fact** 12:20,23
**falling** 24:14
**familiar** 24:3
24:8
**far** 17:11,12
26:22
**features** 23:2
**federal** 1:17
**file** 20:13
**filled** 6:14
**first** 4:1,3
14:22 15:3
15:6,8,15
18:22 19:20
28:12
**fivenine** 13:6
**floor** 5:21,24
6:15,16
14:22 15:3
15:6,9,15
15:16 21:22
23:2,6,10
23:14,22
24:12
**following**
1:23
**follows** 4:5
**food** 14:22
**foregoing**
28:6,16
**four** 5:22
**full** 4:11

19:22
**further** 24:18
27:1

___

**G**

g 2:2,2
**general** 2:11
16:9
**generally**
10:20
**george** 2:12
2:15
**given** 7:18
8:7,22
19:17
**go** 7:15 15:3
15:3,5,8,9
15:14,15
**going** 16:15
20:15 21:10
22:16
**gov** 2:15
**grab** 17:4,7
23:12
**guidelines**
16:7,19
**guy** 12:19
17:18 20:22
22:2
**guys** 18:12
23:9

___

**H**

**hair** 13:18,19
13:23
**half** 4:18 9:18
11:4 12:4,6
**hall** 6:4,5
**hallway** 23:9
**handicap**
17:10 21:13
**handicapped**
9:11 16:14
16:22 17:5

17:8,21
18:6 20:5
20:10 25:17
**headache**
18:14
**hear** 12:22
**heard** 19:21
**heavyset**
13:10
**height** 13:4
**helpful** 22:2
**hereinabove**
28:19
**hes** 20:10,13
21:13
**highfunctio...**
6:18
**house** 6:12
**housed** 6:7
24:12
**hurts** 18:14

___

**I**

**id** 21:6
**illinois** 1:1,9
1:20 2:3,8
2:14 28:1
29:2
**illnesses** 8:6
**im** 5:6,18
7:13 10:21
12:22 16:15
18:1 21:5
23:18 24:6
24:17
**included** 9:4
9:5
**indicated**
25:17
**individuals**
16:3
**information**
26:16
**injured** 24:13

**inmates** 7:3,7
10:16 14:14
14:22 15:21
**inspection**
22:20
**interested**
28:20
**interrogato...**
4:4 28:13
**issue** 21:7
**issues** 18:8,10
**ive** 9:24 11:7

___

**J**

j 1:15 2:7,8
2:12 4:2
**jail** 12:19
20:23 22:23
26:19
**jason** 1:15
4:2,9,13
**john** 4:13
**jump** 17:17

___

**K**

k 28:2
**kin** 28:21
**kind** 15:14
**kinnie** 1:5
**know** 5:5
6:21 7:13
8:17,17
11:18 12:3
12:7,7,11
14:6,12,14
15:2,5,8,23
15:24 16:2
16:6 19:21
20:23 21:16
22:15 24:1
26:5,10
**knowledge**
9:21 11:23
16:9 23:1

JASON STANISZEWSKI
October 15, 2013

**L**

labor 2:12
laboratories
11:5
lead 18:16
leahy 19:8
left 23:12
leg 14:1
legal 2:12
license 29:7
lieutenant
19:9
lift 15:20
limitation
8:16
limitations
8:16
limp 25:1,2
linen 15:6
little 4:18
located 11:10
log 20:3
22:14
logbook 5:9
17:24 25:15
logged 18:7,9
25:21
logs 22:8,19
long 4:16,22
look 18:2
20:24
looked 20:21
20:22 24:21
looking 5:9
looks 12:17
12:18 16:10
lost 13:24
lot 18:8

**M**

m 1:16,20 9:7
9:19,22
11:4,20,24
26:7 28:7

29:6
maintain
22:10
maintained
23:21
making 10:2
18:5 20:3
marked 3:20
martinez
19:7,18,20
mc 1:5
mcdonalds
16:13
mckinnie
12:8,13,16
13:1 17:15
17:19 20:4
20:18 21:9
21:21 22:1
22:7 24:21
25:4
mckinnies
18:6
mcnamara
19:9
mean 9:13
10:16 23:6
meant 5:4
medical 6:16
6:17,23
7:17 8:10
18:15 21:7
21:10,14,22
22:9,10,13
22:14
medication
18:12
mentioned
11:3
metal 9:15
26:20
michael 2:7,9
milton 19:8
misstates

10:5,9
23:16
modern
16:12
morrissey 2:2
2:2 3:3 4:7
4:8 10:7,11
10:13 16:17
16:20 22:15
22:18,22
23:1,18,20
24:18 26:11
27:1
moved 20:13
21:20 25:4

**N**

n 3:1 9:7,19
9:22 11:4
11:20,24
26:7
name 4:11,14
6:24 18:22
19:20,22
22:12 24:2
24:4
named 17:18
28:11
needed 23:15
net 2:4
never 21:20
nonmedical
7:20 21:3
nonpsyche
7:20
northern 1:1
notary 1:16
28:8,15
29:2,7
notation 20:3
notations
22:8
notice 4:9
notification

17:24
notified
17:23
notify 18:15
18:15 20:11
november
5:7 6:6,10
19:14 25:11
29:3

**O**

o 28:2,2
object 16:15
26:11
objection
10:5,9
23:16
observe
20:18
occasion 26:3
26:4
occurred
25:8,13
ochenkowski
1:16 28:8
29:6
october 1:21
office 11:13
23:21
officer 1:15
4:2,9,20
5:12,13,16
7:2,7,17,19
8:3,8 10:14
10:19,24
14:8,21
24:1 25:24
officers 6:1
8:23 18:16
official 29:1
okay 12:10
27:1
old 13:16
once 21:22

oral 4:4
28:13
outside 6:1

**P**

p 1:20
page 3:2
parties 28:21
people 8:24
9:11 15:13
19:21 21:14
period 4:22
5:1 9:23
10:23 17:14
person 15:15
16:14,22
17:5,8
20:21 21:4
23:3,7
24:22
personal
11:22 13:15
personally
12:11
pertaining
1:18
phonetic 19:8
24:2,5
physical 7:8
7:9 8:6,12
8:12,15
13:1
physically
10:19 11:4
23:6
place 26:20
28:8,19
plaintiff 1:6
plaintiffs 2:5
please 4:14
pole 9:15
11:7,8,14
11:19 25:23

26:6,16
portion 14:1
possible 5:9
8:14 9:6
21:23
present 1:22
2:1 9:22
11:4 18:10
28:10
previously
28:11
primarily
23:24
problems 7:4
23:3
procedure
1:17
prosthesis
14:3,8
20:24
psyche 6:17
6:18,22,23
7:3,17,21
7:24
psychologi...
8:1
public 1:17
28:8,15
29:2,7
pursuant
1:17 4:9
put 22:17

**Q**

question 7:22
8:19 9:1
questions
28:13,17

**R**

r 1:16 28:8
29:6
rails 17:4
ramp 9:15

**JASON STANISZEWSKI**
**October 15, 2013**

Page 4

| | | | | | |
|---|---|---|---|---|---|
| **reason** 26:21 | 26:18,20 | **see** 5:10 8:16 | 26:13,23 | **suitable** 23:7 | 6:18 17:4 |
| **recall** 7:1 | **repeat** 6:9 | 8:18 11:8 | 27:2 | **superinten...** | 17:10 19:16 |
| 10:1,3 11:1 | 10:12 | 25:16 | **sorry** 5:7,18 | 19:18,20 | **theyre** 5:17 |
| 12:9,12,21 | **report** 25:21 | **seen** 11:7 | 10:21 12:22 | **supervise** | 5:19 |
| 12:24 13:3 | **request** 22:16 | 17:1 | 24:6 | 10:16 | **thing** 18:16 |
| 13:7,15,18 | **required** | **sergeant** | **sound** 24:3,8 | **supervisor** | **think** 5:7 |
| 13:21,24 | 18:1,17 | 18:19,22 | **south** 1:19 | 17:23 18:15 | 9:20 16:8 |
| 14:3,10 | 21:4 26:20 | 19:4,7,7,8,8 | 2:3,13 | 18:19,21 | 17:6 18:23 |
| 16:5 17:11 | **response** | **sergeants** | **specific** 7:3,6 | 20:11 21:16 | 22:18 23:23 |
| 17:12,15,18 | 20:12 21:19 | 18:24 19:16 | 7:9 8:19 | 21:19 | 23:23,24 |
| 18:5,10 | **restaurant** | **set** 15:13 16:6 | 12:7 14:14 | **supervisors** | **third** 5:21,24 |
| 19:3 20:2,3 | 16:12,13 | 27:3 | 16:3 17:15 | 19:2,11,12 | 6:15 15:16 |
| 21:19,21,24 | **result** 24:13 | **setting** 5:20 | **specifically** | 19:16 | 23:1,6,14 |
| 25:2,8,16 | **richard** 2:8 | 26:19 | 17:18 25:11 | **supply** 11:11 | 23:22 24:12 |
| **receive** 7:21 | **right** 11:21 | **shank** 10:2 | 25:16 26:8 | 26:17 | **thomas** 1:8 |
| 7:24 | 14:1 16:17 | 26:9,12,13 | **speculation** | **sure** 5:10 | 2:2,2 |
| **received** 7:2 | 17:2 18:22 | **sheriff** 1:8 | 16:16 | 10:13 18:9 | **thrown** 6:19 |
| 7:6 9:5 | 21:4 26:1 | 4:17 23:14 | **spell** 4:14 | 20:20 | **tier** 4:19,23 |
| **receiving** | 26:23 | **shift** 5:11,16 | 19:5 | **sworn** 4:1,4 | 5:12,13,13 |
| 14:22 | **robbin** 1:16 | 14:23 19:13 | **ss** 28:1 | 28:12 | 5:16 6:2 |
| **recollection** | 28:7 29:6 | **short** 13:3 | **staff** 18:15 | | 7:19 8:3,8 |
| 17:13 | **room** 2:13 | **shorthand** | **staircase** | _____ | 11:20 12:15 |
| **record** 4:12 | 11:11,18 | 28:14 | 15:11,13 | **T** | 14:7,21 |
| 28:17 | 26:17 | **shouldnt** | **stairs** 20:16 | **taken** 1:16 | 18:16 20:3 |
| **referenced** | **rules** 1:17 | 17:22 20:10 | 21:10 | 4:9 28:7,14 | 20:5,10 |
| 26:13 | _____ | **shower** 11:15 | **stands** 22:4 | **talked** 25:5 | 22:2,8,9,14 |
| **referred** 3:20 | **S** | 16:2,3 17:7 | **staniszewski** | **tall** 13:3,5 | 22:19 23:12 |
| 21:16 28:19 | **s** 1:16 28:8 | 17:11 | 1:15 4:2,9 | **tell** 5:10 20:7 | 23:12 24:1 |
| **referring** | 29:6 | **showers** 9:17 | 4:13,15 | 25:18,20,22 | **tiers** 9:7,19 |
| 11:14 23:4 | **sal** 19:21,21 | 15:24 | **state** 4:11 | 26:18 | 9:22 11:24 |
| **regardless** | **sanitation** | **signature** | 28:1 | **terms** 8:15 | 14:15 |
| 25:21 | 9:24 10:8 | 27:2 29:1 | **statement** | **testified** 4:5 | **time** 4:22 5:1 |
| **regards** 8:6 | 10:14,19,24 | **sit** 6:4,5 | 18:6 | 24:23 25:23 | 5:12 9:23 |
| 17:17 18:5 | 25:24 | **slightest** | **states** 1:1,18 | 26:8 | 10:23 14:7 |
| 21:22,24 | **saturday** 5:3 | 18:17 | 2:6 | **testimony** | 14:21 15:17 |
| 22:7 | **saw** 25:23 | **somebody** | **stenographer** | 10:6,9 | 17:14 18:24 |
| **regular** 22:2 | 26:17 | 7:11 10:15 | 28:15 | 23:17 26:14 | 20:18 28:9 |
| **remember** | **saying** 18:12 | 18:13 | **stocky** 13:7 | **tgmlaw** 2:4 | 28:18 |
| 12:15 13:11 | **says** 18:13 | **sorich** 2:7,9 | **stomach** | **thank** 26:23 | **times** 10:4 |
| 13:20 17:9 | **seal** 29:1 | 3:3 10:5,9 | 18:13 | **thats** 11:12 | 12:3 15:2,4 |
| 21:18,20 | **seat** 16:21 | 16:15,18 | **stood** 20:22 | 14:17,18 | **today** 18:3 |
| 24:23 25:3 | **section** 17:5 | 22:17,20 | **strike** 10:22 | 16:14 17:11 | **todays** 4:10 |
| 25:5,12 | **security** 11:9 | 23:16,19 | 14:13 24:10 | 17:24 20:12 | **toilet** 10:3 |
| **removed** | 11:10 23:21 | 24:20,21 | **stuff** 9:14 | 22:15 26:21 | 11:15 16:10 |
| | | | | **theres** 5:16 | |

**JASON STANISZEWSKI**
**October 15, 2013**

Page 5

16:13,21
17:4
**toilets** 16:6
16:23
**told** 20:9
**trained** 7:13
**training** 7:3,6
7:18,21,24
8:1,7,22 9:2
9:4,5
**treat** 7:12,13
7:14
**tried** 10:1
**trouble** 22:3
**true** 28:16
**trying** 26:9
26:12
**turn** 22:19
**turned** 22:15
22:18
**two** 22:23
26:7
**twofifty**
13:14
**type** 8:4
15:20 16:21
17:7

**U**
**unattached**
10:1,4
**undersigned**
28:15,20
**understand**
7:22 9:1,13
**uniforms**
12:19
**unit** 14:7
**united** 1:1,18
**usually** 11:14
26:19,21

**V**
**v** 4:23 5:2,8

5:12 6:8,12
6:21 12:4
14:7,21
15:24 16:4
16:22 17:5
17:11,14
18:11 19:1
19:13
**vournazos**
2:12,15
22:24
**vs** 1:7

**W**
**waive** 27:2
**walk** 20:18
**walking** 23:3
**wall** 9:16
11:16 26:19
**wanted** 17:21
18:12
**wants** 21:13
**washroom**
11:17,19
**washrooms**
9:14 11:5
**wasnt** 8:3
21:3 22:3
**way** 12:17
23:13 25:15
**weapon**
26:22
**wearing**
12:19
**wed** 25:15
**wednesday**
5:3
**week** 22:23
**weigh** 13:13
**went** 22:22
**western** 2:3
**weve** 19:2,10
**whats** 18:22
**wheelchair...**

7:10
**wheelchairs**
9:15
**whisby** 24:2
**whos** 23:8
**witness** 4:1,3
10:12 28:7
28:12,18
29:1
**work** 10:23
11:2 15:22
**worked** 9:7
9:18 10:7,7
**working**
25:24
**write** 18:14
20:11,12
**writing** 22:17
**wrote** 20:9

**X**
**x** 3:1

**Y**
**yeah** 17:20
**year** 9:18
11:3 12:4,6
**years** 4:18,19
11:24
**youre** 7:23
9:10 11:14
16:20,20
**youve** 11:4
11:18

**Z**

**0**
**00** 5:3,3,11
5:11 19:12
19:12
**084002522**
29:7

**1**

**1** 1:20 2:13
**10** 1:20
**10249** 2:3
**11** 8:9
**13** 1:7 4:18
**1372** 1:7
**15th** 1:21
**18th** 29:3

**2**
**2** 4:20,23
5:21,21
6:15,15
7:16,16 8:8
8:8,21,22
9:8,8 10:24
10:24 11:2
11:12,12,13
14:17,19
23:2,2,7,7
24:12,13
25:24
**2000** 5:6
**2012** 4:19 5:4
5:7 6:10
11:24 19:14
24:11 25:11
**2013** 1:21
4:19 5:4 6:6
6:11 12:2
19:14 24:11
25:12 29:3
**202** 2:13
**2384235** 2:4
**24** 3:3
**2v** 4:20

**3**
**3** 5:3,11
19:12
**3026** 1:19
2:13
**312** 2:9,14

**4**
**4** 3:3
**48** 6:13

**5**
**500** 2:8

**6**
**6035170** 2:9
**60602** 2:8
**60608** 2:14
**60643** 2:3
**6744316** 2:14

**7**
**7** 5:3,11
19:12
**773** 2:4

**8**

**9**
**90day** 4:24

# Exhibit 6

I have been retained by attorney Thomas G. Morrissey to render opinions regarding the court ordered release of Edward Shultz from the Cook County Department of Corrections (CCDOC) on May 8, 2013. On May 8, Mr. Shultz was given a court ordered release and sat in a suburban courthouse detention cell until approximately 4:45PM when he was transported back to the CCDOC. At the CCDOC, and pursuant to policy at the time, Mr. Shultz returned to his former living unit while his discharge paperwork was reviewed.

After being returned to his former living unit, Mr. Shultz was violently attacked in his Dorm bathroom by other inmates. Correctional staff did not render assistance to protect Mr. Shultz who suffered significant injuries. Mr. Shultz alleges that the CCDOC has a practice of stationing correctional officers out of sight and hearing of prisoners, which caused the correctional staff unable to render assistance during his attack.

I was a member of the New York City Department of Correction (NYCDOC) for more than 22 years. I recognize the problems of housing prisoners, in particular detainees who have not been convicted of a crime, in a safe and secure environment. When the legal right to hold a person has been dismissed or otherwise vacated, the process to release that person should be as swift and safe as possible to avoid the potential liability for any injuries.

I am being compensated for my work in this case at the rate of one-hundred and fifty dollars per hour. I have spent approximately 23 hours preparing my expert report.

The opinions I will express are the following:

1. Most, if not all, of the administrative steps necessary to discharge a court ordered release could occur prior to the detainee attending court.

2. Assuming the CCDOC requires inmates with court ordered releases to return to the Jail, "possible discharges" should be segregated from inmates remanded to the CCDOC custody until their status is administratively verified.

3. That on the evening of May 8, 2013 the CCDOC staff assigned to supervise Dorm W in Division 2 were not diligent in their duties and as a result Edward Shultz was severely beaten and medical treatment was delayed.

4. CCDOC staff failed to promptly conduct a thorough investigation into the circumstances surrounding the assault on Mr. Shultz thereby allowing violent predators to continue to operate freely in a dormitory living space.

### I. Qualifications

I was a member of the New York City Department of Correction (NYCDOC) for over 22 years. I worked as a correctional officer, as a supervisor, and as a warden. My career started in the rank of correction officer where I was responsible for the care, custody and control of inmates. I rose to the rank of three star chief where I was responsible for all facilities on New York City's Rikers Island jail complex, with an average daily population of over 10,000 inmates. On a daily basis approximately 2,000 inmates were delivered to the various criminal, supreme and family courts in Manhattan, Brooklyn, Queens, the Bronx and Staten Island. I have worked as a security consultant for Curnyn Consulting since 1995. My curriculum vita is attached as Appendix A.

### II. Facts and Data Considered

On October 27, 2014 I toured the RCDC and the path of travel for a court return assigned to Division 2 Dorm W. I took several photographs of these areas. Additionally, I reviewed the Officer's Living Unit Log for May 8, 2013, Incident Report Number 130086405, the Offense/Incident Report relating to the May 8, 2013 incident, CIID Incident Report, a Nursing Note for May 8, 2013 for Edward Shultz, CCDOC General Order 9.27, dated 10/15/95, Edward Shultz's Dress and Release Form, the recording of Edward Shultz's telephone call on May 8, 2013 and the log reflecting the duration of this call.

I also reviewed depositions of Erica Queen, Assistant Executive Director Michael Holmes, Sheriff Thomas Dart, Correctional Officer Anson, Sergeant Bruce Villanova, and Correctional Officer Dominguez as well as incident reports produced by the Sheriff relating to the Division 2 W Dorm.

### III.    Basis and Reasons for Opinions

On May 8, 2013 detainee Edward Shultz left Dorm 2 in the Cook County Department of Correction (CCDOC) at 6AM for a court appearance at Bridgeview criminal court. He departed the RCDC at 7:45AM and arrived at the Bridgeview criminal court at 8:20AM. The determination of the court that day was that Mr. Shultz should be released from custody.  In accordance with existing policy he was picked up for return to CCDOC at 4:45PM.  He arrived back at the RCDC shortly before 7PM and was booked into Dorm 2 W at 7:15PM.

Sometime between 7:15PM and 8:33PM Mr. Shultz was attacked and brutally beaten in the communal bathroom of Dorm 2 W. The Officer Living Unit Log for this tour shows the assigned dorm officer was at lunch during Mr. Shultz's attack.  At 8:45PM Officer Dominguez sees Mr. Shultz and notices his injuries. He notifies his supervisor, Sergeant Villanova, and Mr. Shultz is taken for medical attention.  At 9:40PM Mr. Shultz is released from the custody of the CCDOC and spends the next two days in Mt. Sinai Hospital as a result of the injuries he received in the Dorm 2 W bathroom.

1. *Most, if not all, administrative steps necessary to determine whether a detainee has any other court holds could be completed before a court appearance*

The depositions of Superintendent Queen and Assistant Director Holmes confirm the CCDOC made no effort in May of 2013 to administratively review paperwork of possible court ordered releases until the inmate returned to the Jail and the court paperwork was received by the Records Office. When the Records Office reviewed the paperwork and a collective decision was made that a mittimus was a possible discharge, the office would request the inmate's complete Jail information to be tendered for review. After several reviews of this paperwork by multiple individuals, a LEADS check would be conducted to determine whether the "possible discharge" had any other holds to remain incarcerated. This LEADS check, according to Assistant Director Holms, is conducted by a computer and takes milliseconds.

The NYCDOC, a correctional setting of similar size and population, takes a much different approach when confronted with a possible court ordered discharge. Prior to a court

appearance, the NYCDOC reviews the inmate's paperwork to determine whether any additional basis for holding that individual other than the future court appearance. As a result, the NYCDOC is capable of releasing discharges from the courthouses through the City. While this process consumes resources, it allows the NYCDOC to expedite the release of inmates from one of the New York City courthouses and greatly reduces liability on the NYCDOC.

Based on my experience and review of the material, I was not provided any evidence conducting LEADS checks prior the movement of detainees to court is administratively infeasible. In my experience, this is best practice and provides a correctional institution a greater ability to protect the rights of court ordered releases. If the CCDOC took steps to begin the administrative review process earlier, Mr. Shultz could have been discharged quicker and may have eliminated any need to return him to his former living unit.

2.   That CCDOC has space to hold inmates who are "possible discharges" outside of living units while their status is verified.

The CCDOC knew Mr. Shultz was a possible discharge following his court appearance on May 8, 2013. A clerk of the court provided a mittimus to the Sheriff while Mr. Shultz waited at the Bridgeview courthouse for transportation back to the Jail. At the time the CCDOC policy did not call for the mittimus to be electronically transmitted to the CCDOC Records Office prior to the body returning to the Jail. It is my understanding the CCDOC implemented a new pilot program sometime in 2014 where the mittimus is electronically transmitted to the CCDOC's Records office to expedite the discharge process.

Following a court appearance, all detainees are returned to the Jail and processed back into their living units. The CCDOC applied this policy to Mr. Shultz on May 8 where he sustained significant injuries while waiting in his former living unit to be administratively discharged from the CCDOC.

CCDOC General Order 9.27, dated 10/15/95, directs the Officer escorting inmates into RCDC from court to separate the accompanying paperwork into four (4) categories: new, possible discharges, continued court dates and special orders. The RCDC supervisor is directed

4

to sign accepting the inmates and acknowledging the paperwork. Therefore, at 7 PM when Mr. Shultz arrived in the RCDC, the CCDOC was again informed he was a possible discharge. Rather than place Mr. Shultz in an RCDC holding pen until his status was verified, Mr. Shultz was put back into his living area. It is my understanding these holding cells are used to stage prisoners returning from court until escorted back to their division. While I understand Mr. Shultz traveled in close proximity to these holding cells at approximately 7:05 PM, they were not used to hold Mr. Shultz from the general population of the CCDOC.

During my tour of Division 2 on October 27, 2014 I walked through a large room on the first floor of Division 2 where inmates returning from court are searched and booked back into the Division. This location is separate and distinct from the RCDC. There were two officers working at computers set up on a long desk along the windows. This area also had a body scan machine, several benches and file cabinets. A large holding pen was located at the rear of the room which I was informed is not used. In my opinion this area could also be used to safely hold inmates returning from court with possible releases while their paperwork was reviewed.

Based on my experience, it is good correctional practice to segregate "possible releases" from inmates remanded to a correctional facility because there is an increased risk of violence by other inmates. Violence can manifest if an inmate borrows from another inmate, is then scheduled for release and is unable to repay the debt. The inmate who is unable to recoup a debt may assault the "possible release" as a warning to other inmates. Other inmates may attack a "possible release" to enhance his (or her) reputation for violence. A "possible release," in my experience, is less likely to press charges or fight back because he (or she) is focused on leaving the correctional facility rather than running the risk of a new charge for assault if they chose to engage in a fight.

The overall responsibility for the discharge process rests with the Sheriff. From review of the Sheriff's deposition, it is apparent he does not discuss this important jail function routinely with senior CCDOC management or have an understanding of the General Order. Moreover, the Sheriff believes this process is sufficient because the Department of Justice has not criticized the CCDOC management of "possible releases" in a monitoring report. The discharge process,

5

however, should be continually reviewed by CCDOC senior management to ensure the rights of a "possible release" are adequately protected.

3. *That on the evening of May 8, 2013 the CCDOC staff assigned to supervise Dorm W in Division 2 were not diligent in their duties and as a result Edward Shultz was severely beaten and medical treatment was delayed.*

According to Division II Log for Living Unit W for the 1500 to 2200 tour on May 8, 2013, Office Anson was out to meal from 8PM to 9PM and Officer Dominguez was the relief officer. Although Officer Dominguez reported seeing the injured Mr. Shultz at 8:45PM, the attack took place well before that time. Mr. Shultz made a telephone call to his grandmother that began at 8:33 and lasted 3 minutes. During the taped telephone conversation with his grandmother Mr. Shultz describes the beating he had just suffered.

However Officer Dominguez did not report seeing Mr. Shultz until 8:45PM – more than 10 minutes after he initiated the telephone call to his grandmother. Tours of inspection of Living Unit W are recorded as occurring at 8PM, 8:30PM and 9PM that evening. The dormitory is a large rectangular room equipped with three electronic watch tour stations: one at the far end of the dormitory opposite the entrance and one on each of the long sides of the dormitory about midway between the front and back. If the watch tour system was in use that evening it would confirm a tour of inspection was conducted at 8:30PM.

In the Incident Report Officer Dominguez states Dorm W was under his direct supervision. Direct supervision would mean Officer Dominguez was either walking around the dormitory or observing the activity from the entrance at all times. This was where I observed officers standing when I toured Division 2 on October 27, 2014. Since Mr. Shultz placed his telephone call at 8:33PM the beating he suffered occurred prior to that time. An officer walking around the dormitory at 8:30PM should have noticed some activity in the area of the bathroom if the assault was in progress. If the assault had already occurred, the seriously injured Mr. Shultz would have been apparent.

6

Officer Dominguez reports that he notified his supervisor and arranged for medical treatment. Mr. Shultz was treated in the Dorm 2 dispensary and the Cermak Medical Facility where he was referred to an outside medical facility for emergency treatment. Mr. Shultz was discharged from CCDOC custody at 9:40PM and spent the next two days in the hospital as a result of the injuries he received in Dorm 2.

If Officer Dominguez was standing in the entrance to Dorm W observing the activity he would have been about three feet from the telephone Mr. Shultz used that night. He also would have been about 20 feet from the entrance to the communal bathroom and in a position to observe who entered and exited the bathroom. Yet Officer Dominguez did not observe Mr. Shultz until 8:45PM and provided no information about which inmates were in the vicinity at the time of the incident.

On October 27, 2014 I inspected Dorm W and the bathroom where Mr. Shultz was attacked. The three inmate telephones in the dormitory are located on a wall directly adjacent to the dormitory entrance. Department records show Mr. Shultz used the telephone on the right, the one closest to the Dorm W entrance, about three (3) feet from the door.

I also reviewed about 91 pages of Incident Reports for Division 2 Dorm 2 W provided by CCDOC for the year prior to this incident. Although the incident descriptions are, for the most part, very brief and some of the reports provided did not occur in Dorm W, at least one of the reports shows the officer was responsible for supervising more than one dorm at the time, or "cross watching." Cross watching is dangerous as it requires the supervising officer to be out of sight and possibly sound of inmates under his/her watch. Some of the incident reports indicate the officer became aware of a violent incident because an inmate reported an assault or the officer investigated a noise but did not observe what occurred. One of the incident reports describes an inmate fight between an inmate from Dorm W and an inmate from Dorm T. This was able to occur because the Dormitory door needs to be open at all times so the supervising officer can maintain a constant view of the activities. The only security at the entrance to each dorm is officer standing there.

7

4.  *CCDOC staff failed to conduct a prompt investigation into the circumstances surrounding the assault on Mr. Shultz thereby allowing violent predators to continue to operate freely in a dormitory living space.*

In the investigation into the incident involving Mr. Shultz on May 8, 2013 there was no mention of the video tape from the surveillance cameras in Dorm W. During my tour of Dorm W, I observed what I recognized as the casing for a surveillance camera on the ceiling opposite the entrance to the communal bathroom. A second camera casing was located on the ceiling at the far of the dormitory facing the dorm entrance. These video from these cameras could have been used to identify the inmates involved in the assault on Mr. Shultz and the activities of the officer on duty.

Whether the CCDOC made any attempt to interview the witnesses immediately after the attack is unclear from review of deposition testimony and the incident reports. According to the Log there were 44 inmates in the living area at the time of the attack. Either all the other inmates participated in the attack on Mr. Shultz or there are some witnesses to the incident yet none were identified. The investigation appeared to conclude that since Mr. Shultz could not identify who assaulted him and was not interested in pressing charges against someone he could not identify, that was the end.

Although the CIID Incident Report identified two gang members several days after the incident may have been involved in attacking Mr. Shultz over "missing commissary items in the washroom" there is no evidence the CCODC took any action to reprimand these individuals to deter future violence and safeguard the well-being of other inmates assigned to the W Dorm. Therefore violent predators remained in a dormitory setting where they could continue to intimidate and possibly assault other inmates. CCDOC failed to properly investigate the incident and placed all the inmates in that dormitory at risk.

## IV. Conclusion

In my opinion CCDOC's policy of knowingly returning those inmates with court order releases back into an inmate living area contradicts the basic correctional tenants of care,

8

custody and control. I recognize that CCDOC has the responsibility to ensure all available records are verified before releasing someone from custody. And the CCDOC Administration has demonstrated their interest in the timely release of inmates by performing daily audits of the time between receipt of release documents and the actual discharge. Nevertheless, by returning an inmate who is a possible release back into a living area, CCDOC is exposing that inmate to unnecessary danger. As identified in this report there are numerous holding cells outside of living areas where inmates could be staged while their paperwork is reviewed. This simple step could help ensure the safety of these inmates and speed up the discharge process as the inmate would be readily available for processing.

Speedy discharges also help another chronic problem in correctional institutions, that of overcrowding. When overcrowding was a very real problem for the New York City Department of Correction we instituted a program whereby sentenced inmates were prepared for discharge the evening before their discharge date so they could legitimately be released at midnight. This simple step saved the Department from violating court orders relative to capacity levels.

Sheila Vaughan

April 27, 2015

9

Appendix A

# SHEILA M. VAUGHAN

162-21 Powells Cove Boulevard
Beechhurst, New York 11357
Phone: 718.767.5009
Fax: 718.732.2703
sheila@curnyn.com

## SUMMARY OF QUALIFICATIONS

- Extensive operational experience extending over twenty-two years in the criminal justice system, beginning as a correction office and serving thirteen years in managerial titles.

- Chief Administrative Officer of a Work Release Facility, a Court Detention Facility, an Adolescent Facility and a Maximum Security Adult Detention Facility.

- Director of New York City Department of Correction Law Libraries resulting in the first successful modification of the Federal Consent Decree.

- Developed and implemented a self-inspection manual for use in the New York City Department of Correction Facilities.

- Served as negotiator for the New York City Department of Correction with the Office of Compliance Consultants and the Legal Aid Society for implementation of the Federal Consent Decrees (Benjamin v. Malcolm).

- Consultant for New York City's Rikers Island Master Plan detailing future construction facility design.

- Consultant for inmate discipline and use of force on Morales Feliciano v. Rossello Gonzalez Civil Lawsuit, San Juan, Puerto Rico.

- Consultant for the planning, construction and operating plan of a secure medical facility to serve the inmate population of Puerto Rico.

## EDUCATION

John Jay College of Criminal Justice
New York, New York
Bachelor of Science Degree, Criminal Justice Administration

1

## PROFESSIONAL EXPERIENCE

**CURNYN ASSOCIATES**                                                    1995 - Present

Correctional operations consultant and expert witness for local and state correctional agencies specializing in security, custody and compliance management. Consulted in litigation concerning search and discharge from custody procedures, suicide prevention procedures, assignment of mixed gender staff and staff training issues. Consultant to attorneys, architectural firms and correctional agencies. Clients include correction officer unions, correctional managers, defendant inmates, architectural and construction firms and correctional agencies.

**NEW YORK CITY DEPARTMENT OF CORRECTION**                              1978 - 2001

Served for over twenty years in the Department of Correction, thirteen of which were in managerial titles, rising from the rank of correction officer to bureau chief. Responsibilities included all aspects of inmate supervision and security, supervision of a mixed gender work force, and supervision of the daily operation of facilities housing between 300 to 2000 inmates with a workforce of over one thousand employees. As bureau chief responsibilities included the department's recruitment, applicant investigation, employee discipline, employee health and absence control unit, nutritional services division and assignment of all uniformed staff. Also responsible for overtime control for the entire department, assignment of staff, physical plant renovation and maintenance, new building programs and implementation of initiatives.

Special Projects: As assistant chief, I served as the department's liaison to the Federal Court and all oversight agencies. Responsibilities included supervision of the Department's internal audit unit. As warden, I opened and operated a work release program, developed ties with the community to dispel fears and concern for public safety. Developed and monitored criteria for work release participation to ensure maximum participation. Principle author of staff training directed specifically for adolescent supervision to improve communication and reduce the inmate on inmate violence. Designed physical plan modifications, prepared procedures and negotiated variance approvals for the Department's first central punitive segregation unit for adolescents. As deputy warden, I designed and supervised the renovation and operation of a homeless shelter for use as a facility to house female offenders. As captain, I served as the director of the New York City Department of Correction fifteen law libraries. Assisted in negotiations to design and implement the first successful modification of the Federal Consent Decree reducing the Department's responsibility for law library operation from seven to five days per week.

2

# RECORD OF TESTIMONY/DEPOSITION/AFFIDAVIT INCLUDING EXPERT WITNESS AND TECHNICAL ASSISTANCE

(1994) Assistant Deputy Warden Association v The City of New York Office of Collective Bargaining RU-1093-91. Expert testimony for the defendant relative to the duties and responsibilities of uniformed managers in the NYC Department of Correction.

(1995) Morales Feliciano v Rossello, et al.79-004 (PG). Technical assistance for the defendant relative to conditions of confinement in prisons in the commonwealth of Puerto Rico.

(1997) Watson v Sheahan 01C 1592. Deposition for the plaintiff relative to the timely release from custody upon court ordered discharge.

(1999) Roslyn Everson, et al v. State of Michigan Department of Correction, et al USDC-ES Case No. 00-73133. Technical assistance for the plaintiff relative to the assignment of a mixed gender staff to inmate housing units.

(1999) Norman Seabrook v The City of New York 99 Civ 9134. Technical assistance and expert testimony for the defendant on the needs of the NYC Department of Correction relative to security equipment worn by staff.

(1999) Munford v. The New York City Department of Correction OATH Index 1631/99. Expert testimony for the defendant on the duties of correction officers and the reasonable accommodation requirements of the ADA.

(2000) James Benjamin, et al v. Bernard B. Kerik, et al 75 Civ 3073. Technical assistance and expert testimony for the defendant on attorney visits at New York City jails.

(2000) Wilkes v. Sheahan 01 C 1592. Technical assistance, affidavit and deposition for the plaintiff relative to Cook County Correction Department strip search procedures for females.

(2001) Francine Humes, et al. v A.C. Gilless, et al. C.A. 01-2028. Technical assistance and preparation of report for plaintiff. Defendants staged a training scenario during which correction officers were held hostage and physically threatened.

(2001) Sisk, et al. v Shawnee County Department of Corrections, C.A. 00-4088-DES. Technical assistance and preparation of report for defendant in wrongful death. Adolescent committed suicide while in custody.

(2001) Samuels V Selsky, et al. C.V. 8235 (AGS) (AJP). Retained by the New York State Attorney General as an expert re contraband as it pertains to the security of a facility. An inmate was prosecuted for the possession of written materials subsequently found to incite a riot.

(2003) Davis v Sheahan. Technical assistance and preparation of a report for the plaintiff regarding Cook County facility search procedures during which inmates are locked down for up to 48 hours on a routine basis.

3

## RECORD OF TESTIMONY/DEPOSITION/AFFIDAVIT INCLUDING EXPERT WITNESS AND TECHNICAL ASSISTANCE (cont)

(2003) Hutchinson v Civitella C.V. 2407 (CBM). Retained by New York State Attorney General as expert in use of force. An inmate died following an incident in which he was restrained and medicated after attacking medical and correctional staff.

(2004) Monmouth County, New Jersey. Sheriff's Office Correction Department. Retained by the County Director of Finance to conduct a security and operational assessment of opportunities for reducing overtime.

((2005) Quentin Bullock and Jack Reid v Michael Sheahan, Sheriff of Cook County, et al. 04 C 1051. Retained by the plaintiff's attorney for technical assistance, report and testimony regarding the discharge from custody after receiving a court order release.

(2006) Gardner v State of New York 04 Civ 4675. Retained by New York State Attorney General as expert in use of force. Report and testimony at deposition.

(2007) Perez v Hewitt, 04 Civ 10112. Retained by New York State Attorney General as expert in use of force. Preparation of a report to be used to settle a case against DOCS.

(2008) Eaton v Hancock County, et al 08-cv-000370. Retained by the plaintiff's attorney for technical assistance and preparation of a report. Plaintiff was involved in a use of force with arresting police officers and corrections officers and was not treated for injuries.

(2009) Wilson v County of Westchester, et al 07-cv-1429. Retained by attorney for Westchester County for preparation of a report and testimony. Inmate injured in a fall in the Westchester County Jail was treated by medical staff and remained in the housing unit.

(2009) Kolvalchik v Hunterdon County, et al 08-cv-00507. Retained by plaintiff's attorney for preparation of a report. Plaintiff involved in a physical altercation in a minimum security housing unit with an improperly classified inmate.

(2009) Robinson v Westchester County, et al 15464/00. Retained by defendant's attorney as expert witness to review files and testify. Plaintiff claims he was assaulted while an inmate in Westchester County jail and officials failed to properly respond and investigate the circumstances.

(2011) Marinova v. Boston Herald, Inc. et al CV10-1314. Retained by the defendant's attorney as expert on prison security procedures regarding visits by elected government officials.

(2013) Baggett v. Michael J. Ashe Jr. and Patricia Murphy 11-CV-30223. Springfield, Massachusetts. Retained by the defendant's attorney as expert on strip search procedures.

## ADJUNCT FACULTY APPOINTMENT                     Jan 2005
### John Jay College of Criminal Justice
### City University of New York

4

# Exhibit 7

# Transcript of the Testimony of
# **WILDREDO CINTRON, JR.**

**Date:** May 15, 2014

**Case:** CLARENCE B. JANUARY VS. THOMAS DART, ET AL

**TOOMEY REPORTING**
Phone: 312-853-0648
Fax: 312-853-9705
Email: toomeyrep@sbcglobal.net
Internet: http://www.toomeyreporting.com/

WILDREDO CINTRON, JR.
May 15, 2014

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CLARENCE B. JANUARY,      )
          Plaintiff,      )
                          )
     v.                   )  No. 13 C 8052
                          )
THOMAS DART, SHERIFF OF   )
COOK COUNTY, and COOK     )
COUNTY, ILLINOIS,         )
          Defendants.     )

     The deposition of WILFREDO CINTRON, JR.,

called by the Plaintiff for examination, taken pursuant

to the Federal Rules of Civil Procedure of the United

States District Courts pertaining to the taking of

depositions, taken before KATHLEEN M. DUFFEE, a Notary

Public within and for the County of Cook, State of

Illinois, and a Certified Shorthand Reporter of said

state, at 500 Daley Center, Chicago, Illinois, on the

15th day of May, A.D. 2014 at 1:41 p.m.

TOOMEY REPORTING
312-853-0648

---

WILDREDO CINTRON, JR.
May 15, 2014

Page 2

1  PRESENT:
2
3        THOMAS MORRISSEY, LTD.,
         10249 South Western Avenue
3        Chicago, Illinois 60643
         (773) 233-7900, by:
4        PATRICK W. MORRISSEY, ESQUIRE,
5            appeared on behalf of the Plaintiff;
6
         ANITA ALVAREZ, STATE'S ATTORNEY OF COOK
7        COUNTY, ILLINOIS,
         500 Daley Center
8        Chicago, Illinois 60602
         (312) 603-4320, by:
9        JILL V. FERRARA, ESQUIRE,
10           appeared on behalf of the Defendants.
11
12
13
14
15
16
17
18
19
20
21
22
23
24  REPORTED BY:  KATHLEEN M. DUFFEE, CSR
         TOOMEY REPORTING    (312) 853-0648

TOOMEY REPORTING
312-853-0648

---

WILDREDO CINTRON, JR.
May 15, 2014

Page 3

1              I N D E X
2  WITNESS                    EXAMINATION
3    WILFREDO CINTRON, JR.
4      By Mr. Morrissey              4
5
6
7
8            E X H I B I T S
9  NUMBER                  MARKED FOR ID
10   Plaintiff's Group Exhibit No. 1    65
11     No. 2                          107
12
13
14
15
16
17
18
19
20
21
22
23
24
         TOOMEY REPORTING    (312) 853-0648

TOOMEY REPORTING
312-853-0648

---

WILDREDO CINTRON, JR.
May 15, 2014

Page 4

1        (WHEREUPON, the witness was
2         duly sworn.)
3    MR. MORRISSEY:  This is a discovery deposition
4  in January v. Dart.  My name is Pat Morrissey.  I
5  represent Clarence January.
6        WILFREDO CINTRON, JR.,
7  called as a witness herein by the Plaintiff, having
8  first been duly sworn, was examined and testified as
9  follows:
10        EXAMINATION
11  BY MR. MORRISSEY:
12   Q.  Will you please state your name for the record?
13   A.  My name is Wilfredo Cintron, Jr.
14   Q.  How do you spell your last name?
15   A.  C-I-N-T-R-O-N.
16   Q.  You're currently a sergeant with the Cook
17  County Department of Corrections?
18   A.  Yes, sir.
19   Q.  Are you currently a Receiving supervisor?
20   A.  Currently, yes, sir.
21   Q.  How long have you been a Receiving supervisor
22  in the Cook County Jail?
23   A.  On and off being in Receiving as a sergeant,
24  the last three and a half, four years.
         TOOMEY REPORTING    (312) 853-0648

TOOMEY REPORTING
312-853-0648

## Page 5

WILDREDO CINTRON, JR.
May 15, 2014

Page 5

1    Q.  Prior to being a sergeant in Receiving, did

2  you work as an officer in Receiving?

3    **A.  Yes, sir.**

4    Q.  How long have you worked as an officer --

5  strike that.

6         How long did you work as an officer in

7  Receiving?

8    **A.  Nine years.**

9    Q.  Presently, where is Receiving?

10    **A.  26th and California, sir, Division V.**

11  **Actually, it's in the RTU building.  Pardon me.**

12    Q.  So the location of the Receiving area changed

13  in the past year?

14    **A.  Yes, sir.**

15    Q.  Approximately when did the location change?

16    **A.  I believe that it was in June of 2013.**

17    Q.  And presently it's in the RTU?

18    **A.  Yes, sir.**

19    Q.  Is that building also referred to as O-8?

20    **A.  Yes, sir.**

21    Q.  Where within this Building O-8 is the

22  Receiving?

23    **A.  It would be the first floor and the basement.**

24    Q.  Presently, do you still work the afternoon

TOOMEY REPORTING   (312) 853-0648

## Page 6

WILDREDO CINTRON, JR.
May 15, 2014

Page 6

1  shifts?

2    **A.  Yes, sir.**

3    Q.  Approximately which hours are you working?

4    **A.  From 2:00 in the afternoon until 10:00 in the**

5  **evening.**

6    Q.  And presently how many other sergeants are on

7  duty working Receiving on the afternoon shift from

8  2:00 until about 10:00?

9    **A.  On Mondays there's four sergeants on duty, and**

10  **the rest of the week there would be three sergeants on**

11  **duty working Receiving.**

12    Q.  You said three?

13    **A.  Yes, sir.**

14    Q.  Are there other shifts during the day that have

15  a sergeant on duty for the Receiving?

16    **A.  Yes, sir.**

17    Q.  Which shifts are they?

18    **A.  That would be from the morning shift, 6:00 in**

19  **the morning until 2:00 in the afternoon, and then from**

20  **10:00 in the evening until 6:00 in the morning.**

21    Q.  To your knowledge, how many sergeants work the

22  10:00 p.m. to 6:00 a.m. shift in Receiving?

23    **A.  Usually one.**

24    Q.  To your knowledge, how many officers work the

TOOMEY REPORTING   (312) 853-0648

## Page 7

WILDREDO CINTRON, JR.
May 15, 2014

Page 7

1  10:00 p.m. to 6:00 a.m. shift in Receiving?

2    **A.  I couldn't give you an exact number, sir.**

3    Q.  Can you give me an approximate number?

4    **A.  I'd say may ten officers.**

5    Q.  To your knowledge, generally on a

6  Tuesday-to-Sunday shift how many officers are assigned

7  to work Receiving during the 2:00 to 10:00 shift?

8    **A.  67 officers.**

9    Q.  Approximately how many officers to your

10  knowledge work the 6:00 a.m. to 2:00 p.m. shift in

11  Receiving?

12    **A.  That number I don't have for you, sir.**

13    Q.  Do you know whether it would be more than ten?

14    **A.  Absolutely more than ten.**

15    Q.  Do you know whether it would be more than 20?

16    **A.  Yes, sir.  I would say they might have the**

17  **same amount, maybe about 60.**

18    Q.  To your knowledge, generally how many sergeans

19  are assigned the 6:00 a.m. to 2:00 p.m. shift in

20  Receiving?

21    **A.  I believe that they have four.**

22    Q.  When you work as a sergeant in Receiving

23  presently, do you supervise officers?

24    **A.  Yes, sir.**

TOOMEY REPORTING   (312) 853-0648

## Page 8

WILDREDO CINTRON, JR.
May 15, 2014

Page 8

1    Q.  Approximately how many officers do you

2  generally supervise in Receiving?

3    **A.  I might have 20 to 25 officers that I**

4  **supervise.**

5    Q.  Do you generally supervise the same officers

6  each day?

7    **A.  Yes, sir.**

8    Q.  Is that pursuant to any General Order or policy

9  that you are assigned specific officers?

10    **A.  No, sir.**

11    Q.  Do officers working in Receiving generally

12  rotate every 90 days?

13    **A.  Yes, sir.**

14    Q.  Is it your understanding that the other

15  sergeants working the 2:00 to 10:00 shift would

16  supervise other officers?

17    **A.  Yes, sir.**

18    Q.  Have you been deposed before?

19    **A.  Yes, sir.**

20    Q.  Approximately how many times have you been

21  deposed?

22    **A.  About four times, sir.**

23    Q.  Did any of those depositions relate to your

24  responsibilities as a Receiving officer?

TOOMEY REPORTING   (312) 853-0648

**WILDREDO CINTRON, JR.**
**May 15, 2014**

Page 9

1     **A.** Yes, sir.

2     Q. Did any of those depositions touch on your

3 duties regarding the discharge of detainees from the

4 Cook County Jail?

5     **A.** Yes, sir.

6     Q. Did you review any documents in preparation

7 for this deposition?

8     **A.** Not particularly, sir.

9     Q. Are there policies and procedures that dictate

10 how you as a sergeant discharge a person from the

11 Cook County Jail?

12     **A.** Yes, sir.

13     Q. What documents are they?

14     **A.** General Orders that are issued to us, sir,

15 same as post orders.

16     Q. Do you know the specific General Order that

17 deals with the discharge of detainees from the jail?

18     **A.** Offhand, no, sir.

19     Q. Do you know when that General Order became

20 effective?

21     **A.** No, sir, I do not.

22     Q. You mentioned post orders.

23     **A.** Yes, sir.

24     Q. How many post orders are you aware of that

TOOMEY REPORTING    (312) 853-0648

---

**WILDREDO CINTRON, JR.**
**May 15, 2014**

Page 10

1 govern the discharge of detainees from the jail?

2     **A.** There should be only one post order assigned

3 to the discharge section.

4     Q. Are you familiar with that post order?

5     **A.** Yes, sir.

6     Q. What is that post order titled?

7     **A.** The actual definition title, sir?

8     Q. Correct.

9     **A.** No, sir, I couldn't tell you.

10     Q. Do you refer to that post order as a sergeant

11 in Receiving?

12     **A.** On occasion.

13     Q. When was the last time you reviewed that post

14 order?

15     **A.** I'd say maybe about a couple of years, two

16 years, three years ago.

17     Q. Same question for that general order. When

18 was the last time you reviewed that, that dealt with

19 the discharge of detainees from the jail?

20     **A.** It's been some time, sir. I couldn't exactly

21 tell you when.

22     Q. Would you agree it's been about two or three

23 years?

24     **A.** I would say that.

TOOMEY REPORTING    (312) 853-0648

---

**WILDREDO CINTRON, JR.**
**May 15, 2014**

Page 11

1     Q. Other than the General Order and that post

2 order we previously discussed, are there any other

3 documents that relate to discharge of detainees from

4 the Cook County Jail?

5     **A.** None that I'm aware of, sir.

6     Q. As a sergeant in Receiving, are you familiar

7 with the procedures for discharge of detainees who

8 have court-ordered discharges?

9     **A.** Yes, sir.

10     Q. Would you agree that you've been familiar with

11 the discharge procedure at the Cook County Jail for

12 more than ten years?

13     **A.** Yes, sir.

14     Q. When do you recall first working Receiving?

15     **A.** 1997 into '99.

16     Q. When did you become a sworn officer?

17     **A.** 1996.

18     Q. What were your responsibilities in '97, '98

19 relating to the discharge of detainees?

20     **A.** '97, '98, when I arrived there, I was not in

21 any way dealing with discharges. I was dealing with

22 intake of the detainees, taking their property.

23     Q. After '98, where did you move?

24     **A.** I went to the Classification section of

TOOMEY REPORTING    (312) 853-0648

---

**WILDREDO CINTRON, JR.**
**May 15, 2014**

Page 12

1 Receiving.

2     Q. That's in the basement of Division V; right?

3     **A.** Yes, sir.

4     Q. How long were you there for?

5     **A.** Classification, maybe three years, sir.

6     Q. After working Classification, where did you

7 work?

8     **A.** I bidded towards regular straight Receiving.

9     Q. And would that put you at about 2001?

10     **A.** About, I believe, yes, sir.

11     Q. From 2001 to the present, have you generally

12 been assigned Receiving?

13     **A.** I did about a year and a half in Division XI.

14     Q. Were you a tier officer?

15     **A.** No. That's around about the time that I got

16 promoted, sir.

17     Q. So you were a sergeant in Division XI?

18     **A.** Yes, sir.

19     Q. And do you know approximately which year you

20 were promoted to sergeant?

21     **A.** Right around that 2001, after I got into

22 regular Receiving.

23     Q. So would it be fair to say around 2002 you

24 were working Receiving as a sergeant?

TOOMEY REPORTING    (312) 853-0648

WILDREDO CINTRON, JR.
May 15, 2014

Page 13

1  A.  I was actually in the Records Office at that
2  time.
3  Q.  And you were a sergeant in the Records Office;
4  correct?
5  A.  Yes.
6  Q.  What is the Records Office?
7  A.  The Records Office maintains all of the records
8  for the detainees housed in the Cook County Department
9  of Corrections.  It held their mittimuses.
10  Q.  How long were you a sergeant in the Records
11  department?
12  A.  I believe, I believe three years, maybe longer
13  than that.
14  Q.  As a sergeant in the Records Office, did you
15  supervise officers?
16  A.  The Records Office is run by civilians.
17  Q.  So as a sergeant, you supervised civilians; is
18  that correct?
19  A.  Yes, sir.
20  Q.  Which shift did you work supervising the
21  Records Office as a sergeant?
22  A.  It varied.  I would do 12:00 to 8:00.
23  Actually, I pretty much did 12:00 to 8:00.  Sorry.
24  Q.  Would you agree that one of the main

TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

WILDREDO CINTRON, JR.
May 15, 2014

Page 14

1  responsibilities in the Records Office was reviewing
2  the mittimuses after they were brought back from the
3  courthouse?
4  A.  Yes, sir.
5  Q.  After working as a Records Office sergeant,
6  did you then go over to Receiving?
7  A.  Yes, sir.
8  Q.  Would you put that around 2005 or 2006 that you
9  became a sergeant in Receiving?
10  A.  Yes, sir, I believe so.  I can't be exact about
11  those dates, sir.
12  Q.  And you've been in Receiving ever since that
13  transition; correct?
14  A.  Yes, sir.
15  Q.  You're familiar with the court-ordered
16  discharges; correct?
17  A.  Yes, sir.
18  Q.  What is a court-ordered discharge?
19  A.  A court-ordered discharge means that there's
20  some kind of disposition releasing a detainee from
21  the custody of the jail.
22  Q.  One form of court-ordered discharge could be
23  time considered served; right?
24  A.  Correct, sir.

TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

WILDREDO CINTRON, JR.
May 15, 2014

Page 15

1  Q.  Another form of court-ordered discharge could
2  be a finding of not guilty; correct?
3  A.  Correct, sir.
4  Q.  Would somebody who had a mittimus that said
5  "probation" be entitled to a court-ordered discharge?
6  A.  Yes, sir.
7  Q.  What does "SOL" mean?
8  A.  Stricken on leave.
9  Q.  Would a person with a mittimus saying SOL be
10  entitled to a court-ordered discharge?
11  A.  Yes, sir.
12  Q.  And for people with court-ordered discharges,
13  it's your understanding as a supervisor in Receiving
14  that they're entitled to be released from the custody
15  of the jail; right?
16  A.  Correct, sir.
17  Q.  What is your understanding of a time -- strike
18  that.
19       Would you agree that a person with a
20  court-ordered discharge is entitled to a timely release
21  from the Cook County Department of Corrections?
22  A.  Yes, sir.
23  Q.  What is your understanding of a timely release?
24  A.  Thoroughness of the pack; making sure that the

TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

WILDREDO CINTRON, JR.
May 15, 2014

Page 16

1  job is completed accurately.
2  Q.  What does that mean?
3  A.  I need to make sure that whatever pack I'm
4  reviewing, I need to review it thoroughly to make
5  sure that I do not discharge a person incorrectly.
6  Q.  In your testimony you've talked about "I";
7  correct?  You mentioned yourself reviewing the pack;
8  correct?
9  A.  Yes, sir.
10  Q.  It's true that there's many different reviews
11  that are done of a pack; correct?
12  A.  Yes, sir.
13  Q.  By the time you review the pack, it's more
14  likely than not been reviewed at least two times;
15  correct?
16  A.  In my current position?
17  Q.  I'm talking about in March of 2013.  If you
18  reviewed a pack, is it true that it would have been
19  reviewed at least two times by the time you reviewed
20  it?
21  A.  Once actually, sir.
22  Q.  What about now; how many times would that pack
23  be reviewed?
24  MS. FERRARA:  Objection, foundation.

TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

WILDREDO CINTRON, JR.
May 15, 2014

Page 17

BY MR. MORRISSEY:

1  Q.  Before you receive the pack for review.

2  A.  It would be four times.

3  Q.  To your knowledge, tell me each layer -- strike

4  that.

5          To your knowledge, tell me who each

6  person would be who reviewed the pack prior to you.

7  A.  In my current situation?

8  Q.  Correct.

9  A.  My current situation, first a civilian would

10 review the pack.  After the civilian, it's reviewed

11 by the sergeant in the Records Office.  From the

12 sergeant, it goes to an auditor.  From the auditor,

13 it's sent to a Receiving officer.  From the Receiving

14 room officer, then it would come to me.

15 Q.  When was that procedure implemented?

16 A.  I don't know, sir.

17 Q.  Was that procedure being followed in March of

18 2013?

19 A.  Yes, sir.

20 Q.  So after you as a sergeant in Receiving would

21 review a pack, would there be any other additional

22 reviews?

23 A.  No, sir.

TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

---

WILDREDO CINTRON, JR.
May 15, 2014

Page 18

1  Q.  In March of 2013, when did the review of this

2  pack begin typically for an inmate with a court-

3  ordered release?

4  A.  Once it arrives into the Records Office, a

5  sergeant would grab all of the mitts, see which ones

6  have court dispositions for discharge, and then it

7  is distributed to the civilians.

8  Q.  Did you say the Records Office sergeant would

9  review the court orders to see which ones have court-

10 ordered discharges?

11 A.  Yes, sir.  They're not separated until they

12 reach the Records Office.

13 Q.  Isn't it true the Transportation officer is

14 responsible for separating the mittimuses with

15 court-ordered discharges?

16 A.  No, sir.

17 Q.  So that's not your understanding of the policy

18 and procedure of the Cook County Department of

19 Corrections; correct?

20 A.  Yes, sir.

21 Q.  To your knowledge in March of 2013, did the

22 Records Office sergeant make any notation of the time

23 that he or she would have received these mittimuses?

24 A.  No, it wouldn't make a notation.  No.

TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

---

WILDREDO CINTRON, JR.
May 15, 2014

Page 19

1  Q.  Do you know whether the mittimuses were

2  time-stamped when they were given to the possession

3  of the Records Office?

4  A.  No, not when they're given to the Records

5  Office.  Only when they're distributed to the

6  civilians.

7  Q.  So the Records Office sergeant would receive

8  the court orders or the mittimuses, review them to

9  see which ones may be entitled to a court-ordered

10 release, and then that individual would distribute

11 them to civilians; is that correct?

12 A.  Yes, sir.

13 Q.  And would the civilian then time-stamp the

14 mittimus when he or she received it?

15 A.  No.  It would already be time-stamped by the

16 sergeant.

17 Q.  The question is:  When would that sergeant

18 time-stamp the mittimus?

19 A.  That question, I mean, it varies, sir.  You're

20 reviewing maybe a hundred sheets of paper, separating

21 them, and then you would time-stamp it as soon as

22 you're available to give it on off to the civilians.

23 Q.  And it's your belief in March of 2013 it was

24 a sergeant who did the time-stamping of the

TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

---

WILDREDO CINTRON, JR.
May 15, 2014

Page 20

1  mittimuses in the Records Office?

2  A.  Yes, sir.

3  Q.  Other than the time-stamp of the mittimus,

4  would there be any other document to your knowledge

5  that would reflect the time that the Records Office

6  receives the mittimus?

7  A.  No, sir.

8  Q.  Do you know whether there would be any entry

9  in IMACS to reflect that the Records Office received

10 the mittimus?

11 A.  No, sir.

12 Q.  In March of 2013 what would be the next step

13 that would happen in the Records Office?

14 A.  Once a civilian receives the mitt with a

15 court-ordered discharge, they would proceed to go and

16 try to find the file for the detainee.

17         Once the file is found, the civilian

18 needs to go through the entire file, placing all of

19 the current mitts that are in there in chronological

20 order.

21 Q.  Would they sometimes be in chronological order,

22 the mittimuses?

23 A.  No, sir.

24 Q.  After the civilian puts the mittimuses in

TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

WILDREDO CINTRON, JR.
May 15, 2014

Page 21

1   chronological order, what's the next step the civilian
2   would take to your understanding in March of 2013?
3       **A.  They would have to run a LEADS on the**
4   **individual to establish whether or not he has or she**
5   **has any warrants or detainers from any other outlying**
6   **agencies or states.**
7       Q.  What would the next step be for the civilian
8   employee?
9       **A.  They would review the LEADS.  Actually, they**
10  **have to wait for the responses, review the LEADS,**
11  **confirm that the LEADS is correct, enter and change**
12  **the disposition into the computer system, review it**
13  **in IMACS to make sure that there are no other cases**
14  **that have been placed into the computer.**
15      Q.  How long would it take generally to get a
16  response from LEADS?
17      **A.  That varies on whether we're running it by**
18  **name, FBI number, state identification, and how common**
19  **is the name.**
20      Q.  For a person who has been in your custody for
21  over a year, your records generally would have their
22  FBI number; correct?
23      **A.  Sometimes they do, yes.**
24      Q.  Isn't it true that each person -- strike that.
            TOOMEY REPORTING   (312) 853-0648

WILDREDO CINTRON, JR.
May 15, 2014

Page 22

1       People who have been picked up before,
2   sometimes have special LEADS numbers; correct?
3       **A.  Yes, sir.**
4       Q.  And if somebody's been in custody for over a
5   year and had prior arrests and been incarcerated at
6   the Cook County Jail, wouldn't the Sheriff already
7   know that person's LEADS number?
8       MS. FERRARA:  Objection, form; improper
9   hypothetical.
10  BY THE WITNESS:
11      **A.  No, sir.  Because -- if I may add?**
12      MR. MORRISSEY:  Sure.
13  BY THE WITNESS:
14      **A.  If we just go by one particular LEADS number**
15  **and a person is using alias names or if a person has**
16  **changed his Social Security number various times,**
17  **the object or the procedure is to confirm that**
18  **this individual is the correct one.**
19          **So we're going to do a general LEADS to**
20  **make sure that if he's used any alias names or alias**
21  **DOBs we can make sure we've covered the entire**
22  **spectrum.**
23  BY MR. MORRISSEY:
24      Q.  So you can't tell me with certainty how long
            TOOMEY REPORTING   (312) 853-0648

WILDREDO CINTRON, JR.
May 15, 2014

Page 23

1   it would take to get a response from LEADS?
2       **A.  No, sir, I cannot tell you, sir.**
3       Q.  You talk about the next step is to confirm
4   LEADS is correct; right?
5       **A.  Yes, sir.**
6       Q.  How would a civilian employee confirm the LEADS
7   response was correct?
8       **A.  Well, they would start off by reviewing the**
9   **LEADS; comparing it to the information that we have**
10  **in front of us as far as the detainee; confirming it**
11  **with, if we happen to have CLEAR, we start running**
12  **comparisons as far as dates of birth, names, middle**
13  **initials, the FBI numbers, the SIDS, the IR numbers.**
14      Q.  So you're saying that the jail wouldn't know
15  whether somebody who's been in their custody for a
16  year might be wanted by another agency for an
17  outstanding warrant?
18      **A.  That's exactly what I'm saying, sir.**
19      Q.  Is that common?
20      **A.  Yes, sir.**
21      Q.  Would you agree it would routinely take an hour
22  to perform this LEADS investigation?
23      **A.  For the civilian aspect, yes.**
24      Q.  You've seen it take about ten minutes, right,
            TOOMEY REPORTING   (312) 853-0648

WILDREDO CINTRON, JR.
May 15, 2014

Page 24

1   to perform this LEADS investigation?
2       **A.  That depends on how many sheets come off of**
3   **LEADS.**
4       Q.  So you would agree that some LEADS
5   investigations can be very quick; right?
6       **A.  Yes, sir.**
7       Q.  And I assume you'd agree that some LEADS
8   investigations are rather extensive?
9       **A.  Yes, sir.**
10      Q.  After this LEADS investigation is confirmed,
11  you talked about entering data into a computer system
12  by the civilian; right?
13      **A.  Yes, sir.**
14      Q.  What computer system would that civilian make
15  this entry into?
16      **A.  Into the IMACS system.**
17      Q.  And after a civilian's investigation and he or
18  she determined this person passed the LEADS exam and
19  is free to be released, what would the notation be in
20  IMACS?
21      MS. FERRARA:  Objection, form.
22  BY THE WITNESS:
23      **A.  They would actually just put the disposition**
24  **from what's on the mittimus into IMACS under that**
            TOOMEY REPORTING   (312) 853-0648

WILDREDO CINTRON, JR.
May 15, 2014

Page 25

1 particular case number.

2 BY MR. MORRISSEY:

3 Q. So if, for example, a mittimus said "time

4 considered served; release on this case only," would

5 that civilian employee write into IMACS: Time

6 considered served?

7 A. Yes, sir.

8 Q. And if somebody was found not guilty and the

9 mittimus reflected not guilty; release on this case

10 only, would that civilian employee write into IMACS:

11 Not guilty?

12 A. Yes, sir.

13 Q. And if somebody had a mittimus that said

14 probation, release on this case only, would that

15 civilian write in the IMACS system: Probation?

16 A. Yes, sir.

17 Q. After the civilian employee writes in the IMACS

18 system the disposition reflected on the mittimus, what

19 happens next?

20 A. Start preparing a Dress and Release form.

21 Q. And the civilian starts to prepare this;

22 correct?

23 A. Yes, sir.

24 Q. What would be the next step after the civilian

TOOMEY REPORTING (312) 853-0648

TOOMEY REPORTING
312-853-0648

---

WILDREDO CINTRON, JR.
May 15, 2014

Page 26

1 begins to complete this Dress and Release form?

2 A. She attaches it to the file.

3 Q. Then what would be the next step?

4 A. It goes to the Records sergeant.

5 Q. You've worked as Records sergeant before;

6 right?

7 A. Yes, sir.

8 Q. What is your understanding of what the Records

9 sergeant would do once he receives this pack with the

10 Dress and Release form attached?

11 A. He begins to take out all the contents of the

12 file; starts to review each page to make sure that the

13 cases are all in chronological order, the case numbers

14 are all correct and matching; making sure that we have

15 proper signatures from the clerk's office, the judge's

16 office, the staff stamp from the clerk; reads the

17 LEADS again to make sure that there's no outstanding

18 warrants or wants.

19           Once he reviews all of that, place the

20 contents back in the inside of the envelope, sign the

21 Dress and Release.

22 Q. Do you know whether that sergeant of Records

23 would date -- strike that.

24           Do you know whether that sergeant in

TOOMEY REPORTING (312) 853-0648

TOOMEY REPORTING
312-853-0648

---

WILDREDO CINTRON, JR.
May 15, 2014

Page 27

1 Records would date and note the time he signed the

2 Dress and Release form?

3 A. Some sergeants do, some sergeants don't.

4 Q. And there's no General Order to your knowledge

5 that requires a Records sergeant to put the time he

6 signed the Dress and Release form?

7 A. In a General Order I believe it does state

8 that you have to put down the time, but because there

9 isn't really a specific section next to your signature,

10 sometimes it happens and sometimes it doesn't.

11 Q. Would that sergeant be required to make any

12 other entry into a log reflecting the time that he

13 or she completed this review of the paper as a Records

14 sergeant?

15 A. No, sir.

16 Q. Do you know whether the Sheriff maintains

17 statistics about how long it takes the pack to be

18 reviewed by the Records Office from the time that

19 the mittimus is in possession of the Records sergeant

20 until the time the sergeant signs his or her name to

21 the Dress and Release form?

22 A. Whether the Sheriff keeps?

23 Q. Correct.

24 A. I have no idea what the Sheriff does as far as

TOOMEY REPORTING (312) 853-0648

TOOMEY REPORTING
312-853-0648

---

WILDREDO CINTRON, JR.
May 15, 2014

Page 28

1 that, sir.

2 Q. Do you know whether any supervisors maintain

3 data about how long it takes from the time the Records

4 sergeant receives the mittimus originally until the

5 time that he signs the Dress and Release form?

6 A. I have no knowledge of that, sir.

7 Q. So is it true you're only speculating about how

8 long it would take for a mittimus to go through the

9 Records Office from the time the sergeant originally

10 got the mittimus to the time the pack is ready to be

11 transferred to the next station?

12 MS. FERRARA: Objection, form.

13 BY THE WITNESS:

14 A. Every pack is different. It's difficult to say

15 how long each pack would take because you might have

16 an individual that has ten, 12 cases. Each case has to

17 be addressed and reviewed. You might have one guy that

18 only has one case.

19 BY MR. MORRISSEY:

20 Q. Other than the time stamp of the mittimus,

21 which we previously discussed, and the civilian making

22 an entry into IMACS, are you aware of any other

23 document or paper that would reflect the timeline of

24 the Records Office's review of the pack?

TOOMEY REPORTING (312) 853-0648

TOOMEY REPORTING
312-853-0648

WILDREDO CINTRON, JR.
May 15, 2014

Page 29

1   A.  Yes, sir.  It would reflect in the time that
2  the division was called for the body to, uh, for the
3  person to come down to the Receiving room.
4      Q.  So after the Records sergeant signs the Dress
5  and Release form, what is the next step to discharge
6  a court-ordered release?
7      A.  It goes to an auditor.
8      Q.  Is this auditor part of the Records Office?
9      A.  Yes, sir.
10     Q.  And what would the auditor do in the Records
11 Office?
12     A.  The auditor is going --
13         MS. FERRARA:  Objection, foundation.  You can
14 answer.  Sorry.
15 BY THE WITNESS:
16     A.  The auditor is going to do the same thing that
17 the other two individuals have just done:  pull out the
18 entire contents of the pack; review it; make sure it's
19 thoroughly ready to go; reviewing the LEADS, making
20 sure that in IMACS there's no other cases pending.
21 BY MR. MORRISSEY:
22     Q.  Are you aware of any time records that an
23 auditor would keep to reflect the time he or she
24 started the audit to the time when it was completed?
            TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

---

WILDREDO CINTRON, JR.
May 15, 2014

Page 30

1      A.  No, sir.
2      Q.  And is the auditor in the same room as the
3  civilian employees and the sergeant?
4      A.  An adjacent office.
5      Q.  And I understand things changed recently,
6  because now it's in O-8 and it used to be in the
7  basement of Division V; correct?
8      A.  Yes, sir.
9      Q.  Now, after the auditor completes the review and
10 approves, what is the next step?
11     A.  It gets sent downstairs to the Receiving
12 officer in charge of discharges.
13     Q.  Now, you mentioned about a telephone call being
14 placed to a division; correct?
15     A.  Yes, sir.
16     Q.  In March of 2013 who would place that telephone
17 call?
18     A.  I believe at one -- we had one individual
19 assigned to do those telephone calls, sir.
20     Q.  Would that be in Receiving?
21     A.  No.  That's in the Records Office.
22     Q.  Was it a civilian, though, who was in charge
23 of making the phone call to the division?
24     A.  Yes, sir.
            TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

---

WILDREDO CINTRON, JR.
May 15, 2014

Page 31

1      Q.  When to your understanding in March of 2013
2  would the phone call be made to the division?
3      A.  That's -- I'm trying to remember correctly.
4  That should happen before it's received by the
5  sergeant.
6      Q.  What would be the purpose of placing this phone
7  call to a division?
8      A.  To advise the division that the person is being
9  discharged, the type of discharge that they're going
10 to be released on.
11     Q.  And would that civilian make an entry in a log?
12     A.  Yes, sir.
13     Q.  What's that log called?
14     A.  The exact name I couldn't tell you.  I know
15 it's a divisional log.  Off that, I can't remember
16 the name of it.
17     Q.  Do you know whether it would be called the
18 Discharge/Running Count Log?
19     A.  I'd have to physically see it, sir.  I couldn't
20 tell you for sure.
21     Q.  Do you know whether that civilian employee
22 would make any notations in this log regarding the
23 type of discharge?
24     A.  Yes.  They would put down who they spoke to,
            TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

---

WILDREDO CINTRON, JR.
May 15, 2014

Page 32

1  the star number of the officer they spoke to, the type
2  of discharge that the individual is going to be going
3  on out.
4      Q.  And at that point was it up to the division to
5  bring the guy to the Receiving room for discharge?
6      A.  Yes, sir.
7      Q.  And there's nothing that the sergeant in the
8  Records Office could do to make the division bring that
9  individual to the Receiving room quicker; correct?
10     A.  Correct, sir.
11     Q.  And the Receiving sergeant didn't have any
12 responsibility over when the division brought the
13 individual; correct?
14     A.  Correct, sir.
15     Q.  So when that phone call would be made, it's
16 your understanding that there were at least two
17 additional reviews of the pack that had to be still
18 completed; right?
19     A.  Correct.
20     Q.  We talked about the pack going downstairs to
21 Receiving; correct?
22     A.  Yes, sir.
23     Q.  In March of 2013 how would the pack get
24 downstairs in Receiving?
            TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

WILDREDO CINTRON, JR.
May 15, 2014

Page 33

1    **A.  The Receiving room officer would periodically**

2 **come upstairs to the Records Office.  There would be**

3 **a bin where the completed packs are placed.  The**

4 **officer would collect them from that bin.**

5    Q.  Now, getting back to the record review, at

6 times I assume something unusual comes up; correct?

7    **A.  Yes, sir.**

8    Q.  Which caused more delay in the review process;

9 right?

10    **A.  Correct, sir.**

11    Q.  To your knowledge, in March of 2013 were there

12 any logs that were maintained that an officer -- that

13 a sergeant or the civilians would have to make a

14 notation in to reflect the delay process in reviewing

15 packs?

16    **A.  Not to my knowledge.  Strike that.**

17          **There is a supervisor's log, but we would**

18 **only note things in there if a computer system were**

19 **to go down, if LEADS was not operational.  Uhm, that**

20 **would be the only major things that we would put in**

21 **there, but as far as individual packs, why it's**

22 **delayed, those are not noted.**

23    Q.  So you talked about a supervisor's log for any

24 major issues --

TOOMEY REPORTING   (312) 853-0648

---

WILDREDO CINTRON, JR.
May 15, 2014

Page 34

1    **A.  Uhm-hmm.**

2    Q.  -- like the computer going down; correct?

3    **A.  Yes, sir.**

4    Q.  Can you give me any other examples when a

5 supervisor would make a notation in this log explaining

6 the delay?

7    **A.  Only if the system goes down; if we're unable**

8 **to run LEADS.**

9    Q.  Is it pursuant to any General Order that you're

10 required to make a notation in the supervisor's log?

11    **A.  No, sir.**

12    Q.  When you worked in Records as a sergeant, did

13 you ever make any notations in the supervisor's log?

14    **A.  On occasion, yes, sir.**

15    Q.  Do you know where that supervisor's log is

16 currently maintained?

17    **A.  I believe it's still in the Records Office,**

18 **sir.**

19    Q.  Getting back on track, we were talking about

20 the Receiving officer coming to collect the completed

21 packs from the bin; correct?

22    **A.  Yes, sir.**

23    Q.  How frequently would that Receiving officer

24 come to the Records Office to collect the packs?

TOOMEY REPORTING   (312) 853-0648

---

WILDREDO CINTRON, JR.
May 15, 2014

Page 35

1    **A.  It varies, sir.  It depends on what they're**

2 **currently doing and if they're available to come**

3 **upstairs.**

4    Q.  Is the same process that was in place in 2013,

5 March, presently in place at the jail?

6    **A.  There have been changes.**

7    Q.  Are the Records Office and Receiving office

8 presently on different floors?

9    **A.  Actually, they're in different buildings now.**

10    Q.  Is the Records Office still in Division V?

11    **A.  Yes, sir.**

12    Q.  So, presently, instead of Receiving officers

13 coming upstairs, that individual has to go to a

14 different building to collect the completed packs;

15 correct?

16    **A.  Well, no, because we're still assigning an**

17 **RCDC officer to the old building so that we're keeping**

18 **them close to the Records Office.**

19    Q.  In March of 2013 after the Receiving officer

20 would retrieve the completed packs from the Records

21 Office, I assume that officer would then bring the

22 packs down to Receiving?

23    **A.  Yes, sir.**

24    Q.  What would be the next step in the discharge

TOOMEY REPORTING   (312) 853-0648

---

WILDREDO CINTRON, JR.
May 15, 2014

Page 36

1 of a person with a court-ordered release?

2    **A.  That particular officer would start to review**

3 **the packs, again doing the same procedure that we did**

4 **upstairs in the Records Office:  removing all of it;**

5 **going sheet by sheet, and reviewing the LEADS to make**

6 **sure that everything is accurate and in chronological**

7 **order.**

8    Q.  So from your understanding this would be the

9 fifth time an individual reviewed the pack; correct?

10    **A.  Yes, sir.**

11    Q.  Were these policies effective in making sure

12 the proper people with court-ordered discharges are

13 released?

14        MS. FERRARA:  Objection, form.

15 BY THE WITNESS:

16    **A.  Is it effective?**

17 BY MR. MORRISSEY:

18    Q.  Correct.

19    **A.  Yes, sir.**

20    Q.  Over the last two years, have you as a sergeant

21 been aware of any mistakes caught by the Receiving

22 officer reviewing the pack?

23    **A.  Yes, sir.**

24    Q.  How frequently have you been made aware over

TOOMEY REPORTING   (312) 853-0648

WILDREDO CINTRON, JR.
May 15, 2014

Page 37

1  the last two years that a Receiving officer found an

2  error during his review of the pack?

3      **A.  I'd say if you're reviewing 200 packs, you'd**

4  **find one.**

5      Q.  When was the last time you recall being told by

6  a Receiving officer he found an error in the pack?

7      **A.  I believe it was about two weeks ago.**

8      Q.  What kind of error was that?

9      **A.  There was a discrepancy within the LEADS.**

10  **The LEADS -- there was a wanted for an individual in**

11  **another county, and there was no response from that**

12  **other county within the pack telling us to release**

13  **this individual.**

14      Q.  So what happened in that situation?

15      **A.  The pack was returned to Records.  It's brought**

16  **back to the sergeant, asking for clarification of that**

17  **pack.**

18      Q.  Were you on duty when that happened?

19      **A.  Yes, sir.**

20      Q.  Is there any record that you were required to

21  make regarding this error that was discovered by one

22  of your Receiving officers?

23      **A.  No, sir.**

24      Q.  Are you aware of any official records that were

TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

---

WILDREDO CINTRON, JR.
May 15, 2014

Page 38

1  required of you to maintain in March of 2013 when a

2  Receiving officer under your supervision discovered

3  an error in reviewing the pack?

4      **A.  No, sir.**

5      Q.  When you were made aware of that error, did you

6  contact your lieutenant?

7      **A.  No, sir.**

8      Q.  Why not?

9      **A.  Because it could be a misinterpretation of the**

10  **paperwork, or once it's addressed to that sergeant**

11  **upstairs in Records he would have taken it to a**

12  **lieutenant if he couldn't get clarification on there,**

13  **but in general those situations are cleared up within**

14  **a half hour or 45 minutes maybe.**

15      Q.  Over the last two years, are you aware of a

16  Receiving officer finding an error where the Dress and

17  Release form says probation but the guy should have

18  been released on a not-guilty finding?

19      **A.  I'm sorry.  Clarify the question, please.**

20      Q.  In the last two years as a sergeant in

21  Receiving have you been made aware that one of your

22  Receiving officers uncovered an error in the Dress and

23  Release form where it reflected the person should be

24  released on probation where in fact the mittimus said

TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

---

WILDREDO CINTRON, JR.
May 15, 2014

Page 39

1  the guy should be released on a finding of not guilty?

2      MS. FERRARA:  Objection; form; improper.

3  BY THE WITNESS:

4      **A.  The way I was taught was that the case that is**

5  **still active is what we place on a mittimus if you**

6  **have -- on the Dress and Release if you have multiple**

7  **cases.**

8          **So if I have three or four cases and four**

9  **of them have been found not guilty but he's going out**

10  **probation or he's going out, uhm, what would be the**

11  **other one?  On a particular, like a task, that's what**

12  **we're going to put on there as far as his release.**

13  BY MR. MORRISSEY:

14      Q.  So getting back to the question, over the last

15  two years as a sergeant in Receiving have you come

16  across an error where the Dress and Release form said

17  release on probation where in fact the mittimus

18  reflected the individual should be released on a

19  finding of not guilty?

20      **A.  You're talking about one case; correct?**

21      Q.  Correct.

22      **A.  No, sir, I've never run into that situation.**

23      Q.  After the Receiving officer reviews the pack,

24  what's the next step in the discharge of a person with

TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

---

WILDREDO CINTRON, JR.
May 15, 2014

Page 40

1  a court-ordered release?

2      **A.  The pack is then turned on over to the**

3  **Receiving supervisor, the sergeant on duty.**

4      Q.  Just to clarify a point in the last few

5  questions, a person who should be released on probation

6  is entitled to be released just like any other person

7  who's released on a finding of not guilty; correct?

8      **A.  Yes, sir.**

9      Q.  So that shouldn't account for any significant

10  delay in the discharge of an individual; correct?

11      **A.  Yes, sir, you're right about that.**

12      Q.  And based on your experience, you're not aware

13  of having any slower procedure to discharge people on

14  probation versus people who are found not guilty;

15  correct?

16      **A.  Correct, sir.**

17      Q.  Now, we're talking about the Receiving

18  supervisor's review of the pack; correct?

19      **A.  Yes, sir.**

20      Q.  What is involved with that review?

21      **A.  The same thing as upstairs in Records, sir.**

22  **He will go through that entire pack sheet by sheet,**

23  **again making sure that the LEADS are correct;**

24  **everything is in chronological order.**

TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

## Page 41

WILDREDO CINTRON, JR.
May 15, 2014

1  Q.  And would this be the sixth time the pack would
2  be reviewed?
3      A.  I believe so, yes, sir.
4      Q.  In your capacity presently as a sergeant, you
5  perform these reviews; correct?
6      A.  Yes, sir.
7      Q.  If the Receiving sergeant is satisfied with
8  the review, what is the next step in discharging a
9  person with a court-ordered release?
10     A.  The Receiving supervisor signs off on the pack,
11  gives it back to the officer that's doing the
12  discharges.
13     Q.  When you say the sergeant would sign the
14  pack --
15     A.  The Dress and Release, sir, I meant.
16     Q.  And while the sergeant is completing this
17  review, the Records Office -- strike that.
18         While the sergeant is completing this
19  review in Receiving, he or she has no control over
20  how quick the division is bringing over this potential
21  court-ordered discharge; correct?
22     A.  Yes, sir.
23     Q.  That's correct?
24     A.  Yes, sir, that's correct.

TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

## Page 42

WILDREDO CINTRON, JR.
May 15, 2014

1      Q.  Now, we've been talking about this pack;
2  correct?
3      A.  Yes, sir.
4      Q.  And this pack would have mittimuses in it;
5  correct?
6      A.  Yes, sir.
7      Q.  And it would have the printouts of a LEADS
8  investigation; right?
9      A.  What the person is deemed to be discharged,
10  yes.
11     Q.  And that would have been made by the Records
12  Office; correct?
13     A.  Yes, sir.
14     Q.  So I'm talking about when the Receiving
15  supervisor receives this pack?
16     A.  Yes, sir.
17     Q.  What would you expect typically to find in the
18  pack?
19     A.  I would expect to see all of his mitts dating
20  back to his original incarceration into the jail.
21         I would expect to see a CLEAR from the
22  Chicago Police Department.
23         I would expect to see a LEADS message in
24  there.

TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

## Page 43

WILDREDO CINTRON, JR.
May 15, 2014

1         I would expect to see his booking card,
2  which is a card with the fingerprint and the signature
3  on there, and that would be it, sir.
4      Q.  And I assume you've seen some fairly large
5  packs; correct?
6      A.  Yes, sir.
7      Q.  And the pack is a folder?
8      A.  Yes, sir.
9      Q.  At times there are notes that are reflected
10  on the pack; correct?
11     A.  Yes, sir.
12     Q.  Can you tell me when you would expect a
13  notation to be made in handwriting on the pack?
14     A.  Notations on the pack would be if a person
15  needs medical, uhm, medication before they're
16  discharged.  Uhm, any information as far as having to
17  contact another agency before discharge, that might
18  be on there.
19     Q.  Do you know whether a sergeant or officer would
20  routinely sign the pack?
21     A.  Yes, sir.
22     Q.  When would that signature be?
23     A.  As every person signs off on the Dress and
24  Release, there's a section onto the envelope where

TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

## Page 44

WILDREDO CINTRON, JR.
May 15, 2014

1  the signature corresponds as well.
2         So as I'm signing as a Receiving room
3  sergeant on the pack, I sign also -- the Dress and
4  Release, I would also sign it on the envelope.
5      MR. MORRISSEY:  I ask that the envelope be
6  produced.
7  BY MR. MORRISSEY:
8      Q.  What is the next step in the discharge of a
9  person with a court-ordered release?
10     A.  Once that's completed, individuals are brought
11  forward out of the holding cells, and then the officer
12  would start conducting an oral interview of the person
13  being discharged.
14     Q.  Now, we're assuming that the soon-to-be-
15  discharged person is actually in the holding cell of
16  Receiving; correct?
17     A.  Yes, sir.
18     Q.  At times I would assume the sergeant could have
19  signed the Dress and Release form and signed the
20  envelope and the detainee may not be present; correct?
21     A.  Yes, sir.
22     Q.  Does that happen on occasion?
23     A.  Yes, sir.
24     Q.  Is it frequent?

TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

**WILDREDO CINTRON, JR.**
**May 15, 2014**

Page 45

1  A.  Sometimes, yes, sir.

2  Q.  Now, what type of investigation would the

3  Receiving officer conduct with this potential

4  discharge?

5  A.  Basic questions to try to make sure that we

6  have the correct person standing in front of us.

7  Questions of:  Who's your emergency contact?  What are

8  you currently charged with?  What is your date of

9  birth?  What is your current address?  Social Security

10  number?

11  Q.  These questions would typically be asked in the

12  division as well; correct?

13  A.  No, sir.

14  Q.  How long would this questioning by an officer

15  in Receiving generally take?

16  A.  It depends.  If everything goes well and

17  there's no discrepancies, it could take two minutes,

18  three minutes.

19  Q.  After this step is completed and the officer

20  is satisfied with the response, where does this

21  individual go?

22  A.  Well, at that point in time we would tear off

23  the Dress and Release, leaving the pink copy attached

24  to the envelope.  We would give the white and yellow

TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

---

**WILDREDO CINTRON, JR.**
**May 15, 2014**

Page 46

1  copy to the individual along with their ID, and we

2  would tell them to have a seat until they're escorted

3  out of the building.

4  Q.  In March of 2013 would that individual already

5  have his or her personal property if he came in with

6  it?

7  A.  Yes, sir.  At that point in time they would be

8  dressed and ready to go.

9  Q.  But they're not free yet; correct?

10  A.  Correct.

11  Q.  What would happen if the individual was unable

12  to find the property he had on when he was incarcerated

13  at the jail?

14  A.  Usually, clothes that have been left behind

15  by other individuals who have been shipped or sent to

16  other counties that have been abandoned or donated to

17  the jail, which happens, we would allow them to pick

18  out clothing from there.

19  Q.  Is that also called "the poor box"?

20  A.  That's the terminology that we use as far as on

21  the job, but yes.

22  Q.  So you've observed individuals retrieve

23  clothing out of the poor box prior to be released from

24  the jail; right?

TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

---

**WILDREDO CINTRON, JR.**
**May 15, 2014**

Page 47

1  A.  Yes, sir.

2  Q.  After an officer gives the soon-to-be-free

3  person a Dress and Release form and tells him to sit,

4  what's the next step in discharging a person?

5  A.  Well, once a group is gathered together, they

6  would be escorted out of the building.

7  Q.  And in March of 2013 they had to go up a

8  flight of stairs in Division V; right?

9  A.  Yes, sir.

10  Q.  After the individuals are escorted out of

11  the building out of -- strike that.

12          After a group of individuals are escorted

13  from the basement to the first floor, what's next?

14  A.  They would appear before the interlock officer,

15  who's controlling the doors from the lobby into the

16  actual Division V jail, which are two doors, and that

17  officer would tell the individuals to hold up their

18  Dress and Release in one hand and to hold up their

19  ID with the other hand.

20          The officer is going to sit there and

21  look at the individual's face, compare it to the ID,

22  compare it to the information that's on the Dress

23  and Release, and do that with all the individuals

24  that are standing in line.

TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

---

**WILDREDO CINTRON, JR.**
**May 15, 2014**

Page 48

1  Q.  And that individual or that officer would make

2  an entry into a log; correct?

3  A.  Yes, sir.

4  Q.  And that officer typically in March of 2013

5  would reflect the time the person is leaving; correct?

6  A.  Yes, sir.

7  Q.  Now, to your knowledge, as a sergeant in

8  Receiving, were there any logs maintained in March of

9  2013 documenting the time frame that your office is

10  taking to process this soon-to-be-released person?

11      MS. FERRARA:  Objection, form.

12  BY THE WITNESS:

13  A.  I have no knowledge, sir.

14  BY MR. MORRISSEY:

15  Q.  So in March of 2013 to your knowledge the

16  Receiving office didn't maintain a log reflecting the

17  time that the packs were brought over by the officer

18  from Records?

19  A.  No, sir.  The only log that we maintain is, I

20  believe, if I remember correctly -- I don't want to

21  say for sure.

22          There is a log when we're walking the

23  individuals on out, a time frame as far as when we're

24  taking them on out, when they got to Receiving.

TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

WILDREDO CINTRON, JR.
May 15, 2014

Page 49

1    Q.  You're talking about walking out.  Walking out
2    from where?
3        A.  When we actually conduct the escort of them
4    going up the stairs, that's when we put into the entry
5    log with this is when they're walking on out.
6        Q.  What is that log called?
7        A.  Discharge Logbook, sir.
8        Q.  To your knowledge, is that different than the
9    "Division Five Main Interlock Record of Release"?
10       A.  Yes, sir, it is different.
11       Q.  What is maintained on the discharge log
12   maintained by Receiving?
13       A.  The time that the individual got to us from
14   the division.
15       Q.  Any other information on that specific log?
16       A.  The time that the person was discharged out
17   of the computer and the time that they were actually
18   walked to the interlock.
19       MR. MORRISSEY:  I ask that that record be
20   produced too because I don't think that it has been
21   produced.
22       MS. FERRARA:  Write me a letter, Patrick.
23       MR. MORRISSEY:  What's that?
24       MS. FERRARA:  Send me a request for production.

TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

---

WILDREDO CINTRON, JR.
May 15, 2014

Page 50

1        MR. MORRISSEY:  I've already asked for all the
2    records regarding discharge, but we can talk about
3    that afterwards.
4    BY MR. MORRISSEY:
5        Q.  After the person in March of 2013 exits the
6    interlock in Division V, is that person free to go?
7        A.  Yes, sir.
8        Q.  Do people typically stay to collect their
9    property from the Division V lobby?
10       A.  Yes, sir.
11       Q.  Is the Division V lobby still used to store
12   property?
13       A.  Personal property, yes.
14       Q.  Now, there's a different discharge procedure
15   currently; correct?
16       A.  Somewhat.  I mean, can you please define?
17       Q.  How is the discharge process presently
18   different from what we just talked about in March of
19   2013 for persons with court-ordered releases?
20       A.  As far as I'm aware of, now mittimuses are
21   scanned and sent to a database where Records sergeants
22   can review the mitts before they actually get to the
23   jail.
24       Q.  Other than this email procedure, are there any

TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

---

WILDREDO CINTRON, JR.
May 15, 2014

Page 51

1    other changes in the policy and procedure to release
2    a person with a court-ordered discharge that are
3    different now than were in place in March of 2013?
4        MS. FERRARA:  Objection, form; mischaracterizes
5    his testimony.
6    BY THE WITNESS:
7        A.  I couldn't answer that.  I mean, the procedures
8    are still the same.  It's just that the attempt is to
9    just make it quicker.
10   BY MR. MORRISSEY:
11       Q.  And this email procedure has been in place
12   since about December of 2013; correct?
13       A.  I can't remember exactly when it was
14   instituted.
15       Q.  Do you know whether it's made the discharge
16   of persons with court-ordered releases more efficient?
17       A.  Yes.
18       Q.  Have you noticed people being released quicker?
19       A.  Yes, sir.
20       Q.  Approximately how much quicker on average?
21       A.  At least for when I'm on duty, I would say
22   that it's cut down maybe two, possibly three hours.
23       Q.  The discharge process?
24       A.  Uhm-hmm.

TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

---

WILDREDO CINTRON, JR.
May 15, 2014

Page 52

1        Q.  It creates more work for you as a sergeant in
2    Receiving; correct?
3        A.  Not so much for me in Receiving.  It creates
4    a little bit more work for the Records sergeant.
5        Q.  Would you agree that there'd be a higher
6    concentration of people that are being processed out
7    during your shift presently as there were in March
8    of 2013?
9        A.  A higher volume on my shift?
10       Q.  Correct.
11       A.  Yes, sir.
12       Q.  Is it significant?
13       MS. FERRARA:  Objection, form.
14   BY THE WITNESS:
15       A.  Significant?  Somewhat, yes.  Yes.
16   BY MR. MORRISSEY:
17       Q.  Do you know whether there's been more officers
18   assigned to assist with Receiving as a result of this
19   email process?
20       A.  Well, yes, because before there would only be
21   maybe two officers conducting this discharge procedure
22   for Receiving where now we -- I can't remember if we
23   had the 5:00 to 1:00 shift or not back then.
24       So there's about maybe four officers,

TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

Page 53

1  five officers that start at 5:00 in the afternoon
2  until 1:00 in the morning, and they come on in
3  specifically to help speed up the discharges.
4      Q.  And they're assigned from 5:00 in the afternoon
5  until 1:00 in the morning?
6      A.  Yes, sir.
7      Q.  And you said that there were four to five
8  officers?
9      A.  Yes, sir.
10     Q.  Prior to this new procedure, the emailing of
11 the mittimuses, there were not these additional
12 officers that came on the 5:00 to 1:00 shift; correct?
13     A.  I can't remember exactly, sir.
14     Q.  As a supervisor or a sergeant in Receiving,
15 do you now supervise more officers?
16     MS. FERRARA:  Objection, foundation.
17 BY THE WITNESS:
18     A.  Because of the 5:00 to 1:00 shift?
19 BY MR. MORRISSEY:
20     Q.  Correct.
21     A.  No.  They have their own supervisors.
22     Q.  Now, in March of 2013 detainees would come
23 back from the jail following court; correct?
24     A.  Yes, sir.
           TOOMEY REPORTING   (312) 853-0648

---

Page 54

1      Q.  There was a policy in March of 2013 in the
2  Sheriff's Office to have these individuals go back
3  to their divisions even though they had a court-
4  ordered discharge; right?
5      MS. FERRARA:  Objection, form.
6  BY THE WITNESS:
7      A.  We send everyone back to the divisions from the
8  Receiving room.  At the time that they come back from
9  court the Receiving room has no knowledge of their
10 dispositions, so everyone has to go back to their
11 divisions.
12 BY MR. MORRISSEY:
13     Q.  Does every detainee who goes to court pass
14 through Receiving in March of 2013?
15     A.  Yes, sir.
16     Q.  And that's true for people who go over to
17 the criminal court building at 26th and California;
18 right?
19     A.  Correct, sir.
20     Q.  And you also talked about this, but every
21 person coming back from court who is a detainee is
22 also processed through Receiving; correct?
23     A.  Every detainee coming back from court?
24     Q.  Correct.
           TOOMEY REPORTING   (312) 853-0648

---

Page 55

1      A.  We don't process, but yes, sir.
2      Q.  What do you mean, you don't process?
3      A.  They're already in the system.  All we're
4  doing is, uhm, it's a staging area until the divisions
5  are able to pick them on up.
6      Q.  So in March of 2013 if an individual, a
7  detainee in Division I went to court and the judge
8  says you're free to go, it was your understanding
9  that person would be required to come back to the jail
10 and go back to his division?
11     A.  Yes, sir.
12     Q.  Is that presently the case?
13     A.  Yes, sir.
14     Q.  Are you aware of any procedure to change that
15 if a person goes to court and receives a court-ordered
16 discharge from the jail?
17     MS. FERRARA:  Objection, form; foundation.
18 BY THE WITNESS:
19     A.  I have no knowledge of any plans of changing
20 anything like that, sir.
21 BY MR. MORRISSEY:
22     Q.  Who presently is your superintendent?
23     A.  Jeff Johnson.
24     Q.  Prior to Superintendent Johnson, Superintendent
           TOOMEY REPORTING   (312) 853-0648

---

Page 56

1  Green was your superintendent; correct?
2      A.  Yes, sir.
3      Q.  Are you aware of any documents describing this
4  policy of emailing mittimuses to the Records Office?
5      A.  No, sir, I have no knowledge.
6      Q.  How did you learn about this procedure?
7      A.  Instructed to us by the superintendent.
8      Q.  Which superintendents?
9      A.  Queen, Queen actually did that.
10     Q.  What did Superintendent Queen tell you about
11 this email procedure?
12     A.  That we were going to be receiving scanned
13 documents; that we were to review them.  That was at
14 the initial startup, I believe.
15     Q.  Anything else Superintendent Queen told you?
16     A.  I can't remember right now exactly.
17     Q.  Do you know whether she memorialized this in
18 any letter or email to you?
19     A.  I can't remember, sir.
20     Q.  You said the superintendent said there'd be
21 a new procedure of scanning mittimuses and reviewing
22 the mittimuses; correct?
23     A.  Yes, sir.
24     Q.  Did she tell you who would be scanning these
           TOOMEY REPORTING   (312) 853-0648

WILDREDO CINTRON, JR.
May 15, 2014

Page 57

```
 1    mittimuses?
 2         A.  At the time it was the clerks.
 3         Q.  Is it different now?
 4         A.  Yes, sir.
 5         Q.  Do civilian employees do it at the jail -- at
 6    the courthouses?
 7         A.  Yes, sir.  Civilians who were originally
 8    assigned to the Records Office have been dispatched
 9    to the surrounding courthouses to do that.
10         Q.  When were they dispatched?
11         A.  The exact date, I couldn't tell you, sir.
12         Q.  Do you know what month?
13         A.  I believe it started just about at the
14    beginning of this year, I believe, sir.
15         Q.  You talked about reviewing the mittimuses that
16    were sent by email; correct?
17         A.  Yes, sir.
18         Q.  Who to your understanding was to review the
19    mittimuses that were emailed?
20         A.  The sergeants in the Records Office.
21         Q.  As a Receiving sergeant, this didn't have any
22    impact on your review of the pack?
23         A.  Correct, sir.
24         Q.  Other than Superintendent Queen providing
```

TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

WILDREDO CINTRON, JR.
May 15, 2014

Page 58

```
 1    guidance of this new email procedure, did any other
 2    supervisors talk about it?
 3         A.  Not as far as I'm aware of.
 4         Q.  Who's currently the Executive Director at
 5    the jail?
 6         A.  Carman, I believe, or Cara, Cara.  I can't
 7    remember the last name.  I'm sorry.
 8         Q.  As a sergeant over the past two years, have
 9    you had contact with this Executive Director Cara?
10         A.  No, I haven't had direct contact with the
11    Executive Director.
12         Q.  There are no captains that are assigned to the
13    discharge unit; correct?
14         A.  In Records?  Receiving?
15         Q.  Correct.
16         A.  Well, Receiving has a commander and
17    lieutenants, and the commander of Receiving is also
18    the commander of Records.  Records has two
19    lieutenants on each shift.
20         Q.  Are you aware of a Director Michael Holmes?
21         A.  Yes, sir.
22         Q.  As a sergeant in Receiving, do you have
23    contact with Director Holmes?
24         A.  Yes, sir.
```

TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

WILDREDO CINTRON, JR.
May 15, 2014

Page 59

```
 1         Q.  Is it frequent?
 2         A.  Yes, sir.
 3         Q.  Did you have a conversation with Director
 4    Holmes regarding this new email procedure?
 5         A.  Yes, sir, we had talked about it.
 6         Q.  What did you talk to Director Holmes about?
 7         A.  He had mentioned about the new procedure, and
 8    we were talking, uhm, this was at early-on stages, the
 9    hopes of speeding up the process for the discharges.
10         Q.  Did you have a conversation with Director
11    Holmes about why you would want to speed up the
12    process of discharging people?
13              MS. FERRARA:  Objection, foundation.
14    BY THE WITNESS:
15         A.  No, sir, I never had that kind of conversation
16    with him.
17    BY MR. MORRISSEY:
18         Q.  Were you curious why Director Holmes would be
19    wanting to facilitate a quicker discharge process?
20              MS. FERRARA:  Objection, foundation.
21    BY THE WITNESS:
22         A.  I didn't look at it so much like that.  I
23    looked at it more as that we were finally entering
24    into the 21st century.
```

TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

WILDREDO CINTRON, JR.
May 15, 2014

Page 60

```
 1              Up to this point, everything was done by
 2    paper.  So I looked at it as a great new way of finally
 3    getting computers to work for us instead of constantly
 4    going by paper.
 5    BY MR. MORRISSEY:
 6         Q.  In your opinion was there anything wrong with
 7    the old discharge process?
 8              MS. FERRARA:  Objection, form; relevance.
 9    BY THE WITNESS:
10         A.  Yes, there's a lot of things that are wrong
11    with the old way.
12    BY MR. MORRISSEY:
13         Q.  The old way took a long time to discharge a
14    person with a court-ordered release; correct?
15         A.  Yes, sir.
16         Q.  Sheriff Dart occasionally comes to the
17    Receiving area; correct?
18         A.  Yes, sir.
19         Q.  Have you had conversation with Sheriff Dart
20    about the discharge process?
21         A.  No, sir.
22         Q.  When did you last observe Sheriff Dart in
23    the discharge area?
24         A.  I believe it was sometime last year before
```

TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

## Page 61

WILDREDO CINTRON, JR.
May 15, 2014

Page 61

1 the new building opened on up.

2    Q. Did he have a press conference in the discharge

3 area?

4      MS. FERRARA: Objection, relevance.

5 BY THE WITNESS:

6    **A. Not as far as I'm aware of, no, sir.**

7 BY MR. MORRISSEY:

8    Q. What was Sheriff Dart doing in the discharge

9 area?

10      MS. FERRARA: Objection, relevance.

11 BY THE WITNESS:

12    **A. I have no idea, sir. I'm not prone to ask my**

13 **boss why you're walking in your own building.**

14 BY MR. MORRISSEY:

15    Q. Do you know whether he had any conversation

16 with any Sheriff's employees?

17    **A. Not as far as I'm aware of. I mean, just hi;**

18 **how are you doing; just questions like that.**

19    Q. Was he with anybody?

20      MS. FERRARA: Objection, relevance.

21 BY THE WITNESS:

22    **A. He was with other individuals, yes.**

23 BY MR. MORRISSEY:

24    Q. Who was he with?

TOOMEY REPORTING (312) 853-0648

TOOMEY REPORTING
312-853-0648

## Page 62

WILDREDO CINTRON, JR.
May 15, 2014

Page 62

1    **A. The names, I don't know, sir.**

2    Q. Do you know whether he was with Superintendent

3 Queen?

4    **A. I don't remember if she was there or not, sir.**

5    Q. Other than Sheriff Dart being in the discharge

6 area about a year ago, over the last two years do

7 you recall him being there any other times?

8      MS. FERRARA: Objection, asked and answered.

9 BY THE WITNESS:

10    **A. Well, yeah, right when the new building opened**

11 **on up. He's been there a couple of times in the new**

12 **building.**

13 BY MR. MORRISSEY:

14    Q. Just so I'm clear, you've never had any

15 personal conversations with Sheriff Dart?

16      MS. FERRARA: Objection, asked and answered.

17 BY THE WITNESS:

18    **A. I asked to see his ID, sir.**

19 BY MR. MORRISSEY:

20    Q. And that's the extent of your conversation

21 with the Sheriff?

22    **A. Yes, sir.**

23    Q. Is sergeant Green also a sergeant who you work

24 with on the afternoon shift?

TOOMEY REPORTING (312) 853-0648

TOOMEY REPORTING
312-853-0648

## Page 63

WILDREDO CINTRON, JR.
May 15, 2014

Page 63

1    **A. Yes, sir. He's a sergeant on the 5:00 to**

2 **1:00 shift.**

3    Q. Who else do you work with as a sergeant in

4 Receiving?

5    **A. Sergeant Staszak, he works 5:00 to 1:00.**

6      **On 2:00 to 10:00 there is Sergeant**

7 **Hatton, and there's Sergeant Bill Burger.**

8      **I'm sorry. I'm used to calling them**

9 **different nicknames and stuff like that.**

10      **Uhm, let me see. Sergeant -- what is his**

11 **last name? Atkins.**

12    Q. We talked about auditors being in Records?

13    **A. Uhm-hmm.**

14    Q. That's a "yes"?

15    **A. Yes, sir. I'm sorry.**

16    Q. Are auditors working in Records 24 hours a day?

17    **A. No, sir.**

18    Q. To your knowledge, when would an auditor not

19 be on duty in Records?

20    **A. There's always an auditor on duty in Records.**

21    Q. Who is the lieutenant that you report to?

22    **A. Right now we're going through a transition,**

23 **but it was Lieutenant Lewis.**

24    Q. How long had you reported to Lieutenant Lewis?

TOOMEY REPORTING (312) 853-0648

TOOMEY REPORTING
312-853-0648

## Page 64

WILDREDO CINTRON, JR.
May 15, 2014

Page 64

1    **A. Almost a year.**

2    Q. So is it fair to say presently there is no

3 lieutenant you report to --

4    **A. Well, no.**

5    Q. -- regularly?

6    **A. In Receiving?**

7    Q. Correct.

8    **A. Well, no. They just came out with bids. I**

9 **was with her two days ago. She's not on duty. She**

10 **wasn't on duty yesterday, so I reported to Commander**

11 **Sheahan.**

12    Q. And what's his last name?

13    **A. Sheahan.**

14    Q. How long has Commander Sheahan been the

15 commander in Receiving?

16    **A. I believe about nine months now.**

17    Q. Do you have regular contact with Commander

18 Sheahan?

19    **A. Yes, sir.**

20    Q. Does Commander Sheahan have an active role

21 in the discharge of people?

22      MS. FERRARA: Objection, form.

23 BY THE WITNESS:

24    **A. He works both Receiving and Records. As far**

TOOMEY REPORTING (312) 853-0648

TOOMEY REPORTING
312-853-0648

WILDREDO CINTRON, JR.
May 15, 2014

Page 65

1  as being downstairs in Receiving, he doesn't play
2  an active role.  I'm not sure exactly what's going on
3  in Records.
4  BY MR. MORRISSEY:
5     Q.  And the individual above Commander Sheahan is
6  Superintendent Queen?
7     A.  Superintendent Queen and Superintendent
8  Johnson, he has to interact with both of them.
9        MR. MORRISSEY:  Why don't we mark this as
10  Plaintiff's Exhibit No. 1.  I'm going to use the
11  washroom.
12        MS. FERRARA:  Okay.
13                  (WHEREUPON, a recess was had from
14                   3:05 p.m. to 3:08 p.m.)
15                  (WHEREUPON, Plaintiff's Exhibit
16                   No. 2 was marked for
17                   identification as of 05/15/2014.)
18  BY MR. MORRISSEY:
19     Q.  Showing you what's been marked as Plaintiff's
20  Exhibit No. 1, it's a group exhibit.  Let me direct
21  your attention to the first page, which includes the
22  Cook County Department of Corrections Dress and
23  Release form.  Do you see that?
24     A.  Yes, sir.
         TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

---

WILDREDO CINTRON, JR.
May 15, 2014

Page 66

1     Q.  Is your name on this document?
2     A.  Yes, sir.
3     Q.  Where is your name, Sergeant?
4     A.  As far as Records Supervisor.
5     Q.  Now, your normal assignment in March of 2013
6  was not Records sergeant, was it?
7     A.  Yes, sir.
8     Q.  I thought we previously talked about you being
9  a sergeant in Receiving.
10     A.  I'm currently a sergeant in Receiving.  At the
11  time of 2013, though, I was in Records.  It was not
12  an official bidded position.  I was assisting them.
13     Q.  So on this Dress and Release form, your
14  signature is under Records Supervisor; right?
15     A.  Correct, sir.
16     Q.  And there's a line for your star number;
17  correct?
18     A.  Yes, sir.
19     Q.  What does that say?
20     A.  It should be 1068.
21     Q.  Looking at the Dress and Release form, do you
22  see any time that you recorded to note when you signed
23  the Dress and Release form?
24     A.  This copy is not very clear, sir, but I do see
         TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

---

WILDREDO CINTRON, JR.
May 15, 2014

Page 67

1  some numbers on there.  I just can't remember if that
2  is a time frame.
3     Q.  Where do you see numbers, Sergeant?
4     A.  Underneath the supervisor.  I'm not sure if it
5  is a number or not.
6     Q.  Is that your handwriting?
7     A.  It's difficult to say with this copy, sir.
8     Q.  At the top of the form it says Inmate's Name:
9  January Clarence.  Do you see that?
10     A.  Yes.
11     Q.  And there's a Jail ID number; right?
12     A.  Yes, sir.
13     Q.  Do you see any entry made under the Date line?
14     A.  No, sir, I can't see.
15     Q.  Who would be responsible for writing the date
16  on the Dress and Release form?
17     A.  A civilian who prepared the pack.
18     Q.  And would that civilian who prepared the pack
19  write the inmate's name?
20     A.  Yes, sir.
21     Q.  And that person would also write the inmate's
22  ID number; correct?
23     A.  Yes, sir.
24     Q.  And the civilian would write the division the
         TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

---

WILDREDO CINTRON, JR.
May 15, 2014

Page 68

1  person was housed in; right?
2     A.  Correct, sir.
3     Q.  In looking at Mr. January's Dress and Release,
4  it looks like he was in Division I Tier A; correct?
5     A.  Yes, sir.
6     Q.  Type of Discharge, it says P-R-O-B.  Do you
7  see that?
8     A.  Yes, sir.
9     Q.  Would the civilian have written that?
10     A.  Yes, sir.
11     Q.  What does "Prob." mean?
12     A.  Probation.
13     Q.  Below that, it says Division Called At and
14  there's a blank.  Do you see that?
15     A.  Yes, sir.
16     Q.  Do you see any notation in that line?
17     A.  None that I can identify, sir, no.
18     Q.  Would the civilian generally make a notation
19  in that line?
20     A.  Yes, sir, the person who's making the calls.
21     Q.  There's a star number next to it.  Do you see
22  that?
23     A.  Yes, sir.
24     Q.  A civilian generally does not have a star
         TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

WILDREDO CINTRON, JR.
May 15, 2014

Page 69

1    number; correct?
2        A.  Yes, sir.
3        Q.  What could generally be entered in the star
4    number?
5        A.  The star number of the individual who received
6    the phone call.
7        Q.  And from looking at Exhibit 1, which has been
8    Bates-stamped January 517 perhaps, it doesn't look
9    like there's any star number.  Do you see that?
10       A.  Correct, sir.
11       Q.  And the next line says OFC.  Do you see that?
12       A.  Yes, sir.
13       Q.  What does that mean?
14       A.  It's short for "officer."
15       Q.  And would the civilian generally be required
16   to enter the name of the officer he or she spoke with?
17       A.  Yes, sir.
18       Q.  And you don't see any officer there; correct?
19       A.  Correct, sir.
20       Q.  The next line is the Inmate Brought to
21   Receiving (Time) column.  Do you see that?
22       A.  Yes, sir.
23       Q.  What is generally supposed to be included in
24   that column?

TOOMEY REPORTING    (312) 853-0648

TOOMEY REPORTING
312-853-0648

---

WILDREDO CINTRON, JR.
May 15, 2014

Page 70

1        A.  The time that the individual was brought to
2    Receiving.
3        Q.  Who would generally make the notation on the
4    Dress and Release form for that column?
5        A.  That's done downstairs by Receiving.
6        Q.  It looks like there's no entry in that one,
7    either.
8        A.  Correct, sir.
9        Q.  Just so I'm clear, Division Called At, Star
10   Number, and OFC should be completed by the civilian
11   in Records?
12       A.  Correct, sir.
13       Q.  And this would be prior to the Records
14   supervisor reviewing?
15       A.  Correct, sir.
16       Q.  And the next line says Discharge from
17   C.C.D.O.C. (Time).  Do you see that?
18       A.  Yes, sir.
19       Q.  From your understanding, what does generally
20   that line mean?
21       A.  The time we've discharged him out of our
22   computer and the individual has left the building.
23       Q.  So it's not only the individual out of the
24   building, but it's the time the computer system

TOOMEY REPORTING    (312) 853-0648

TOOMEY REPORTING
312-853-0648

---

WILDREDO CINTRON, JR.
May 15, 2014

Page 71

1    deletes the entry?
2        A.  Correct, sir.
3        Q.  So that could be after the individual walks
4    out of the jail campus; correct?
5        A.  Yes, sir.
6        Q.  So that wouldn't be a fair and accurate time
7    to identify the exact moment the person became free;
8    right?
9        MS. FERRARA:  Objection, form; argumentative.
10   BY THE WITNESS:
11       A.  The exact moment that the person is free is
12   once they get past Division V.
13   BY MR. MORRISSEY:
14       Q.  And Discharge from C.C.D.O.C., there's no time;
15   correct?
16       A.  Correct, sir.
17       Q.  Who would generally write the time the
18   individual was discharged from the CCDOC based on
19   your knowledge?
20       A.  Receiving.
21       Q.  Would this be before the person goes through
22   the Interlock or after the Division V interlock?
23       A.  As they're going up to the interlock.
24       Q.  So the bottom half of the page says Approved

TOOMEY REPORTING    (312) 853-0648

TOOMEY REPORTING
312-853-0648

---

WILDREDO CINTRON, JR.
May 15, 2014

Page 72

1    By.  Do you see that?
2        A.  Yes, sir.
3        Q.  It looks to be a Records personnel.  Do you
4    see that?
5        A.  Yes, sir.
6        Q.  And there's a name there?
7        A.  I believe so, yes, sir.
8        Q.  Do you know whose name that is?
9        A.  Not offhand, sir.  I don't know the signature.
10       Q.  Would that be a civilian Records personnel?
11       A.  Yes, sir.
12       Q.  And the civilian would generally sign that
13   after the review of the pack?
14       A.  Correct, sir.
15       Q.  The Records Supervisor, do you see that one?
16       A.  Yes, sir.
17       Q.  And we talked about this previously.  That's
18   your signature and your star number; right?
19       A.  Yes, sir.
20       Q.  And we don't know whether there's a time on
21   there; right?
22       A.  Correct, sir.  I mean, I see something, but
23   I can't -- something is definitely written under there.
24       Q.  Does that have any significance to you now as

TOOMEY REPORTING    (312) 853-0648

TOOMEY REPORTING
312-853-0648

WILDREDO CINTRON, JR.
May 15, 2014

Page 73

1  you review it?

2  **A. It could be a time, sir.**

3  Q. Other than it being a time, do you know whether

4  it could be any other notation to your knowledge

5  sitting here today?

6  **A. No, sir.**

7  Q. The next line says Bond Officer Receiving. Do

8  you see that?

9  **A. Yes, sir.**

10 Q. Would this be the auditor who we've previously

11 talked about?

12 **A. No, sir.**

13 Q. What is the Bond Officer Receiving?

14 **A. That's the officer that has reviewed the pack**

15 **downstairs in Receiving before giving it to the**

16 **Receiving sergeant.**

17 Q. And there's a name there; correct?

18 **A. Yes, sir.**

19 Q. Do you know what officer that is?

20 **A. No, sir.**

21 Q. And there's a star number; correct?

22 **A. Yes, sir.**

23 Q. Do you know whether the Bond Officer Receiving

24 is required to enter the time he or she does the review

TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

---

WILDREDO CINTRON, JR.
May 15, 2014

Page 74

1  of the pack?

2  **A. Not as far as I'm aware of, sir.**

3  Q. Then there's a Supervisor Receiving below that.

4  Do you see that?

5  **A. Yes, sir.**

6  Q. Would that be the sergeant of Receiving?

7  **A. Yes, sir.**

8  Q. Do you know whose signature that is?

9  **A. No, sir.**

10 Q. And then there's a star number there also;

11 correct?

12 **A. Yes, sir.**

13 Q. Do you know whether the supervisor of Receiving

14 is required to make a notation for the time he or she

15 signs it?

16 **A. None that I'm aware of, sir.**

17 Q. Presently, you as the supervisor of Receiving

18 have no obligation to note the time that you signed

19 a Dress and Release?

20 **A. Correct, sir.**

21 Q. The next line says Division Five Supervisor.

22 Do you see that?

23 **A. Yes, sir.**

24 Q. What is a Division V supervisor?

TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

---

WILDREDO CINTRON, JR.
May 15, 2014

Page 75

1  **A. It is supposed to be the supervisor that is**

2  **currently working in Division V. He's supposed to**

3  **sign off on it.**

4  Q. Would that be a lieutenant?

5  **A. No, sir. That would be -- well, it could be**

6  **a lieutenant. It's any supervisor from Division V.**

7  Q. And you as a sergeant if you were working

8  Division V would be considered a supervisor; right?

9  **A. Correct, sir.**

10 Q. And there's no signature there; right?

11 **A. Correct, sir.**

12 Q. At times is there no Division V supervisor

13 to sign the Dress and Release form?

14 **A. Yes, sir, they generally don't sign those.**

15 Q. Below the Division Five Supervisor line,

16 there's a star number. Do you see that?

17 **A. Yes, sir.**

18 Q. What does that mean to you, that entry?

19    I'm not asking for the signature for

20 the line. I'm just asking what that column means

21 to you.

22 **A. Star, Date, Time, the column would be probably**

23 **from the last individuals who are reviewing the pack.**

24 Q. Would that be an auditor from Receiving?

TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

---

WILDREDO CINTRON, JR.
May 15, 2014

Page 76

1  **A. No. Receiving doesn't have auditors.**

2  Q. Would that be the sergeant in Receiving?

3  **A. Not necessarily, because the sergeant has**

4  **already placed his star number next to his name.**

5  Q. So is it common for those three lines to be

6  completed?

7  **A. No, sir, it's not common.**

8  Q. It's not common?

9  **A. No, sir.**

10 Q. Why do you say it's not common?

11 **A. It just depends on who it is that's doing it,**

12 **sir. Sometimes the officer that's doing the interview**

13 **might put his star number and time on there, but it's**

14 **not something that's definitive for this person to**

15 **leave.**

16 Q. So the Star, Date, and Time do not have to be

17 completed for an individual to be released?

18 **A. No. Correct, sir. The main ones are: Records**

19 **Personnel, Records Supervisor, Bond Officer, and**

20 **Supervisor from Receiving.**

21 Q. Does it raise any red flags to you that the

22 star number, date, and time weren't completed?

23 **A. No, sir.**

24 Q. The top of the page is a Discharge/Release From

TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

## Page 77

WILDREDO CINTRON, JR.
May 15, 2014

Page 77

1   Custody form relating to a bus pass.  Do you see that?

2   **A.  Yes, sir.**

3   Q.  When generally in March of 2013 would that be

4   completed by an inmate being released?

5   **A.  This is usually done right after the interview.**

6   Q.  And this is in Receiving; correct?

7   **A.  Yes, sir.**

8   Q.  During that interview or after the interview,

9   the individual sits on a bench, waiting to be escorted

10   out; correct?

11   **A.  Correct, sir.**

12   Q.  Do you know whether this would be a detainee's

13   last signature he would generally sign before being

14   released from the Cook County Jail?

15   **A.  Unless he wants his property, yes.  If he**

16   **wants his property, he will still have to sign for**

17   **his property.**

18   Q.  A detainee isn't required to retrieve his

19   personal property after being discharged, is he?

20   **A.  No, he's not required.**

21   Q.  At times do you observe inmates leave without

22   even attempting to pick up their personal property?

23   **A.  Yes, sir.**

24   Q.  The next page, it's a mittimus marked January

TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

## Page 78

WILDREDO CINTRON, JR.
May 15, 2014

Page 78

1   543.  Take a moment and look at this, Sergeant.

2   **A.  (Witness complied.)**

3   Q.  This is a mittimus; correct?

4   **A.  Yes, sir.**

5   Q.  And it looks like it was entered on March 19,

6   2013?

7   **A.  Yes, sir.**

8   Q.  We talked about how a sergeant in Records

9   would conduct that first initial review of the

10   mittimus; correct?

11   **A.  Yes, sir.**

12   Q.  Can you walk me through how you would assess

13   this mittimus if it was given to you for an initial

14   assessment for a person who may be a court-ordered

15   discharge?

16   **A.  Right off the bat, I would see the "PNG JW,"**

17   **which would be -- "D," I'm sorry, not "P."  Defendant**

18   **not guilty.  Jury waived.  Finding of not guilty.**

19   **Defendant to be released.**

20   **I would assess the signature as correct**

21   **for the judge, the stamp of the Circuit Court, the**

22   **dates are correct and match.  This would be a mitt**

23   **to be handed on out to one of the civilians.**

24   Q.  Do you recall reviewing Mr. January's mitt

TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

## Page 79

WILDREDO CINTRON, JR.
May 15, 2014

Page 79

1   on March 19, 2013?

2   **A.  No, sir, I do not, because I'm dealing with**

3   **500 other sheets of paper at the same time.**

4   Q.  Looking at Mr. January's mitt from March 19,

5   2013, do you see a time stamp on it by the Records

6   Office?

7   **A.  No, sir, not on this copy, sir.**

8   Q.  Would it be the general practice of the

9   sergeant to time-stamp the mitt when he received it

10   in Records?

11   **A.  Yes, sir.  The time stamp is done on the back**

12   **of the mitts.**

13   MR. MORRISSEY:  So I'm going to make a demand

14   for the back of the mitt, if you can.

15   BY MR. MORRISSEY:

16   Q.  And it's your belief that the practice of the

17   Records Office sergeant is to time-stamp the mitt

18   upon receipt?

19   **A.  Yes, sir.**

20   Q.  Do you know whether the time stamp would be

21   the exact time that he received the mittimus?

22   **A.  No, sir.  The time stamp would reflect when**

23   **I'm handing it to the civilians to start processing.**

24   Q.  So after you assessed a handful of mittimuses,

TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

## Page 80

WILDREDO CINTRON, JR.
May 15, 2014

Page 80

1   then would you time-stamp them; correct?

2   **A.  Yes, sir.**

3   Q.  And how many mittimuses would you review as a

4   record sergeant?

5   MS. FERRARA:  Objection, foundation.

6   BY MR. MORRISSEY:

7   Q.  In the afternoon.

8   MS. FERRARA:  Objection, foundation.

9   BY THE WITNESS:

10   **A.  I would --**

11   MS. FERRARA:  Go ahead.

12   BY THE WITNESS:

13   **A.  I would review all the mitts coming back from**

14   **courts, from criminal courts and all other outlying**

15   **courts.  So if we had four or 500 people come back,**

16   **I would review each one of their mitts to find out**

17   **which ones are court-ordered discharges and which**

18   **are continuances for a future court date.**

19   BY MR. MORRISSEY:

20   Q.  That's what you do every day in March 2013 when

21   you work there?

22   **A.  Yes, sir.**

23   Q.  So it was common for there to be 500 people

24   returning from court on a weekday?

TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

**WILDREDO CINTRON, JR.**
May 15, 2014

Page 81

1    A.  Yes.

2    Q.  Do you know the statistics of how many people

3 go to court every day?

4        MS. FERRARA:  Objection, foundation; form.

5 BY THE WITNESS:

6    A.  A guesstimate, between 800 and 1,100 people.

7 BY MR. MORRISSEY:

8    Q.  So assuming you were working as a Records

9 sergeant, you would review each mitt that returned

10 to the jail?

11    A.  Myself and other sergeants, yes, sir.

12    Q.  And how would these mitts be divided for each

13 sergeant to review so one didn't have to do more

14 than the other?

15    A.  We would just divide them up in equal stacks,

16 and we would each grab a stack and start going

17 through them.

18    Q.  And when you were going through the stacks,

19 you would have to put the potential court-ordered

20 release and continued remand Sheriff; correct?

21    A.  Yes, sir.

22    Q.  How long would that take in the average

23 afternoon in March of 2013?

24    A.  Initially, depending on what's there when we
         TOOMEY REPORTING    (312) 853-0648

TOOMEY REPORTING
312-853-0648

---

**WILDREDO CINTRON, JR.**
May 15, 2014

Page 82

1 arrive, that process could take an hour and a half,

2 maybe longer than that.

3    Q.  Just to identify which mitts are people who

4 have a continuance and must go to court again and be

5 remanded into custody and people who are free?

6    A.  Yes, sir.

7    Q.  Are you aware of -- strike that.

8        Have you worked in Records as a sergeant

9 in the last six months?

10    A.  No.

11    Q.  Are you familiar with how the sergeants in

12 records presently divvy up and review emailed

13 mittimuses?

14    A.  Not presently, sir, no.

15    Q.  Do you know whether the mittimuses are emailed

16 to the sergeant's personal email, or is there an

17 official?

18    A.  No.  It's an official County email.

19    Q.  Is it like recordsoffice@sheriff.org?

20    A.  I'm not sure of the exact designation right

21 now, sir.

22    Q.  Is it your understanding that there's just one

23 email that the civilians email to the Records Office?

24    A.  Yes, sir.
         TOOMEY REPORTING    (312) 853-0648

TOOMEY REPORTING
312-853-0648

---

**WILDREDO CINTRON, JR.**
May 15, 2014

Page 83

1    Q.  As a Records sergeant, would there be -- would

2 you be familiar with all the judges' signatures?

3    A.  I can't tell you that I would be familiar with

4 all the judges' signatures, sir.

5    Q.  Would there be a template to match a specific

6 mittimus's signature to a --

7    A.  No, sir, there's no template like that.

8    Q.  So you'd just use your experience and your best

9 guess, best judgment to ascertain whether a judge's

10 signature is accurate?

11    A.  Correct, sir.

12    Q.  The next document, Bates-stamped January 006,

13 which looks like Cook County Sheriff's Office Inmate

14 Moves for a Clarence January.  Do you see that?

15    A.  Yes, sir.

16    Q.  Are you familiar with this document generally?

17    A.  Generally, yes, sir.  It's a printout of

18 movement from all the different posts where the inmate

19 has come across.  At every post IDs are scanned as

20 they come by the post.

21    Q.  And this is through the IMACS system?

22    A.  Correct, sir.

23    Q.  Do you know how to interpret this document?

24    A.  Somewhat, yes, sir.
         TOOMEY REPORTING    (312) 853-0648

TOOMEY REPORTING
312-853-0648

---

**WILDREDO CINTRON, JR.**
May 15, 2014

Page 84

1    Q.  I want to look at the first entry for March 19,

2 2013.  Do you see that?  It's kind of halfway down.

3    A.  Yes, sir.

4    Q.  And I assume that's the date this went into

5 the computer database?

6    A.  Correct, sir.

7    Q.  There's a time; correct?

8    A.  Yes, sir.

9    Q.  And it says 7:08?

10    A.  Yes, sir.

11    Q.  And then the next column says:  From Location.

12 Do you see that?

13    A.  Yes, sir.

14    Q.  And it says:  In-cell?

15    A.  Correct.

16    Q.  The next column says:  To Location?

17    A.  Correct.

18    Q.  And it says:  In-transit?

19    A.  Correct.

20    Q.  The next line says:  Status.  Do you see that?

21    A.  Yes, sir.

22    Q.  And it says:  Completed?

23    A.  Yes, sir.

24    Q.  Reading those three columns, what does that
         TOOMEY REPORTING    (312) 853-0648

TOOMEY REPORTING
312-853-0648

WILDREDO CINTRON, JR.
May 15, 2014

Page 85

1  mean to you?

2      A.  7:08, the individual was in his cell.  He

3  began to get moved to a particular area, and it was

4  completed and scanned at 7:08.

5      Q.  So the in-transit location, you don't know

6  where that is; correct?

7      A.  Well, if we look up at the next line,

8  in-transit, it would be in-transit.  He was moving

9  to a Division I post.

10     Q.  So around 7:38 this individual was at the

11 Division I post --

12     A.  Correct.

13     Q.  -- would that be fair to say?

14     A.  Yes, sir.

15     Q.  And the individual was scanned, right, at the

16 post?

17     A.  Correct, sir.

18     Q.  The right column says, priority.  Do you see

19 that, Event Priority, at the far right?

20     A.  Yes, sir.

21     Q.  It says a "7."  Do you see that?

22     A.  Yes, sir.

23     Q.  What does that mean?

24     A.  It's just a way of prioritizing that movement.

TOOMEY REPORTING    (312) 853-0648

TOOMEY REPORTING
312-853-0648

---

WILDREDO CINTRON, JR.
May 15, 2014

Page 86

1      So, in other words, if the individual had

2  to go to Cermak because of an emergency, that would be

3  a priority 1.  It means that any other scheduled

4  movement that the person has would get pushed back

5  because priority 1 takes over.

6      Q.  So it's your understanding the Sheriff's Office

7  has control of the event priority designation?

8      A.  My understanding is yes, sir.

9      Q.  And so in this one-page document of inmate

10 moves for Mr. January, most of these are a "7" for

11 event priority; correct?

12     A.  Correct, sir.

13     Q.  Is that unusual to see a lot of event

14 priorities as a "7"?

15     MS. FERRARA:  Objection, foundation.

16 BY THE WITNESS:

17     A.  I couldn't tell you because I don't deal a

18 lot with scanning of the movement of the detainees as

19 far as the paper and the computer.

20 BY MR. MORRISSEY:

21     Q.  Do you know whether the event priority has to

22 be manually entered by a Sheriff's employee?

23     A.  I believe it does, sir.

24     Q.  Our next, uhm, let's move along this timeline.

TOOMEY REPORTING    (312) 853-0648

TOOMEY REPORTING
312-853-0648

---

WILDREDO CINTRON, JR.
May 15, 2014

Page 87

1      A.  Uhm-hmm.

2      Q.  The next, Schedule Date, it says 8:10.  Do you

3  see that?

4      A.  Yes, sir.

5      Q.  And it says:  "Division 1 Post"?

6      A.  Correct, sir.

7      Q.  And it says criminal court -- court criminal.

8  Do you see that?

9      A.  Yes, sir.

10     Q.  What does that mean to you?

11     A.  That they have him, they're scanning him out

12 as going to court.

13     Q.  By looking at this document, can you tell which

14 court he went to?

15     A.  I'd say the criminal court, sir.

16     Q.  At 26th Street; correct?

17     A.  Yes, sir.

18     Q.  And it says Completed under the Status; right?

19     A.  Correct, sir.

20     Q.  Sometimes statuses say "pending"; right?

21     A.  Sometimes.  I believe so.  Like I said, I'm not

22 too familiar on how this works because I'm not -- I

23 don't scan the individuals.

24     Q.  And it says Actual Date.  Do you see that to

TOOMEY REPORTING    (312) 853-0648

TOOMEY REPORTING
312-853-0648

---

WILDREDO CINTRON, JR.
May 15, 2014

Page 88

1  the right?

2      A.  Correct, sir.

3      Q.  It says 8:10?

4      A.  Yes, sir.

5      Q.  Would that be the time the individual was

6  scanned in the criminal courts?

7      A.  No.

8      Q.  When would that time be?

9      A.  That's the time that they actually scanned

10 them out of the post to go to the criminal court.

11     Q.  So was this individual brought to Division V

12 prior to going to court?

13     A.  Yes, sir.

14     Q.  How do you know that by looking at this

15 document?

16     A.  The way, uhm, all the divisions drop all

17 detainees going to court to Receiving in the morning.

18 Once they're there, the Receiving room starts to divide

19 them on up to which courthouse they're going to go.

20     As far as criminal courts, we would

21 divide them according to judge.

22     So before he makes it to the criminal

23 courts, we're giving the mitts to the court deputies.

24 We're telling them here's all the individuals and the

TOOMEY REPORTING    (312) 853-0648

TOOMEY REPORTING
312-853-0648

WILDREDO CINTRON, JR.
May 15, 2014

Page 89

1   mitts for the judge.

2      Q.  So in Receiving you're not required to scan

3   the individual who's going to court?

4      A.  Correct.

5      Q.  You could scan them theoretically; correct?

6      A.  Correct, sir.

7      Q.  Then you'd know exactly what time he was in

8   your post going to be moved to the courthouse?

9      A.  Correct, sir.

10     Q.  Going up the next line, it says 18:11 Criminal

11  Court.  Do you see that?

12     A.  Yes, sir.

13     Q.  And then it says:  To Location.  It says:

14  In-cell?

15     A.  Correct.

16     Q.  The next line says:  Completed.  Do you see

17  that?

18     A.  Yes, sir.

19     Q.  What does that mean to you as a sergeant?

20     A.  The individual got back to Division I at 1811

21  hours.

22        And prior to getting back to Division I, that

23  individual was in Receiving?

24     A.  Correct, sir.
        TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

---

WILDREDO CINTRON, JR.
May 15, 2014

Page 90

1      Q.  And there's no record of the time that

2   individual was in Receiving; correct?

3      A.  Correct, sir.

4      Q.  And that's because you're not obligated to

5   scan them in Receiving; correct?

6      A.  Correct, sir.

7      Q.  So what time, from looking at this document,

8   was this individual placed in the cell?

9      A.  1811 hours, sir.

10        Well, I can't say what time he was

11  actually placed in the cell.  I can say that he made

12  it into the division at 1811.

13     Q.  The next line, it reads:  3/20/2013.  Do you

14  see that?

15     A.  Yes, sir.

16     Q.  And there's a time?

17     A.  Yes, sir.

18     Q.  And there's a note --

19     A.  Yes, sir.

20     Q.  -- below that?  The note reads:  Probation Per

21  Records.  Do you see that?

22     A.  Yes, sir.

23     Q.  Would that be made by the civilian in the

24  Records?
        TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

---

WILDREDO CINTRON, JR.
May 15, 2014

Page 91

1      A.  No, sir, I don't believe it is.  I believe

2   that notation is done at the division.

3      Q.  So who to your understanding would make that

4   notation in the division?

5      A.  That would be the post officer before the

6   individual walks out of the division.

7      Q.  So prior to this time, the review of the pack

8   had already started; right?

9      A.  It should have, yes, sir.

10     Q.  And this record reflects he was in the RCDC

11  discharge.  Do you see that?

12     A.  Yes, sir.

13     Q.  Is that the Receiving room?

14     A.  Yes, sir.

15     Q.  And it shows he was in the Receiving room at

16  013 hours?

17     A.  Correct, sir.

18     Q.  So prior to 013 hours --

19        MS. FERRARA:  Where do you see 013 hours?

20  BY MR. MORRISSEY:

21     Q.  Well, prior to 013, a civilian from Records

22  called the division to have the guy moved?

23     A.  Correct, sir.

24     Q.  How do you know that the post officer in the
        TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

---

WILDREDO CINTRON, JR.
May 15, 2014

Page 92

1   division would make the notation "Probation per

2   Records"?

3      A.  I can't -- I don't know.  It's an assumption,

4   sir.

5      Q.  So you have no knowledge of whether that would

6   be made by the post officer in that individual's

7   division?

8      A.  Correct, sir.  I don't have that knowledge.

9   I know that Records wouldn't do that.

10     Q.  How do you know a civilian in Records wouldn't

11  be able to make that notation in IMACS?

12     A.  Because this is for movement, and the Records

13  personnel, they stick to the general case screens where

14  they can change the disposition on the case screens.

15  They don't make notations like that.

16     Q.  And under this entry where the note says

17  Probation Per Records, there's an event priority;

18  correct?

19     A.  Yes, sir.

20     Q.  And it says 8?

21     A.  Yes, sir.

22     Q.  Is it your understanding that a Sheriff's

23  employee would make the event priority an 8?

24     A.  Possibly.  Yes, sir.
        TOOMEY REPORTING   (312) 853-0648

TOOMEY REPORTING
312-853-0648

WILDREDO CINTRON, JR.
May 15, 2014

Page 93

1    Q.  The line above, it shows time 014 and it says
2  from "RCDC disch" to Division V post?
3    A.  Correct, sir.
4    Q.  Can you interpret that more for me?
5    A.  That he was scanned as going up the stairs
6  to exit the building, I believe, sir.
7            Actually, that one is difficult to
8  interpret, to be honest to you.
9            Oh, okay.  I understand now.  I'm sorry,
10  sir.  So from the in-cell, they scanned him on out
11  to go to RCDC discharge.  On route to RCDC discharge,
12  he was scanned at the Division V post, because there's
13  a post in between Receiving and 5.
14    Q.  So from Division V post, he went to the RCDC
15  post; correct?
16    A.  Exactly.  The RCDC Post O, which is the line
17  above at 016, that's when he actually made it to the
18  Receiving room and now Receiving has the body.
19    Q.  The next page in this group exhibit is January
20  007.  Do you see that?
21    A.  Yes, sir.
22    Q.  What is this document?
23    A.  This is a picture of the IMACS screen of the
24  first screen when looking up an individual in IMACS.

TOOMEY REPORTING   (312) 853-0648

---

WILDREDO CINTRON, JR.
May 15, 2014

Page 94

1    Q.  Would this be part of the civilian's
2  investigation of the pack?
3    A.  It's the start, yes, sir.  When they first go
4  to make changes to his disposition in IMACS, this is
5  the first page that they're going to come across.
6            Then they would click -- if you look at
7  the bottom, you'll see all of the different sections
8  that you can click on.  They would click on Offenses,
9  which would then take you to a second screen to make
10  adjustments to the disposition on their cases.
11    Q.  So there are additional screens for this
12  individual's IMACS; correct?
13    A.  Yes, sir.
14    Q.  So this is like the home page of the IMACS
15  account?
16    A.  For him, yes.
17    Q.  So there's a tremendous amount of information
18  for this individual you can find?
19    A.  Yes, sir.
20    Q.  The middle column, it says Actual Release.
21  Do you see that?
22    A.  Yes, sir.
23    Q.  And it says 3/20/13?
24    A.  Yes, sir.

TOOMEY REPORTING   (312) 853-0648

---

WILDREDO CINTRON, JR.
May 15, 2014

Page 95

1    Q.  There's a time 3:56 RCDC?
2    A.  Yes, sir.
3    Q.  What would that mean to you as a sergeant?
4    A.  That was the actual time they discharged
5  him out of the computer system from RCDC.
6    Q.  From looking at this document, can you identify
7  why this individual was discharged?
8    A.  From looking at this initial?
9    Q.  Correct.
10    A.  No, sir.
11    Q.  And this is just one of many steps that the
12  civilian has to complete in the discharge process;
13  right?
14    A.  Correct, sir.
15    Q.  And the civilian would look at -- can you tell
16  me other columns the civilian employee would look at
17  reflected on his IMACS?
18        MS. FERRARA:  Objection, foundation.
19  BY THE WITNESS:
20    A.  They would go to Warrants/Orders to see if
21  anyone's entered any warrants or holds from other
22  counties.
23        Then they would go to the Offense section to
24  see the offenses that he has in IMACS, and then using

TOOMEY REPORTING   (312) 853-0648

---

WILDREDO CINTRON, JR.
May 15, 2014

Page 96

1  that screen they would then pull the file and make
2  sure that whatever case numbers we have in IMACS we
3  have paperwork for.
4  BY MR. MORRISSEY:
5    Q.  Would there be any other screens that the
6  civilian employee would generally look at prior to
7  pulling the file?
8    A.  They might go into Moves and Transfers to see
9  if they have any scheduled moves to other courtrooms
10  even though they're not incarcerated.
11    Q.  To be proactive; correct?
12    A.  Exactly.  That way we can notify them, hey,
13  remember you have a future court date, like in Markham
14  or something like that.
15    Q.  And would the civilian employee then print
16  each of these screen shots?
17    A.  No, sir.
18    Q.  So there's no requirement for the civilian
19  employee to print these screen shots and put them
20  into the pack?
21    A.  Correct, sir.
22    Q.  The next page looks to be a Discharge/Running
23  Count Log.  It's marked January -- I think it's 008.
24  Have you seen this type of document before, Sergeant?

TOOMEY REPORTING   (312) 853-0648

WILDREDO CINTRON, JR.
May 15, 2014

Page 97

1  A. Yes, sir.

2  Q. Can you identify the document generally?

3  A. It is a daily running count log for -- it

4  appears to be Division I.

5  Q. How do you know it's for Division I?

6  A. The bottom left-hand corner I see "Division"

7  and the "I," which I take it for one.

8  Q. And would this be maintained by an officer in

9  Division I?

10  A. Yes, sir.

11  Q. So the Records Office has no responsibility

12  for completing this document?

13  A. Correct, sir.

14  Q. And Receiving has no responsibility for

15  completing this document?

16  A. Correct, sir.

17  Q. Do you know when an officer would make an entry

18  in the Discharge/Running Count Log?

19  A. Every time a person is moved in or out of the

20  jail or out of that particular division, if he's moved

21  to another section within that division, they would

22  use this.

23  Q. So from looking at this document, do you see an

24  individual named "Clarence January" in the middle?

WILDREDO CINTRON, JR.
May 15, 2014

Page 98

1  A. Yes, sir.

2  Q. And from your experience, it reflects that

3  there was a call from Records around midnight?

4  A. Correct, sir.  Well, actually -- yes, sir.

5  I'm sorry.

6  Q. And at the time he was being moved from?  Is

7  there a living unit that's identified?

8  A. Yes, sir, A2 06.

9  Q. He was being moved; is that correct?

10  A. Yes, sir.

11  Q. And there's something that's written there?

12  A. RCDC discharge.  Probation.

13  Q. And this individual, it looks like he was

14  discharged from the division at midnight?

15  A. Correct, sir.

16  Q. And there's a time delivered to RCDC.  Do you

17  see that?

18  A. Yes, sir.

19  Q. And this says 0010?

20  A. Yes, sir.

21  Q. Would an individual from Receiving call the

22  division saying they received the individual?

23  A. No.  The officer that actually delivered him

24  to Receiving would get onto the radio and advise

WILDREDO CINTRON, JR.
May 15, 2014

Page 99

1  the officer the time and who he dropped him off to.

2  Q. So that would be a movement officer; right?

3  A. Correct.

4  Q. And next to the time 0010 there's a name;

5  right?

6  A. Correct, sir.

7  Q. Whose name would be there?

8  A. That's the officer who received the detainee

9  from the Transportation officer.

10  Q. So this would be a Receiving officer; correct?

11  A. Correct.

12  Q. Do you know an Officer Guesst?

13  A. Yes, sir.

14  Q. And it looks like there's a running count.

15  Do you see that?

16  A. Yes, sir.

17  Q. And it's 1234.  Is that what it says?

18  A. It's broken off, but, yes, sir, it's the

19  running count for the building of Division I.

20  Q. For that specific day?

21  A. For -- right.  Actually, for that division

22  period.  So in Division I once he left or if we look

23  at the top, it started off with 1240 inmates being

24  housed in Division I.

WILDREDO CINTRON, JR.
May 15, 2014

Page 100

1  Then as people are being moved for

2  whatever reason, the count is either deducted or

3  raised.

4  Q. It's like the census --

5  A. Yes, sir.

6  Q. -- for the division?

7  All right.  The next page looks like it's

8  January 009.  Do you see that?

9  A. Yes, sir.

10  Q. Would this just be a continuation of that

11  previous log for Division I?

12  A. Correct, sir.

13  Q. And the next page says January 010.  Is this

14  just, to your understanding, a continuation of the

15  same Division I log?

16  A. Correct, sir.

17  Q. In the second column there looks to be a name

18  Javante Houston.  Do you see that?

19  A. Yes, sir.

20  Q. And to the left of his name there's a name.

21  Do you see that?

22  A. Yes, sir.

23  Q. Is Ranzino an officer?

24  A. No, sir.

**WILDREDO CINTRON, JR.**
**May 15, 2014**

Page 101

1  Q.  What's Ranzino?

2  A.  **Ranzino is a civilian that works in the Records**

3  **Office.**

4  Q.  So from your understanding, would Ranzino

5  have called Division I?

6  A.  **Correct, sir.**

7  Q.  Okay.  And it reflects this individual was

8  living in Division I?

9  MS. FERRARA:  Objection, relevance.

10 BY THE WITNESS:

11 A.  **Yes, sir.**

12 BY MR. MORRISSEY:

13 Q.  And it looks like this individual was

14 discharged?

15 MS. FERRARA:  Objection, relevance.

16 MR. MORRISSEY:  It's a policy case.

17 MS. FERRARA:  This is not a 30(b)(6) witness.

18 He's not going to respond to questions regarding a

19 30(b)(6) witness.

20 BY MR. MORRISSEY:

21 Q.  So under the "To" it says "SOL."  Do you see

22 that?

23 A.  **Yes.**

24 Q.  What does "SOL" mean to you, Sergeant?

TOOMEY REPORTING   (312) 853-0648

---

**WILDREDO CINTRON, JR.**
**May 15, 2014**

Page 102

1  A.  **Stricken on leave, sir.**

2  Q.  It looks like this person was then transferred

3  to the RCDC at 1725?

4  A.  **Correct.**

5  Q.  Is Hernandez an officer that works in

6  Receiving?

7  A.  **Correct, sir.**

8  Q.  Let's look at the last page of this Group

9  Exhibit 1.  It looks like January 011.  Do you see

10 that, Sergeant?

11 A.  **Yes, sir.**

12 Q.  And this is the "Division Five Main Interlock

13 Record of Release"?

14 A.  **Correct, sir.**

15 Q.  And we've previously talked about this; right?

16 A.  **Yes, sir.**

17 Q.  And there's an individual by the name of

18 Clarence January on the bottom.  Do you see that?

19 A.  **Yes, sir.**

20 Q.  And it says -- and there's an inmate ID number;

21 right?

22 A.  **Correct, sir.**

23 Q.  And his name?

24 A.  **Correct.**

TOOMEY REPORTING   (312) 853-0648

---

**WILDREDO CINTRON, JR.**
**May 15, 2014**

Page 103

1  Q.  And there's a column for Location; correct?

2  A.  **Yes, sir.**

3  Q.  Is that the location he was presently living

4  at?

5  A.  **Yes, sir, in Division I A2.**

6  Q.  There's a line for how he was released.  Do

7  you see that?

8  A.  **Yes, sir.**

9  Q.  It says PROB?

10 A.  **Yes, sir.**

11 Q.  What does that mean to you as a sergeant?

12 A.  **Probation, sir.**

13 Q.  There's an officer's signature?

14 A.  **Correct, sir.**

15 Q.  Who is that officer who signed it?

16 A.  **It appears to be Officer Watson.**

17 Q.  Is he a Receiving officer?

18 A.  **No.  Officer Watson would be working in**

19 **Division V, sir.**

20 Q.  The interlock?

21 A.  **Correct, sir.**

22 Q.  Do you know whether that's his signature?

23 A.  **I -- it's a signature.  I don't know if it's**

24 **his signature.**

TOOMEY REPORTING   (312) 853-0648

---

**WILDREDO CINTRON, JR.**
**May 15, 2014**

Page 104

1  Q.  The next column is Supervisor Signature; right?

2  A.  **Correct, sir.**

3  Q.  It says Sergeant Hill?

4  A.  **Yes.**

5  Q.  Do you know a Sergeant Hill?

6  A.  **Yes, sir.**

7  Q.  Who is Sergeant Hill?

8  A.  **He works at the jail, but I'm not sure where**

9  **he's currently working at.  I believe he was working**

10 **Division V.**

11 Q.  Would the supervisor's signature be the

12 supervisor in Division V?

13 A.  **I believe so.  Yes, sir.**

14 Q.  And there's a time; correct?

15 A.  **Yes, sir.**

16 Q.  It says 0315?

17 A.  **Correct, sir.**

18 Q.  Is this the time the individual became a free

19 person?

20 A.  **Correct.  He walked through the interlock.**

21 Q.  And this reflects page 6; right?

22 A.  **It appears so, sir.**

23 Q.  Of 8-1/2.

24 A.  **Correct, sir.**

TOOMEY REPORTING   (312) 853-0648

**WILDREDO CINTRON, JR.**
**May 15, 2014**

Page 105

1  Q.  So is it fair to say there would be two and
2  a half more pages of releases this day?
3  **A.  Absolutely, sir.**
4  Q.  And they would have come after 0315; right?
5  **A.  Correct, sir.**
6  Q.  Some of those people could have been time
7  considered served; right?
8  **A.  I suppose, sir.**
9  Q.  Some of those people could have been a
10 court-ordered discharge?
11 MS. FERRARA:  Objection, calls for speculation.
12 BY THE WITNESS:
13 **A.  I suppose so, sir.**
14 BY MR. MORRISSEY:
15 Q.  Between the time of 255 and 315 on March 20,
16 2013, as reflected on page 6, a number of these people
17 are court-ordered discharges; right?
18 **A.  Yes, sir.**
19 Q.  How many individuals are court-ordered
20 discharges?
21 **A.  It appears to be about 16, sir.**
22 Q.  Some of these releases have a letter in front
23 of it, D-1.  Do you see that?
24 **A.  Yes, sir.**
                TOOMEY REPORTING   (312) 853-0648

---

**WILDREDO CINTRON, JR.**
**May 15, 2014**

Page 106

1  Q.  What does that mean?
2  **A.  That is the D-bond number on the receipt.**
3  Q.  So those are the people who posted bond?
4  **A.  Correct, sir.**
5  Q.  Are you familiar with audits that are conducted
6  in Receiving and Records?
7  MS. FERRARA:  Objection, asked and answered.
8  BY THE WITNESS:
9  **A.  I know about the audits that happen in Records.**
10 BY MR. MORRISSEY:
11 Q.  What about internal audits by the Sheriff?
12 **A.  I'm not privy to any of those, sir.**
13 Q.  Are you aware that the Sheriff keeps statistics
14 on how long it takes to discharge individuals from
15 custody?
16 MS. FERRARA:  Objection, asked and answered.
17 BY THE WITNESS:
18 **A.  I'm not aware of those.**
19                     **(WHEREUPON, a recess was had from**
20                     **3:53 p.m. to 3:58 p.m.)**
21 BY MR. MORRISSEY:
22 Q.  Do you remember working on March 19 and
23 March 20, 2013?
24 **A.  I'm sure I was there, sir.**
                TOOMEY REPORTING   (312) 853-0648

---

**WILDREDO CINTRON, JR.**
**May 15, 2014**

Page 107

1  Q.  Do you recall any unusual occurrences related
2  to the discharge process that day?
3  **A.  Not that I can recall, sir.**
4  Q.  Do you recall there being any medical emergency
5  for a person who was to be discharged?
6  **A.  Not as far as I can recall.**
7  Q.  I'm going to show you what we'll mark as
8  Exhibit No. 2.
9                     (WHEREUPON, Plaintiff's Exhibit
10                     No. 2 was marked for
11                     identification as of 05/15/2014.)
12 BY MR. MORRISSEY:
13 Q.  Sergeant, we've reviewed a document like this
14 before, right, "Division 5 Main Interlock Record of
15 Release"?
16 **A.  Correct, sir.**
17 Q.  Why don't you look at the first six pages.  I'm
18 going to briefly ask you a couple of questions about
19 them.  I'll represent to you it will be the March 7,
20 2013, record.
21 **A.  Okay.**
22 Q.  Take a moment just to look at the first seven
23 pages.
24 **A.  Okay, sir.**
                TOOMEY REPORTING   (312) 853-0648

---

**WILDREDO CINTRON, JR.**
**May 15, 2014**

Page 108

1  Q.  I think actually the first eleven pages are
2  the March 7, 2013, discharge.  Take a look at that and
3  make sure it's accurate.
4  **A.  Okay, sir.**
5  Q.  Do you see on the seventh page it says that
6  there was 125 times discharges between the hours of
7  2300 and 0700 hours.  Do you see that?
8  **A.  Yes, sir.**
9  MS. FERRARA:  I'm sorry.  What page?  What's
10 the Bates stamp?
11 MR. MORRISSEY:  There is no Bates stamp.
12 MS. FERRARA:  At the top.
13 MR. MORRISSEY:  All right.  Oh, 1422.
14 MS. FERRARA:  Okay.
15 BY THE WITNESS:
16 **A.  Okay.  Yes, sir.**
17 BY MR. MORRISSEY:
18 Q.  Is that fair to say?
19 **A.  Yes, sir.**
20 Q.  Do you know how many branch courtrooms there
21 are in Cook County?
22 **A.  I'm guessing about eight or nine, sir.**
23 Q.  And those are outside of 26th and California?
24 **A.  Correct, sir.**
                TOOMEY REPORTING   (312) 853-0648

WILDREDO CINTRON, JR.
May 15, 2014

Page 109

1    Q.  Over the last two years based on your working
2    in Receiving and Records, does it take longer to
3    process people who go to court at the facilities
4    outside of 26th and California who have court-ordered
5    discharges?
6         MS. FERRARA:  Objection, form; improper
7    hypothetical.
8    BY THE WITNESS:
9         A.  The bottom line is it all depends on what
10   time they're getting to us.  It's difficult to say
11   for that exact question, sir.
12   BY MR. MORRISSEY:
13        Q.  Are you aware of any new procedure the Sheriff
14   is considering for potential court-ordered discharges
15   to not have them returned to their assigned division?
16        MS. FERRARA:  Objection, asked and answered.
17   BY THE WITNESS:
18        A.  Not as far as I'm aware of.
19        MR. MORRISSEY:  I have nothing further.
20        MS. FERRARA:  Nothing further.  I've got no
21   questions.
22        MR. MORRISSEY:  Okay.
23        MS. FERRARA:  You have two options.  You can
24   waive signature or reserve signature.

TOOMEY REPORTING    (312) 853-0648

TOOMEY REPORTING
312-853-0648

---

WILDREDO CINTRON, JR.
May 15, 2014

Page 110

1         The court reporter has taken down
2    everything that you said here today.  So if you want
3    to, you can review it for its accuracy, which means
4    scrivener's errors where you can change those.
5         So do you want to review it and sign it,
6    or do you want to waive it?
7         THE WITNESS:  What do you suggest actually?
8         MS. FERRARA:  We will waive.
9         FURTHER DEPONENT SAITH NOT.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

TOOMEY REPORTING    (312) 853-0648

TOOMEY REPORTING
312-853-0648

---

WILDREDO CINTRON, JR.
May 15, 2014

Page 111

1    STATE OF ILLINOIS   )
                        )  SS:
2    COUNTY OF COOK      )
3         I, KATHLEEN M. DUFFEE, a Notary Public within
4    and for the County of Cook, State of Illinois, and a
5    Certified Shorthand Reporter of said state, do hereby
6    certify:
7         That previous to the commencement of the
8    examination of the witness, WILFREDO CINTRON, JR., he
9    was first duly sworn to testify the whole truth
10   concerning the matters herein;
11        That the foregoing deposition transcript was
12   reported stenographically by me, was thereafter reduced
13   to typewriting via computer-aided transcription under
14   my personal direction, and constitutes a true record of
15   the testimony given and the proceedings had;
16        That the said deposition was taken before me at
17   the time and place specified;
18        That the reading and signing by the witness of
19   the deposition transcript was waived;
20        That I am not a relative or employee of
21   attorney or counsel, nor a relative or employee of such
22   attorney or counsel for any of the parties hereto, nor
23   interested directly or indirectly in the outcome of
24   this action.

TOOMEY REPORTING    (312) 853-0648

TOOMEY REPORTING
312-853-0648

---

WILDREDO CINTRON, JR.
May 15, 2014

Page 112

1         IN WITNESS WHEREOF, I do hereunto set my hand
2    and affix my seal of office at Chicago, Illinois, this
3    1st day of June, 2014.
4
5
6         _____
          KATHLEEN M. DUFFEE
7         Notary Public, Cook County, Illinois
          My commission expires September 25, 2014
8
9
10
11   CSR Certificate No. 084-003497
12
13
14
15
16
17
18
19
20
21
22
23
24

TOOMEY REPORTING    (312) 853-0648

TOOMEY REPORTING
312-853-0648

**WILDREDO CINTRON, JR.**
**May 15, 2014**

**A**

a2 98:8 103:5
abandoned 46:16
able 55:5 92:11
absolutely 7:14 105:3
account 40:9 94:15
accuracy 110:3
accurate 36:6 71:6 83:10 108:3
accurately 16:1
action 111:24
active 39:5 64:20 65:2
actual 10:7 47:16 87:24 94:20 95:4
add 22:11
additional 17:22 32:17 53:11 94:11
address 45:9
addressed 28:17 38:10
adjacent 30:4
adjustments 94:10
advise 31:8
affix 112:2
afternoon 5:24 6:4,7 6:19 53:1,4 62:24 80:7 81:23
agencies 21:11
agency 23:11 43:17

ago 10:16
37:7 62:6 64:9
agree 10:22 11:10 13:24 15:19 23:21 24:4,7 52:5
ahead 80:11
alias 22:15,20 22:20
allow 46:17
alvarez 2:6
amount 7:17 94:17
anita 2:6
answer 29:14 51:7
answered 62:8,16 106:7,16 109:16
anybody 61:19
anyones 95:21
appear 47:14
appeared 2:5 2:10
appears 97:4 103:16 104:22 105:21
approved
approves 30:10
approximate 7:3
approxima... 5:15 6:3 7:9 8:1,20 12:19 51:20
area 5:12 55:4 60:17

60:23 61:3
61:9 62:6
85:3
argumenta... 71:9
arrests 22:5
arrive 82:1
arrived 11:20
arrives 18:4
ascertain 83:9
asked 45:11
50:1 62:8
62:16,18
audit 29:24
auditor 17:13
17:13 29:7
29:8,10,12
29:16,23
30:2,9
63:18,20
auditors
63:12,16
76:1
audits 106:5
available
19:22 35:2
avenue 2:2
average
51:20 81:22
aware 9:24
11:8 28:22
29:22 36:21
36:24 37:24
38:5,15,21
40:12 50:20
55:14 56:3
58:3,20
61:6,17
74:2,16
82:7 106:13
assuming

44:14 81:8
assumption
92:3
atkins 63:11
attached
26:10 24:5
attaches 26:2
attempt 51:8
attempting
77:22
attention
65:21
attorney 2:6
111:21,22
audit 29:24
auditor 17:13
17:13 29:7
29:8,10,12
29:16,23
30:2,9
based 40:12
74:18 109:1
basement
5:23 12:2
30:7 43:13
73:10 75:24
bates 108:10
108:11
batestamp...
69:8 83:12
began 85:5
beginning
57:14
begins 26:1
56:3
belief 21:52
9:6
believe 5:16
7:21 12:10
13:12,12
14:20 27:7
30:18 34:17
37:7 41:3
48:20 56:14

109:13,18
58:6 60:24
64:16 72:7
86:23 87:21
91:1,1 93:6
104:9,13
**B**
b 1:3 3:8
101:17,19
back 14:2
26:20 33:5
34:19 37:16
39:14 41:11
42:20 52:23
53:23 54:2
54:7,8,10
54:21,23
55:9,10
79:11,14
80:13,15
86:4 89:20
89:22
based 40:12
74:18 109:1
bench 77:9
best 83:9,7
bidded 12:8
66:12
bids 64:8
bill 63:7
bin 33:3,4
34:21
birth 23:12
45:9
blank 68:14
body 29:2
93:18
bond 73:7,13
73:23 76:19
106:3
bookkeeping
43:1
books 61:13
bottom 71:24
94:7 97:6
102:18
109:9
box 46:19,23
branch
108:20
briefly
107:18
bring 32:5,8
35:21
bringing
41:20
broken 99:18
brought 14:2
32:12 37:15
44:10 48:17
69:20 70:1
88:11

57:13,14
58:6 60:24
64:16 72:7
86:23 87:21
91:1,1 93:6
104:9,13

---

**WILDREDO CINTRON, JR.**
**May 15, 2014**

building 5:11
5:12
15:14,17
46:3 47:6
47:11 54:17
61:1,13
62:10,12
70:22,24
93:6 99:19
buildings
35:9
burger 63:7
bus 77:1

**C**
c 1:5 70:17
70:17,17
71:14,14,14
california
5:10 54:17
108:23
109:4
call 30:13,17
30:23 31:2
31:7 32:15
69:6 98:3
98:11
called 1:11
4:7 29:2
112:4,17
46:19 49:6
68:13 70:9
91:22 101:5
calling 63:8
calls 30:19
68:20
campus 71:11
cant 14:10
22:24 31:15
53:13 56:16
56:19 58:6
67:1,14

72:23 83:3
90:10 92:3
capacity 41:4
captains
58:12
card 43:21,2
carman 58:6
case 25:1,4,9
25:14 26:13
28:16,18
39:4,20
55:12 92:13
92:14 96:2
101:16
category 46:8
caused 33:8
ccdoc 71:18
99:11
cells 44:11
census 100:4
center 1:22
2:7
century
59:24
cermak 86:2
certainty
69:15 70:10
72:10,12
90:23 91:21
92:10 95:12
certificate
112:11
certified 1:20
111:5
certify 111:6
change 5:15
21:11 55:14
92:14 110:4
changed 5:21
22:16 30:5

changes 35:6
51:1 94:4
changing
55:19
charge 30:12
30:22
charged 45:8
chicago 1:22
2:3,8 42:22
112:2
chronologi...
20:19,21
21:1 26:13
36:6 40:24
cintron 1:10
3:3 4:6,13
4:15 111:8
circuit 78:21
civil 1:12
civilian 17:10
17:11 19:13
20:14,17,24
21:1,7 23:6
23:23 24:12
24:14 25:5
25:10,15,17
25:22,24
28:21 30:3
30:22 31:11
31:21 57:5
60:24 70:4
69:15 70:10
72:10,22
84:11,16
85:18 94:20
100:17
92:10 95:12
95:15,16
96:6,15,18
civilians
24:2 29:3
33:2 34:24
53:13 56:16
56:19 58:6
67:1,14

57:7 78:23
79:23 82:23
93:7 97:14
4:5 67:9
83:14 97:24
102:18
charged 45:8
clarify 38:19
40:4
classification
21:24 25:5
34:20 84:24
24:21 28:11
11:24 12:5
65:5
commence...
111:7
commission
112:7
common
21:18 23:19
76:5,7,8,10
80:23
compare
47:21,22
compared
44:12 52:21
comparisons
2:2,23
complete
26:1 95:12
completed
16:1 27:13
29:24 32:18
58:19 84:20
85:3,12
86:24 95:4
column 47:8
54:24 95:16
come 17:15
24:2 29:3
33:2 34:24
53:13 56:16
56:19 58:6
67:1,14

97:12,15
complied
78:12
computer
21:12,14
24:11,14
33:18 34:2
44:17 70:22
70:24 84:5
86:19 95:5
computeri...
111:13
computers
60:3
concentrati...
concerning
111:10
conduct 45:3
conducted
106:5
conducting
44:12 52:21
conference
61:2
confer
21:11 22:17
23:3,6
confirmed
16:1 27:13
29:24 32:18
confirming
21:10
considered
14:23 25:4
25:6 75:8
consistently
constantly
60:3
constitutes
112:14
contact 38:6

---

**WILDREDO CINTRON, JR.**
**May 15, 2014**

43:17 45:7
58:9,10,23
64:17
contents
26:11,20
29:18
continuance
82:4
continuances
80:18
continuation
100:10,14
continued
81:20
controlling
47:15
conversation
59:3,10,15
60:19 61:15
62:20
conversatio...
62:15
cook 1:6,6,18
2:6 4:16,22
9:4,11 11:4
11:11 13:8
15:21 18:18
22:6 65:22
77:14 83:13
108:21
111:2,4
112:6
copy 45:23
46:1 66:24
67:7 79:7
corner 97:6
correct 10:8
13:14,15
14:13,16,24
15:2,3,16
16:7,1 17:6
16:15 17:9

18:19 19:11
21:11,22
22:2,18
23:4,7
83:22 84:6
84:15,17,19
97:23 98:7
92:10 94:2
30:14 32:9
32:10,13,14
32:19,21
33:6,10
34:2,21
35:15 36:9
36:18 39:20
39:21 40:7
40:10,15,16
40:18,23
41:5,21,23
41:24 42:2
45:6,12
46:9,10
49:6,10
48:2,5
100:12,16
101:6 102:4
102:7,14,22
102:24
103:1,14,21
104:2,14,17
105:10,24
107:16
107:24
108:24
corrections
4:17 13:9
15:21 18:19
65:22
correctly
31:3 48:20
corresponds
44:1
couldnt 7:2
10:9,20
31:14,19

78:3,10,20
78:22 80:1
81:20 83:11
83:22 84:6
84:19 85:6
85:12,17
86:11,12
87:6,16,19
88:2 89:4,5
89:9 90:2,3
90:2,5,6
91:17,23
92:8,18
93:3,15
98:8 104:24
15:21 18:18
22:6 65:22
corroborated
11:8 14:16
14:18,19,22
15:1,5,10
15:12,20
18:15 19:9
20:5,20
36:1,12
40:1 41:9
41:21 44:9
50:19 51:2
51:16 55:15
60:14 78:14
80:17 81:19
105:19
courthouse
14:3 88:19
89:8
courthouses

21:52 51:7
57:11 86:17
counsel
111:21,22
count 31:18
96:23 97:3
99:19 100:2
26:16 34:12
36:1,12
40:1 41:9
41:21 44:9
50:19 51:2
51:16 55:15
counties
36:12
county 1:6,7
1:18 2:7
courts 1:14
88:6,20,23
covered
22:21
crawl 112:2
creates 52:1
52:3
criminal
39:8 53:23
54:3,9,13
54:17,21,23
55:7,15
62:4 72:14
112:11
currently
34:16 35:2
45:8 50:15
58:14 63:10

57:6,9
14:21 15:14
21:20 22:4
23:15 77:1
82:5 106:15
cut 51:22
**D**
d 1:24 3:1
70:17 71:14
78:14
d1 105:23
daily 97:3
daley 1:22
2:7
dart 1:6 4:4
60:16,19,22
61:8 62:5
62:15
data 24:11
28:3
database
50:21 84:5
date 26:23
27:1 45:8
57:11 67:13
67:15 75:22
76:16,22
80:18 84:4
87:2,24
96:13
dates 14:11
23:12 78:22
dating 42:19
day 1:24 6:14
8:6 63:16
80:20 81:3
99:20 105:2
107:2 112:3
days 8:12
64:9
dbond 106:2
deal 86:17
dealing 11:21

---

**WILDREDO CINTRON, JR.**
**May 15, 2014**

11:21 79:2
deals 9:17
dealt 10:18
december
1:10:2
deducted
100:2
deep 92:2
defendant
78:17,19
defendants
1:8 2:10
define 50:16
definitely
72:23
definition
10:7
definitive
76:14
delay 33:8,14
34:6 40:10
delayed
33:22
deletes 71:5
delivered
26:16
demand
79:13
department
4:17 13:8
13:11 15:21
18:18 42:22
65:22
depending
81:24
depends 24:2
35:3 45:16
76:11 109:9
deponent
1:9:7
deposed 8:18
8:21
deposition
1:10 4:3 9:7

111:11,16
111:19
depositions
1:16 8:23
9:2
deputies
88:23
describing
56:3
designation
82:20 86:7
detainee
14:20 20:16
23:10 44:20
54:13,21,23
57:6 78:19
99:8
detainees 9:3
9:17 10:1
11:7,11,21
11:24 14:18
14:22 15:2
15:5,10
16:18 20:15
20:19 36:1
detainers
26:17
detainer
4:17 13:8
13:11 15:21
18:42 57:21
65:22
determined
24:18
dictate 9:9
didnt 32:11
48:16 57:21
99:23
different
60:13,20,23
depositions

65:20
direction
111:14
directly
79:23
director 58:4
77:19 95:4
disch 93:2
discharge 9:3
11:8,21
14:16 15:12
18:10,15
30:12 36:12
41:12 53:3
59:8 80:17
81:9 105:17
105:20 50:9
108:6 55:7,10
discharging
41:8 47:4
59:12
discovered
37:21 38:2
discovery 4:3
4:5 17:13
45:17
discrepancy
91:2,4,6,22
92:1 93:12
93:12,14
98:12
disposition
99:19,21,22
dispositions
10:3,19
distribute
19:10
distributed
18:7 19:5

discharged
31:9 42:9
43:16 44:13
88:18,21
89:2 90:22
division 1:2
5:10 12:2
42:2 86:23
29:2 30:7
8:15 9:22
30:14,23
86:9 87:13
88:19 95:17
45:12 47:8
47:16 49:9
50:9,11
documenting
48:9
documents
9:6,13 11:3
56:3,13
doesnt 27:10
doing 35:2
36:3 41:11
59:6 41:8
55:4 61:8
96:20 80:18
92:17 93:2
93:12,14
97:4,5,6,9
dont 7:12
17:17 27:3
48:20 49:20
51:1,2 62:1
62:4 65:9
79:22 109:2
dollars 46:16
donated
46:16
dont 7:12
17:17 27:3
distributed

divisions
54:3,7,11
55:4 88:16
divvy 82:12
dobs 22:21
document
20:4 28:23
66:1 83:12
106:23
documented
89:1 87:22
documenting
48:9
documents
9:6,13 11:3
56:3,13
documenting
documenting
documents
divorced
district 1:1,1
1:14
divide 81:15
divided 81:12
division 1:2
dividing 9:6
does 46:19
80:19
directly
doing 35:2

## Page 5

WILDREDO CINTRON, JR.
May 15, 2014
Page 5

downstairs 30:11 32:20 32:24 65:1 70:5 73:15
dress 25:20 26:1,10,21 27:2,6,21 28:5 29:4 38:16,22 39:6,16 41:15 43:23 44:3,19 45:23 47:3 47:18,22 65:22 66:13 66:21,23 67:16 68:3 70:4 74:19 75:13
dressed 46:3
drop 88:16
dropped 99:1
duflee 1:16 2:24 111:3 112:6
duly 4:2,8 111:9
duties 9:3
duty 6:7,9,11 6:15 37:18 40:3 51:21 63:19,20 64:9,10

**E**
e 3:1,8
earlyon 59:8
eastern 1:2
effective 9:20 36:11,16
efficient 51:16
eight 108:22
either 70:7 100:2
eleven 108:1
email 50:24 51:11 52:19 56:11,18 57:16 58:1 59:4 82:16 82:18,23,23
emailed 57:19 82:12 82:15
emailing 38:22 39:16
employees 30:3 57:5 61:16
enter 21:11 69:16 73:24
entered 69:3 78:5 86:22 95:21
entering 24:11 59:23
entire 20:18 22:21 29:18 40:22
entitled 15:5 15:10,14,20 19:9 40:6
entry 20:8 21:12 35:12 28:22 31:11 48:22 49:4 67:13 70:6 71:1 75:18 84:1 92:16 97:17
envelope 26:20 43:24 44:4,5,20 45:24
equal 81:15
error 37:2,6 37:8,21 38:3,5,16 38:22 39:16
errors 110:4
escort 49:3
escorted 46:2 47:6,10,12 77:9
esquire 2:1 2:5,10,17 31:21 86:22 92:23 95:16 96:6,15,19 111:20,21
establish 21:4
esquire 32:4
evening 6:5 6:20
event 85:19 86:7,11,13 86:21 92:17 92:23
exact 7:2
examination 1:11 3:2 4:10 111:8
examined 4:8
example 25:3
examples
exactly 10:20 23:18 51:13 53:13 56:16 65:2 89:7 93:16 96:2
exam 24:18 14:15 82:11 83:2,3,16 87:22 106:7 96:7
far 23:10,12 27:24 33:21 39:22 43:1

executive 58:4,9,11
exhibit 3:10 65:10,15,20 65:20 69:7 69:19 102:9 107:8,9
exit 93:6
exits 50:5
expect 42:17 42:19,21,23 43:1,12
experience 40:12 83:8 98:2
expires 112:7
explaining 34:5
extensive 24:8
extent 62:10

**F**
face 47:3,11
facilitate 59:19
facilities 109:3
fact 38:24 39:17
fair 12:23 64:2 71:6 85:13 105:1 108:18
fairly 43:4
familiar 10:4 11:6,10
fifth 36:9
find 20:16 26:12 96:1
finally 59:23 60:2
find 20:16 37:4 42:17

46:20 48:23 50:20:58:3 61:6,17 64:24 66:4 74:2 85:19 86:19 88:20 107:6 109:18 fbi 21:18,22 23:13 federal 1:12 ferrara 2:9 16:22:2:8 24:21 28:12 29:13 36:14 39:2 48:11 49:22,24 51:4 52:13 53:16 54:5 55:17 59:13 59:20 60:8 61:4,10,20 63:22 65:2 75:13 81:16 81:18 87:12 88:12,17,19 89:3,8,10 93:5 94:5 100:18 107:8,18 108:9,12,14 109:6,16,20 109:23 110:8 110:15 111:6 fifth 36:9 flags 76:21 flight 47:8 floor 5:23 47:13 floors 35:8 folder 43:7 followed 17:18 following 53:23 follows 4:9 foregoing 111:11 form 14:22 15:1 22:8 24:21 25:20 26:10 27:2,6,21 28:5,11 29:4 32:19

46:12 80:16 94:18 finding 15:2 38:16,18 39:1,19 40:7 78:18 fingerprint 43:2 first 4:8 5:23 11:14 17:10 21:18 65:1,6 66:9 66:16 78:9 84:1 93:24 94:5 107:17 94:7,17,22 107:22 102:7 108:1 11:19 109:8 five 49:9 53:1 102:12 53:7 74:21

## Page 6

WILDREDO CINTRON, JR.
May 15, 2014
Page 6

52:13 54:5
55:17 60:8
62:4,22 65:23
66:13,21,23
67:8,16
70:4 71:9
75:13 77:1
81:4 109:6
forward 44:11
found 20:17 25:8 37:1,6 25:8 37:1,6
foundation 16:24 29:13
53:16 55:17
52:3 70:3,19
80:5,8 81:4
86:15 95:3
four 4:24 6:9 7:21 8:22
17:3 39:8,8
39:9 40:14
frame 48:9 48:23 67:2
free 24:19 46:9 50:6
55:8 71:7
71:11 82:5
104:18
frequent 44:24 59:1
frequently 34:23 36:24
front 23:10 45:6 105:22
further 109:19 110:9
future 80:18 96:13

gathered 47:5
general 8:8 8:12 8:24
88:10,19
10:17 11:1
22:19 27:4
27:7 34:9
38:13 79:8
92:13
generally 7:5 7:18 8:2,5
8:11 12:11
21:15,21
21:21,18,22
45:15 68:18
68:24 69:3
79:2,10
80:5,8 81:6
86:15 95:3
guy 4:2:6
92:1 4:24:9
97:2
getting 33:5
52:24 53:7
80:15
60:3 89:22
109:10
93:5 94:5
19:22 34:4
45:24
given 19:2,4
78:13
given 11:15
gives 41:11
47:2
giving 73:15
88:23
go 14:6 20:15
24:8 29:19
40:22 45:21
46:8 47:7
50:6 54:2
54:10,16

**G**

81:6
58:1
guilty 15:2
25:8,9,11
39:1,9,19
40:7,14
75:2 77:20
78:18,18
guy 28:17
guess 83:9
96:7
guessing
108:22
guesst 99:12
guesstimate

**H**
h 3:8
half 4:24
12:13 38:14
71:24 82:1
105:2
halfway 84:2
hand 47:18
47:19 112:1
handed 78:23
handful
79:24
handing
79:23
handwriting
43:13 67:6
happen 20:13
23:11 31:4
44:22 46:11
106:9
happened
37:14,18
happens
25:19 27:10
46:17
hatton 63:7
havent 58:10
held 13:9
help 53:3
heres 88:24
hereto 111:22
hereunto

112:1
hernandez
102:5
hes 22:20
39:9,10
62:11 63:1
75:2 77:20
84:10 101:8
104:9
hey 96:12
hi 61:17
higher 52:5,9
hill 104:3,5,7
hold 47:17,18
holding
44:11,15
holds 95:21
holmes 58:20
58:23 59:4
59:6,11,18
60:14,22,24
home 94:14
honest 93:8
honestly 72:3
hoover 25:9
hour 23:21
38:14 82:1
hours 6:3
51:22 63:16
82:4 89:21
89:21 90:9
98:8 104:8
housed 13:8
68:1 99:24
houston
70:9 74:2
74:16 75:19
75:20 78:17
79:2,20
hundred 6:9
hypothetical
22:9 109:7

47:19,21
62:18 67:11
67:22 87:16
102:2
idea 27:24
61:12
identificati...
21:18 65:11
65:18 65:17
101:18
identified
98:7
identify
68:17 71:7
82:23 95:6
97:2
ids 83:19
illinois 1:1,7
1:20,22 2:3
2:8,19 111:1
111:4 112:2
112:6
im 111:16:3
16:17 23:18
11:33 38:19
42:14 44:2
50:20 51:21
58:3,7 61:6
61:12,17
62:14 63:8
63:8,19
65:2,10
68:19 70:9
80:20 84:2
84:16 75:12
75:20 78:17
87:22 93:8
98:5 104:8
106:24 111:8
107:7,17
108:9,22

id 3:9 7:4
10:15 31:19
37:3 46:1

## Page 7

WILDREDO CINTRON, JR.
May 15, 2014
Page 7

109:18
imacs 20:9
21:13 24:16
24:20,24
25:5,10,15
25:17 28:22
29:20 83:21
92:11 93:23
93:24 94:4
94:12,14
95:17,24
96:2
impact 57:22
implemented
17:16
incarcerated
22:5 46:12
96:10
incarcerati...
42:20
incell 84:14
89:14 93:10
included
69:23
includes
65:21
incorrectly
16:5
indirectly
1:11:23
individual
19:10 21:4
22:18 28:16
30:18 32:2
32:9,13
33:21 35:13
36:9 37:10
37:13 39:18
40:10 45:21
48:1 49:13

55:6 65:5
69:5 70:1
70:22,23
71:3,18
76:17 79:6
87:24 88:11
88:11 89:3
89:20,23
90:2,8 91:6
91:7 95:24
96:17,24
98:13,21,22
102:12
103:20
104:20
107:14
internal
46:15,22
internet
83:23 93:4
interview
44:12 76:12
77:5,8,8
intranit
84:18 85:5
85:8,8
investigation
23:22 24:1
24:10,17
42:8 45:2
investigatio...
24:5,8
involved
40:20
ir 23:13
isnt 18:13
21:24 27:9
77:18
issued 9:14
issues 33:14
ive 39:22

inside 26:20
instituted
51:14
instructed
76:17 77:9
instruction
6:21
intake 11:22
interact 65:8
interested
111:23
interlock
47:14 49:9
49:18 50:6
71:22,22,23
102:12
103:20
104:20
107:14
individuals
29:17 44:10
individuals
46:15,22
interpret
83:23 93:4
interview
44:12 76:12
77:5,8,8
intranit
84:18 85:5
85:8,8
investigation
23:22 24:1
24:10,17
42:8 45:2

50:1 109:20

**J**
jail 4:22 9:4
9:11,17
10:19
11:4,11
11:15,21
22:6 23:14
35:5 42:20
46:13,17,24
47:16 50:23
53:23 55:9
55:16 57:5
58:5 67:11
71:4 77:14
81:10 97:20
104:8
january 1:3
4:4,5 67:9
69:8 77:24
83:12,14
86:10 93:19
96:23 97:24
102:9,18
januarys
68:3 78:24
79:4
javaute
100:18
jeff 55:23
jill 2:9
job 16:1
46:21
johnson
55:23,24
65:8
jr 1:10 3:3
4:6,13
judge 55:7
78:21 88:21
89:1

judges 26:15
83:2,4,9
judgment
83:9
june 5:16
112:3
jury 78:18
jw 78:16

**K**
kathleen 1:16
2:24 111:3
111:3
keep 29:23
keeping
35:17
keeps 27:22
104:8
kind 14:20
37:8 59:15
84:2
layer 17:7
leads 21:3,9
21:10,11,16
22:2,7,14
22:19 23:1
23:4,6,9,22
24:1,3,4,7
24:10,18
26:17 29:19
31:9 33:11
30:14,23
42:7,23
learn 56:6
leave 15:8
76:15 77:21
102:1
leaving 45:23
48:5
left 46:14
70:22 99:22
86:21 99:11
lefthand 97:6
letter 49:22
56:18

99:12
103:22,23
104:5 106:9
108:20
knowledge
6:21,24 7:5
7:10,18
17:4,6
18:21 20:4
33:11,16
48:7,13,15
49:8 54:9
55:19 56:5
63:18 71:19
73:4 92:5,8

**L**
large 43:4
layer 17:7
leads 21:3,9
21:10,11,16
22:2,7,14
22:19 23:1
23:4,6,9,22
24:1,3,4,7
24:10,18
26:17 29:19
31:9 33:11
30:14,23
42:7,23
learn 56:6
leave 15:8
76:15 77:21
102:1
leaving 45:23
48:5
left 46:14
70:22 99:22
86:21 99:11
lefthand 97:6
letter 49:22
56:18

## Page 8

WILDREDO CINTRON, JR.
May 15, 2014
Page 8

105:22
lewis 63:23
63:24
lieutenant
16:3,12
63:21,23,24
64:3 75:4,6
lieutenants
58:17,19
line 47:24
66:16 67:13
69:11,20
70:16,20
73:7 74:21
75:15,20
84:20 85:7
89:10,16
91:16 93:15
93:16 103:8
109:9
lines 76:5
little 52:4
living 98:7
101:8 103:3
lobby 47:15
50:9,11
location 5:12
51:18
locations
63:23 64:3
98:9 103:1
103:3
m 1:16,24
2:24 6:22
logbook 49:7

logs 33:12
48:8
long 4:21 5:4
7:19 65:14
65:14
100:20,20
111:3 112:6
lobby 107:13
look 47:21
68:12 86:16
77:22 78:1
87:5 94:6
95:22 69:8
78:1 84:1
85:7 94:19
looked 59:23
looking 62:21
63:9 69:7
77:4 87:13
88:14 90:7
looks 68:4
68:14 97:13
103:3
loud 70:7:23
78:5 83:10
31:6 31:1
32:23 33:11
35:5,19
38:1 44:4
43:15 107:4
lot 60:10
15:24 26:14
28:21 29:19
30:23 36:11
40:23 68:20
75:18 85:1
mark 65:9
86:22
march 16:17
17:18 18:1
18:21 19:23
lunch 20:22
machine 20:9
morning 6:18
m 1:16,24
2:24 6:22

6:22 7:1,1
7:10,10,19
7:19 65:14
106:22 84:1
106:21,22
mark 65:9
65:19 82:16
102:7
mark 65:9
86:22
match 76:22
matching
26:14
matters
34:18 36:1
matter 43:15
mean 15:7
16:2 19:19
79:17 81:9
means 14:18
15:24 26:14
28:21 29:19
20:3,6,10
29:21 36:1
31:22 32:7
34:8,16,22
34:15 48:2
48:16,19,22
54:5,6,11
56:17
54:14,24
mentioned
9:22 16:7
30:13 59:7

message
42:23
michael
58:20
middle 23:12
94:20 97:24
midnight
98:3,14
minutes
23:24 38:14
45:17,18
markham
51:4
misinterpr...
82:9
mistakes
36:21
mitt 20:14
78:22,24
79:17
missed 8:17
morrissey 2:2
2:4 3:4 4:3
4:4,11 17:1
22:12,23
25:2 28:19
29:21 36:1
31:22 32:7
34:8,16,22
34:15 48:2
48:16,19,22
54:5,6,11
56:17
54:14,24
mentioned
9:22 16:7
30:13 59:7

mittimus
83:6
mitts 18:5
mitt 20:14
middle 23:12
94:20 97:24
modified
81:12 82:3
88:23 89:1
moment 71:7
71:11 78:1
107:22
moods 6:19
morning 6:18
6:19,20
mornings 6:18
6:19,20
morrissey 2:2
2:4 3:4 4:3
4:4,11 17:1
22:12,23
25:2 28:19
29:21 36:1
31:22 32:7
34:8,16,22
34:15 48:2
48:16,19,22
54:5,6,11
56:17
54:14,24
87:2 88:10,20
90:14 92:16
93:19 95:11
96:9 101:18
101:16,20
106:10,21

TOOMEY REPORTING
312-853-0648

---

**WILDREDO CINTRON, JR.**
**May 15, 2014**

107:12
105:13,13
108:17
109:12,19
109:22
**move** 11:23
86:24
**moved** 85:3
89:8 91:22
97:19,20
98:6,9
100:1
**movement**
83:18 85:24
86:4,18
92:12 99:2
**moves** 83:14
86:10 96:8
96:9
**moving** 85:8
**multiple** 39:6

**N**
**n** 3:1
**name** 4:4,12
4:13,14
21:18,19
27:20 31:14
31:16 58:7
63:11 64:12
66:1,3 67:8
67:19 69:16
72:6,8
73:17 76:4
99:4,7
100:17,20
100:20
102:17,23
**named** 97:24
**names** 22:15
22:20 23:12
62:1
**necessarily**
76:3

**need** 16:3,4
**needs** 20:18
43:15
**never** 39:22
59:15 62:14
**new** 53:10
56:21 58:1
59:4,7 60:2
61:1 62:10
62:11
109:13
**nicknames**
63:9
**nine** 5:8
64:16
108:22
**normal** 66:5
**northern** 1:1
**notary** 1:16
111:3 112:6
**notation**
18:22,24
34:9 33:14
34:5,10
43:13 68:16
68:18 70:3
73:4 74:14
91:2,4 92:11
92:11
**notations**
31:22 34:13
43:14 92:15
**note** 27:11
33:18 66:22
74:18 90:18
90:20 92:11
**noted** 33:22
**notes** 43:9
**notgulity**
38:18
**notify** 51:18
**notify** 96:12
**number** 3:9
72:3,12

21:18,22
22:7,14,16
25:1 32:1
45:10 66:16
67:5,11,22
68:21 69:1
69:4,5,9
70:10 72:18
73:21 74:10
75:16 76:4
76:13,22
102:20
105:16
106:2
**numbers**
22:2 23:13
23:13 26:13
67:1,3 96:2

**O**
**o** 70:17 71:14
93:16
**o8** 5:19,21
30:6
**object** 22:17
**objection**
16:24 22:8
24:21 28:12
29:13 36:14
39:2 48:11
51:4 52:13
53:16 54:5
55:17 59:13
59:20 60:8
61:4,10,20
62:8,16
64:22 71:9
80:5,8 81:4
86:15 95:18
101:9,15
105:11
106:7,16
109:6,16
**obligated**

90:4
**obligation**
74:18
**observe**
60:22 77:21
**observed**
46:22
**occasion**
10:12 34:14
44:22
**occasionally**
60:16
**occurrences**
107:1
**ofc** 69:11
70:10
**offense** 95:23
**offenses** 94:8
95:24
**offhand** 9:18
72:9
**office** 13:1,3
13:6,7,14
13:16,21
14:15
17:12 18:4
18:21,22
19:3,5,7
20:1,5,9,13
26:15,16
27:18 28:9
29:8,11
30:4,21
32:8 33:2
34:17,24
35:7,7,10
35:18,21
36:4 41:17
42:12 48:9
48:16 54:2
56:7,8,12
57:20 79:6
79:17 82:23

97:11 101:3
112:2
112:22
**officer** 5:2,4
5:6 8:24
11:16 12:14
17:14,15
18:13 30:12
32:1 33:1,4
33:12 34:20
34:23 35:17
36:2,22
37:1,6 38:2
38:16 39:23
45:14,19
47:2,14,17
47:20 48:1
48:4,17
69:14,16,18
73:7,13,14
76:12,19
91:5,24
92:6,7,8
92:9 93:9,9
93:10,11,14
95:5,8 97:6
102:5
103:15,16
103:17,18

**official** 37:24
66:12 82:17
82:18
**oh** 93:9
10:3
108:13
**okay** 65:12
93:9 101:7
107:21,24
108:4,14,16
109:22
**old** 35:17
60:7,11,13
one 16:21
18:4 20:14
20:17 26:9
27:14 81:18
71:18 88:18
99:22
**onepage** 86:9
**ones** 18:5,9
19:9 76:18
80:17
**opened** 61:1
62:10
**operational**
33:19
**opinion** 60:6
**options**
109:23
**oral** 44:12
**order** 8:8
9:16,19
10:2,4,6,10
10:14,17
11:1,2
20:20,21
21:1 26:13
27:4,7 34:9
36:7 40:24
ordered 18:3
18:10 54:4
orders 91:4
9:15,22,24

**TOOMEY REPORTING**
**312-853-0648**

---

**WILDREDO CINTRON, JR.**
**May 15, 2014**

18:9 19:8
99:22
**org** 82:19
**original**
42:20
**originally**
28:4,9 57:7
**outcome**
111:23
**outgoing** 21:5
80:14
**outside**
108:23
109:4
**outstanding**
23:17 26:17

**P**
**p** 1:24 6:22
7:1,10,19
65:14,14
78:17
106:20,20
**pack** 15:24
16:3,7,11
16:13,18,22
17:2,7,11
17:22 18:2
26:9 27:17
28:10,14,15
28:24 29:18
32:17,20,23
36:9,22
37:15,17
38:3 39:23
40:1,10,14
42:1,4,15
42:18 43:7
43:20 44:3
57:22 67:17
67:18 72:13

49:22
**pending**
29:20 87:20
**people** 15:12
22:1 36:12
82:16
50:8 51:18
52:6 54:16
59:12 64:21
80:15,23
81:2,6 82:3
82:5 100:1
84:6 89:3
106:3 109:3
**perform**
23:22 24:1
31:2,6
32:15 69:6
**period** 99:22
**periodically**
33:1
**person** 9:10
15:9,19
16:5 17:7
21:20,24
22:15,15
24:18 29:3
31:8 36:1
38:23 39:24
40:5,6 41:9
42:9 43:14
44:12,15
46:4 47:3,4
49:16 50:5
50:6 51:2
54:21 55:9
62:17 68:20
71:11,21
76:14 78:14
86:4 97:19

104:19
107:5
**personal** 46:5
50:13 62:15
46:7 60:1
**personnel**
36:11
**pertaining**
1:14
**phone** 30:13
31:26
32:15 69:6
**photo** 46:19
46:23
**physically**
19:2 27:19
**pick** 46:17
55:5 77:22
**picked** 22:1
**picture** 63:23
**pink** 45:23
**place** 26:19
30:16 35:4
35:5 39:5
51:3,11
111:17
**placed** 21:14
42:9 43:14
93:14,15,16
**posted** 106:5
**posts** 83:18
**pound** 8:12
31:6
**plaintiff** 1:4
1:11 2:5 4:7
**plaintiffs**
6:21 68:1
68:20 71:7
71:11,21
**play** 65:1
**please** 4:12

**38:19** 50:16
**png** 78:16
**poor** 46:19
40:4 45:22
46:7 60:1
**policies** 9:9
36:11
**policy** 8:18
18:17 51:1
54:1 56:4
101:16
**poor** 46:19
46:23
**position**
31:6
22:15 69:6
**possibly**
111:1
**possibly**
111:1
**pass** 11:23
68:20 71:7
71:11,21
76:14 78:14
86:4 97:19
94:11
**post** 9:15,22
9:24 10:2,4
10:6,10,13
11:1 83:19
93:1 114:6
**posted** 106:5
**posts** 83:18
**pound** 8:12
31:6
**power** 41:20
8:19
**power** 79:6
79:16

67:17,18
**preparing**
25:20
**present** 2:1
12:11 44:20
**presently** 5:9
5:17,24 6:6
7:23 35:5,8
35:12 41:4
50:17 52:7
55:12,22
64:2 74:17
112:4,13
**press** 61:2
**pretty** 13:23
**previous**
100:11
111:7
**previously**
11:2 28:21
68:8 72:17
73:10
**print** 96:15
96:19
**printouts**
46:2
**prior** 5:1
17:7 22:5
46:23 53:10
55:24 70:13
88:12 89:22
91:7,18,21
96:6
**priorities**
84:4
**prioritizing**
85:24
**priority**
85:18,19
86:3,5,7,11

**TOOMEY REPORTING**
**312-853-0648**

---

**WILDREDO CINTRON, JR.**
**May 15, 2014**

86:21 92:17
92:23
**privy** 106:12
**proactive**
96:11
**prob** 68:6,11
103:9
**probably**
75:22
**probation**
15:5 25:14
25:15 34:17
38:24 39:10
39:17 40:5
40:14 68:12
90:20 92:1
92:17 98:12
103:12
**procedure**
1:12 11:11
17:16,18
18:18 22:17
36:3 40:13
50:14,24
51:1,11
52:5 53:10
55:14 56:6
56:11,21
59:1,24
109:13
**procedures**
9:9 11:7
51:7
**proceed**
20:15
**proceedings**
111:15
**process** 33:10
33:14 35:4
59:12 60:9
51:23 52:19
55:1,2 59:9
59:12,14
60:7,20

82:1 95:12
107:2 109:3
**processed**
52:6 54:22
**processing**
79:23
**produced**
**production**
44:6 49:20
49:21
**production**
49:24
**promoted**
12:16,20
**prone** 61:12
32:9 36:12
**property**
11:22 46:5
**proper** 26:15
36:12
**property**
11:22 46:5
**proper** 26:15
36:12
**property**
12:10 52:10
51:9,18,20
71:19,22
**providing**
57:24
**public** 1:18
111:3 112:6
**pull** 29:17
96:1
**pulling** 96:7
**purpose** 31:6
**pursuant**
1:11 8:8
**pushed** 86:4
**put** 12:9 14:8
72:19,22
91:8 18:12
**reading**
84:24
111:18
**reads** 26:16
90:13,20
**ready** 28:10
29:19 46:8
**really** 27:9

56:10,15
57:24 62:3
65:6,7
**question**
10:17 19:17
19:19 38:19
39:14
109:11
**questioning**
45:14
**questions**
40:5 45:5,7
45:11 61:13
101:18
103:14
43:24
69:5 79:9
79:21 98:22
99:8
**receives** 20:6
20:14 26:9
28:4 42:15
**receiving**
4:19,21,23
5:1,2,7,9,12
5:22 6:7,11
6:15,22 7:1
7:7,11,20
7:22 8:2,11
8:24 10:11
11:6,14
11:8,12,12
12:22,24
14:6,9,12
15:13 17:14
17:14,21
29:3 30:11
30:20 32:5
32:24 33:1
34:20,23
37:5,12,19
34:20,23
37:1,6,22
38:21,16,21
38:22 39:15
39:23 40:23

**reason** 100:2
**recall** 11:14
37:5 62:7
78:24 107:1
107:3,4,6
**receipt** 79:18
106:2
**receive** 17:2
19:7
**received**
18:23 19:14
20:9 31:4
69:5 79:9
**receives** 20:6
20:14 26:9
**recorded**
**record** 41:12
33:5 37:20
34:23 37:20
37:1,6,22
**reed** 4:1,3 5:3
**reding**
84:24
111:18

40:17 41:7
41:10,19
42:14 44:2
44:16 45:3
45:15 48:6
48:16,24
49:12 52:2
52:3,18,22
53:14 54:8
54:9,14,22
56:12 57:21
58:14,16,17
58:22 60:17
63:4 64:6
63:4 64:6
70:2,5
71:20 73:7
73:13,15,16
73:23 74:3
74:6,13,17
74:23 75:24
75:24 76:21
77:6,8 81:7
80:2,4 76:20
90:5 91:13
93:18,18
93:18,18
93:18,18
97:14 98:21
98:24 99:10
101:8
99:16,17
101:6 109:2

111:14
**recorded**
66:22
**records** 13:1
13:5,6,7,7
13:10,14,16
13:21 14:1
14:5 17:12
18:4,8,12
20:24 21:2
21:26,58:10
28:3,9,24
29:4,9,22
44:22
**reed** 4:1,3 5:3

**TOOMEY REPORTING**
**312-853-0648**

---

**WILDREDO CINTRON, JR.**
**May 15, 2014**

92:2,9,10
92:12,17
97:11 98:3
101:2 106:6
106:9,9
**recordsoffice**
82:19
**recover** 46:9
**reduced**
41:9,15
**refer** 10:10
**referred** 51:9
**reflect** 20:5,9
28:23 29:1
29:23 33:14
48:5 79:22
**reflected** 25:9
25:18 38:23
39:18 43:9
95:17
105:16
**reflecting**
27:12 48:16
**reflects** 91:10
98:2 101:7
**reduced**
91:14
**refer** 10:10
**regarding**
9:3 31:22
46:23 51:18
59:4 101:18
**regular** 12:8
12:22 64:17
**regularly**
64:5
**relate** 8:23
**related** 107:1
**relating**
11:19 77:1
**relative**
11:1 20:21
**release** 15:20
15:23 18:3
19:10 25:4

25:9,14,20
26:1,10,21
27:2,6,21
28:5,9,18
31:3,5 35:3
38:17,23
39:6,12
41:19,23
42:9 49:24
**removing**
36:4
**report** 63:21
64:3
**reported** 2:24
**reporter** 1:20
100:11 111:5
**reporting**
110:1 111:5
**represent** 4:5
**request** 41:24
**required**
27:11 34:10
37:20 33:5
30:9 33:5,8
**remand**
46:24 47:24
37:20 30:1
**remanded**
50:24 51:24

52:24 53:24
54:24 55:24
77:18,20
89:2
90:19 91:22
92:16,18
95:13 96:24
97:1 98:3
104:10,10
104:24 105:1
107:6,9
106:22
**removing**
36:4
**response**
10:13,18
16:14,18,19
16:19,23
17:7,11
17:11
**responses**
21:10
**responsibil...**
8:24 11:18
**responsibl...**
14:1 16:4,7
15:24 18:1
19:20 23:8
29:19 33:14
**responsible**
18:14 67:15
36:5,22
**result** 52:18
**retrieve**
35:20 46:22
**reviews**
16:10 17:23
**returned**
37:15 81:9
39:23 41:5
**right** 12:2,13
14:23 15:15
23:4,24
24:5,12
24:19 25:22

73:24 74:14
77:18,20
89:2
111:14
requires 27:5
reserve
90:18
respond
110:4
reviewed
10:13,18
16:14,18,19
16:23
17:7,11
responsibil...
11:14 16:4,7
15:24 18:1
**reviewing**
14:1 16:4,7
15:24 18:1
**revised** 16:23
**richard** 54:4
36:5,22
**right** 12:2,13
14:23 15:15
right 12:2,13
23:4,24
24:5,12
24:19 25:22

41:8,17,19
50:22 56:13
57:18,22
72:13 73:1
73:24 78:9
80:3,13,16
80:3,13,16
82:12 91:7
110:3,5
**reviewed**
10:13,18
16:14,18,19
16:23
17:7,11
17:11
16:19,23
17:11
**right** 12:2,13
14:23 15:15
23:4,24
24:5,12
24:19 25:22
21:3,5,13
34:23 41:8
40:18,20
72:18,21

**TOOMEY REPORTING**
**312-853-0648**

## Page 13

| | | | | |
|---|---|---|---|---|
| 75:8,10 | 98:22 | 110:4 | 103:7 | 52:1,4 | 22:6 27:16 |
| 77:5 78:16 | saw 38:17 | seal 112:2 | 105:23 | 53:14 57:21 | 27:22,24 |
| 82:20 85:15 | 55:8 67:8 | seat 46:2 | 108:5,7 | 58:8,22 | 60:16,19,22 |
| 85:18,19 | 68:6,13 | second 94:9 | sen 23:24 | 62:23,23 | 61:8 62:5 |
| 99:5,21 | 69:11 70:16 | 100:17 | 43:4 96:24 | 63:1,3,5,6,7 | 62:15,21 |
| 100:7 | 71:24 73:7 | section 10:3 | send 49:24 | 63:10 66:3 | 81:20 82:19 |
| 95:13 99:2 | 74:21 84:9 | 11:24 27:9 | 54:7 | 66:6,9,10 | 106:11,13 |
| 99:5,21 | 84:11,14,16 | 43:24 95:23 | sent 17:14 | 67:3 73:16 | 109:13 |
| 100:7 | 84:18,20,22 | 97:21 | 30:11 46:15 | 74:6 75:7 | sheriffs 54:2 |
| 102:15,21 | 85:18,21 | sections 94:7 | 50:21 57:16 | 76:2,3 78:1 | 61:16 83:13 |
| 104:1,21 | 87:2,5,7,18 | security | 74:8 78:9 | 78:8 79:9 | 86:6,22 |
| 105:4,7,17 | 87:24 88:3 | 22:16 45:9 | 18:11 | 79:17 80:4 | 92:22 |
| 107:14 | 89:10,13,13 | see 18:5,9 | separating | 81:9,13 | shes 64:9 |
| 108:13 | 89:16 92:16 | 19:9 31:19 | 112:7 | 82:8 83:1 | shift 6:7,18 |
| role 64:20 | 92:20 93:1 | 42:19,21,23 | september | 89:19 95:3 | 6:22 7:1,6,7 |
| 66:2 | 94:20,23 | 43:1 62:18 | 112:7 | 96:24 | 7:10,19 |
| room 17:15 | 98:19 99:17 | 63:10 65:23 | separated | 100:24 | 8:15 13:20 |
| 29:3 30:2 | 100:13 | 66:22,24 | 4:23 5:1 | 102:10 | 52:7,9,23 |
| 32:5,9 33:1 | 101:21 | 67:3,9,13 | 6:15 7:22 | 103:11 | 53:12,18 |
| 44:2 54:8,9 | 102:20 | 67:14 68:7 | 9:10 10:10 | 104:3,5,7 | 58:19 62:24 |
| 88:18 91:13 | 103:9 104:3 | 68:14,16,21 | 11:16 12:17 | 107:13 | 63:2 |
| 91:15 93:18 | 104:16 | 69:9,11,18 | 12:20,24 | sergeants 6:6 | shifts 6:1,14 |
| rotate 8:12 | 108:5 | 69:21 70:17 | 13:3,10,14 | 6:9,10,21 | 6:17 |
| route 93:11 | scan 87:23 | 72:1,4,15 | 13:17,21 | 7:18 8:15 | shirt 69:14 |
| routinely | 89:2,5 90:5 | 72:22 73:8 | 14:5,9 | 27:3,3 | 46:5 |
| 23:21 43:20 | scanned | 74:4,22 | 17:12,13,21 | 50:21 57:20 | short 69:14 |
| rts 5:11,17 | 50:21 56:12 | 75:16 77:1 | 18:18,21 | 81:11 82:11 | shorthand |
| rules 1:12 | 83:19 85:4 | 78:16 79:5 | 19:7,16,17 | shorthand | 1:20 111:5 |
| run 13:16 | 85:15 88:6 | 83:14 84:2 | 19:24 26:4 | 1:20 | shot 96:16 |
| 21:3 34:8 | 88:9 93:5 | 84:20 85:18 | served 14:23 | 44:13 | 96:19 |
| 39:22 | 93:10,12 | 85:18,21 | 46:5 | shots 96:16 | shouldnt |
| running | scanning | 86:13 87:3 | 27:11,14,19 | 96:19 | 4:9 |
| 21:17 23:11 | 56:21,24 | 87:8,24 | 27:20 28:4 | shouldnt | show 107:7 |
| 31:18 96:22 | 88:8,15,17 | 88:18 91:4 | seven 107:22 | 4:9 | showing |
| 97:3,18 | schedule 87:2 | 90:14,21 | seventh | show 107:7 | 65:19 |
| 99:14,19 | scheduled | 91:11,19 | 108:5 | showing | shows 91:15 |
| | 86:3 96:9 | 93:20 94:7 | sheahan | 65:19 | 93:1 |
| **S** | screen 93:23 | 94:21 95:20 | 64:11,13,14 | shows 91:15 | 93:18 |
| s 3:8 | 93:24 94:9 | 95:24 96:8 | 68:10,20 | 93:1 | sids 23:1 |
| saith 110:9 | 96:1,16,19 | 97:6,23 | 38:10,20 | 93:18 | sign 26:20 |
| 96:1,16,19 | 97:6,23 | 99:15 40:3 | 39:15 40:3 | sheet 36:5,5 | 41:13 43:20 |
| satisfied 41:7 | screens 92:13 | 98:7 99:15 | 41:4,7,13 | 40:22 | 44:3,6 |
| 45:20 | 99:11 94:11 | 100:8,18,21 | 41:16,18 | sheets 19:20 | 72:12 75:3 |
| saying 15:9 | 96:5 | 101:21 | 43:19 44:3 | 24:2 79:3 | 75:13,14 |
| 23:14,18 | scriveners | 102:9,18 | sheriff 1:6 | 77:13,16 |

## Page 14

| | | | | |
|---|---|---|---|---|
| 110:5 | 12:16,18 | 48:19 49:7 | 78:4,7,11 | 103:2,5,8 | 47:2 |
| signature | 13:19 14:4 | 49:10 50:7 | 79:2,7,7,11 | 103:10,12 | soontobere... |
| 27:9 43:2 | 14:7,10,11 | 50:10 51:19 | 79:19,22 | 103:14,19 | 48:16,18 |
| 43:22 44:1 | 14:14,17,24 | 52:11 53:6 | 80:2,22 | 103:21 | sorry 13:23 |
| 66:14 72:9 | 15:3,6,11 | 53:9,13,24 | 81:11,21 | 104:2,6,13 | 29:14 38:19 |
| 72:18 74:8 | 15:16,22 | 54:5,19 | 82:6,14,21 | 104:15,17 | 58:7 63:8 |
| 75:10,19 | 16:9,12,21 | 54:15,19 | 82:24 83:4 | 104:22,24 | 66:15 72:13 |
| 77:13 78:20 | 17:17,20,24 | 55:20 56:2 | 83:7,11,15 | 105:8,10 | 93:9 98:5 |
| 83:6,10 | 18:11,16,20 | 56:5,19,23 | 83:17,21,24 | 105:13,18 | 100:8 |
| 103:13,22 | 19:12,19 | 57:4,7,11 | 84:3,6,8,10 | 105:21,24 | south 2:2 |
| 103:23,24 | 20:2,7,11 | 57:14,17,23 | 84:13,21,23 | 106:4,12,24 | special 22:2 |
| 104:1,11 | 20:23 22:3 | 58:21,24 | 85:14,17,20 | 107:3,16,24 | specific 8:9 |
| 109:24,24 | 22:11 23:2 | 59:2,5,15 | 85:22 86:8 | 108:4,8,16 | 9:16 27:9 |
| signatures | 23:2,5,18 | 60:15,18,21 | 86:12,23 | 108:19,22 | 49:15 83:5 |
| 26:15 83:2 | 23:20 24:6 | 61:6,12 | 87:4,6,9,15 | 108:24 | 99:20 |
| 83:4 | 24:9,13 | 62:1,4,18 | 87:17,19 | 109:1 | specifically |
| signed 27:1,6 | 25:12,16 | 62:22 63:1 | 88:2,4,8 | sit 47:3,20 | 53:8 |
| 44:19,19 | 25:23 26:7 | 63:15,17 | 89:6,9,12 | sits 77:9 | specified |
| 66:22 74:18 | 27:15 28:1 | 64:19 65:24 | 89:18,24 | sitting 73:5 | 111:24 |
| 103:15 | 28:6 29:1,6 | 66:2,7,15 | 90:3,6,9,15 | situation | spectrum |
| significance | 30:1,8,15 | 66:18,24 | 90:17,19,22 | 17:8,10 | 22:22 |
| 72:24 | 30:19,24 | 67:7,12,14 | 90:23 91:3 | 23:18 | speculating |
| significant | 31:12,19 | 67:20,23 | 91:14,17,23 | situations | 28:7 |
| 40:9 52:12 | 32:6,10,14 | 68:2,5,8,10 | 92:4,8,19 | 18:3 | speculation |
| 52:15 | 32:22 33:7 | 68:15,17,20 | 92:21,24,24 | sites 81:8 | 105:11 |
| signing 44:2 | 33:10 34:3 | 68:23 69:2 | 93:3,6,10 | 107:17 | speed 53:3 |
| 74:11,14,18 | 34:6,10,14 | 69:5,7,10 | 93:14 94:3 | sixth 41:11 | 59:11 |
| signs 27:20 | 34:22 35:1 | 69:19,22 | 94:14,19,22 | slower 40:13 | speeding |
| 28:5 29:4 | 35:11,23 | 70:8,12,15 | 94:24 95:2 | social 22:16 | 59:9 |
| 41:10 43:23 | 36:10,19,23 | 70:18 71:2 | 95:10,14 | 45:9 | spell 4:14 |
| sir 4:18 8:10 | 37:19,23 | 71:6,16 | 95:19 96:4 | sol 15:7,9 | spoke 31:24 |
| 5:3,10,14 | 38:4,7 | 72:2,5,7,9 | 96:17,21 | 101:21,24 | 32:1 69:16 |
| 5:18,20 6:2 | 40:11,16,19 | 72:19 22 | 96:24 97:2 | somebody | ss 111:1 |
| 6:13,16 7:2 | 40:21 41:3 | 73:2,6,9,12 | 97:16 98:1 | 31:4 33:15 | stack 81:16 |
| 7:12,16,24 | 41:6,15,22 | 73:18,20,22 | 98:15,18,20 | 33:18,23 | stacks 81:15 |
| 8:7,10,13 | 41:24 42:3 | 74:2,5,7,9 | 99:18 100:5 | somebodys | 82:1 |
| 8:17,21,24 | 42:6,13,18 | 74:12,14,16 | 100:9,12,16 | 22:4 | staff 26:16 |
| 9:1,5,8,12 | 43:3,6,8,11 | 74:23 75:5 | 100:18,20 | someone | stages 99:8 |
| 9:14,18,21 | 43:21 44:17 | 75:9,11,14 | 100:24 | 50:16 52:15 | staging 93:15 |
| 9:23 10:5,7 | 44:24 45:7 | 75:17 76:7 | 101:2,4,6 | 83:24 | stairs 47:8 |
| 10:9,20 | 45:1,13 | 76:9,12,18 | 101:7,11,11 | sometime | 49:4 93:5 |
| 11:5,9,13 | 46:7 47:1,9 | 76:23 77:2 | 102:4,6,6 | 44:14 | stamp 26:16 |
| 12:3,5,10 | 48:3,6,13 | 77:5,7,17 | 102:11,16 | soontobefree | 28:20 78:21 |
| | | | | | 79:5,11,20 |

## Page 15

| | | | | |
|---|---|---|---|---|
| 79:22 | 29:5 30:10 | 74:13,17,21 | take 21:2,15 | telling 37:12 | 68:14,21 |
| 108:10,11 | 35:24 39:24 | 74:24 75:1 | 23:1,21,24 | 82:4 | 69:9 70:6 |
| standing 45:6 | 41:8 44:8 | 75:6,8,12 | 26:11 28:8 | tells 47:3 | 71:14 72:6 |
| 47:24 | 45:19 47:4 | 75:15 76:19 | 28:15 45:15 | template 83:5 | 72:20 73:17 |
| star 32:1 | steps 95:11 | 76:24 100:4 | 63:17 78:1 | 83:7 | 73:21 74:3 |
| 66:16 68:21 | stick 92:13 | 104:12 | 81:22 82:1 | ten 7:4,13,14 | 74:10 75:10 |
| 68:24 69:3 | store 50:11 | supervisors | 94:9 97:7 | 11:12 23:24 | 75:16 82:22 |
| 69:5,9 70:9 | straight 12:8 | 28:2 33:17 | 107:22 | 28:16 | 83:7 84:7 |
| 72:18 73:21 | street 87:16 | 33:23 34:10 | 108:2 109:2 | terminology | 90:1,16,18 |
| 74:10 75:16 | stricken 15:8 | 34:13,15 | taken 1:11,16 | 46:20 | 92:17 93:12 |
| 75:22 76:4 | 102:1 | 40:18 53:21 | 38:11 110:1 | testified 4:5 | 94:17 95:1 |
| 76:13,16,22 | strike 5:5 | 58:2 104:11 | 111:16 | testify 111:9 | 96:18 98:11 |
| start 23:8,11 | 15:17 17:4 | suppose | takes 27:17 | testimony | 98:16 99:4 |
| 25:20 36:2 | 21:24 26:23 | 105:8,13 | 28:3 86:5 | 16:6 51:5 | 99:14 |
| 44:12 53:1 | 33:16 41:17 | supposed | 106:14 | 111:15 | 100:20 |
| 79:23 81:16 | 47:11 82:7 | 69:23 75:1 | 100:7 | that 2:2,15 | 102:17,20 |
| 94:3 | stuff 63:9 | 75:2 | talk 23:3 50:2 | 18:17 23:18 | 103:1,6,13 |
| started 29:24 | suggest 110:7 | sure 15:23 | 58:2 59:6 | 30:21 31:1 | 104:14 |
| 57:13 91:8 | superinten... | 16:3,5 | 94:14 97:7 | 39:11 41:11 | therere 18:1 |
| 99:23 | 55:22,24,24 | 21:13 22:12 | 33:23 58:18 | 41:23,24 | 18:11 19:4 |
| starts 25:21 | 56:1,7,10 | 22:20,21 | 54:20 57:15 | 44:4 46:14 | 19:5 31:9 |
| 26:12 88:18 | 56:15,20 | 26:12,14,17 | 59:5 63:12 | 47:22 49:6 | 35:1,2,9 |
| startup 56:14 | 57:24 62:2 | 29:18,20 | 66:8 72:17 | 54:16 62:20 | 83:1 93:22 |
| staszak 63:5 | 65:6,7,7 | 30:3 41:10 | 73:11 78:8 | 63:14 70:5 | 88:11 93:2 |
| state 1:18,22 | superinten... | 36:11 40:23 | 102:15 | 72:17 73:14 | 93:14 |
| 4:12 21:18 | 56:8 | 45:5 48:21 | talking 16:17 | 73:22 81:11 | 94:9 99:14 |
| 27:7 111:1 | supervise | 65:2 67:4 | 34:19 39:20 | 88:18,19 | 94:9 99:11 |
| 111:4,5 | 7:23 8:2,4,5 | 82:20 96:2 | 40:17 42:1 | 88:9 94:5 | this |
| states 1:1,14 | 8:7,10,13 | 97:4 103:2 | 42:14 49:1 | 96:10 100:9 | tho 3:6 |
| 2:6 21:6 | 53:15 | 104:24 | 73:9 100:19 | theyre 15:14 | thing 29:16 |
| station 28:11 | supervised | 108:3 | task 39:11 | 103:22 | 40:21 |
| statistics | 13:17 | surrounding | 37:12 | things 30:5 | things 30:5 |
| 27:17 81:2 | supervising | 96:7 | taught 39:4 | theoretically | 8:14 15:13 |
| 106:13 | 13:20 | tear 45:22 | 88:3 | 82:4 | 18:17 21:2 |
| status 84:20 | supervision | 16:16 111:9 | telephone | thered 52:5 | 26:8 31:1 |
| 87:18 | 32:1 | tell 10:9,21 | 30:13,16,19 | 60:10 | 34:8 52:18 |
| statuses | supervisor | theres 6:9 | theres 6:9 | think 49:20 | waiting 77:9 |
| 87:20 | 4:19,21 | 14:19 16:10 | 14:19 16:10 | 96:23 108:1 | waive 109:24 |
| stay 50:8 | 15:13 34:5 | 17:4,6 | 17:4,6 | thomas 1:6 | waived 78:18 |
| stenograph... | 40:3 41:10 | 22:24 23:2 | 22:24 23:2 | 2:2 | 111:19 |
| 111:12 | 42:15 53:14 | 31:14,20 | 31:14,20 | thoroughly | walk 78:12 |
| step 20:12 | 66:4,14 | 47:17 56:10 | 47:17 56:10 | 16:4 29:19 | walked 49:18 |
| 21:7,13 3 | 67:4 70:14 | 56:24 57:11 | 56:24 57:11 | 92:22 | 104:20 |
| 25:24 26:3 | 72:15 74:3 | 83:3 88:5 | thought 66:8 | 101:4 | |
| | | **T** | 87:13 95:15 | three 4:24 | unit 58:13 |
| | | t 3:8 | | | 98:7 |

## Page 16

| | | | | |
|---|---|---|---|---|
| 6:10,12 | 99:4 104:14 | 29:24 30:24 | 108:24 | 62:6 64:9 | united 1:1,12 |
| 10:16,22 | 104:18 | 31:24 32:24 | 110:24 | 105:1 109:1 | unusual 33:6 |
| 12:5 13:12 | 105:6,15 | 33:24 34:24 | 110:24 | 109:23 | 86:13 107:1 |
| 39:8 45:18 | 109:10 | 100:10 | 112:4 | type 31:9,23 | upstairs 33:2 |
| 52:12 56:2 | 111:17 | 111:7 | 112:2 | 52:1 45:2 | 51:3 |
| 84:24 | timeline | 39:24 40:24 | top 67:8 | 68:6 96:24 | 33:6,8,11 |
| tier 12:14 | 28:23 86:24 | 41:24 44:24 | 76:24 99:23 | typewriting | 34:1 |
| 68:4 | timely 15:20 | 43:24 44:24 | 102:8 | 111:3 | useful 45:3 |
| time 10:13,18 | 15:23 | 49:24 96:24 | touch 9:2 | typically 18:2 | 65:10 83:8 |
| 10:20 12:15 | times 8:20,22 | 49:24 96:24 | track 34:19 | 42:17 45:11 | 97:22 |
| 13:14 23 | 16:14,19,22 | 49:24 96:24 | transcript | 48:4 50:8 | usually 6:23 |
| 14:9 16:21 | 16:22 19:24 | transcript | 111:11,19 | | 14:1 77:11 |
| 16:19 18:22 | 33:6 43:9 | 22:5 24:9 | transcription | uh 29:2 | |
| 20:25 23:3,4 | 44:18 62:7 | 55:24 56:24 | 111:13 | uhm 33:19 | **V** |
| 27:1,5,8,12 | 62:11 75:12 | 32:20 94:24 | transferred | 39:10 43:15 | v 1:5 2:9 4:4 |
| 27:18,20 | 77:21 108:6 | 94:24 96:24 | 28:11 102:2 | 43:15 55:4 | 5:10 12:2 |
| 28:3,5,9,10 | 108:24 | 61:24 71:24 | transfers | 59:8 61:10 | 30:7 35:10 |
| 28:20 29:1 | 19:13,18,21 | 72:24 84:24 | 96:8 | 50:6,9,11 | 37:8,18 |
| 29:23,23,24 | 20:3 79:9 | 87:24 | transition | 71:12,22 | 47:8,19 |
| 36:9 37:5 | 79:17 80:1 | tremendous | 14:13 63:22 | 74:24 75:2 | 50:6,9,11 |
| 41:1 45:22 | 108:18 | transportat... | transportat... | 74:24 75:2 | 71:12,22 |
| 46:7 48:5,9 | timestamp | 103:18 | 18:13 99:9 | 71:12,22 | 74:24 75:2 |
| 48:17,23 | 19:13,18,21 | unable 34:7 | 83:13 87:1 | 63:13 87:1 | 88:11 93:2 |
| 49:13,16,17 | title 10:7 | 71:24 72:24 | 46:11 | 88:11 93:12 | 93:12,14 |
| 54:8 57:2 | 19:22 73:19 | true 16:10,18 | 74:24 | uncovered | 100:8,10 |
| 63:10 64:11 | 73:22 78:4 | 18:13 21:24 | title 10:7 | 38:22 | 104:10,12 |
| 66:22 67:2 | today 73:5 | 28:7 54:16 | true 16:10,18 | underneath | variable 34:7 |
| 69:21 70:1 | 110:2 | 111:14 | 18:13 21:24 | 67:4 | varies 19:19 |
| 70:17,21,24 | 83:2 84:24 | tried 10:10 | understand | 21:17 35:1 |
| 71:6,14,17 | 56:15 | 82:4 93:19 | 30:5 93:9 | understand | various 22:16 |
| 72:20 73:2 | toomey 2:24 | 89:24 90:1 | tsuedaytos... | 8:14 15:13 | versus 40:14 |
| 73:3,24 | 3:24 72:20 | turn 31:3 | 45:5 | 18:17 21:2 | volume 52:9 |
| 75:22 76:13 | 73:4 87:24 | tuesdaytos... | trying 31:3 | 8:14 15:13 | |
| 76:16,2 | 89:24 96:24 | turned 40:2 | 7:4 | 114:15:13 | **W** |
| 79:3,3,11 | 11:24 12:24 | two 10:15,22 | 18:17 21:2 | 26:8 31:1 | w 2:4 |
| 79:20,21,22 | 20:14 94:24 | 16:14,19 | 2:6 16:19 | 34:8 52:18 | walls 110:10 |
| 84:7 88:5,8 | 33:14 96:24 | 29:17 32:16 | two 10:15,22 | 83:19 88:5 | waiting 77:9 |
| 88:9 89:7 | 12:24 88:24 | 36:20 37:1 | 16:14,19 | 70:19 82:22 | waive 109:24 |
| 89:9 99:11 | 24:24 56:24 | 83:7 44:6 | 66:6,9 91:3 | 66:6,9 91:3 | waived 78:18 |
| 93:1 95:1,4 | 23:24 24:24 | 100:24 | 92:22 | 92:22 | 111:19 |
| 97:19 98:6 | 27:24 28:24 | 105:24 | 100:1 101:4 | 100:1 101:4 | walk 78:12 |
| 98:16 99:1 | | 107:24 | 58:8,18 | 58:8,18 | walked 49:18 |
| | | | | | 104:20 |

**WILDREDO CINTRON, JR.**
**May 15, 2014**

Page 17

| | | | | |
|---|---|---|---|---|
| walking | 24:24 31:13 | 6:24 7:7,10 | year 5:13 | 7:10,19,19 | 87:2 88:3 |
| 48:22 49:1 | 39:24 47:4 | 7:22 12:7 | 12:13,19 | 8:15,15 | 100 81:6 |
| 49:1,5 | 47:13 49:23 | 13:20 52:1 | 21:21 22:5 | 13:22,22,23 | 10249 2:2 |
| 61:13 | 64:12 65:2 | 52:4 60:3 | 23:16 57:14 | 13:23 52:23 | 1068 66:20 |
| walks 71:3 | 65:19 81:24 | 62:23 63:3 | 60:24 62:6 | 52:23 53:1 | 107 3:11 |
| 91:6 | 100:1 108:9 | 80:21 | 64:1 | 53:2,4,5,12 | 1189:10 |
| want 48:20 | whereof | worked 5:4 | years 4:24 | 53:12,18,18 | 12 13:22,23 |
| 59:11 84:1 | 112:1 | 26:5 34:12 | 5:8 10:15 | 63:1,2,5,5,6 | 28:16 |
| 110:2,5,6 | white 45:24 | 82:8 | 10:16,16,23 | 63:6 | 1234 99:17 |
| wanted 23:16 | whos 23:15 | working 6:3 | 11:12 12:5 | 0010 98:19 | 1240 99:23 |
| 37:10 | 40:7 45:7 | 6:7,11 8:11 | 13:12 36:20 | 99:4 | 125 108:6 |
| wanting | 47:15 58:4 | 8:15 11:14 | 37:1 38:15 | 006 83:12 | 13 1:5 94:23 |
| 59:19 | 68:20 89:3 | 12:6,24 | 38:20 39:15 | 007 93:20 | 1422 108:13 |
| wants 26:18 | wilfredo 1:10 | 14:5 63:16 | 58:8 62:6 | 008 96:23 | 15 65:17 |
| 77:15,16 | 3:3 4:6,13 | 75:2,7 81:8 | 109:1 | 009 100:8 | 107:11 |
| warrant | 111:8 | 103:18 | yellow 45:24 | 010 100:13 | 15th 1:24 |
| 23:17 | witness 3:2 | 104:9,9 | yesterday | 011 102:9 | 16 105:21 |
| warrants | 4:1,7 22:10 | 106:22 | 64:10 | 013 91:16,18 | 1725 102:3 |
| 21:5 26:18 | 22:13 24:22 | 109:1 | youd 24:7 | 91:19,21 | 18 89:10 |
| 95:20,21 | 28:13 29:15 | works 63:5 | 37:3 83:8 | 014 93:1 | 1811 89:20 |
| washroom | 36:15 39:3 | 64:24 87:22 | 89:7 | 016 93:17 | 90:9,12 |
| 65:11 | 48:12 51:6 | 101:2 102:5 | youll 94:7 | 0315 104:16 | 19 78:5 79:1 |
| wasnt 64:10 | 52:14 53:17 | 104:8 | youre 4:16 | 105:4 | 79:4 84:1 |
| watson | 54:6 55:18 | wouldnt | 14:15 19:19 | 05 65:14,17 | 106:22 |
| 103:16,18 | 59:14,21 | 18:24 22:6 | 19:22 23:14 | 107:11 | 1996 11:17 |
| way 11:21 | 60:9 61:5 | 23:14 71:6 | 28:7 34:9 | 06 98:8 | 1997 11:15 |
| 39:4 60:2 | 61:11,21 | 92:9,10 | 37:3 39:20 | 0700 108:7 | 1st 112:3 |
| 60:11,13 | 62:9,17 | write 25:5,10 | 40:11,12 | 08 65:14 84:9 | |
| 85:24 88:16 | 64:23 71:10 | 25:15 49:22 | 41:9 55:8 | 85:2,4 | 2 |
| 96:12 | 78:2 80:9 | 67:19,21,24 | 61:13 89:2 | 084003497 | 2 3:11 6:4,8 |
| week 6:10 | 80:12 81:5 | 71:17 | 90:4 | 112:11 | 6:19 7:7,10 |
| weekday | 86:16 95:19 | writes 25:17 | youve 11:10 | | 7:19 8:15 |
| 80:24 | 101:10,17 | writing 67:15 | 14:12 16:6 | 1 | 63:6 65:16 |
| weeks 37:7 | 101:19 | written 68:9 | 23:24 26:5 | 1 1:24 3:10 | 104:23 |
| went 11:24 | 105:12 | 72:23 98:11 | 43:4 46:22 | 52:23 53:2 | 107:8,10 |
| 55:7 84:4 | 106:8,17 | wrong 60:6 | 62:14 | 53:5,12,18 | 20 7:15 8:3 |
| 87:14 93:14 | 108:15 | 60:10 | | 63:2,5 | 90:13 94:23 |
| western 2:2 | 109:8,17 | | Z | 65:10,20 | 105:15 |
| weve 22:21 | 110:7 111:8 | X | z 3:1,8 | 69:7 81:6 | 106:23 |
| 42:1 70:21 | 111:18 | x 3:1,8 | xi 12:13,17 | 86:3,5 87:5 | 200 37:3 |
| 73:10 | 112:1 | xi 12:13,17 | | 102:9 | 2001 12:9,11 |
| 102:15 | words 86:1 | Y | | 10 6:4,8,20 | 12:21 |
| 107:13 | work 5:2,6 | yeah 62:10 | | 6:22 7:1,7 | 2002 12:23 |
| whats 21:1 | 5:24 6:21 | | 00 6:4,4,8,8 | 8:15 63:6 | 2005 14:8 |
| | | | 6:18,19,20 | | |
| | | | 6:20,22,22 | | |
| | | | 7:1,1,7,7,10 | | |

**WILDREDO CINTRON, JR.**
**May 15, 2014**

Page 18

| | | | | |
|---|---|---|---|---|
| 2006 14:8 | 30 101:17,19 | 87:24 88:24 | 6 6:18,20,22 | 35:24 36:24 | 111:24 |
| 2013 5:16 | 312 2:8,24 | 89:24 90:24 | 7:1,10,19 | 37:24 38:24 | 112:24 |
| 16:17 17:19 | 3:24 4:24 | 91:24 92:24 | 101:17,19 | 39:24 40:24 | |
| 18:1,21 | 5:24 6:24 | 93:24 94:24 | 104:21 | 41:24 42:24 | 9 |
| 19:23 20:12 | 7:24 8:24 | 95:24 96:24 | 105:16 | 43:24 44:24 | 90 8:12 |
| 21:2 30:16 | 9:24 10:24 | 97:24 98:24 | 60 7:17 | 45:24 46:24 | 97 11:18,20 |
| 31:1 32:23 | 11:24 12:24 | 99:24 | 6034320 2:8 | 47:24 48:24 | 98 11:15,18 |
| 33:11 35:4 | 13:24 14:24 | 100:24 | 60602 2:8 | 49:24 50:24 | 11:20,23 |
| 35:19 38:1 | 15:24 16:24 | 101:24 | 60643 2:3 | 51:24 52:24 | |
| 46:4 47:7 | 17:24 18:24 | 102:24 | 65 3:10 | 53:24 54:24 | |
| 48:4,9,15 | 19:24 20:24 | 103:24 | 677:8 | 55:24 56:24 | |
| 50:5,19 | 21:24 22:24 | 104:24 | | 57:24 58:24 | |
| 51:3,12 | 23:24 24:24 | 105:24 | 7 | 59:24 60:24 | |
| 52:8 53:22 | 25:24 26:24 | 106:24 | 7 84:9 85:2,4 | 61:24 62:24 | |
| 54:1,14 | 27:24 28:24 | 107:24 | 85:10,21 | 63:24 64:24 | |
| 55:6 66:5 | 29:24 30:24 | 108:24 | 86:10,14 | 65:24 66:24 | |
| 66:11 77:3 | 31:24 32:24 | 109:24 | 107:19 | 67:24 68:24 | |
| 78:6 79:1,5 | 33:24 34:24 | 110:24 | 108:2 | 69:24 70:24 | |
| 80:20 81:23 | 35:24 36:24 | 111:24 | 773 2:3 | 71:24 72:24 | |
| 84:2 90:13 | 37:24 38:24 | 112:24 | | 73:24 74:24 | |
| 105:16 | 39:24 40:24 | | 8 | 75:24 76:24 | |
| 106:23 | 41:24 42:24 | 315 105:15 | 8 13:22,22,23 | 77:24 78:24 | |
| 107:20 | 43:24 44:24 | 38 85:10 | 87:2 88:3 | 79:24 80:24 | |
| 108:2 | 45:24 46:24 | | 92:20,23 | 81:24 82:24 | |
| 2014 1:24 | 47:24 48:24 | 4 | 800 81:6 | 83:24 84:24 | |
| 65:17 | 49:24 50:24 | 4 3:4 | 8052 1:5 | 85:24 86:24 | |
| 107:11 | 51:24 52:24 | 41 1:24 | 81 104:23 | 87:24 88:24 | |
| 112:3,7 | 53:24 54:24 | 45 38:14 | 8530648 2:24 | 89:24 90:24 | |
| 21st 59:24 | 55:24 56:24 | | 3:24 4:24 | 91:24 92:24 | |
| 2300 108:7 | 57:24 58:24 | 5 | 5:24 6:24 | 93:24 94:24 | |
| 2337900 2:3 | 59:24 60:24 | 5 52:23 53:1 | 7:24 8:24 | 95:24 96:24 | |
| 24 63:16 | 61:24 62:24 | 53:4,12,18 | 9:24 10:24 | 97:24 98:24 | |
| 25 8:3 112:7 | 63:24 64:24 | 63:1,5 | 11:24 12:24 | 99:24 | |
| 255 105:15 | 65:24 66:24 | 93:13 | 13:24 14:24 | 100:24 | |
| 26th 5:10 | 67:24 68:24 | 107:14 | 15:24 16:24 | 101:24 | |
| 54:17 87:16 | 69:24 70:24 | 500 1:22 2:7 | 17:24 18:24 | 102:24 | |
| 108:23 | 71:24 72:24 | 517 69:8 | 19:24 20:24 | 103:24 | |
| 109:4 | 73:24 74:24 | 53 106:20 | 21:24 22:24 | 104:24 | |
| | 75:24 76:24 | 543 78:1 | 23:24 24:24 | 105:24 | |
| 3 | 77:24 78:24 | 56 95:1 | 25:24 26:24 | 106:24 | |
| 3 65:14,14 | 79:24 80:24 | 58 106:20 | 27:24 28:24 | 107:24 | |
| 90:13 94:23 | 81:24 82:24 | | 29:24 30:24 | 108:24 | |
| 95:1 106:20 | 83:24 84:24 | 6 | 31:24 32:24 | 109:24 | |
| 106:20 | 85:24 86:24 | | 33:24 34:24 | 110:24 | |

# Exhibit 8

1

<pre>
 1              UNITED STATES DISTRICT COURT

 2              NORTHERN DISTRICT OF ILLINOIS

 3                    EASTERN DIVISION

 4    -------------------------------------------------------

 5    Brian Otero,

 6

 7              Plaintiff,

 8

 9       vs.                      Case Number 1:2012cv03148

10

11    Thomas J. Dart and Cook County Illinois,

12

13              Defendants.

14    -------------------------------------------------------

15           Deposition of Michael Charles Holmes

16                        Thursday

17                   June 27th, 2013

18

19                         -at-

20

21           Myron M. Cherry & Associates

22              30 North LaSalle Street

23                     Suite 2300

24              Chicago, Illinois 60602

25
</pre>

2

```
1                    APPEARANCES
2
3            For the Plaintiff:
4            Myron Milton Cherry
5            Jacie Campbell Zolna
6            Myron M. Cherry & Associates
7            30 North LaSalle Street
8                 Suite 2300
9            Chicago, Illinois 60602
10
11           For the Defendants:
12           Anthony E. Zecchin
13       Cook County State's Attorney's Office
14           50 West Washington Street
15               500 Daley Center
16             Chicago, Il 60602
17
18        Nicholas Stephen Scouffas
19        Cook County Sheriffs Office
20          50 West Washington Street
21              704 Daley Center
22            Chicago, Il 60602
23
24            Also present:
25             Mike Lieschke
```

3

```
1          RECORDER:  Good morning, we are now on record
2   on June 27, 2013.  The time is 10:16 a.m.  We are
3   located at Myron M. Cherry & Associates, 30 North
4   LaSalle Street, Suite 2300, Chicago, Illinois 60602,
5   for a deposition in the matter of Brian Otero v. Thomas
6   J. Dart and Cook County Illinois, case number 2012 CV
7   03148, venue Northern District of Illinois, Eastern
8   Division.  This is the 30(b)(6) deposition of Cook        0:00:31
9   County, Illinois, and the witness is -- is not present.
10         MR. CHERRY:  This is a deposition.  My name
11  is Myron Cherry and I represent the Plaintiff.  This
12  deposition is called at 10:00.  It's now -- 10:16 and
13  no one is here nor did anyone call me.  Besides being   0:01:02
14  late, this is very discourteous.  We'll pause the
15  record until they show up.
16         RECORDER:  Going off the record, 10:17 a.m.
17            (Off the record)
18         RECORDER:  We are back on record, 10:22 a.m.
19  The witness today is Michael Charles Holmes.  Mr.
20  Holmes, would you please raise your right hand for the
21  oath?
22            (Witness sworn)
23         RECORDER:  Would the attorneys please state
24  their names for the record?                              0:01:31
25         MR. ZECCHIN:  Anthony Zecchin, Z-E-C-C-H-I-N,
```

4

```
1   on behalf of the plaintiff.
2          MR. SCOUFFAS:  Nicholas Scouffas,
3   S-C-O-U-F-F-A-S, from the Sheriff's Office.
4          MR. LIESCHKE:  Also present, Mike Lieschke,
5   In Demand Reporting.
6          RECORDER:  That completes the required
7   information.  We can proceed.
8          MR. CHERRY:  Who's representing the witness?
9          MR. ZECCHIN:  I am representing the witness.
10         MR. CHERRY:  Okay.  So you -- if there are
11  any comments to be made on your side, you'll be the one
12  --
13         MR. ZECCHIN:  That's correct.               0:01:56
14         MR. CHERRY:  I ask you to mark Second Amended
15  Notice of Deposition, Rule 30(b)(6), four pages, case
16  captioned before the Honorable Amy J. St. Eve.  You can
17  mark that as plaintiff's deposition Exhibit 1 Holmes.
18  Here's a copy for you.                                  0:02:33
19         MR. ZECCHIN:  Thanks.
20              EXAMINATION
21  BY MR. CHERRY:
22    Q.   Mr. Holmes, would you please state your
23  position?
24    A.   I'm the assistant executive director at Cook
25  County Sheriff's Office.                                0:02:54
```

5

```
1    Q.   I'm sorry, could you keep your voice up?
2    A.   Yes.  Assistant executive director at Cook
3   County Sheriff's Office Department of Corrections.
4    Q.   And who's the executive director?
5    A.   Presently at this time -- this time is John
6   Murphy.
7    Q.   And do your duties encompass supervision of
8   the entire office?
9    A.   No, sir.                                      0:03:19
10   Q.   What are you duties?
11   A.   Presently I am over the records office,
12  receiving room, Division 9, Division 1, and our newest
13  building, Division 8, RTU.
14   Q.   And what areas are you uninvolved with?
15   A.   Would be the rest of the Department of
16  Corrections.  Other areas.                             0:03:43
17   Q.   Would you give me examples or tell me what
18  they are?
19   A.   Divisions 2, 4, 5, 6, 9, 10, external
20  operations, V.R.I.C, pre-release, day reporting.
21   Q.   Now, do your duties involve the supervision
22  of the process by which people get discharged from the
23  prison?                                                0:04:18
24   A.   Yes.
25   Q.   And I'm showing you what I've marked as PX
```

6

```
1    Holmes.  And your presence here is taken by me as a
2    representation by your counsel that you are a
3    representative of the defendant Sheriff with knowledge of at
4    least each of those ten categories.  And would you              0:04:57
5    please review those ten categories to yourself and tell
6    me if what I said is correct, that you are in fact
7    knowledgeable of each of those ten categories.  I mean,
8    your knowledge of all of the categories as they relate
9    to the State's Attorney's Office.  If I ask you             0:05:21
10   questions about them, you could give me answers on
11   behalf of the defendant State's Attorney that would be
12   clear, concise, and accurate.
13           MR. ZECCHIN:  For the record, the defendant
14   is the Sheriff, not the State's Attorney.
15           MR. CHERRY:  I stand corrected and I'll, with
16   your permission, counsel, amend my prior question --
17   questions, and substitute Sheriff for State's Attorney.
18           MR. ZECCHIN:  That's --
19           MR. CHERRY:  All right?
20           MR. ZECCHIN:  Yes.                                      0:05:52
21       Q.  Do you understand the question, Mr. Holmes?
22       A.  Yes.
23       Q.  Okay.  When you're ready to answer, let me
24   know.
25       A.  I'm ready.                                             0:06:23
```

7

```
1        Q.  Okay.  And is the answer to my question
2    "yes"?
3        A.  Yes, sir.
4        Q.  Now, I am therefore going to ask you
5    questions about the Sheriff's Office consistent with
6    the allegations in this lawsuit and this deposition.
7    And it is correct that you are speaking on behalf of
8    the Sheriff, correct?  Well, let me ask -- ask the              0:07:06
9    question a different way.  You have been tendered to us
10   as a representative to speak to the issues that we're
11   going to discuss today on behalf of the Sheriffs and
12   that your statements can be taken by me as statements
13   on behalf of the Office of the Sheriff.  Is that
14   correct?                                                        0:07:39
15       A.  Can you repeat that one more time, counsel?
16       Q.  I'm going to ask you some questions and they
17   obviously call for your own personal knowledge.
18   Because you can't anything that you don't know.  But my
19   understanding of this deposition is that if I were to
20   ask the Sheriff the same questions, he would disagree
21   with you once you give me an answer.  You're speaking          0:08:13
22   on behalf of the defendant, correct?
23           MR. ZECCHIN:  I'm going to -- I'm going to --
24   I'm going to object to the form of the question.  If
25   you understand it, you can answer it.
```

8

```
1        A.  I would answer on my knowledge of my job
2    experience of the departments that I'm over, which is
3    over the receiving and records department.                     0:08:48
4            MR. CHERRY:  We asked for a representative of
5    the Sheriff's Office.
6            MR. ZECCHIN:  That's correct.
7            MR. CHERRY:  You're stipulating that he is
8    that representative?
9            MR. ZECCHIN:  He was the person designated by
10   the Sheriff's Office to answer the questions that were
11   propounded on the Sheriff pursuant to you 30(b)(6)
12   notice.                                                         0:09:09
13           MR. CHERRY:  Okay.  So there's no
14   disagreement that his statements are made on behalf of
15   the Sheriff's Office.
16           MR. ZECCHIN:  Yes, that's correct.
17           MR. CHERRY:  Okay.
18       Q.  You understand that now, Mr. Holmes?
19       A.  Yes.
20       Q.  Okay.  Now, have you read the -- any of the
21   pleadings in this case?                                         0:09:39
22       A.  No.
23       Q.  Do you know what this case is about?
24       A.  Yes.
25       Q.  What is your understanding of what this case
```

9

```
1    is about?
2        A.  The discharge procedure of Mr. Brian Otero.
3        Q.  Anything else?
4        A.  No.
5        Q.  What -- what about the discharge procedure of
6    Brian Otero?                                                   0:10:08
7        A.  As far as from the time that he returned to
8    the jail and the time when he was released from the
9    Department of Corrections.
10       Q.  And do you understand what Mr. Otero is
11   alleging, what his complaint is?
12       A.  Yes.
13       Q.  And please tell me your understanding.               0:10:31
14       A.  My understanding is his complaint is of the
15   time from his -- of his release from the Department of
16   Corrections.
17       Q.  Now, Mr. Otero, you recall, was a person
18   entitled to be discharged.  Correct?                          0:11:07
19       A.  Correct.
20       Q.  And is it your testimony that the way Mr.
21   Otero was treated or handled from the time the
22   Sheriff's Office had directions to discharge him until
23   he was discharged -- do you follow me so far?  During
24   that time period.                                             0:11:40
25       A.  Yes.
```

10

1      Q.   Is it your testimony that Mr. Otero was
2  treated exactly like any other person who at that time
3  was scheduled to be discharged?
4      A.   Yes.
5      Q.   Okay.  So there's no difference between how,
6  according to your testimony and the Sheriff's
7  testimony, how Mr. Otero was treated in terms of his
8  discharge than any other person who would be in a class
9  just like Mr. Otero for these purposes?          0:12:17
10         MR. ZECCHIN:  That's been asked and answered.
11  You can answer if you know.
12     A.   According to my testimony, yes.
13     Q.   Okay.
14         MR. LIESCHKE:  For the record, Jacie Zolna
15  entered the deposition at 10:24 a.m.              0:12:56
16         MR. ZOLNA:  Thanks, Mike.
17         MR. LIESCHKE:  You're welcome.
18         MR. CHERRY:  I'm marking as plaintiff's
19  deposition Exhibit 2 Holmes a three-page document Bates
20  stamped 00143, 144, and 145, which I represent are
21  pictures purporting to be the layout of parts of the
22  jail and the Sheriff's Office and I'll have the witness
23  specifically describe for the record.            0:13:39
24     Q.   Will you review -- do -- do I call you
25  Assistant Director Holmes?  I -- I want to use your

11

1  right title or right -- is that your right title?
2      A.   Yes, sir.
3      Q.   Okay.  If I call you Mr. Witness or Mr.
4  Holmes from time to time, it's not an -- an offense.
5  Assume I have forgotten it for the moment your title.  0:14:11
6      A.   No problem.
7      Q.   I'm asking for leave to not always remember
8  Assistant Director.  Is that okay?
9      A.   Yes, sir.
10     Q.   Thanks.  Have you reviewed plaintiff Exhibit
11  2 Holmes?
12     A.   Yes.
13     Q.   Have you seen these documents before?  Or do
14  you know what they are?                          0:14:38
15     A.   Yes.
16     Q.   Could you describe what is on the first page
17  of PX 2 Holmes, that is the page that's Bates stamped
18  143?  What does that show?                       0:14:54
19     A.   It's the -- a map of the Department of
20  Corrections complex.
21     Q.   An aerial view?
22     A.   Yes, sir.
23     Q.   And how about page 2 or Bates 1 -- excuse me,
24  144?
25     A.   Aerial view, yes, sir.                  0:15:19

12

1      Q.   Of parts of the complex.
2      A.   Correct.
3      Q.   And 145?  It's an aerial view of a smaller
4  part of the complex.
5      A.   Correct.
6      Q.   Now, you see where the parking lot is on page
7  1 of Exhibit 2?                                  0:16:02
8      A.   I see two, counsel.
9      Q.   There are two parking lots.  Is that what you
10  said?
11     A.   Yes, sir.
12     Q.   But they're together, is that right?  Or
13  they're next to each other.
14     A.   No, sir.
15     Q.   Okay.  So one is in the middle of the upper
16  portion of the Exhibit?
17     A.   Yes.                                    0:16:26
18     Q.   And it's -- if you look at it, it's shaped a
19  little bit like an "R".
20     A.   Yes, sir.
21     Q.   Okay.  Would you mark -- do you have a -- an
22  ink pen?  Well, maybe we can use --
23         MR. ZOLNA:  What color?
24         MR. CHERRY:  A grease pen.  Get an ink pen
25  from -- we'll mark it -- we'll mark that in a moment.  0:16:56

13

1      Q.   In the lower right-hand corner, is there
2  another parking lot?
3      A.   Yes, sir.
4      Q.   And those are the two parking lots that you
5  were referring to?  When you said you saw two?
6      A.   Yes, sir.  Not all the way lower right hand,
7  just directly behind Division 11.                0:17:21
8      Q.   Oh, it's very small.
9      A.   Yes, sir.
10     Q.   And I am pointing to it?
11     A.   Correct.
12     Q.   And I'm going to have you mark these on the
13  Exhibit.  What is this area here?
14     A.   That's City of Chicago property.
15     Q.   What is it, do you know?                0:17:42
16     A.   I believe it's a -- a storage of -- of salt
17  for wintertime for the streets.
18     Q.   So, would you mark with an "A" and a
19  circle the parking lot that's the Sheriff's parking lot
20  that looks like an "R" at the top?  An "A" with a
21  circle?  And then would you mark with a "B" with a    0:18:11
22  circle the City property that's the lower right-hand
23  corner, not quite at the lower, but on the right that
24  you just described as the salt property?  And then mark
25  with "C" the smaller parking lot that's to the lower

```
                                                14
1    right of the Division 11.  Have you done that?        0:18:44
2        A.   Yes, sir.
3        Q.   Okay.  Now, all of them, everything else that
4    I am going to be talking about are marked.  The Circuit
5    Court building, Administration building, the Cermak
6    Hospital, the various Divisions.  There is a -- so that  0:19:14
7    we can refer to those without having them, there is a
8    tunnel between the court and the jail, is that correct?
9        A.   Yes.
10       Q.   And is that tunnel shown on here the -- the
11   line that comes from the Circuit Court building and
12   then goes through the Circuit Court Administration
13   building and then the Cermak Hospital?  Is that the
14   tunnel?                                                 0:19:51
15       A.   I'm sorry, can you repeat it, sir?
16       Q.   Is the tunnel the line directly below the
17   Circuit Court building that goes to the Administration
18   building and then continues on to the Cermak Hospital,
19   etc., is that the tunnel?                               0:20:17
20       A.   No, sir.
21       Q.   That's the street?
22       A.   Yes, sir.
23       Q.   And what street is that?
24       A.   That's California.
25       Q.   Okay.  And would you mark just below the
```

```
                                                15
1    Circuit Court building with -- with a "D" and a circle
2    as California Avenue.  Where is the tunnel that leads
3    from the Circuit Court building to the jail?            0:20:49
4        A.   I'm not sure I understand, sir.
5        Q.   Isn't there a tunnel that goes from the court
6    building to jail proper?
7        A.   Yes.
8        Q.   Can you show me where the tunnel is on this
9    picture, if you can?  Or in the approximate area it
10   would be.                                               0:21:12
11       A.   Basically, all I can say is underneath the
12   diagram of the Circuit Court building, branching out
13   from there is the tunnel.
14       Q.   Okay.  And what's the structure just to the
15   left of the Circuit Court building on this picture?     0:21:37
16       A.   The left from me looking at it?
17       Q.   Yes.
18       A.   That would be Division 1.
19       Q.   Okay.  And the tunnel goes into Division 1?
20       A.   Yes.
21       Q.   And then to get to the other Divisions, there
22   are -- you have to connect from Division 1.
23       A.   No.
24       Q.   The tunnel will go to other Divisions
25   directly from the tunnel?  In other words, are there    0:22:06
```

```
                                                16
1    branches of the tunnel -- if I wanted to go to Division
2    5, would I simply come further down the tunnel, go
3    through the -- underneath the Circuit Court
4    Administration building and there's a tunnel there to
5    Division 5?
6        A.   Yes.
7        Q.   So, if an inmate was in the Circuit Court
8    building and for some reason he needed to be taken to
9    Division 5, the normal course would be to go through
10   the tunnel, go under the Circuit Court Administration
11   building, and then turn into a branch of the tunnel to
12   Division 5, is that correct?                            0:23:06
13       A.   No.
14       Q.   Well, how would you get from the Circuit
15   Court building to Division 5 if you were going to use
16   the tunnel?  And if you wouldn't use the tunnel, how
17   would you go?
18       A.   I don't know the exact build-out from
19   underneath the Court build -- excuse me -- underneath
20   the Court building to Division 5.  But it does not go   0:23:41
21   underneath the Circuit Court Administration building.
22       Q.   Okay.  So the tunnel from the Circuit Court
23   building goes to Division 5, but you're saying
24   clearly on plaintiff's Exhibit 2, but you're saying
25   that it goes more directly than making a right angle
```

```
                                                17
1    turn under the Circuit Court Administration building.   0:24:11
2        A.   Yes.
3        Q.   So, it would be diagonally rather than -- or
4    more diagonally rather than down to the Circuit Court
5    Administration building and then a right turn.
6        A.   Correct.
7        Q.   Okay.  So, would it be fair for purposes of
8    our discussion to draw a diagonal line from the Circuit
9    Court building to Division 5 to represent only the
10   tunnel that would lead to Division 5?  For purposes of  0:24:53
11   our discussion, would that be a fair depiction of where
12   a tunnel would be?
13       A.   To the best of --
14       Q.   It may make some curlicues, but I'm -- I'm
15   just saying that -- I want to be able to talk about the
16   tunnel without arguing about how many twists and turns
17   it may have.  So, it is fair generally to say that      0:25:17
18   there is a tunnel that goes from the Circuit Court
19   building to the Division 5?
20       A.   Yes.
21       Q.   Okay.  So would you draw a line with the pen
22   from the Circuit Court building diagonally to Division
23   5 to represent that tunnel?  And would you put your     0:25:40
24   initials, please, on that line?  So, during this
25   deposition, when I refer to the tunnel leading to
```

18

1   Division 5, I'm talking about the line you've agreed
2   fairly represents that tunnel in your prior testimony.
3   Okay?                                          0:26:09
4       A.   Yes.
5       Q.   And I know it might not be exact twists and
6   turns, I'm not necessarily interested in that.  So
7   there -- there's more than one tunnel emanating from
8   the Circuit Court building, they go to different
9   places?  Or there's one tunnel with branches off of
10  them.
11      A.   Correct.                             0:26:30
12      Q.   Okay.  So, all of the branches at some point
13  prior to the Circuit Court of Cook County lead in to
14  that one tunnel, and then when you're exiting that
15  tunnel, you have different branches at various points
16  along the way.
17      A.   Correct.
18      Q.   Okay.  Are these tunnels lighted?    0:26:54
19      A.   Yes.
20      Q.   And are the lights always on or do they go on
21  by motion?
22      A.   Some now do have the motion sensors.
23      Q.   How long is the tunnel from the Circuit Court
24  of Cook County to Division 5, this line that you've
25  drawn, having in mind that it may have curlicues?  But

19

1   could you give me a rough estimate of how long it is?  0:27:26
2   And -- and use city blocks, if you can.  Is it a couple
3   of city blocks?  Use football fields, if you want.  But
4   something where I can get an idea of how long that part
5   of the tunnel is from the Circuit Court to Division 5
6   -- to Division 5.
7       A.   Approximately two city blocks.       0:27:48
8       Q.   Okay.  So we're talking in a leisurely walk
9   about three to five minutes?  To go from the Circuit
10  Court building to Division 5 through that tunnel?       0:28:17
11      A.   Correct.
12      Q.   And if you were walking fast, you might make
13  it in a couple of minutes.
14      MR. ZECCHIN:  Objection, foundation.  You can
15  answer if you know.
16      Q.   Well, you've walked it now, haven't you?
17      A.   Yes.
18      Q.   Many times.
19      A.   Yes.
20      Q.   Okay.  So if you were walking fast, you might
21  make it in a couple of minutes?                         0:28:39
22      A.   I'm not sure.
23      Q.   But for sure you could walk fast and make it
24  in three minutes.
25      A.   Yes.

20

1       Q.   Now, how big is that tunnel compared to the
2   room we're in now?  And let's say that this room is,
3   right or wrong, let's say this room is 12 feet across.  0:29:09
4   To give you an idea of what 12 feet would like look,
5   how -- how long is the -- how wide is the tunnel?  It's
6   actually 14 or 15 feet, if you go window to wall.
7       A.   To the best of my knowledge, I would sway
8   approximately 15 feet.                                  0:29:37
9       Q.   Okay.  So the tunnel is as wide roughly as
10  this room.
11      A.   Yes.
12      Q.   So easily you could have three lanes in that
13  tunnel.  One going one way, another one going another
14  way, and people standing in the middle, and there would
15  be still enough room.                                   0:30:00
16      A.   No, sir.
17      Q.   Why not?
18      A.   For security purposes, the -- the way --
19      Q.   Well, least -- for a moment.  You're just
20  talking space-wise what I say is correct, that 15 feet
21  would be enough for a lane going one way, another lane
22  going another way, and even room for structures or
23  people in the center.                                   0:30:25
24      MR. ZECCHIN:  Objection, relevance and
25  hypothetical.  You can answer.

21

1       MR. CHERRY:  I'm sure you know that all
2   objections --
3       MR. ZECCHIN:  Are you addressing me, counsel?
4       MR. CHERRY:  Yes.  And all objections are
5   preserved.  So you don't -- you need not make another
6   objection, and you can make any objection that you
7   could have made at this deposition without any
8   delimitation at the time that portion of the
9   deposition's been used.  Normally it's my practice and  0:31:02
10  lawyers in the Federal Court don't make objections
11  because it interferes with the flow and it has a
12  tendency to interrupt the witness or maybe even
13  unfairly not purposely educate them.  So I would ask
14  for you to just consider that unless it's an
15  attorney-client privilege or you have some problem with
16  the question that you want to ask me, which I'll be
17  glad to rephrase, that you refrain from making any
18  objections since you don't need to.                     0:31:36
19      MR. ZECCHIN:  Sure.  That's fine.  Maybe your
20  partner or your associate was there and I just -- you
21  know, he was making the same type of objection more
22  than this.  Actually, I was just, you know, the normal
23  thing that I do.  But I've noted your request and I'll
24  certainly consider it, counsel.
25      MR. CHERRY:  Thanks.

22

1     Q.   So, what I'm just trying to get you to
2  confirm that -- without regard to your specific
3  procedures about how you use the tunnel, which we're
4  going to get into in detail, 15 feet would be wide
5  enough for a lane one way, a lane another way, and even
6  some structures or a third empty area in the center.
7  It would be big enough for that.       0:32:21
8     A.   Yes.
9     Q.   Okay.  Now, when you transport a prisoner,
10  what is the normal number of policemen that deal with a
11  single person under your procedures?    0:32:47
12     A.   I'm sorry.  Can you repeat, counsel?
13     Q.   If you were being transported as a prisoner,
14  how many policemen would be accompanying you normally?
15     A.   Normally, depending on the classification,
16  would be one officer.
17     Q.   One officer.  And by depending on the
18  classification, I assume generally you mean that if
19  he's a dangerous murderer or he's trying to escape or
20  something, you might have two officers.    0:33:21
21     A.   In --
22     Q.   Or more.
23     A.   In the Department of Corrections, a -- a
24  Level 4 inmate is required two officers and one
25  supervisor.

23

1     Q.   Okay.  And a Level 4 inmate is someone who
2  has been convicted of or charged with something like
3  murder?
4     A.   Not necessarily.  It's a high security risk
5  inmate within the Department of Corrections.    0:33:49
6     Q.   Okay.  But it also might include people who
7  -- oh, so it goes by a subjective evaluation of the
8  security risk rather than the crime that he's accused
9  or convicted of.
10     A.   Both.
11     Q.   Okay.  So every Level 4 would -- every
12  murderer would be on Level 4, person convicted of a
13  murder.    0:34:13
14     A.   No.
15     Q.   They might be on a lower level?
16     A.   Correct.
17     Q.   So there would be some deduction of Level 4
18  if that person who is convicted of murder was not
19  considered a security risk.
20     A.   I'm sorry, can you --
21     Q.   Was not considered a security risk.  He's 85
22  and crippled in a wheelchair, but he was convicted of
23  murder, so even though that's a -- serious crime, you
24  might have one policeman escort that person for the
25  reasons I suggest.    0:34:52

24

1     A.   Correct.
2     Q.   Okay.  But then you might have someone who's
3  convicted of a -- a serious criminal traffic violation
4  but you think he's a really high security risk and he's
5  tried to break out and he's a lot of trouble, you might
6  have two or three people with him.
7     A.   Would be two -- two officers and a --
8     Q.   And a supervisor.
9     A.   -- supervisor.    0:35:15
10     Q.   Okay.  So, you make a judgment about how many
11  people escort a prisoner through the tunnel based upon
12  actual circumstances of what's needed.
13     A.   No.
14     Q.   Well, I thought you said that the
15  circumstances describe -- the judgment you make about
16  whether the person is a security risk is one of the
17  factors you consider.    0:35:47
18     A.   Correct.
19     Q.   And that depends from person to person,
20  correct?
21     A.   Yes.  Anyone houses in the level system.
22     Q.   So everyone housed in the level system is
23  treated the same?
24     A.   Yes.
25     Q.   Okay.  So there isn't a judgment made.

25

1  Everybody housed in the security system is considered a
2  flight risk.    0:36:14
3     A.   Can you repeat that?
4     Q.   Is everybody housed in one of the divisions
5  considered automatically a flight risk?
6     A.   No.
7     Q.   So some people will have one person escort
8  them from court back to jail or vice-versa and some
9  people will have two and a supervisor, correct?    0:36:42
10     A.   Correct.
11     Q.   And whether you have one person or three
12  people depends upon your subjective judgment about
13  whether that person is a security risk.
14     A.   Correct.
15     Q.   Okay.  Is the same true of people who are
16  arrested but not convicted?    0:37:10
17     A.   I don't understand.
18     Q.   Well, you understand the difference between
19  somebody who's been convicted and somebody who's been
20  arrested.
21     A.   Yes.
22     Q.   I asked you about the number of people who
23  accompany a convicted person, and you told me that it's
24  one or up to three depending upon whether you consider
25  that convicted person a flight risk.  Do you recall

```
                                                      26

 1    that testimony?                               0:37:40

 2        A.   Yes.

 3        Q.   And now I'm asking the same question about

 4    someone who's merely a -- an arrestee as opposed to

 5    someone who's been convicted.

 6        A.   The Department of Corrections, we don't deal

 7    with arrestees.

 8        Q.   So you're never escorting someone who is

 9    arrested through the tunnel?

10        A.   An arrested person would not be at the

11    Department of Corrections.                     0:38:09

12        Q.   Under no circumstances.

13        A.   No, sir.  The only people that -- that are

14    escorted at the Department of Corrections are those

15    remanded by a judgment to the Department of

16    Corrections.

17        Q.   Well, how about people who are freed by a

18    court who happen to be in jail?  They would go through

19    the tunnel, wouldn't they?

20        A.   No, sir.

21        Q.   So, the people who go through the tunnel then

22    are convicted people and free people.  Right?  One or  0:38:42

23    the other.

24        A.   No, sir.

25        Q.   Well, you said that an arrested person
```

```
                                                      27

 1    doesn't go through the tunnel.

 2        A.   Correct.

 3        Q.   And you told me that convicted people go

 4    through the tunnel.

 5        A.   Correct.

 6        Q.   So how about someone who is ordered released

 7    by the court?  He goes through the tunnel.

 8        A.   Correct.                              0:39:09

 9        Q.   Are there any other categories therefore of

10    people who go through the tunnel besides convicted

11    people and free people?  That is, people who have been

12    ordered to be freed by a court?

13        A.   Every other inmate in the Department of

14    Corrections that's been remanded by a judge awaiting

15    the adjudication of their case is escorted through the

16    tunnel.                                        0:39:38

17        Q.   Okay.  So there are three categories of

18    people.  There are people who are convicted, right, who

19    go through the tunnel?

20        A.   Yes.

21        Q.   There are people who have been arrested and

22    are awaiting trial but they're not on bond so they're

23    in jail.

24        A.   Correct.

25        Q.   And then there are free people.  That is,
```

```
                                                      28

 1    people who the judge has ordered released.     0:40:03

 2        A.   Yes.

 3        Q.   And Mr. Otero fell into that last category.

 4    He was essentially a free person.  He was ordered to be

 5    released.  Correct?

 6        A.   He was ordered by that particular judge that

 7    he is to be released on that case.             0:40:33

 8        Q.   Okay.  So, in terms of that judge and Mr.

 9    Otero, he was a free man.

10        A.   Not necessarily.

11        Q.   Well, did the judge say hold him?

12        A.   The judge said -- the judge adjudicated the

13    case that Mr. Otero was before the judge.      0:40:57

14        Q.   And he released him.

15        A.   He -- he adjudicated his case before him.

16        Q.   Well, I -- I mean, you only have to watch TV,

17    when the jury finds you're not guilty, you're a free

18    man, right?

19             MR. ZECCHIN:  Objection.  Legal conclusion.  0:41:20

20        Q.   Is that true?

21        A.   Not unless you have other cases pending

22    somewhere else within the Cook County.

23        Q.   Well, you don't see that on -- and I don't

24    mean to push this television example -- but you never

25    see that on -- on -- on television, or maybe can show
```

```
                                                      29

 1    me an example.  I don't recall any Perry Mason murders

 2    where they say, "Not guilty", and then the judge says,

 3    "Hold him while we see if he's been arrested for

 4    anything else."  Normally your memory of these crime   0:41:53

 5    shows is when they say "Not guilty", he's free.  You'll

 6    give me at least that, right?

 7        A.   I would answer that only to TV and not real

 8    life.

 9        Q.   Right.  TV, not real life.  Okay.

10             MR. CHERRY:  Now, can you mark this as

11    plaintiff's Exhibit 3, which is Bates stamped 42.      0:42:23

12        Q.   Have you seen this document marked PX 3, it's

13    a court order in the Criminal Division Municipal

14    Department in case 09CR2218501 signed and stamped by

15    Judge Arthur F. Will?                          0:43:02

16        A.   Yes, sir.

17        Q.   And this is with respect to Mr. Otero.

18    Right?

19        A.   Correct.

20        Q.   And it says, "Verdict of not guilty.  Release

21    as to this C-A-S-E, this case, only".  Right?

22        A.   Yes, sir.

23        Q.   Okay.  So as far as Mr. Otero's case was

24    concerned, he was a free man, this case.  Right?       0:43:33

25        A.   Correct.
```

30

```
1        Q.   Okay.  Now, do you at the Sheriff have a
2   policy of detaining free people?
3        A.   I'm sorry, can you repeat, counsel?
4        Q.   Sure.  Does the Sheriff have a policy of
5   detaining free people?
6        A.   No, sir.                                    0:44:04
7        Q.   And you would admit -- are you a lawyer?
8        A.   No, sir.
9        Q.   But you have a pretty good understanding of
10  the law as a layman, right, at least criminal law?
11       A.   No, sir.
12       Q.   You know a murder -- you know what a murder,
13  the elements of a murder are, right?
14       A.   Yes, sir.                                   0:44:25
15       Q.   And you probably know the difference between
16  robbery and burglary.
17       A.   Correct.
18       Q.   And you know the difference between a
19  criminal trespass -- trespass and some kid just
20  breaking a window in a baseball game.
21       A.   Yes.
22       Q.   So you have some working knowledge of -- of
23  criminal law, right?
24       A.   Yes.                                        0:44:46
25       Q.   So you would agree with me that the State's
```

31

```
1   Attorney has no right to hold a free person.
2        K    Objection again to the State's Attorney.
3        Q.   I'm sorry.  The Sheriff.
4        A.   I'm sorry, sir.
5        Q.   The Sheriff has no right to detain a free
6   person.  You would agree with that.
7             MR. ZECCHIN:  Yeah.  I'm going to object.
8   This is a legal conclusion you're asking him to make.   0:45:17
9             MR. CHERRY:  I'm asking for his
10  understanding.
11       K    Same objection.
12       A.   And -- and the phrase of the question,
13  counselor, to -- to me is very vague as asking about
14  policy of detaining --                                  0:45:40
15       Q.   Well, let me ask --
16       A.   -- a free man.
17       Q.   Let -- let -- let me answer -- answer the --
18  ask the question in a more broad way.  Okay?  You don't
19  believe the Sheriff has the right to just stop anyone
20  on the street and put him in a car and say, "Stay
21  there", do you?  There has to be some reason to do that
22  that's allowed under the law.                           0:46:04
23            MR. ZECCHIN:  Objection again.
24       A.   I would answer in follow -- following the law
25  that any law enforcement person can do that.
```

32

```
1        Q.   Because he doesn't like what a guy looks
2   like?
3        A.   Within the scope of his and -- his duties and
4   with the law of the state.                              0:46:32
5        Q.   Okay.  But I didn't say probable cause and
6   within his duties.  I just said willy-nilly just go out
7   and stop free people.  You don't have the right to do
8   that, do you?  You're not even going to give me that?
9        A.   I would say based on the scenario and --
10       Q.   No, we're not talking about this case.  I'm
11  just saying you don't have the right to go out and just
12  tell my secretary what to do.  You can't order me to do  0:46:58
13  anything.  You have limitations.  Correct?
14            MR. ZECCHIN:  I'm going to also object, this
15  is beyond any of the categories that are listed in the
16  Rider A.
17       Q.   Want to answer the question?
18       A.   Can you repeat it, please?
19       Q.   You don't have the authority to just
20  willy-nilly detain anyone.  The Sheriff.                 0:47:23
21       A.   In my -- in my job, I detain anyone that I am
22  ordered to by a judge.
23       Q.   Well, I didn't have "ordered to by a judge".
24  I just meant you decide because you don't like someone
25  you're going to retain -- you're going to detain him.
```

33

```
1   You can't do that.  Correct?                           0:47:47
2        A.   Again I would answer, counselor, depending on
3   the scenario of -- even a civilian detaining
4   someone is based on the scenario that is being played
5   out at the time.                                        0:48:12
6        Q.   Okay.  Let's say you were appearing at a
7   grammar school and a five-year-old kid said, "What's
8   your job?"  Would you answer that question correctly by
9   saying, "Oh, I'm a representative of the Sheriff, I can
10  do whatever the hell I want."  Would --
11            MR. ZECCHIN:  Same objection.  The rider does
12  not cover any of this topic that you're asking about.    0:48:34
13       Q.   Would you say that?
14       A.   No, sir.
15       Q.   Would you say, "I'm a representative of the
16  Sheriff, I can detain anyone I want"?
17       A.   I would say I would be able --
18       Q.   No, would you say what I said?  That's my
19  question.  Would you say, "I am a representative of the
20  Sheriff, kids, and I can detain anybody I want for any
21  reason"?                                                 0:49:01
22       A.   No, sir.
23       Q.   Okay.  So you do agree that you have some
24  limitations on your power or the Sheriff's power to
25  detain people.
```

34

1     A.   Yes.

2     Q.   Okay.  Now, do you regard people who are

3 found not guilty in terms of your duties as having

4 rights?  Do they have any rights?          0:49:51

5     A.   I'm sorry, can you repeat, counsel?

6     Q.   Mr. Otero went to trial and was found not

7 guilty.  Right?

8     A.   Yes.

9     Q.   Did he acquire any rights as to his freedom,

10 in your understanding, as a result of that not guilty

11 verdict?

12     MR. ZECCHIN:  Objection, calls for a legal

13 conclusion.                      0:50:15

14     A.   Yes.

15     Q.   Okay.  And one of those rights is that he was

16 a free man.

17     A.   Not that I would be aware of.      0:50:40

18     Q.   Well, it says, "Verdict of not guilty.

19 Released as to this case only".  As a result of this,

20 Mr. Otero was free unless there was some other reason

21 to hold him.  Right?

22     A.   Correct.

23     Q.   Okay.  So, if you hear that he's a free man,

24 does the Sheriff to your knowledge have procedures to

25 protect his rights as a free man?         0:51:09

---

35

1     A.   Can you repeat that again?

2     Q.   Policies and procedures.  Does the Sheriff

3 have a policy to protect the rights of Otero when he is

4 in the Sheriff's possession after he has been declared

5 a free man and has acquired the rights of being a free

6 man that you just testified to?           0:51:52

7     A.   Under the Department of Corrections --

8     Q.   It's yes or no.  Does the Sheriff have a

9 policy -- I'll get into his -- I want to find out, is

10 there a policy that is called something like protecting

11 the rights of free man like Otero who are found not

12 guilty?  Or something like that.       0:52:17

13     A.   No.

14     Q.   So, who protects the rights of a free man if

15 you don't have a policy?  Just you do what you want,

16 and if you happen to be right, you're right?  If you're

17 wrong, you're wrong?

18     MR. ZECCHIN:  Do you mind if I get a little

19 coffee --                        0:52:43

20     MR. CHERRY:  Sure.

21     MR. ZECCHIN:  Take a break too.  Well, is

22 there a question pending?  I'm not quite sure.

23     MR. CHERRY:  Yeah.

24     MR. ZECCHIN:  Okay.  We'll wait then.   0:53:04

25     MR. CHERRY:  You have the last question on

---

36

1 your screen.  Would you Read it, please?  Just the last

2 question.                        0:54:35

3          (Recording replayed)

4     MR. CHERRY:  Just read it.  Would you please

5 read it?  Just read it out loud?

6     MR. LIESCHKE:  We play it back.

7     MR. CHERRY:  I understand that, but I'd like

8 her to read it.

9     MR. LIESCHKE:  She can't.  It's audio.

10 There's no words on the screen.           0:54:57

11     Q.   Do you remember the last question?

12     A.   No --

13     Q.   Who protects the rights of the free man?  Do

14 you remember we were talking that you had no policy to

15 protect the rights of the free man.  You said that Mr.

16 Otero had rights as a free man.  Who protects his

17 rights as a free man?  That's my question.  In your

18 office.                         0:55:17

19     A.   In my office, under the Department of

20 Corrections, until somebody is physically released from

21 the inner walls of the Department of Corrections, the

22 person is not free.                  0:55:43

23     Q.   I understand that.  But you told me as soon

24 as he was -- Mr. Otero was found not guilty, he had

25 some rights.  And one of those rights was that he was a

---

37

1 free man.  So, what I know is between the time he's

2 found not guilty, when you told me he has rights as a

3 -- as a free man, who is protecting those rights?  And  0:56:08

4 I take it your testimony is nobody.

5     A.   Not at all.  As far as inside the confines of

6 the Department of Corrections, the staff that is

7 employed is protecting and serving everybody within the

8 confines of the --

9     Q.   I'm not talking about everybody.  I'm talking

10 about who is protecting Mr. Otero's right to be free?  0:56:39

11 You told me as soon as he is -- got a verdict of not

12 guilty, one of the rights he has is to be free.  Who's

13 looking out to protect Mr. Otero in this case to be

14 free?

15     A.   My answer was that to that case he -- it was

16 adjudicated.  That I did not know at that time if he

17 was to be released from the Cook County jail or not.  0:57:06

18     Q.   Okay.  Let -- let's see if I can break this

19 down.  You're coming to my house for dinner.  We got

20 that so far?

21     A.   Yes.

22     Q.   And you say to me, "Hey, Mike, are we going

23 to have clean dishes for dinner?  Because I got sick

24 the other night, I don't want any dirty dishes." And I  0:57:38

25 say, "Don't worry.  I will protect you.  I'm going to

38

1  wash all the dishes and put them in the microwave and
2  everything else is correct."  So, I've now agreed to
3  protect your rights to have a clean plate.  You with me
4  so far?
5      A.  Yes.
6      Q.  You told me that Mr. Otero has a right to be
7  free as a result of plaintiff's Exhibit 3.  What I want      0:58:07
8  to know, is anyone assigned to say, let's watch out and
9  protect Mr. Otero's right to be free?  That's my
10  question.  You didn't have any policy, so I want to
11  know is there someone assigned, is there an officer in
12  charge of freedom, is there a -- an assistant director
13  in charge of freedom, does the State's Attorney have as
14  one of its primary goals to protect the right of Mr.
15  Otero to be free as you told me he had a right to do so
16  under plaintiff's Exhibit 3?  That's my question.          0:58:41
17      MR. ZECCHIN:  Just objection to State's
18  Attorney once again being named.
19      Q.  Yeah.  I -- any time I say State's Attorney
20  by accident, I mean Sheriff's.  You understand that,
21  will you agree with me, I -- I apologize for saying
22  State's Attorney.  If I say State's Attorney, I mean
23  Sheriff.  Is that okay?
24      A.  Yes.
25      Q.  Okay.  So, will you answer my question?          0:59:03

39

1      A.  And again, counselor, I would say from the
2  adjudication of that case, the Department of
3  Corrections would still not know if Mr. Otero was in
4  fact a free man.
5      Q.  So, when the judge says he's free, he's not
6  really free.  Is that what you're telling me?          0:59:29
7      A.  The -- the judge is saying that that
8  particular case has been adjudicated.
9      Q.  Right.  So he may be free and he may not be
10  free depending on something that we don't know yet.
11  Right?
12      A.  Correct.
13      Q.  But he could be free.
14      A.  Once the --          0:59:53
15      Q.  No, no, no, no.  At this moment, when the
16  judge says he's free, he could be free because you
17  found nothing else to hold him on, right?
18      A.  But it wouldn't be at that time.
19      Q.  No, no.  But it would revert back to that
20  time.  That means during the time you held him, you
21  were holding him when he was a free man.  Right?          1:00:18
22      A.  Again, we would not know that until all the
23  --
24      Q.  I know -- I know you wouldn't know that.  But
25  if you -- if you took, say, six and a half years to

40

1  find out whether or not he had any other crimes against
2  society, let's say six and a half years, and you found
3  out nothing, during that six and a half years you are
4  holding a free man, right?          1:00:43
5      A.  I wouldn't say yes to that.  No, sir.
6      Q.  Well, what prevented Mr. Otero during that
7  six and a half years from being free if you hadn't --
8  you -- you -- you went through all the records and
9  there was nothing to hold him.  So, what prevented him
10  from being free?          1:01:08
11      A.  I would again say it would just be like a
12  police officer on the street that detained somebody.
13  During the whole time of thoroughly checking out if
14  there was reason for someone to be arrested at that
15  time, he's --
16      Q.  But -- but -- but --
17      A.  -- detained --
18      Q.  But under my example, I said there
19  wasn't any reason to hold him, and you took six and a
20  half years to find that out.  Right?  So, once you          1:01:42
21  found out after six and a half years that Mr. Otero had
22  no reason to hold him from the very beginning, in
23  hindsight you were holding a free man for six and a
24  half years --
25      MR. ZECCHIN:  Objection.

41

1      Q.  -- right?
2      A.  Legal conclusion, hypothetical, not relevant.
3      A.  I couldn't answer yes to that, sir.          1:02:05
4      Q.  You -- you want to answer no?
5      A.  Again, under my -- my job and my scope is
6  that until I verify all aspects of holding that
7  individual until he's -- nothing is holding him by a
8  judge of Cook County, then he would be released.          1:02:33
9      Q.  Okay.  During that period of time, if you
10  find nothing, then you release him.
11      A.  Yes.
12      Q.  So, the time period that you take to make
13  that judgment is a time period the two parties are
14  interested in, you and Mr. Otero.  Right?          1:03:02
15      A.  Can you repeat that?
16      Q.  Well, Mr. Otero would like you to make that
17  judgment as quick as you can.  Because he knows that
18  there's nothing to hold him from being free.  So, if
19  you can make that decision in 30 seconds, he's happier
20  than if you took six and a half years.  Right?
21      A.  Yes.
22      Q.  So you have some obligation to make that
23  decision as quickly as possible.  Because he may be a
24  free man.          1:03:33
25      A.  And that's exactly what we do.

42

1    Q.   Well, but whether you do it or not we'll get
2    into.  I just want to know that you have agreed that
3    you have the absolute responsibility to make sure that
4    you determine as quickly as possible that you're not
5    holding a free man.
6    A.   Yes.                                          1:04:00
7    Q.   Okay.  And you agree that if you didn't do it
8    as quickly as possible, you would be doing something
9    wrong.
10        MR. ZECCHIN:  Objection, calls for legal
11   conclusion and ultimate issue in this case.  You can
12   answer, if you know.
13   A.   I don't know.
14   Q.   You don't know under the way you operate the
15   office that if you were violating the rule you just
16   told me you follow you wouldn't be doing something
17   wrong?                                             1:04:26
18   A.   I would answer that we explore --
19   Q.   Not we.  You.  If you knew that you were
20   violating the rule because you weren't working quickly
21   enough but you didn't care, you would be violating your
22   own rule.  Right?
23   A.   Yes.
24   Q.   Okay.  So I take it you make some effort,
25   yourself and the people that you supervise, to make

43

1    sure that Mr. Otero's rights to freedom are moved
2    forward as quickly as possible.                    1:05:04
3    A.   Yes.
4    Q.   Now, when you check on Mr. Otero's background
5    or any inmate's background, when you do that process,
6    you know what I'm referring to?                    1:05:37
7    A.   Yes.
8    Q.   Asking.  Do you do this?  Do you go to a
9    bunch of boxes, put them on your desk, and start going
10   through files?  Maybe you got a hundred boxes, it could
11   take you a couple of weeks, and you just go through
12   files, take out papers and read them?  Do you do it
13   like that?
14   A.   For -- are you referring to one individual?   1:06:00
15   Q.   Any particular individual.  Do you say, "Oh
16   my God, another guy we gotta check if he's free", and
17   you look through a hundred boxes to see if there's
18   anything there.  Is that how you do it?
19   A.   No.
20   Q.   You do it through some computer.
21   A.   It's both computer and manual.
22   Q.   What part of it's on computer and what part
23   of it is done manually?  I take it manually is the     1:06:22
24   order from the judge.  Because that may not be on the
25   computer yet.  But other than that order, everything

44

1    else is on the computer, right?
2    A.   No, sir.
3    Q.   What in addition to the order is not on the
4    computer?
5    A.   The county's -- the court system still
6    operates on paper.  So, anything related to one
7    individual of the 10,000 people incarcerated in Cook
8    County is all kept in a file.                      1:06:55
9    Q.   And where is that file?
10   A.   In the records office.
11   Q.   And how long would it take for plaintiff's
12   Exhibit 3 to get to that file?
13   A.   Based on the returns of files and people
14   going to court and deciphering of the paperwork to
15   actually check to see if the -- the pack would be
16   pulled to when you begin to go through a search of all
17   other cases were adjudicated, could take roughly an
18   hour to two hours.                                 1:07:45
19   Q.   You say to make a determination whether the
20   pack should be pulled.  Is that what you said?
21   A.   Yes, sir.
22   Q.   What do you mean by that?
23   A.   Every -- every day Cook Court Department of
24   Corrections will --
25   Q.   I just want to know what you mean by "the

45

1    pack".  To determine whether the pack would be pulled.
2    What pack are you talking about and tell me about that
3    determination.                                     1:08:15
4    A.   The individual's pack itself.
5    Q.   His file.
6    A.   His file.
7    Q.   So you don't look at the file of everyone who
8    a judge has released.
9    A.   Yes.
10   Q.   I thought you said you have to take time to
11   determine whether you will look at the file.
12   A.   As I was saying, of the thousand,
13   approximately a thousand that go out to court every day
14   --
15   Q.   Mm-hmm.                                        1:08:37
16   A.   -- each piece of paper that comes back on
17   every inmate is looked at by approximately six to 12
18   different people to determine even if there is a
19   possibility someone is going to be discharged from the
20   Department of Corrections.  Which would then in the
21   process have a certain individual go and pull that
22   particular inmate's file.                          1:09:05
23   Q.   I'm not following you.  Any one of these 12
24   people can determine to pull the file?
25   A.   No.

46

1     Q.   But all these 12 people have to look at the

2  order from the judge before they determine to pull the

3  file?

4     A.   Correct.  For the safety and security --   1:09:29

5     Q.   You've answered my question.  So, all of the

6  12 people have to say, "No, I don't want to look at his

7  file" before he's released.

8     A.   I'm sorry, can you repeat?

9     Q.   Twelve people have to look at his piece of

10  paper, the order from the judge that said he's a free

11  man.  All 12 people have to say, "I don't want to look   1:09:55

12  at his file" before he can be released.

13     A.   No, it would -- wouldn't be in that -- done

14  in that manner.

15     Q.   Well, who makes the decision as to whether

16  someone should look at a file after the 12 people have

17  reviewed the order that said he's a free man?   1:10:26

18     A.   The supervisor.

19     Q.   Whose supervisor?

20     A.   The supervisor assigned to the records

21  office.

22     Q.   So, there's 13 people who have to get

23  involved in this decision, the 12 people who look at

24  the order and then the supervisor who makes a decision.

25     A.   And I wouldn't -- counsel, if it -- it's

47

1  exactly 12, but --   1:10:56

2     Q.   A lot of people.  It could be eight, ten, 11.

3  But we're talking about a lot of people of different

4  departments have to look at the order, and then somehow

5  those people communicate to the supervisor to hold him

6  or not to hold him.

7     A.   That particular supervisor not to hold him,

8  not to hold him.  To be -- to go ahead and pull the

9  file as a possible release from Cook County.   1:11:26

10     Q.   Okay.  So, when a person is found not guilty

11  and has the right to be free, your office first of all

12  has somewhere between eight and 12 people look at that

13  order and read it.   1:11:50

14     MR. ZECCHIN:  Object to the form.

15     A.   Again, yes, for the County to be --

16     Q.   But I don't --

17     A.   -- crystal clear --

18     Q.   -- need the reason, the crystal clear.  I

19  just want to know if I'm correct.  I'm looking at the

20  procedure.  A judge says not to guilty, free the guy.

21  You've agreed he's got rights to be free.  But the

22  first thing your office does is have up to 12 people

23  read the order of the judge.   1:12:15

24     MR. ZECCHIN:  Objection --

25     Q.   Is that right?

48

1     MR. ZECCHIN:  -- that misstates the

2  testimony.

3     MR. SCOUFFAS:  Same objection.

4     A.   To make sure we're correct, yes.

5     Q.   No.  Whether -- I'll get to the reasons

6  later.  Is it correct what I said, that after the judge

7  has found him not guilty or the jury has found him not

8  guilty, and you've confirmed to me that he has the

9  rights of a free man, the first thing you do is have 12

10  people read that judge's order, up to 12 people.   1:12:42

11     MR. ZECCHIN:  Same objection.

12     Q.   Is that right?

13     A.   Again, to verify, yes.

14     Q.   Well, please don't give me the reasons unless

15  I give you a question what are the reasons.  So I'm

16  going to ask you again.  And just answer my question

17  yes or no.  After a judge has said not guilty, he's a

18  free man, and you have confirmed that a free man has

19  rights, the first thing you do when you become aware of

20  that, that is to say the Sheriff's Office, is have 12

21  people read the order.  Is that correct?   1:13:17

22     A.   Through our process, yes.

23     Q.   Okay.  Now, the order is one page, right?

24     A.   No, sir.

25     Q.   What's -- what else is in the order besides

49

1  PX 3?

2     A.   Every time someone comes from court, there's

3  two pages.   1:13:43

4     Q.   Well, where's the rest of this order?

5     A.   I'm not sure.

6     Q.   Well, what would be the second page?

7     A.   It's basically the same.

8     Q.   So it's a copy.

9     A.   Correct.

10     Q.   Okay.  So, the actual order is only one page.

11     A.   We read every piece of paper.

12     Q.   Well, but you all -- you know he's -- you're

13  getting a copy.  So when you look at a copy, you're

14  just reading a copy.  It wouldn't take a genius to know

15  that he's looking at --   1:14:10

16     MR. ZECCHIN:  Objection.

17     Q.   -- a copy.

18     MR. ZECCHIN:  And argumentative question.

19     Q.   Right?

20     A.   If the clerk wrote something on another piece

21  of paper it's detrimental to the release of that

22  person.

23     Q.   Okay.  But you're talking about two pieces of

24  paper.

25     A.   Each time he goes to court.

50

1    Q.   No, no.  I'm talking about when the judge
2    says he's free, I'm only talking about the last order
3    which says he's free.  You've done whatever you're          1:14:32
4    going to do about those other orders under your
5    procedures and that's done and gone now.  What I want
6    to know is, when the judge says not guilty, he is
7    released as to this case, the first thing that happens
8    in your office is 12 people read this page.  Right?         1:14:55
9    A.   That page and a thousand others.
10   Q.   Well, why a thousand others?
11   A.   Because I sent a thousand out to court.  And
12   -- and make that returns from court, from 17 court
13   locations.  Every piece of paper that returns, whether
14   it's 2,000, 6,000, 8,000, every piece has to be
15   thoroughly read and looked at to ensure a judge's
16   order.                                                      1:15:19
17   Q.   Well, would you look at plaintiff's Exhibit
18   3?  You have no difficulty understanding "Verdict of
19   not guilty".  Right?
20   A.   Yes.
21   Q.   And then it says, "Release as to this case
22   only".  You have no problem in understanding that.
23   A.   No, sir.                                               1:15:46
24   Q.   So, with respect to just this case, not any
25   other case, you would not need anything else but

51

1    plaintiff's Exhibit 3 to know that Mr. Otero should be
2    released.  Correct?
3    A.   No, sir.
4    Q.   Why not?
5    A.   Again, through the process of a thousand that
6    went to court, and that's --
7    Q.   A thousand what that went to court?              1:16:10
8    A.   A thousand inmates.
9    Q.   Well, I'm just talking about Mr. Otero.  I'm
10   not talking about the other thousand.  I'm just talking
11   about Mr. Otero.  And I just want to know, you would
12   have no difficulty in knowing that Mr. Otero was found
13   not guilty and released because of this case by just
14   reading this one page.
15   A.   No, sir.                                         1:16:32
16   Q.   Well, what else would you have to read?  Not
17   other --
18   A.   His file -- his file itself.  And we run a
19   LEADS a warrant background check.  There's a whole
20   process that goes through, besides this case being
21   adjudicated, to ensure there are no other cases, or
22   while he's been incarcerated, that any other cases were
23   put on Mr. Otero to then not release him based on
24   another -- some other piece of paper remanding him back
25   to the DOC.                                          1:17:02

52

1    A.   And you start that process after a judge has
2    said release him.
3    A.   We start that after the paperwork and the
4    body returns to the Department of Corrections.
5    Q.   Well, then it's even longer after the judge
6    says release him.
7    A.   Correct.
8    Q.   So it's the judge's -- you start the -- this
9    process that you're about to tell me about, to
10   determine whether or not you're going to release him
11   sometime after a judge has ordered him to be released.      1:17:35
12   A.   Yes.
13   Q.   So, you're now impinging on his rights.
14   MR. ZECCHIN:  Objection, calls for legal
15   conclusion.
16   A.   I couldn't answer that.
17   Q.   Well, you told me he has rights to be free as
18   a result of the judge's order.
19   A.   Once he's cleared, processed and safely and
20   secured -- securely through the Department of
21   Corrections clearing him.                                   1:18:05
22   Q.   I see.  Now, when do you know under your
23   procedures that you're going to do that for innocent
24   people, look through the file?
25   A.   Again, I wouldn't know if he's innocent or

53

1    not.
2    Q.   Well, you know some people are going to be
3    innocent.
4    A.   Once we check everybody's file that's a
5    possible release, then we would know.                       1:18:29
6    Q.   Well, you would agree with me that when
7    someone is arrested, for every ten people arrested a
8    lot of them get found innocent, right?
9    MR. ZECCHIN:  Objection, hypothetical --
10   Q.   Some of them.
11   A.   I couldn't answer that.
12   Q.   How about out of a million?  Some of them who
13   get arrested out of a million are going to be found
14   innocent, right?                                            1:18:49
15   MR. ZECCHIN:  Same objection.
16   A.   Yes.
17   Q.   And some out of 10,000 who are arrested are
18   going to be found innocent.
19   A.   Yes.
20   Q.   And some out of a thousand who are arrested
21   are going to be found innocent.
22   A.   Yes.
23   Q.   And some out of a hundred who are arrested
24   are going to be found innocent.
25   A.   Yes.                                                   1:19:09

54

1  Q.  And some out of 50 who are arrested are going
2  to be found innocent.
3  A.  Yes.
4  Q.  And some out of 20 who are arrested are going
5  to be found innocent.
6  A.  Yes.
7  Q.  And some out of ten who are arrested are
8  going to be found innocent.
9  A.  Yes.
10  Q.  So you know every day you go to work that
11  there are going to be lots of innocent people who you
12  have to go through some process and procedures before
13  you release that innocent person.  You know that right   1:19:44
14  now for tomorrow.  Right?
15  A.  No.
16  Q.  You don't think anybody'll be found innocent
17  tomorrow?
18  MR. ZECCHIN:  Objection.  Again.
19  A.  I wouldn't know, counselor, till the
20  paperwork tells me.
21  Q.  No, no.  But you just told me that it is your
22  expert opinion that out of a million, 10,000, a
23  thousand, all the way down to ten, that some people are
24  going to be found innocent.  So, using that as a   1:20:13
25  backdrop, you know as you're sitting here now that out

55

1  of trials that are going on right now or tomorrow, some
2  of those people are going to be found innocent.
3  MR. ZECCHIN:  Objection to the form.  He's
4  not here as an expert on who's innocent, who's not
5  innocent.  It's beyond the scope of the rider.  And
6  therefore he can give an opinion as you've asked a
7  million times, but he's certainly not giving an expert
8  opinion as to that.  And it's not covered by this, so
9  --   1:20:37
10  MR. CHERRY:  This -- this is all covered by
11  the policies and procedures and the purposes the steps.
12  I don't have to ask narrow questions.
13  Q.  But you know as you sit here, and you have
14  known for all of the time that you have worked at the
15  Sheriff's Office, that in a given day some people are
16  going to be found innocent and some people are going to
17  be found guilty as a general rule.  Correct?   1:21:01
18  A.  I would say, to my personal belief, yes.
19  Under --
20  Q.  Okay --
21  A.  -- my job, until I thoroughly search that --
22  Q.  Well, no, no, no, no, wait.  You even know it
23  as -- as to your job.  You know that you are going to
24  get a significant number of orders every day from the
25  court that says a guy is innocent of the charge.  You

56

1  know that as a matter of practice and policy for all
2  the time you've been working at the Sheriff's Office.   1:21:31
3  A.  Yes.
4  Q.  Okay.  And you know that's going to happen in
5  the future.
6  A.  Yes.
7  Q.  And I take it the reason why you don't start
8  this process earlier, that is check the files of people
9  earlier, is because you don't want to.   1:22:01
10  A.  Not at all.
11  Q.  Well, you could.  You could've checked Mr.
12  Otero's file during the trial.
13  A.  No, sir.
14  Q.  Why not?
15  A.  We don't work in the court buildings.
16  Q.  But you could've ordered the files sent over,
17  you could've had someone to go over to the court, you
18  could've put everything on a computer.  If you wanted   1:22:27
19  to, you could devise a procedure to check someone's
20  files way before a judge says release him.
21  MR. ZECCHIN:  Object to speculation.
22  Q.  I mean, I understand that's not the current
23  procedure.  But you and I could come up with a
24  procedure that would allow that process to begin
25  earlier.   1:22:52

57

1  A.  Sitting here, I couldn't answer that a yes or
2  no till I would be able to thoroughly look at the
3  system, look at everything.  Again, outside the
4  Department of Corrections, I have no idea, and the
5  courts, the --
6  Q.  So, at least you're not saying no, it's
7  impossible.  You're saying that you don't -- can't
8  answer it yes or no because it might be possible.   1:23:21
9  A.  I would say nothing's impossible.
10  Q.  Okay.  Now, I want to show you the policy on
11  discharge.
12  MR. CHERRY:  Can we mark that as the next
13  Exhibit, please?
14  WITNESS:  Thank you.
15  MR. CHERRY:  And we've marked this
16  plaintiff's Exhibit 4?   1:24:03
17  RECORDER:  Yes, 4.
18  Q.  A document entitled GENERAL ORDER NO. 9.27,
19  00066 through 00075.  Did I correctly describe that,
20  sir?
21  A.  Yes.
22  Q.  And you're familiar with this, are you not?
23  A.  Yes.
24  Q.  Find for me in this general order policy the
25  section that says the protection of rights of a not

58

1    guilty or innocent man.                                  1:24:38
2        A.   Can you repeat that, sir?
3        Q.   With respect to plaintiff's Exhibit 4,
4    GENERAL ORDER NO. 9.27, which is the policy for
5    discharge, find me the section entitled "protecting the
6    rights of the innocent man."                             1:25:16
7        A.   In this order I don't see it.
8        Q.   So, you told me there's no policy at the
9    Sheriff's Office that protects the rights of the
10   innocent men, no such policy.  Remember that earlier
11   testimony?
12       A.   Correct.                                        1:25:40
13       Q.   And in the order on discharge, there is no
14   section that deals with protecting the rights of the
15   innocent or to be released person.  Correct?
16       A.   Correct.
17       Q.   How does anybody know at your office, the
18   people who work for you, that they should protect the
19   rights of the innocent man, the freed man, the -- the
20   free man, if there is no policy or procedure about it?   1:26:26
21       A.   And again I would answer we don't know that
22   the man was free or be released from jail until we
23   thoroughly search his file and ascertain and go through
24   every check to ensure that the person is supposed to be
25   released.                                                1:26:46

59

1        Q.   Well, I -- I understand that.  But under my
2    assumption, he's a free man.  You're just taking time
3    to look through and confirm that according to your
4    procedures.  But I want to know what directions are
5    given to employees to make sure that they, during this
6    process, don't dillydally, that they get right to it,
7    that they realize the guy's in jail, that he may get
8    beat up, and where do you tell people to kind of
9    balance the -- the situation?  Like, if I went out to   1:27:27
10   lunch with a deaf and dumb person, and I would say to
11   people who were going out with me, "This person can't
12   speak, so if you don't know sign language, be prepared
13   to write out your questions to him because he can read
14   and write", so I would be helping that person who
15   couldn't speak communicate with the rest of the group.  1:27:55
16   So, what I'm trying to figure out is who the hell at
17   the Sheriff's Office, pardon my expression, is telling
18   people to protect the free man?
19       K    I'm going to object to this question.  Form,
20   foundation, legal conclusion.
21       A.   Again, counselor, nobody at the Department of
22   Corrections would know that anybody that went to court
23   is a free man.  The -- the Department of Corrections    1:28:23
24   takes every step just like in the general order and the
25   requirements that inmates are entitled to a timely

60

1    release.
2        Q.   Okay.
3        A.   We have every measure in place to effectively
4    thoroughly check that person's file out of the thousand
5    that went to court, decipher who is a possible release
6    or not.                                                  1:28:46
7        Q.   Well, forget the thousand.  Because you can
8    solve that problem by hiring more people.  If you had
9    one person who was looking at a thousand records, that
10   wouldn't allow you to keep people in jail for ten years
11   to look at their records.  So, how many people you have
12   doing this and all that, that's your business.  Because
13   I'm a single person.  My client's Mr. Otero.  I'm only  1:29:08
14   interested in him.  Now, if he loses his rights because
15   you're too busy, just tell me that.  We can't protect
16   Mr. Otero's right because we're too busy.  Is that
17   true?
18            MR. ZECCHIN:  Objection, argumentative.
19       Q.   Is that true?
20       A.   No, sir.
21       Q.   Okay.  So, then I don't want to hear about
22   the thousand people and all that kind of stuff.  I just  1:29:28
23   want to -- you just said you're not too busy to protect
24   his rights.  Now, where in GENERAL ORDER 9.27 is this
25   timely word that you --

61

1        A.   Number -- page would be 00067, number III
2    under "REQUIREMENTS".                                    1:29:47
3        Q.   And read me the sentence.
4        A.   "Inmates/detainees are entitled to timely
5    release when they have posted bond, been granted an
6    AMF, ordered released by the court, completed a
7    sentence or pending authorized transfer to another
8    agency.  All releases" --
9        Q.   Okay.  That's enough.  I just want to know
10   that sentence.  So, this sentence is your way of saying  1:30:08
11   protect the free man.
12       A.   No, sir.
13       Q.   So there's nothing in here to protect the
14   free man?
15       A.   Again I'm going to say we do not know if he's
16   a free man.
17       Q.   Well, if you went through the files and there
18   was nothing to hold him, he was free right after the
19   order of court because there was nothing to hold him.    1:30:38
20   You may have a process that you want to go to, but he
21   was still free as of the date of the order.  You wanted
22   to confirm it, but you're just confirming his freedom.
23   So in any instance when you look through the files to
24   find out that there was nothing in the world to
25   disagree with the judge's order, he was free as of the

62

1    date of that judge's order, and the only reason he
2    isn't free is because you went through your procedures.
3    Right?                                                    1:31:09
4         A.    Again, I would not know that --
5         Q.    I understand that.
6         A.    -- under after that procedure.
7         Q.    That's what your testimony is, you would not
8    know that.  We know from plaintiff's Exhibit 3 that
9    he's free as of the judge, right?
10        A.    I'm sorry?
11        Q.    We know from plaintiff's Exhibit 3 that the
12   judge freed him.
13        A.    On that case.                                  1:31:31
14        Q.    Right.  And if he had no other case, then
15   he's free as of the date of that order.
16        A.    Yes.
17        Q.    And the only reason that he's not free as of
18   the date of the order is that you guys are taking a
19   period of time to find out if there's some other reason
20   to hold him.
21        A.    Yes.                                           1:31:54
22        Q.    And in that period of time you're finding
23   this out, we have the rights of two people or two
24   entities that are being balance, your right to follow
25   your procedures and his right to be free right after

63

1    the judge said so.
2         A.    Can you say that one more time, counsel?       1:32:21
3         Q.    When you go through your procedures, as of
4    and during the period of time you're going through the
5    procedures, there are two competing interests, the
6    Sheriff's Office interest to look through the files and
7    Mr. Otero's interest to be free in accordance with the
8    judge's order.                                            1:32:48
9         A.    Correct.
10        Q.    Okay.  And you're the keeper of the balancing
11   of those interests.  Your office.
12        A.    I wouldn't say I'm the keeper.
13        Q.    Well, the Sheriff's Office is.  They
14   determine how quickly they're going to look through
15   files, how quickly they're going to make a decision to
16   release Mr. Otero, whether they start now or start a
17   week from now, whether to take a lunch break, whether
18   they do it tomorrow morning.  You're the determiner of   1:33:25
19   how quickly you make that decision.
20        A.    Correct.
21        Q.    Now, how long did it take for you to make the
22   decision for Mr. Otero?
23        A.    Approximately four hours.
24        Q.    I thought it was ten hours.
25        A.    I didn't say ten hours.                        1:33:48

64

1         Q.    Well, that -- that's my recollection from the
2    file.  You sure it was four hours?
3         A.    Well, based on what I've seen from him
4    leaving Division 6 and exiting out the door was
5    approximately four hours.
6         Q.    I'm talking from the time he was acquitted by
7    the judge until the time he was released.  That period   1:34:20
8    of time I thought from the file was about ten hours.
9         A.    I'm not sure.
10        Q.    Do you have something that would refresh his
11   recollection?  And while we're doing that, so it was
12   four hours you think from the time someone in your
13   office got the order.                                     1:34:45
14        A.    Approximately, yes, sir.
15        Q.    Okay.  And when someone in your office got
16   the order, did they get that order along with a
17   thousand other orders?
18        A.    Yes, sir.
19        Q.    So, how much time did it take to go through
20   the other thousand orders and how much time did it take
21   to go through just Mr. Otero's files?                     1:35:10
22        A.    I'm not sure I understand, counselor, as far
23   as --
24        Q.    Well, the four hours includes going through a
25   bunch of other files.

65

1         A.    Correct.
2         Q.    So, going through Mr. Otero's files wouldn't
3    take four hours.                                          1:35:33
4         A.    No.  In the process of how many, it was
5    approximately a thousand went to court.  From 17
6    different courthouse locations coming back to one
7    central point in the receiving room at the Department
8    of Corrections.  Deciphering all through those files
9    and which would be -- if it was just 2 -- 2,000 pieces
10   of paper, from the receiving room officer that checks
11   the paperwork to ensure the right body, to an auditor
12   that reviews all the paperwork, to up to the records
13   office where the sergeants to again check the paperwork
14   for a possible discharge.  And then to disseminate that  1:36:13
15   information to the person processing discharges, and
16   then to pulling that file.  Researching the file,
17   running a LEADS and warrants check for the sergeant to
18   approve that, an auditor to review it, the receiving
19   room officer and sergeants review it, and the person
20   being called for it and brought to the receiving room
21   to be discharged.  In a four-hour, approximately         1:36:44
22   four-hour timeframe.
23        Q.    So just for Mr. Otero's files it took four
24   hours.
25        A.    In the whole aspect of everyone coming back

66

1   from court that day, yes.

2      Q.  I don't know what you mean.  I want to -- how

3   long it took to go through Mr. Otero's files, and you

4   said you can't separate that out, that the process

5   included other files coming back from the court.  He    1:37:18

6   was part of that process and that process took four

7   hours.

8      A.  Correct.

9      Q.  Okay.  Now, the first part of the process is

10   to look at the order and make piles.  Right?

11      A.  Look at all the orders, yes.    1:37:41

12      Q.  Yeah.  And so right away, when you get to Mr.

13   Otero's, you put them on the free pile.

14      A.  Possibly.

15      Q.  Possible free pile.

16      A.  Yes, sir.

17      Q.  Okay.  And do you wait until all the other

18   piles are made before you start working on the free

19   pile?

20      A.  No, sir.

21      Q.  So as soon as you reach Mr. Otero's files,

22   which says, "Verdict of not guilty, release", somebody

23   is given that to start working on just his file.  Or do    1:38:10

24   you wait until all of the piles are made from the

25   thousand that come over?

67

1      A.  Depending again in the process of what we

2   have -- we have anywhere from 12 to 30 buses on the

3   street and approximately 500 inmates at the Criminal

4   Court building.  Depending on what time all of those    1:38:36

5   return back to the Department of Corrections, if you

6   will picture -- if -- if a bus comes in with 53 people

7   on it, all that paperwork is brought to an officer who

8   then begins the process of identifying the right person

9   to that piece of paper.  And then that person's    1:39:00

10   accepted.  So, all through the day and through the

11   night, they're accepting returns coming in.  After each

12   break of reviewing that paperwork, it's turned over to

13   a records person, who then begins separating the

14   paperwork of possible releases, future court dates,

15   sentenced inmates.  That paper of that group is    1:39:25

16   collected and brought to the records office, so we'll

17   give it to a sergeant, so when that -- that sergeant

18   verifies what the next -- what the before person looked

19   at to verify if they concur with that.  From that, that

20   sergeant then spreads to the room of people that are

21   updating future court dates, sentenced inmates, and

22   possible discharged inmates.  Of the thousand that went    1:39:55

23   to court, or however many are a possible release, there

24   are certain individuals on a certain side of the room

25   that are then, a sergeant on a piece of a paper -- so,

68

1   to keep track in our process of possible people to be

2   released, so we don't keep them.  Sergeant pulls out

3   who they're assigning paperwork to.  It's our checking    1:40:19

4   down system.  And then that records person might have

5   20, 30, 40 different people to go through.  Then they

6   begin their tasks.  They go and get the file and they

7   work each pack to its completion.  Once it's completed,

8   it again goes back to a sergeant to verify what that

9   person did.  That sergeant reviews it, signs it.  Then    1:40:45

10   it goes to an auditor for an auditor to review every

11   step taken that person did.  And then it goes to the

12   receiving room officer who's responsible for releasing

13   that person.  They go through the entire pack.  Then it

14   goes to the sergeant in receiving who reviews the

15   entire pack.  And the person's brought upstairs to    1:41:07

16   Division 5, where the Division 5 officer verifies who's

17   in front of them, dress and release form that that

18   person's allowed to exit the confines of Division 5,

19   and then they go out to property to retrieve their --

20   anything that they were arrested on and were remanded

21   to the Cook County by a judge, they receive that.  It's    1:41:35

22   another checkpoint that verifies that that's the right

23   person leaving.  And when they get out to the last

24   outer gate before they leave, there's another check, a

25   verification of who that person is.  But all in

69

1   segments could be ten, 20, 30 of -- of all the thousand

2   that went to court that day, each and every day.    1:41:58

3      Q.  And everybody who is to be released -- in

4   your example there were 20 or 30, there might be more

5   than that in a month or a year, way more than that, do

6   you agree?

7      A.  To be released?

8      Q.  Mm-hmm.  The number of people to be released

9   you said in your example was 20 to 30 in the

10   hypothetical you just gave me.    1:42:26

11      A.  No.  In each group.

12      Q.  In each group.

13      A.  Yes, sir.

14      Q.  And how many groups are there?

15      A.  Depending on the court call -- approximately

16   had a thousand a day and 12 to 30 vehicles out on the

17   street.  Each bus holds 53, not counting new coming in.

18   And 500 in the Criminal Court building.  You could have

19   anywhere from a thousand to 15 hundred.  And if -- each

20   group can be 20, 30, 50, 400 coming back from criminal

21   courts.  It's -- each day is different.    1:43:01

22      Q.  Okay.  But in a given day, based upon what

23   you're saying, there could be anywhere from 50 to 300

24   people who are scheduled to be released.

25      A.  Correct.

70

```
 1        Q.   And all of those people, the procedures with
 2   -- with respect to all of those people, is exactly the
 3   same.                                              1:43:23
 4        A.   Yes.
 5        Q.   And if I extended that out a week, your
 6   answer would be the same, that if there are 50 to 300
 7   in a day, there might be somewhere between 250 to 25
 8   hundred in a week, all of those people to be released,
 9   and that week would be treated exactly the same under
10   your office's procedures.                         1:43:48
11        A.   Yes, sir.
12        Q.   Would you look at the first page, please, of
13   plaintiff's Exhibit -- the policy, is that Exhibit 4?  1:44:19
14        A.   Yes, sir.
15        Q.   Do you see under C, it says "Internal
16   Audits"?
17        A.   Yes, sir.
18        Q.   This is an audit to make sure that you're,
19   among other things, having the timely release of people
20   who are essentially free.                         1:44:45
21        A.   Yes, sir.
22        Q.   And how often do you do an audit?
23        A.   Every month.
24        Q.   And what's the purpose of the audit, to just
25   get numbers or to make sure that you're not keeping a
```

71

```
 1   free man too long or to see if you released someone who
 2   shouldn't be released?  What's the purpose of the
 3   audit?                                            1:45:06
 4        A.   I would say it was -- it was multiple -- if
 5   there was a multiple question, it would be all of the
 6   above.
 7        Q.   I'm sorry.  I didn't hear you.
 8        A.   I would say it would be all of the above.
 9        Q.   Is this a written audit?
10        A.   No, sir.                               1:45:30
11        Q.   How is it made?
12        A.   It's stats that are compiled and then -- I'm
13   not a computer expert -- basically broke down into a
14   graph.
15        Q.   So, that's writing.
16        A.   I'm sorry?
17        Q.   That's a writing.  It's not a handwriting,
18   but it's -- it's physical.
19        A.   No, it's like a pie -- a pie chart.     1:45:57
20        Q.   Okay.  But the audit is on one or pieces of
21   paper.
22        A.   Correct.
23        Q.   And for a given month, how many pieces of
24   paper would be audited, on average?  How --
25        A.   Accumulated?
```

72

```
 1        Q.   Yeah.
 2        A.   I'm not aware of the -- a lot.           1:46:23
 3        Q.   Couple hundred pages?
 4        A.   More than that.
 5        Q.   Couple thousand pages?
 6        A.   It could be, yes.
 7        Q.   And then there's a summary sheet on the top.
 8        A.   No, sir.
 9        Q.   Well, if the supervisor wanted to know how
10   you were doing without reading the 2,000 pages, can he
11   do that?                                          1:46:45
12        A.   From the pie graph I was -- I told you about.
13        Q.   Okay.  So that's a summary of sorts.  Now,
14   these weren't produced according to our review -- at
15   least they weren't produced in an organized fashion
16   saying this is the internal audit.  But you have these  1:47:06
17   readily available, so if I ask you to go get last
18   week's internal audit, you could easily get your hands
19   on it.
20        A.   Not -- not last week's.  I guess that we -- I
21   -- I internally audit on a month -- on a monthly basis.
22        Q.   Okay.  Each month's audit.  If I asked you to
23   get this month's audit if it was done, you'd -- you'd
24   know where it was.  You could find it.             1:47:30
25        A.   I would say hopefully I'd be able to find it.
```

73

```
 1   Yes.
 2        Q.   Okay.  And last month's audit, you could find
 3   that too.
 4        A.   Yes.
 5        Q.   And how long do you keep these audits?
 6        A.   Approximately a year.                    1:48:00
 7        Q.   And then what happens after a year?
 8        A.   Through our records retention program,
 9   they're -- all records are sent to a warehouse and then
10   by order of the state they're -- I don't know if you'd
11   say shredded, whatever, disposed of.               1:48:20
12        Q.   So every year they're gone.
13        A.   I -- I'm not over that.  I just know every
14   year we sent -- through records retention, we send our
15   files to a warehouse.
16        Q.   So they might still be at the warehouse.
17        A.   Possibly.
18        Q.   You don't know.
19        A.   No, sir.
20        Q.   But if you were looking for a past audit file
21   and it wasn't in your office, one of the places you
22   might look is the warehouse.                       1:48:47
23        A.   Yes.
24        Q.   Now, is there any summary kept at your office
25   so -- like the summary sheet that you can look back
```

74

```
1    over a period of time and see a pattern of how your
2    audits have gone even though you don't have the
3    underlying material?                          1:49:11
4        A.   No, sir.
5        Q.   So there's no check and balance to see how
6    you've been doing the last five years on these audits?
7        A.   No, sir.
8        Q.   Why not?
9        A.   Again, through the records retention, through
10   the policy, we -- we don't hold records that long.
11       Q.   Well, how about just the summary sheet?   1:49:34
12       A.   No, sir.
13       Q.   Or some conclusion on a piece of paper that
14   says we're doing good in audits, we're doing poor in
15   audits, we don't know what we're doing, we're doing
16   great?  Why isn't -- how do you know whether or not
17   your process and procedures have been audited properly
18   over the years?  Let's say I took over this job.  And   1:49:55
19   you left.  And I wanted to know if you were audited
20   properly.  How would I know that?
21       A.   Based on the -- the -- the superintendent of
22   that particular unit.  You would want to review their
23   -- their audits, their files.                 1:50:22
24       Q.   The internal audit is of several different
25   offices?
```

75

```
1        A.   No, I was referring to if every general order
2    -- whatever order looked for an internal audit of what
3    each superintendent would keep.
4        Q.   So, some of these audit materials are kept by
5    the superintendent.                           1:50:47
6        A.   Correct.
7        Q.   So they're not all destroyed.  If we wanted
8    to go back to your office, we could go not to the audit
9    file, because that's been sent to the warehouse and you
10   don't know what happens after that, but copies of that
11   audit file before sending to the warehouse have been
12   distributed to various other people, correct?  1:51:09
13       A.   I'm not sure -- copies of the --
14       Q.   Audit.
15       A.   As far as?
16       Q.   You make copies and you sent it to other
17   people.  Interested people.
18       A.   Yes.
19       Q.   So you might be able to get audits that go
20   back several years by going to a particular
21   supervisor's office.
22       A.   Oh no, that's why I was saying I wasn't sure
23   what you were saying.  But under the GOs, we're
24   required -- any -- any paperwork from that year is
25   boxed and sent to the warehouse.              1:51:44
```

76

```
1        Q.   Even in the supervisor's office.
2        A.   Yes.
3        Q.   So, at the end of a given year, everybody
4    starts with a desk sort of.
5        A.   Basically.  Yes.
6        Q.   So, would there be any way if the warehouse
7    didn't have this information to determine whether
8    you've done a good job or a bad job by virtue of the
9    audits?                                       1:52:09
10       A.   I'm not aware at this time.
11       Q.   So, if I started to take your job and I
12   wanted to know how well you were doing in implementing
13   the discharge policy, I'd have to just talk to people.
14       A.   Correct.                            1:52:33
15       Q.   And take their word for it.
16       A.   And based on -- from -- from whenever you
17   would take over, based on the paperwork of discharging,
18   you'd be able to formulate your own audit.
19       Q.   For the future.
20       A.   Yes, sir.
21       Q.   Yeah.  But in terms of the past, like I'm
22   here right now, you have no record to determine whether
23   or not your release procedures have been good, bad,
24   indifferent, unconstitutional, constitutional, you just
25   don't know one way or the other.              1:53:03
```

77

```
1            MR. ZECCHIN:  Objection, calls for a legal
2    conclusion.
3        A.   I couldn't answer that.
4        Q.   You're unable to answer that.
5        A.   No, sir.
6        Q.   Well, then answer it.
7        A.   Again I'm going to -- under my job scope, I
8    couldn't answer constitutional or unconstitutional --  1:53:34
9        Q.   Legally.  In --
10       A.   Or legally.  Correct.
11       Q.   You -- but you or I would have no way of
12   making any judgment about the process because there are
13   no files, other than talking to people.
14       A.   I would say, counselor, in -- not in just
15   talking to people but under the -- the job of the
16   records department, the process in the GO that we in a
17   timely manner release inmates that are to be released
18   from the Department of Corrections.           1:54:23
19       Q.   If I want to check that for two years ago, if
20   there are no records, the only way I can check that is
21   to talk to somebody if he was around or she was around
22   at the time.
23       A.   Correct.
24       Q.   Okay.  So the only way in which Mr. Otero can
25   check whether you were doing an acceptable proper job
```

78

1    under your release policy is to take your word for it.          1:54:49
2    Because you have, in way or another, destroyed all of
3    the relevant records.
4         A.   Correct.
5              MR. ZECCHIN:   Counsel, I'm going to suggest
6    we break for lunch.  It's 12:15.
7              MR. CHERRY:   That sounds like a good idea.
8              RECORDER:   Going off the record, 12:16 p.m.          1:55:17
9                   (Off the record)
10             RECORDER:   Going back on the record, 1:14
11   p.m.
12        Q.   Maybe I can try to expedite this.  I want to
13   see if I can get a description in some order, A, B, C,
14   D, E, of what happens when a hypothetical person is
15   acquitted.  From that moment until he's in his jail          1:56:05
16   cell.  So, I'm going to try to suggest to you what I
17   think your answers, and you can say yes, that's
18   correct.  If it's not correct, then I'll answer -- I'll
19   ask you to tell me what's incorrect about it.  But if I      1:56:29
20   do this right, you're just going to give me a series of
21   yeses.  Okay?
22        A.   Correct.
23        Q.   A defendant is acquitted in a court.  He's
24   now turned over to the Sheriff's representative.
25   Correct?

79

1         A.   Yes.                                                 1:56:53
2         Q.   And the first thing that happens is he's
3    handcuffed.
4         A.   I couldn't say, counselor, from the
5    courthouses their -- their procedures.
6         Q.   Well, doesn't the Sheriff's Office have a
7    procedure to, when they're starting to take someone out
8    of court, to handcuff them?                                   1:57:22
9         A.   I can tell you from under the DOC's policy --
10        Q.   DOC?
11        A.   Department of Corrections.  If
12   transportation, which is under Department of
13   Corrections, outlying courts before a defendant boards
14   the bus, they're handcuffed under our policy.                 1:57:44
15        Q.   How about before he goes through the tunnel?
16   From the court to the jail.
17        A.   Are you referring to from Criminal Courts?
18        Q.   Yeah.
19        A.   At 26th Street?
20        Q.   Yes.
21        A.   They're -- the defendants are handcuffed from
22   Division 5 receiving room out to their Division.             1:58:15
23        Q.   So, the procedure of the Department of
24   Corrections does not require, and to your knowledge it
25   doesn't happen, handcuffs in the courtroom.

80

1         A.   I'm not aware.
2         Q.   Okay.  So he's not handcuffed.  But he goes
3    from the courtroom to a holding cell or directly with a
4    representative to start his walk back through the
5    tunnel?  Is he put in a holding cell, next to the            1:58:49
6    courthouse, and then someone comes and picks him up?
7         A.   He's actually placed in a holding cell behind
8    the judge's chambers.
9         Q.   Okay.  So he's acquitted, and the first thing
10   that happens to him after he's acquitted is he's put in
11   a -- a jail cell.
12        A.   A holding cell behind the judge's chambers.        1:59:13
13        Q.   That's a jail cell.  He can't get out.
14        A.   But not a jail cell.
15        Q.   Well, it's a got a lock and key in it, right?
16        A.   Correct.
17        Q.   And the acquitted person is placed into this
18   cell and the door is locked until the Sheriff's Office
19   takes whatever the next step is.                             1:59:36
20        A.   Again, I'm not aware of their internal
21   procedures.
22        Q.   Well, you know that he's put in a holding a
23   cell.
24        A.   Yes.
25        Q.   Doesn't the Sheriff's Office eventually take

81

1    him from the holding cell?
2         A.   The Sheriff's personnel from the courthouses,
3    from -- the deputies.                                        2:00:00
4         Q.   Yeah, but that's part of the Sheriff's
5    Office.
6         A.   Correct.
7         Q.   They take him from the holding cell.
8         A.   Yes.
9         Q.   And I take it that the -- the -- the
10   acquitted defendant has to wait for the Sheriff's
11   deputies to take him somewhere.  He's -- he's got to go
12   in the holding cell and he can't make up his own
13   determination of what he wants to do even though he's
14   at that moment a free man.                                   2:00:29
15        A.   Correct.
16        Q.   Then the Sheriff's deputies take him where?
17        A.   The --
18        Q.   From the holding cell.
19        A.   The court deputies, from whatever holding
20   cell defendants are in behind the judge's chambers, are
21   then --
22        Q.   He's not a defendant.  He's acquitted.  So,
23   you mean not only acquitted people but people who
24   happen to be in court who are convicted of murders or
25   awaiting trial, they're all in the same -- the -- it's

82

```
1    all under the same procedure.  Correct?              2:01:13
2         A.    Again, every -- everybody is treated and the
3    process is the same for everybody till the
4    determination is made somebody is to be released from
5    the Department of Corrections.
6         Q.    Okay.  So, if a person in Judge A's courtroom
7    is found guilty, and a person in Judge B's courtroom
8    has just finished one day of a several-week trial, and
9    a person in Judge C's courtroom has just been
10   acquitted, all three of those people indiscriminately
11   without regard to how they got to the end of the day,
12   whether they were acquitted, trial's not over, or
13   they're convicted, they all go to into the holding cell
14   behind the -- the judge's courtroom.                 2:02:20
15        A.    No.
16        Q.    What's wrong with my statement?
17        A.    There's -- there's holding cells behind each
18   judge's --
19        Q.    Well --
20        A.    -- chambers.
21        Q.    -- that's what I mean.  That in each
22   courtroom the convicted guy, the guy on trial, and the
23   acquitted guy, each one of those at the end of the day
24   would go in to the holding cell of their respective
25   courtrooms.                                          2:02:49
```

83

```
1         A.    Correct.
2         Q.    Okay.  So, so far whether you're a bad guy, a
3    good guy, we don't know what kind of a guy, you're --
4    you're treated exactly the same in the process.
5         A.    Correct.
6         Q.    Now, each one of those courtrooms has a -- a
7    person in it, a bad guy, the we don't know guy, and the
8    good guy, acquitted guy.  Someone comes from the deputy  2:03:23
9    Sheriff deputies in each courtroom and -- and takes him
10   somewhere.  Correct?
11        A.    Correct.
12        Q.    Do you know whether they handcuff him before
13   they take him?
14        A.    I'm not aware.
15        Q.    Now, where do the Sheriff's deputies take
16   that person from the holding cell from each of the
17   three courtrooms that I've used in my hypothetical?   2:03:50
18        A.    All of the defendants are brought to a
19   centralized -- what we would call a lockup.  So, it's a
20   multitude of holding cells in that respective
21   courthouse.                                          2:04:15
22        Q.    The Sheriff deputies, each one of them, takes
23   whoever is in the holding cell of his judge at the end
24   of the day, right, and takes him where?              2:04:39
25        A.    To a --
```

84

```
1         Q.    Larger holding cell.
2         A.    Correct.
3         Q.    And where is that?  Somewhere in the
4    courtroom?  In the courthouse?
5         A.    Yes.
6         Q.    In the basement?
7         A.    I'm not aware of where all of them are
8    located.
9         Q.    So there more -- may be more than one second
10   holding cell.  We'll call the first one the first
11   holding cell.  And now the Sheriff deputies take them  2:05:06
12   to a second holding cell.  And now they're all
13   commingled, is that right?
14        A.    Yes.
15        Q.    So, the convicted guy, the guy who's on
16   trial, and the acquitted guy are all taken and put in a
17   holding cell with each other.                        2:05:34
18        A.    Not -- not all in one large holding cell.
19   It's -- it's one central holding area with multitude of
20   holding cells.
21        Q.    And how many people are in each cell?
22        A.    I'm not aware.
23        Q.    Well, who would know?                     2:06:00
24        A.    An administrator from the court side.
25        Q.    And what's your best educated guess, even
```

85

```
1    though I won't hold it to you, as to when the Sheriff's
2    deputies from the various courtrooms take all these
3    people and take them to this larger area, how many
4    people go into a cell?  And I won't hold you to.     2:06:24
5    I'm just asking for your best estimate based on your
6    experience.
7         A.    Can range, from my personal notes, anywhere
8    from 25 to 150.                                      2:06:56
9         Q.    In a single cell.
10        A.    No, sir.
11        Q.    So what's the 25 to 150?  How many people are
12   collected at the end of the day?
13        A.    Yes.
14        Q.    Okay.  Now when they're collected, let's say
15   there's 50, okay?
16        A.    Okay.                                     2:07:18
17        Q.    They go to this other general area.  They're
18   brought there by the deputies from the various courts.
19   Correct?
20        A.    Correct.
21        Q.    You don't know whether they're handcuffed or
22   not on that trip from the courthouse to this holding
23   area.
24        A.    Correct.
25        Q.    But the holding area is on the other side of
```

86

1   the tunnel.  The one you're talking about, or is it
2   before the tunnel?                                    2:07:44
3       A.   That's what I was saying.  There's -- there's
4   17 other court locations prior -- than the criminal
5   court building.  So you have 17 spread throughout all
6   of Cook County.
7       Q.   I'm just talking about the one that -- the
8   Criminal Court.
9       A.   Okay.
10      Q.   So, when the judges take them out of the one
11  on 26th and California, I mean when their Sheriff's
12  deputies take them out of these three hypothetical
13  courts, A, B, C -- you with me so far?                2:08:18
14      A.   Yes.
15      Q.   Where do they go?  They go to another area?
16      A.   They're all dropped to an area that's called
17  the -- the bridge.
18      Q.   The bridge.  And is that a confined area?
19      A.   Yes.
20      Q.   So, they come from a confined area, the
21  judge's holding cell.
22      A.   Yes.                                         2:08:45
23      Q.   And they're walked, depending upon who they
24  are and what their background is, by one person or
25  three people.

87

1       A.   I'm not aware.
2       Q.   Well, you told me that when people are being
3   moved in you said a tunnel, but I assume it's true
4   throughout this area, that sometimes one person can
5   take a prisoner, and then if they have flight reasons
6   or something else, there might be up two people plus a
7   supervisor.  You told me that this morning.           2:09:19
8       A.   So like on the jail side.
9       Q.   Right.  So, I assume the same is true on the
10  court side.
11      A.   I'm not aware.
12      Q.   You don't know.
13      A.   I don't know.
14      Q.   You don't know if that's true or not true.
15      A.   Correct.
16      Q.   Okay.  So, one or more deputies have taken
17  the guy from the courtroom to the bridge area.
18      A.   Yes.                                         2:09:45
19      Q.   And however many people are brought to the
20  bridge area, you said could be from 50 to 150.
21      A.   I would correct my statement now, counselor.
22  I was describing the 17 courthouse locations.
23      Q.   Okay.  So, let's say an average at 26th and
24  California.  How many would come out of that area to
25  the bridge area?                                      2:10:12

88

1       A.   Five hundred.
2       Q.   Five hundred.  And what -- is that an
3   estimate?
4       A.   Yes.
5       Q.   And can I say that estimate is between 4 and
6   600 or between 3 and 800?  I mean, how -- how sure are
7   you of that estimate?
8       A.   Daily I review the court calls going to
9   outlying courts and the Criminal Court.  And in my best  2:10:40
10  estimates, I always view a range from 400 to 500.
11      Q.   Oh, okay.  So it's a pretty good answer that
12  at the end of each day at 26th and California there are
13  500 people at the bridge.
14      A.   I'm going to say no.                         2:11:08
15      Q.   Four to 500 people at the bridge?
16      A.   I'll say it'll grow more -- what -- what I'm
17  explaining is 4 or 500 will go to court.  So you have 4
18  to 500 defendants returning from court and anywhere
19  from a hundred to 200 new inmates coming in that have
20  -- have been remanded by a judge.                     2:11:36
21      Q.   So that would be people whose trial has
22  ended.  In my hypothetical it would be riddled with
23  people who now have finished their trial and they're
24  coming back.  You're saying that the -- at the end of
25  each day, in addition to the people who are -- no, no,

89

1   just -- confused now.  Let -- let me see if I can start  2:12:14
2   it over.  At the end of each day, the Sheriff deputies,
3   so far as you know, or someone from the correct --
4   Sheriff deputies, we don't know, but it's someone from
5   the institution, takes the people from the courtroom to
6   the bridge.
7       A.   Yes.                                         2:12:34
8       Q.   And in addition to those people from the
9   various courtrooms, you're saying there's an additional
10  150 or 250?  They would be included in that group.  You
11  just want to make it larger than 500.
12      A.   No, that's what I'm -- I'm saying.  From the
13  regular court call of the day and then bond court at
14  26th and California, anywhere from a hundred to 200 are
15  remanded to the custody of the Sheriff that were
16  arrested by the Chicago Police Department.            2:13:13
17      Q.   Okay.  So we have people brought by the
18  Sheriff's deputies from the courtroom and we have
19  people brought the Sheriff's deputies who are being
20  remanded.  They may come from a courtroom, but they're
21  still someone whose process started that day as opposed
22  to earlier.                                           2:13:34
23      A.   Correct.
24      Q.   But I'll include those as people the Sheriff
25  deputies takes from the courtroom.  So, a convicted

90

```
1    guy, a guy on trial, a guy acquitted, and a guy
2    remanded.  So now we got four groups of people.  They
3    make up the bridge people.
4        A.   And also a inmate that's case has been
5    continued.                                    2:13:56
6        Q.   I thought I was including him in one of my
7    categories, but we can -- I just want to get a decent
8    description.  At the end of the day, there are various
9    categories of people who are transported from the
10   courthouse to the bridge.
11       A.   Correct.                             2:14:26
12       Q.   And they include people who've been convicted
13   that day.
14       A.   Yes.
15       Q.   People who are in the middle of their trial
16   that day.
17       A.   Yes.
18       Q.   People who have been remanded that day, say
19   after an arrest warrant, for example.
20       A.   Yes.                                 2:14:50
21       Q.   And then people who have been acquitted.
22       A.   And also --
23       Q.   Is that true?
24       A.   Yes.
25       Q.   Okay.  So that's four groups that are taken
```

91

```
1    at the end of the day.  Anyone falling in those groups
2    that are brought as a larger group to the bridge.  Are
3    there any other subgroups that are brought to the
4    bridge?                                        2:15:17
5        A.   Yes.
6        Q.   And what are those?
7        A.   Those would be inmates that are -- that have
8    been remanded by a judge to the custody of the
9    Department of Corrections and going to court, awaiting
10   trial.
11       Q.   I thought I've covered that by a judge who
12   remands someone to the Sheriff's Office for a variety
13   of reasons.                                    2:15:43
14       A.   That -- that would be an individual who was
15   just arrested by the police department, went for a bond
16   hearing, and was remanded by a judge, so he would be
17   considered a new.  We have a multitude of inmates that
18   are going back and forth to court every day in -- in
19   between coming in on a new and awaiting trial.  2:16:06
20       Q.   Okay.  So, any other categories?
21       A.   Not that I'm aware.
22       Q.   So, these categories again are convicted,
23   remanded for one reason or another to continue the
24   trial or as a result of an arrest warrant or a bond
25   hearing, whatever the multitude of reasons why a judge
```

92

```
1    might remand them, and then some further event for the
2    Sheriff.  That's category number two.  Correct?  2:16:41
3        A.   Yes.
4        Q.   And then category number three is people who
5    have been arrested that day?
6        A.   Not that day but have been brought to bond
7    court for a bond hearing.
8        Q.   Okay.  And -- and any other category?
9        A.   The inmate who's going back and forth to
10   court, awaiting trial.                         2:17:10
11       Q.   Any others?
12       A.   No, I don't believe so.
13       Q.   How about the acquitted person?  That would
14   be another category.
15       A.   The -- I would refer to him as possible
16   acquitted.
17       Q.   Well, when the judge says his verdict's not
18   guilty, how about people who have not guilties that
19   day.
20       Q.   Okay.  So, we have several groups of people,  2:17:39
21   only one of which has been determined by a judge to be
22   not guilty.  And they're all lumped together.  Right?
23       A.   I would say no to that.              2:18:05
24       Q.   And why is that?
```

93

```
1        A.   Based on judges' orders, it's not -- all the
2    court orders are not not guilty.  There's a multitude
3    of dispositions on -- on cases.
4        Q.   Well, I'm only talking about the ones that
5    are not guilty.  I know there are multitude of  2:18:29
6    dispositions, and we covered that in the second
7    category, where they could be remanded back to the
8    Sheriff's Office for a variety of reasons.  I didn't
9    describe those reasons, but they're infinite.  That's
10   one category.  So, a convicted guy, a guy who's
11   remanded for whatever reason you can remanded for with
12   limitation, a new arrestee, and then a category of
13   people who are acquitted.                      2:19:03
14       A.   I would say to a point yes, but again they
15   have a multitude of dispositions from a judge being
16   probation --
17       Q.   Okay.  Let's start over again.  Convicted.
18   That's one category that comes over.  People who are
19   convicted.
20       A.   Yes.                                 2:19:28
21       Q.   And then there's a category of people who are
22   in jail and convicted and go over to court for some
23   reason but they're coming back.
24       A.   Yes.
25       Q.   Okay.  That's two categories.  Right?  2:19:53
```

94

1     A.   Correct.

2     Q.   And that second category is very broad,

3  because it covers anybody who's going back to the

4  courtroom because the judge remands them for an

5  infinite number of reasons.

6     A.   Correct.

7     Q.   Okay.  So now we have two categories.  We've

8  got the convicted guy and then we got the category of

9  people who are remanded back to the jail by a judge for

10  any number of infinite reasons.  Okay?       2:20:31

11     A.   Yes.

12     Q.   Then the third category is new arrests.

13     A.   Yes.

14     Q.   And the fourth category is people who were

15  acquitted.

16     A.   But a broader range of acquitted.

17     Q.   No, no.  They were acquitted, found not

18  guilty. How's that?  The fourth category is people who   2:21:00

19  were found not guilty.

20     A.   I would say no to that.

21     Q.   Do you ever have anybody in a fourth category

22  who was found not guilty?

23     A.   I don't understand the question.

24     Q.   They went to court, they had a trial.  Not

25  guilty.  Do you ever have some of those people at the

95

1  end of a day come back to the bridge with all these

2  other people?                             2:21:25

3     A.   Yes.

4     Q.   Okay.  So, let me do this my way.  Because I

5  will stay here for a year if I have to.  The people on

6  the bridge include people who were convicted at that

7  day and remanded to the Sheriff.

8     A.   Yes.                          2:21:50

9     Q.   They also include people who were in jail and

10  had to go to court for one reason or another and were

11  remanded back to the Sheriff for any number of reasons

12  without limitation.

13     A.   Correct.

14     Q.   That's the second category.  Right?      2:22:12

15     A.   Correct.

16     Q.   The third category is people who were just

17  arrested.  New people.

18     A.   Correct.

19     Q.   The fourth category is anyone who was found

20  not guilty at the end of that day.

21     A.   Correct.

22     Q.   Okay.  The not guilty person is treated along

23  with the groups of the guilty person at that point at

24  the bridge, with no differentiation made.      2:22:47

25     A.   Correct.

96

1     Q.   And all the not guilties are treated also

2  alike because they're in the same group with everybody

3  else who's treated the same without differentiation.

4     A.   Correct.  The other category I was referring

5  to, counselor, was you could have somebody found guilty

6  and sentenced to probation.                 2:23:13

7     Q.   Okay.  But if there were such a person, he

8  would just make the group bigger.  Because he'd be in

9  the same group.

10     A.   Correct.

11     Q.   And you estimate that at the end of each day

12  on the bridge, the people who are brought there by the

13  Sheriff's deputies from the courtroom or some other

14  Sheriff's personnel, with or without handcuffs, they're

15  all at the bridge at the end of the day and there are

16  about 500 of them.  More or less, on average.    2:24:00

17     A.   Correct.

18     Q.   Now, according to your testimony, there would

19  also be 500 officers at least there.  One for each one.

20     A.   No, sir.

21     Q.   Why not?

22     A.   In my testimony I had said that you could

23  have one officer escorting one prisoner.       2:24:33

24     Q.   So, if there are 500, you're going to have

25  500 prisoners and 500 officers coalesce at the bridge.

97

1     A.   No, sir.

2     Q.   Why -- why not?

3     A.   Because you have a multitude of officers that

4  escort a multitude of inmates.  It is not -- it's not a

5  one on one escort.                     2:24:59

6     Q.   So I guess this all depends.  But sometimes

7  you're going to have an officer escort to the bridge

8  one person in this group of 500 that we have

9  characterized now.  I'm going to call them the bridge

10  group, okay?  Do you know what I'm talking about?

11     A.   Yes.                        2:25:21

12     Q.   That includes anybody who was in court that

13  day, whether he's entitled to be released or not.

14  Right?

15     A.   Yes.

16     Q.   Okay.  So the bridge group of 500 people will

17  have a minimum of, what, 50 officers?

18     A.   No, sir.                     2:25:43

19     Q.   One officer?

20     A.   Approximately six to ten officers.

21     Q.   Six to ten officers.  Now, you think common

22  sense would tell you that they're going to be

23  handcuffed, right?

24          MR. ZECCHIN:  It's argumentative.  Objection.

25     Q.   I'm asking you.  You have 500 people, some of

98

1    whom are convicted murderers, and they're led from the
2    court system where they're collected by the people you
3    already described, over to the bridge.  Wouldn't you      2:26:17
4    think they would be handcuffed?  Would that be your
5    best guess?
6         A.   I'm not aware.
7         Q.   But -- but wouldn't it make sense that they
8    would be handcuffed?
9         A.   I'm not aware of their policies.
10        Q.   I know you're not aware.  But you're a
11   security person, you've been working for the Sheriff's
12   Office for a long time.  I just asked you whether you
13   think it would make sense that they were handcuffed.     2:26:38
14        A.   Again, not familiar with their --
15        Q.   I know you're --
16        A.   -- policy.
17        Q.   -- not familiar with it.  But I'm -- but if I
18   asked you would it make sense that you would get wet if
19   it's raining outside, you'd say yes even though you
20   were sitting in here and you know it outside.  I'm just
21   saying from your understanding of moving 500 people
22   from the courtrooms to the bridge, would it make sense
23   that if you only have five or six or seven officers
24   that the people are handcuffed, so they can't overwhelm
25   the officers, run away, cause a riot, any number of

99

1    things?                                                   2:27:20
2         A.   They don't move 500 all at one time.
3         Q.   How many do they move?
4         A.   I'm not aware.
5         Q.   What's your best understanding?
6         A.   Possibly one to ten.
7         Q.   One to ten.  So they go from the courtroom to
8    a holding area.
9         A.   A multitude of holding areas, yes.            2:27:43
10        Q.   And then there's a list and each one's picked
11   up in some order?
12        A.   No.
13        Q.   Well, there's a multitude of holding areas
14   and each holding area has, I assume, a multitude of
15   jail cells.
16        A.   No, sir.
17        Q.   Well, what's a holding area?
18        A.   It's just --
19        Q.   Is it a lunchroom?
20        A.   It's just a big room with benches and a -- a
21   toilet and sink.                                          2:28:12
22        Q.   And there could be 500 people in there.
23        A.   Not in one, no.
24        Q.   How many would be in a holding area?
25        A.   A -- an estimate of approximately 50.

100

1         Q.   Fifty.  And they all came from courtrooms.
2         A.   Yes, sir.
3         Q.   So, how many holding areas are in that larger
4    area?                                                     2:28:41
5         A.   Best of my recollection, eight.
6         Q.   Eight.  Okay.  So, if we added up everybody
7    in those eight areas, then we'd get to the 500 that you
8    used as a hypothetical.  More or less.                    2:29:08
9         A.   Correct.
10        Q.   And is each one of these eight areas comprise
11   the bridge?
12        A.   Yes.
13        Q.   And these different categories of people that
14   we went over before, the A, the B, the C, and the D,
15   the convicted, the remanded, the -- the new arrestees,
16   and the acquitteds, they all come from the various
17   courtrooms and then they're put in to one or -- one of
18   these eight holding areas.                                2:29:44
19        A.   Correct.
20        Q.   And it's by random.  So, holding area 1 of 8
21   might have more convicted and less acquitted, and
22   holding area 2 might have more acquitted and less on
23   trial, or is there some order to it?
24        A.   Yes, there's an order.  It's basically
25   designed by classification, meaning a -- a minimum,

101

1    medium, or a maximum security class they make.          2:30:17
2         Q.   So it's what they were accused of.
3         A.   No.
4         Q.   Or it's whether they're a flight risk.  Plus
5    what they're accused of.
6         A.   It's a -- a multiple of classification system
7    we have at the department determines their
8    classification status.                                   2:30:38
9         Q.   And these are people who are going back to
10   jail.
11        A.   Yes.
12        Q.   Where does the acquitted person go, since
13   he's not subject to any classification since he's been
14   acquitted?  How do you select what room he goes in or
15   is he random?
16        A.   He's designated by his Division, which
17   stipulates the classification, which bullpen he will go
18   in.                                                       2:31:05
19        Q.   Take that a little slower.  He's designated
20   by his what?
21        A.   Classification and Division.
22        Q.   Well, but he's been acquitted.
23        A.   Possibly.
24        Q.   But they're -- not possibly.  He's been
25   acquitted.  He might be held on some other charge, but

102

```
1    there's no doubt that he's been acquitted in is charge,
2    he's been found not guilty.  There's no possible about    2:31:29
3    that.  You may hold him for some other charge, but
4    there's no question he's been acquitted on the charge
5    he was on trial for.  So, it's not -- there's no
6    possible about it.  So, where do you put the acquittal
7    person?
8        A.   In his designated bullpen.
9        Q.   And how do you select the designated bullpen
10   of the acquitted person?  By looking at the charge he
11   was acquitted of?                                         2:31:56
12       A.   By the Division he's housed in.
13       Q.   So, Otero was housed in Division 5 I think?
14       A.   I believe it was 6.
15       Q.   Six.  Does Division 6 have a different
16   classification than Division 5 and 4 and 3?              2:32:21
17       A.   They have a different classification from
18   Divisions 9, 1, and 10.
19       Q.   Nine, 1, and 10 are what?
20       A.   Maximum security.
21       Q.   And all the other Divisions are the same?
22       A.   Minimums and mediums.
23       Q.   What's Division 5?
24       A.   Division 5 is a medium.
25       Q.   Okay.  So Otero's classification was medium,
```

103

```
1    what, security?                                          2:32:47
2        A.   Yes.
3        Q.   And someone has designated one or more of the
4    eight rooms as medium?
5        A.   Yes.
6        Q.   So you got maximum, medium, and minimum.
7    Right?  The eight are divided into maximum, minimum,
8    and medium.
9        A.   Yes.                                             2:33:12
10       Q.   And that depends upon the list of people and
11   where they came from.
12       A.   Yes.
13       Q.   What about the new arrestees?  How are they
14   classified?
15       A.   They're classified once they begin the
16   process of coming in to the jail.
17       Q.   Because they're going to be sent to
18   someplace.                                                2:33:42
19       A.   Correct.
20       Q.   So, even though a person hasn't been to jail,
21   you know he's going to number 5, so therefore he's
22   going to be in the holding room for number 5.
23       A.   Yes.
24       Q.   So the fact that Mr. Otero was acquitted is
25   not taken into consideration at all at the end of that
```

104

```
1    day into where he goes in this gigantic holding cell.    2:34:19
2        A.   Correct.  He's -- he's returned to the
3    designation to where he's being housed at.
4        Q.   His acquittal's -- hasn't had any impact so
5    far.  On the system.  He's been acquitted, but you
6    haven't officially recognized it in any way.  You're
7    still treating him as someone who was arrested and is
8    Division 5.                                               2:34:49
9        A.   Correct.
10       Q.   And is this true, that is, that you treat
11   acquitted people for purposes of assembling them at the
12   bridge as if they had just been arrested and were
13   serving time, for every acquitted person, they're all
14   treated the same?                                        2:35:16
15       A.   I'm sorry.  Can you repeat that, counsel?
16       Q.   You remember just telling me that Mr. Otero's
17   acquittal was not recognized as yet by the Sheriff's
18   Office.  He's treated as if he had just been arrested.
19       A.   Yes.  When -- depending on when Mr. Otero was
20   returned to the bullpen, as the paperwork follows him
21   --                                                        2:35:56
22       Q.   I'll get to the paperwork in a minute.  Is
23   the answer to my question yes?
24       A.   The answer is yes, staff does not know at
25   that time of anybody's --
```

105

```
1        Q.   Well, that's your reason.  And it may be true
2    or not.  But I'm just saying that you don't have any
3    system in place to differentiate between murderers and
4    people who are acquitted at the end of each trial day.   2:36:22
5        A.   Correct.
6        Q.   So a murderer and an acquitted person is
7    treated exactly the same.
8             MR. ZECCHIN:  Objection, asked and answered.
9        A.   Yes.
10       Q.   And all acquitted people are treated the same
11   as every other acquitted person in the mix with the
12   criminals.                                                2:36:44
13       A.   Yes, every defendant is treated the same.
14       Q.   Okay.  Now we're in a holding cell.  Okay?
15   And you've told me how we divide people into these
16   eight rooms.  What happens next?
17       A.   From the bridge area, the defendants are
18   escorted to the receiving room, bullpen areas.           2:37:15
19       Q.   On -- still on the courthouse side?
20       A.   No, sir.
21       Q.   In other words, they've been collected from
22   the judge's holding area to the bridge area, and now
23   they're escorted through the tunnel?
24       A.   Yes.
25       Q.   Okay.  And how many are escorted at one --
```

106

| | | |
|---|---|---|
| 1 | one point? Three to ten I think you said? | 2:37:38 |
| 2 | A. No, it would be approximately -- depending on | |
| 3 | staff, could be anywhere from 40 to a hundred. | |
| 4 | Q. Forty to a hundred. And you said depending | |
| 5 | on staff. How many people would transport 40 to a | |
| 6 | hundred through that tunnel? | 2:38:00 |
| 7 | A. Approximately three to five. | |
| 8 | Q. Three to five. So, if five people are taking | |
| 9 | a hundred through the tunnel, you don't know whether or | |
| 10 | not they're handcuffed. | |
| 11 | A. From the point when the correction sides | |
| 12 | takes over, they're handcuffed. | |
| 13 | Q. But you don't know if they're handcuffed | |
| 14 | before that. | 2:38:22 |
| 15 | A. Correct. | |
| 16 | Q. Okay. | |
| 17 | MR. CHERRY: Would you find that -- | |
| 18 | MR. ZECCHIN: Sure. Yeah, yeah, absolutely. | |
| 19 | Yes. | |
| 20 | MR. CHERRY: Do you know? | |
| 21 | MR. ZECCHIN: I don't know off the top of my | |
| 22 | head actually. | |
| 23 | MR. CHERRY: Do you know? | |
| 24 | MR. SCOUFFAS: No, I don't. | |
| 25 | MR. CHERRY: Okay. | |

107

| | | |
|---|---|---|
| 1 | Q. Are these Sheriffs carrying guns? | |
| 2 | A. No, sir. | |
| 3 | Q. No guns. Now they're on the other side of | |
| 4 | the tunnel. What happens next? | 2:38:53 |
| 5 | A. In the -- when they're brought to the | |
| 6 | receiving room, they're placed again in bullpens with | |
| 7 | designated divisional housing locations. | |
| 8 | Q. Same classifications you used on the other | |
| 9 | side of the tunnel? | |
| 10 | A. Yes. | |
| 11 | Q. Okay. So, if a person was in holding area A | |
| 12 | of 1 through 8, or holding area 1 of 1 through 8 on the | |
| 13 | courthouse side of the bridge, he will be put in | |
| 14 | holding area 1 of 8 holding areas on the jail side of | |
| 15 | it. | 2:39:32 |
| 16 | A. No, sir. | |
| 17 | Q. I thought you said they coordinated. | |
| 18 | A. Different number of bullpens on the jail side | |
| 19 | than on the bridge side. | |
| 20 | Q. Oh, give me a break. But essentially what I | |
| 21 | said is true. Right? | |
| 22 | A. No, sir. | |
| 23 | Q. Okay. How many bullpens on the jail side? | |
| 24 | A. Eleven. | 2:39:57 |
| 25 | Q. Eleven. So, I assume that if you housed them | |

108

| | | |
|---|---|---|
| 1 | all in eight on the courthouse side, you would put them | |
| 2 | in the eight on the jail side unless you wanted to | |
| 3 | break them up into smaller groups, in which event you | |
| 4 | use 11. | |
| 5 | A. Correct. | |
| 6 | Q. So sometimes you use eight, sometimes you use | |
| 7 | nine, sometimes you use ten, sometimes you use 11. And | |
| 8 | for some reason, you might take those eight and put | |
| 9 | them in five. It all depends on a variety of | 2:40:31 |
| 10 | essentially irrelevant circumstances you have, | |
| 11 | personnel or time of day, etcetera, correct? | |
| 12 | A. Correct. | |
| 13 | Q. But this system I described from courtroom | |
| 14 | now to holding cell by the judge through pre-tunnel at | |
| 15 | the bridge to going through the tunnel to the holding | |
| 16 | area on the opposite side of the tunnel, that's all | |
| 17 | true in any given day for everybody in the courthouse, | |
| 18 | whether he's a convicted murderer, an arrestee, | |
| 19 | remanded, acquitted. | |
| 20 | A. Correct. | 2:41:23 |
| 21 | Q. Then what happens? | |
| 22 | A. Then at that time we have a transport team | |
| 23 | that picks up, calls out, and escorts the detainees | |
| 24 | from particular Divisions back to their Division. | |
| 25 | Q. From -- from particular holding areas to | |

109

| | | |
|---|---|---|
| 1 | their Divisions. | 2:41:54 |
| 2 | A. Yes, sir. | |
| 3 | Q. And you used the word "Division" twice | |
| 4 | because each of the holding areas has a named that | |
| 5 | corresponds to the Division. That's where they're put | |
| 6 | in when they get across the tunnel. | |
| 7 | A. Correct. | |
| 8 | Q. So somewhere pre-tunnel there is some | |
| 9 | paperwork that tells someone at the other end of the | |
| 10 | tunnel where that guy's going to go. | 2:42:17 |
| 11 | A. It's a court pass. | |
| 12 | Q. And each person carries his own court pass? | |
| 13 | A. No, sir. | |
| 14 | Q. So, how do you know -- how does the person at | |
| 15 | the jail side of the tunnel know where to put people? | |
| 16 | What is he given and who gives it to him? | |
| 17 | A. He's the -- the officer's carrying the court | |
| 18 | pass. The detainee has his ID on him. And the officer | |
| 19 | matches the -- calls out for the court pass, checks the | |
| 20 | ID, and places them in the designated bullpen. | 2:42:48 |
| 21 | Q. So it takes a while to get out of the tunnel. | |
| 22 | If you had a hundred people in the tunnel, and a guy is | |
| 23 | checking each one of these badges against some | |
| 24 | clipboard he's got to tell them where to go, it's going | |
| 25 | to take a little bit no matter how fast you're going. | |

110

```
1       A.   Correct.
2       Q.   So the process -- there's no checking on the
3   other end.  Right?  They go right from the holding area
4   into the tunnel.                                        2:43:15
5       A.   No, sir.
6       Q.   There's also a badge check in there?
7       A.   There's also -- we call it roll call, yes
8   sir.  When the deputies are transferring the inmate
9   from their custody to our custody, that's when I was
10  saying the -- the paperwork, the ID, and the body is
11  roll called for us to accept the prisoner back to
12  verify who he is and then to put him in the respective
13  bullpen.                                                2:43:40
14      Q.   So they're coming from the courtroom and
15  they're in some bigger area -- area or standing in line
16  somewhere.  And before they get into the bullpen, the
17  group that brought them over there checks with the jail
18  personnel and in effect says I'm now handing over Mr.
19  Otero with these qualifications and then the jail guy
20  looks, Otero and these qualifications, yes, put him in
21  holding cell or holding area 2.                         2:44:13
22      A.   Correct.  He's verifying that he's taking
23  custody of the right person.
24      Q.   Okay.  And he stays in 2 until it's time to
25  go through the tunnel.
```

111

```
1       A.   Correct.
2       Q.   There's no other check at the beginning of
3   the tunnel.  They just take people out of the tunnel --
4   out of the holding areas, where they've done checks
5   before that to put them in the holding areas, then take
6   them out the holding area, and he goes through the
7   tunnel, and then at the end of tunnel, there's another
8   check.                                                  2:44:42
9       A.   Correct.
10      Q.   Okay.  And that check says is this Mr. Otero.
11  You look and see if he's got the right, etc., and then
12  he's put into another predetermined holding area.
13      A.   Yes.
14      Q.   Now, this process I described is without
15  exception applicable to everybody at the end of each
16  day at trial.
17      A.   Yes.                                           2:45:12
18      Q.   Now, once he is in the holding cell on the
19  other side of the bridge, what happens next?
20      A.   When the transport team is going to transport
21  back to the defendants' housing locations, typically
22  the same process.  The officer has the court passes,
23  he's calling the names out of the bullpen, the inmate
24  steps out.  The officer verifies that's the correct     2:45:44
25  person.  They line them up in twos, handcuff the
```

112

```
1   defendants, and when they have a good count, then they
2   escort them back to their Division.
3       Q.   When you say "a good count," you mean
4   everything checks out.                                  2:46:08
5       A.   Yes.
6       Q.   About how many people are in that group?
7       A.   Approximately -- it can vary depending how
8   many came back from court at that time.  A lot of --
9       Q.   Say 500.  Let's stick with the 500.
10      A.   Approximately -- depending on officers, 40,
11  could be 20 to 40 to 60.                                2:46:32
12      Q.   Twenty to 40 to 60.  And how many officers?
13      A.   Varies.  If it's 20 inmates, could be one
14  officer.  Forty would be two.  Sixty would be two.
15      Q.   And they're all handcuffed.
16      A.   Yes.  They're handcuffed side by side.
17      Q.   So, two prisoners are handcuffed to each
18  other.
19      A.   Correct.                                       2:46:52
20      Q.   Left hand to right hand?
21      A.   Right hand over left hand.
22      Q.   Right hand over left hand.  Are they
23  shackled?
24      A.   No, sir.
25      Q.   So they could run but they can't be free.
```

113

```
1       A.   They could possibly attempt to run.
2       Q.   Then what happens?  They're escorted to jail
3   cells?                                                  2:47:17
4       A.   Part of the process.
5       Q.   What happens after they're handcuffed just
6   before they're about to move?  What -- what's the next
7   step?
8       A.   After they are -- the -- the count is good
9   and -- and they move out to the Division.  They're
10  received at the Division.  The Division has what you
11  would call -- there's a different couple names -- a
12  staging area, a holding area, a receiving area.         2:47:48
13  There's an -- when you enter that Division, there's a
14  -- an officer who will do the same as when the person
15  is coming from courts.  We will transfer custody from
16  that officer to that divisional officer, who will again
17  roll call every inmate that he's accepted.
18      Q.   Now, would all these people know if there is
19  in this -- in any one of the groups being escorted to
20  what you call the second staging area or at the staging
21  area or at any time thereafter, all of those people are
22  aware of a particular person that he has been
23  acquitted?  Because it's in his file?                   2:48:32
24      A.   Staff or inmate?
25      Q.   Staff.
```

114

```
 1        A.   No, sir.
 2        Q.   Well, doesn't his card say he's been
 3   acquitted?
 4        A.   No, sir.
 5        Q.   So, after he has in fact been acquitted,
 6   there's no effort on behalf of the State's Attorney to
 7   -- or the Cook County Sheriff to update his card to
 8   show that he's essentially a free man.  From the court.   2:49:05
 9        A.   His -- the -- court pass is a
10   computer-generated pass.  It doesn't have the
11   technology, it's not for updating or -- where -- it's
12   just to be able to move throughout the department.
13        Q.   And if you were receiving someone at the
14   opposite end of the tunnel, where they get handcuffed
15   -- you with me so far?                                    2:49:28
16        A.   Yes, sir.
17        Q.   On the jail side of the tunnel.  Before the
18   good group, as you call it.
19        A.   Yes, sir.
20        Q.   You -- you with me where I am?
21        A.   Good count?
22        Q.   Good count.  Yeah.  And you wanted to know
23   for some reason who was acquitted.  How could you find
24   out?  Out of the group of 20 or 40 or whatever that
25   just came out of the tunnel.                              2:49:53
```

115

```
 1        A.   I wouldn't be able to find out.
 2        Q.   Well, where are their records?
 3        A.   At any part of that movement or that
 4   timeframe, I couldn't exactly tell you where the
 5   paperwork is because the -- the body is doing one thing
 6   and the paperwork is also doing a multitude of
 7   transport, if you would.                                  2:50:19
 8        Q.   So, is there any time when the inmate is
 9   holding his own paperwork?
10        A.   No, sir.
11        Q.   Never.  Is there any time when the officers
12   who are transporting people through the prison, one of
13   them is carrying any of the paperwork?
14        A.   No, sir.
15        Q.   So, let's now see if we can trace the
16   paperwork like we traced a person.  Right?  We traced a  2:50:47
17   person from the end of a court date.  He's now in jail.
18   Okay?
19        A.   Yes, sir.
20             MR. CHERRY:  I can't hear you.
21        Q.   Sir, Mr. Zolna asked a question that I think
22   you've already answered, but let me ask you it again.
23   After the groups are in the good count area, right?
24        A.   Yes.                                            2:51:27
25        Q.   Are they transported one by one to their
```

116

```
 1   cell?  Or is the good count group transferred as a
 2   group left, right, and then when you get to that guy's
 3   cell you unlock and let him in?
 4        A.   If I can, counselor, I'll back it up.  When
 5   the -- when the transport officer's moving that group
 6   of 20, 40, or 60 to the Division, when he lands at, to
 7   make it simple, when he lands at the threshold of that
 8   Division, the detainees are unhandcuffed and through
 9   the verification of the ID and the divisional officer's
10   book showing who's out to court and they match and
11   write in the book that that person's back from court,
12   then that divisional officer takes possession of all
13   those inmates.                                            2:52:19
14        Q.   And he might handcuff them again.
15        A.   Correct.  And then they're -- they're placed
16   in a holding area in that Division.  And then from that
17   holding area, they are sent back up to their living nit
18   received by the living unit officer, who then -- that
19   living unit officer puts them back in their cell.        2:52:44
20        Q.   And they're individual cells.  More than one
21   person in a cell because they're individual cells.
22        A.   Correct.
23        Q.   There might be two, three, depending on how
24   much the system is pushed.
25        A.   Two.
```

117

```
 1        Q.   There have been some lawsuits about that,
 2   weren't there?
 3             MR. ZECCHIN:  Objection.
 4        Q.   Haven't there been overcrowding lawsuits?      2:53:10
 5             MR. ZECCHIN:  I'm going to object to any
 6   other lawsuits regarding overcrowding.
 7        Q.   You may answer.
 8        A.   Yes, sir.
 9        Q.   When they come from the tunnel and they're
10   taken to the Division that they're ultimately going to
11   be housed in according to their records, the people who
12   go to that Division are again not discriminated into
13   groups.  They include the acquitted, the guilty, the    2:53:43
14   under arrest, just arrested, like we said before, each
15   one of those groups, A, B, C, and D.
16        A.   Correct.
17        Q.   And all acquitted inmates go through this
18   process.
19        A.   Every inmate goes through the process, yes.    2:54:11
20        Q.   Then what happens next?
21        A.   Is that the inmate returned to his Division
22   living unit.  The paperwork that has come from the
23   courts is now being separated, deciphered, and looked
24   at as far as what we had stated earlier as far as a --
25   a possible discharge, a -- an update with a future
```

118

|  |  | 2:54:51 |
|---|---|---|
| 1 | court date, or a sentenced inmate. | |
| 2 | Q.  So, after they're locked away, you then sit | |
| 3 | down to figure out who should stay locked away and who | |
| 4 | might have a shot or a right to get out. | |
| 5 | A.  It's -- it's -- it's happening at the same | |
| 6 | time. | |
| 7 | Q.  But it's not completed before they're locked | |
| 8 | away. | 2:55:15 |
| 9 | A.  I wouldn't be able to answer that. | |
| 10 | Q.  Oh, but you told me they are locked away. | |
| 11 | And then you go through the paperwork, or it's going on | |
| 12 | at the same time, but I assume once they figure out | |
| 13 | that someone has been acquitted, they go get it. | |
| 14 | A.  Correct. | |
| 15 | Q.  So he's in his cell.  So he has been locked | |
| 16 | away while the paperwork's being locked at. | 2:55:37 |
| 17 | A.  I would say not necessarily in his cell. | |
| 18 | He's -- he's returned to his housing unit, and whatever | |
| 19 | activity is going on for the housing unit that day is | |
| 20 | what they're participating in. | |
| 21 | Q.  Okay.  And if it's -- if there's no activity, | |
| 22 | he'd be in his cell. | |
| 23 | A.  No, sir, he'd be out in the dayroom. | |
| 24 | Q.  They don't put him in a cell? | |
| 25 | A.  Not till that night. | 2:56:00 |

119

| 1 | Q.  If it's 7:00 at night, he's in a cell. | |
|---|---|---|
| 2 | A.  No, sir. | |
| 3 | Q.  What time does he go to a cell? | |
| 4 | A.  Lockup time is approximately 9:30. | |
| 5 | Q.  Okay.  So if it's 9:30 when you're coming | |
| 6 | back from court -- is that at all possible? | |
| 7 | A.  Yes. | |
| 8 | Q.  If it's 9:30, he'll go right to a cell.  If | |
| 9 | it's before 9:30, he'll go in the dayroom.  But the | |
| 10 | point is, he's been acquitted and he's still confined. | 2:56:23 |
| 11 | A.  I would not say he's then acquitted yet. | |
| 12 | Q.  He's been found not guilty.  But he's still | |
| 13 | confined. | |
| 14 | A.  On that particular case. | |
| 15 | Q.  Okay.  And he may not have any other case. | |
| 16 | A.  And until the department thoroughly | |
| 17 | researches that and ensures the security of the | |
| 18 | taxpayers and the department, he is not looked at as a | |
| 19 | full discharge, he's a possible discharge until all | |
| 20 | resources are exhausted. | 2:57:04 |
| 21 | Q.  But when you research -- when you go through | |
| 22 | all your resources and you find nothing, it is true | |
| 23 | that there is a free man who's been delayed release so | |
| 24 | that you can do your paperwork. | |
| 25 | A.  I wouldn't agree with that. | 2:57:31 |

120

| 1 | Q.  Well, yeah, you will.  Let's say that I have | |
|---|---|---|
| 2 | a man named Johnny who's been acquitted.  Okay?  He's | |
| 3 | been found not guilty by a judge.  And you've gone | |
| 4 | through all the paperwork and there is nothing at all | |
| 5 | about Johnny, just zero, his file is completely empty | |
| 6 | and there's nothing to warrant any holding at all. | 2:58:04 |
| 7 | Johnny has been free, according to the law, from the | |
| 8 | moment the end of that court day. | |
| 9 | MR. ZECCHIN:  Objection, form, calls for | |
| 10 | legal conclusion. | |
| 11 | Q.  It's just taken you a little while longer to | |
| 12 | confirm that he's free. | |
| 13 | A.  Through the department's process we are | |
| 14 | confirming that he is -- | 2:58:34 |
| 15 | Q.  Free. | |
| 16 | A.  -- allowed to go.  To leave the Department of | |
| 17 | Corrections. | |
| 18 | Q.  Right.  Free.  Use the word "free". | |
| 19 | MR. ZECCHIN:  He can use whatever word he | |
| 20 | wants. | |
| 21 | Q.  Well, I'm asking you to use the word "free". | |
| 22 | He's been free since the verdict.  And you went through | |
| 23 | your paperwork and it took you several hours to go | |
| 24 | through your paperwork, and you found nothing.  So he's | |
| 25 | been free and confined since the end of that day just | |

121

| 1 | for your convenience to go through the paperwork. | 2:59:04 |
|---|---|---|
| 2 | MR. ZECCHIN:  Objection to form. | |
| 3 | Argumentative. | |
| 4 | A.  And I would answer, counselor, it's part of | |
| 5 | the process of the thousand people that went to court. | |
| 6 | Q.  I want to just talk about my guy for a | |
| 7 | moment.  Johnny.  Johnny has been free since the jury | |
| 8 | said not guilty, and you have found nothing in all of | |
| 9 | the time you took.  The reason Johnny is not released | 2:59:25 |
| 10 | has nothing to do with his right to be free, it has to | |
| 11 | do with your desire to go through your files. | |
| 12 | A.  Not a desire, a process. | |
| 13 | Q.  Okay. | |
| 14 | A.  That ensures the safety of the Cook County | |
| 15 | residents. | |
| 16 | Q.  But in this case it didn't ensure the safety | |
| 17 | of anybody because Johnny -- you didn't find anything | |
| 18 | out about Johnny and he has been denied his freedom | |
| 19 | since the day -- since the moment the court released | |
| 20 | him.  You didn't find anything, so as to that guy that | 2:59:57 |
| 21 | you didn't find anything, he has been denied his | |
| 22 | freedom in order to accommodate your process. | |
| 23 | A.  No, sir. | |
| 24 | Q.  Well, is the only reason he is not released | |
| 25 | so you can do your process? | |

122

1     A.  It is -- it is to ensure from the

2 adjudication of that court case upon release from the

3 department to ensure there is nothing else to hold him

4 in the department.     3:00:35

5     Q.  Right.  But that's a process you go through.

6 Johnny doesn't care if you go through that process.

7 He's held in order for you to go through your process.

8     A.  Again I would say it's a process to ensure

9 the safety of the citizens --

10     Q.  That may be the reason --

11     A.  -- of Cook County.

12     Q.  -- for it.  But the -- the actuality, the

13 tactics of it, is he's being held so you can do your

14 process.  It may be because that's good, bad, whatever.     3:00:55

15 I'm not interested in the reason.  I'm just interested

16 in the process.  The reason Johnny is not free at the

17 moment he's found not guilty is so that you can through

18 your process.  Now, you have reasons why you go through

19 your process.  But the reason he's not free is to     3:01:17

20 accommodate your process.

21     A.  Again, I wouldn't say accommodate, it's to

22 ensure not having a wrongful release of someone that

23 should not be out of the confines of the Cook County --

24     Q.  Okay, but under my hypothetical, you found

25 nothing about Johnny.  But you went through your

---

123

1 process.  So, he is only there so that you can confirm     3:01:39

2 he's free by going through your process.

3     A.  And I can confirm he's able to be released.

4     Q.  That he's able to be released.

5     A.  Correct.

6     Q.  Okay.  And the reason he is -- you're trying

7 to confirm that he's able to be released is to see if

8 there is some other reason to hold him.     3:02:06

9     A.  Correct.

10     Q.  But when you find as to Johnny in my

11 hypothetical that there's no reason to hold him -- you

12 with me so far?

13     A.  Yes.

14     Q.  You then release.

15     A.  Absolutely.

16     Q.  But the only reason he wasn't released

17 earlier was so you were able to go through that

18 process.

19     A.  Again, that I was able to confirm he was not

20 wanted by any jurisdiction.     3:02:35

21     Q.  Okay.  Let's call that process.  The only

22 reason he was not released earlier was to allow the

23 State's Attorney to go through its process that you've

24 described.  That's the only reason he's not free.

25         MR. ZECCHIN:  Just objection again to State's

---

124

1 Attorney.  I know you said it, counsel, just making

2 sure.

3         MR. CHERRY:  Yeah.  The Sheriff's Office.

4     Q.  The only reason he's not free, even though

5 the judge set him free, is so that you can through your

6 process.     3:03:00

7     A.  Yes.

8     Q.  I take it then it's important to Johnny for

9 you to move that process quickly.

10         MR. CHERRY:  I'm going to object.

11 Speculation, foundation, legal conclusion.     3:03:24

12     A.  And referring back to GO 9.27, that is what

13 we do as we effectively do that in a timely response.

14     Q.  And you do that because you could be holding

15 a free man.

16     A.  I -- I would say it's verifying that it is a

17 person to be released after he's cleared through all

18 the checks, to ensure the safety of the citizens of Cook

19 County.     3:03:54

20     Q.  But if you find nothing, you really are doing

21 that to a person who's free.

22     A.  Through the department's process in clearing

23 and checking, then we release the individual.

24     Q.  Right.  But you released him, but you found

25 nothing and in my hypothetical since you found nothing,

---

125

1 he was free already.  The only reason he was detained     3:04:22

2 is because the -- Cook County Sheriff has these

3 processes to detain innocent people to make sure

4 they're innocent.

5         MR. ZECCHIN:  Objection, legal conclusion and

6 the word "innocent" versus "not guilty".

7     Q.  Or just say not subject to detention people

8 to make sure that when a judge says he can be released,

9 you are making sure that he should be released

10 according to your processes.  And that's the only     3:04:53

11 reason he's not released.

12     A.  And -- and again, counselor, I'm ensures --

13 I'm ensuring to the citizens, to anyone --

14     Q.  I -- I get the reasons for it.

15     A.  -- that's he free --

16     Q.  But what I said --

17     A.  -- to leave.

18     Q.  -- is true.  The only reason he's not free is

19 because you're going through your process.

20         MR. ZECCHIN:  Asked and answered.

21     A.  Again, he's being checked to be cleared to

22 leave the institution.     3:05:17

23     Q.  Right.  And the only reason he's not free is

24 because you're going through your process of checking.

25     A.  And again, not -- not free, he's being

126

1  cleared.  So --
2      Q.   Well, he was already cleared by the judge and
3  you found nothing for -- about him.
4      A.   And then he's released.
5      Q.   Right.  But during that period of time that
6  you found nothing, the only reason he is not being
7  released is to accommodate your process.                    3:05:47
8      MR. ZECCHIN:  Asked and answered.
9      A.   Again, counsel, I would say it's a safeguard
10  to the --
11      Q.   I don't care --
12      A.   -- citizens.
13      Q.   -- what the reason is.  The fact is the only
14  reason he isn't released is so you can do your process.
15      A.   So we do the County's job.
16      Q.   Call it the County's job.  But the -- the job
17  you're doing is this process of checking.                   3:06:08
18      A.   Correct.
19      Q.   Okay.  Now, if you could do this process
20  earlier that would fall within the policy of trying to
21  do it timely, wouldn't it?  The earlier the better.
22      A.   And again at this time I'm not aware of any
23  way --                                                      3:06:39
24      Q.   I didn't ask that.  I just --
25      A.   Yeah.

127

1      Q.   -- said the earlier the better.  According to
2  your discharge process, your timely means as quickly as
3  possible.
4      A.   From the time that we receive him back from
5  court, yes.  Okay.  Now, when is the last time you know of
6      Q.   Now, when is the last time you know of
7  that you've looked at your procedure to see if you can
8  make that process more streamlined and maybe even do it
9  significantly earlier?                                       3:07:06
10      A.   I -- I don't have a concise answer.  But I
11  review it -- I would use the word "constantly" to -- to
12  -- to always make sure they were expediting any -- any
13  process in the jail.  Whether it's people coming in on    3:07:45
14  the new, people going to court --
15      Q.   No, no, just deal with --
16      A.   -- returning from court.
17      Q.   -- my process.  When is the last time the
18  process between not guilty and the end of the paperwork
19  process was reviewed to see if it could be shortened?
20  That particular process.                                    3:08:06
21      A.   Not being accurate --
22      Q.   You don't know for sure.
23      A.   I don't know for sure.  But the -- the
24  beginning, the startup of the transport team, was --
25      Q.   Let me ask the question another way.  Is

128

1  there any record of your efforts to expedite the
2  process after acquittal for a free man to go through
3  your checking process in the last ten years?  Is there    3:08:47
4  any place I could look to see where a study was made,
5  etc.?
6      A.   I'm not aware.
7      Q.   So at least you don't have to report to
8  anyone that you've done something like this.  It's not
9  a requirement of your job.  Every month, every six
10  months, every year, you don't report to Mr. Murphy, I
11  have specifically reviewed the process after acquittal
12  because after all we're potentially holding an innocent
13  man, and I have found a way to expedite it or I can't
14  find a way to expedite it.  There's no check in the       3:09:30
15  system to require you or anyone else to report on
16  trying to expedite this procedure.
17      A.   No, sir.
18      MR. ZECCHIN:  You know, counsel, before you
19  ask another question -- your restroom.
20      MR. CHERRY:  Sure.
21      MR. ZECCHIN:  Okay -- with Nick if I can go.
22      RECORDER:  Going off the record, 2:28 p.m.          3:10:08
23      (Off the record)
24      Q.   -- about the word "timely" in this policy.
25  Is there anything written down anywhere that -- that

129

1  sets forth some criteria as to what "timely" is that I
2  could check to say, well, here, it says this is timely
3  but this isn't timely.  I'm -- I'm looking for a
4  written criteria as to the word "timely".  And you
5  don't have to answer that now.  He's going to --          3:10:30
6      MR. ZECCHIN:  If you want to answer the
7  question, you can answer that question.
8      A.   No, sir.
9      MR. CHERRY:  Okay.  We'll take a break now.
10  But you're staying close.
11      RECORDER:  Going off the record, 2:29 p.m.
12      (Off the record)
13      Q.   Just before the break, you said --
14      RECORDER:  Going back on the record, 2:39
15  p.m.
16      Q.   Just before the break, you said there was
17  nothing that would tell you or me or anybody how --
18  what "timely" means.  Do you recall that testimony?      3:10:56
19      A.   Yes.
20      Q.   So, I take it there is nobody who is checking
21  on whether something is timely if there's not criteria
22  as to what timely means.
23      A.   I would disagree, counselor, with --          3:11:23
24      Q.   Okay.  Stop.  You -- you've answered my
25  question as no.  Is there a criteria about what is

130

1    timely?

2        A.    No, sir.

3        Q.    Okay.  So, if you hired me today and said,

4    "Go check and see if we have timely discharges", and I

5    say to you, "Okay, what's the criteria", and you say

6    there isn't any, how would I do my job?            3:11:50

7        A.    I would hope that doing -- in your job,

8    knowing the -- taking into account the amount that goes

9    to court, comes to court, the new processing, the

10   paperwork, the planning, the checking, the

11   double-checking to ensure, you would be able to look at

12   what would be a timely release of somebody.         3:12:16

13       Q.    So the answer to the question that I would

14   say what criteria, you say to me, "Do your best job."

15       A.    No, I -- I would say --

16       Q.    No, no, I didn't ask you what you would say.

17   I said you would say, "Do your best job."  And your to

18   that is no, you wouldn't say that.

19       A.    Correct.                                   3:12:38

20       Q.    If I asked you what criteria should I use,

21   you would say there isn't any.

22       A.    Correct.

23       Q.    So, if you asked five people to determine

24   whether it was timely, we could have five different

25   answers.

131

1        A.    Possibly.                                  3:13:06

2        Q.    Well, for sure, because there's no criteria,

3    and each person would apply whatever criteria they

4    wanted to with that.

5        A.    Following the protocol, you --

6        Q.    Well, sure.

7        A.    -- could have --

8        Q.    But one guy might give weight to this

9    protocol and another guy might not understand this

10   document and he might give weight to this protocol.  I

11   mean, if you explain to people how to go from

12   here to New York, we could a myriad of different ways.  3:13:31

13   Right?  I could go up to Canada and across and down, I

14   could go to California and fly, I could to go Texas and

15   drive, I could go to Pennsylvania and I could go to New

16   York.  There's no way for us to know or for you to

17   supervise anybody who's checking on whether this is

18   timely, correct?

19       A.    Just the opposite.  There is a way by the

20   process.  And your process changes every day and is     3:13:53

21   dictated by all other entities of how long in court,

22   how long to get back from court, how much paperwork --

23       Q.    Okay, let me --

24       A.    -- how long --                               3:14:15

25       Q.    -- ask it another way.  Is there a time limit

132

1    for how long it should take for a hundred people versus

2    200 people or does it just all depend?

3        A.    And -- and again --

4        Q.    Does it -- is there a time limit or does it

5    just depend on a bunch of factors and who's doing it?   3:14:40

6        A.    I would say not on who's but the multitude of

7    factors that entail --

8        Q.    And --

9        A.    -- again and it's all based on the security

10   and the safeness of citizens of Cook County.

11       Q.    Yeah, but people might interpret that

12   differently.

13       A.    From my experience, I would want to ensure

14   that who I let out that is supposed to be --

15       Q.    Your --

16       A.    -- out hat door.

17       Q.    -- experience.  But there are more people

18   than just you who are doing this analysis of release.   3:15:07

19   And I'm just saying that if there is no criteria,

20   you're depending on the good faith of each one of the

21   employees who would have something to do with this

22   process without any guidance.

23       A.    The chain of command the County has, the

24   supervision, ultimately up to me to ensure that that

25   policy is being followed.                               3:15:29

133

1        Q.    Okay.  But if you have five people and they

2    all did it slightly differently, who's right and who's

3    wrong?

4              MR. ZECCHIN:  Object, argumentative.

5              MR. CHERRY:  It -- it's not argumentative.

6        Q.    Let's say --

7              MR. ZECCHIN:  Yeah, it's --

8        Q.    -- we had Johnnies, Johnny 1 through Johnny

9    5.  Johnny 1 takes 15 minutes to be released or all

10   cleared.  Johnny 2 takes two and a half days to be

11   released.  Johnny 3 takes 14 hours to be released.     3:15:55

12   Johnny 3 (sic) takes six and a half hours.  They're all

13   different.  And all their file consists of one page in

14   a folder.  Wouldn't you now say what the hell is

15   happening?

16       A.    Before that I would look at to what factors

17   led up to those different times.                        3:16:18

18       Q.    Okay.  And one guys says, "I went to lunch."

19       A.    And if there was -- if there was a report

20   that the bus from Rolling Meadows broke down, which is

21   instead of --

22       Q.    Oh, okay, I understand.  You can determine

23   after the fact whether someone was operating timely by

24   investigating the circumstances.                        3:16:45

25       A.    I wouldn't say after.  During.

134

1    Q.   Well, you're not looking at every single
2  discharge or acquittal to discharge as it's happening,
3  not every single one.  That's impossible.
4    A.   Not every single one, but --
5    Q.   Okay, so --
6    A.   -- every -- every day.
7    Q.   You're looking at them every day but not
8  while they're happening.  You're looking at them after
9  they've happened.  Maybe some of them during when        3:17:08
10 they're happening.  But people, if they have not
11 criteria, will at least start out doing things
12 differently.
13   A.   We --
14   Q.   In any event, you don't think it's a problem
15 if the State's Attorney has no criteria for what's
16 timely.
17        MR. ZECCHIN:  Objection to the State's
18 Attorney and also if -- counsel, if you could just let
19 him finish his answer, that's all I ask.              3:17:34
20   Q.   That's the Sheriff's Office had -- it doesn't
21 bother you if the Sheriff's Office has no definition or
22 criteria for what's timely, as you sit here.
23   A.   I disagree, counselor.  In the multitude of
24 factors affecting every detainee there, the GO is
25 explicit in a timely fashion.  And in the chain of

135

1  command, we are ensure that that policy is followed.    3:18:01
2    Q.   You want to change your answer that there's
3  no criteria for timeliness?
4    A.   No, sir.
5    Q.   Okay.  Now, I think I've asked you this
6  question.  In an average day, going over the last       3:18:31
7  several years, and I'm just looking for an estimate,
8  out of the people who are in the system -- we used 500,
9  do you remember we used that as an example that you
10 said would be a good rough estimate?                    3:18:54
11   A.   For criminal courts?
12   Q.   Yeah.
13   A.   Yes, sir.
14   Q.   And I think we used that for 26th and
15 California.
16   A.   Yes, sir.
17   Q.   How many of that 500 are released on any
18 given day?  Approximately.
19   A.   I couldn't give you an answer.              3:19:19
20   Q.   Well, would it be many?  In other words, are
21 we talking about 20 to a hundred?
22   A.   In -- in looking at -- what I -- what I look
23 at, counselor, is everybody that goes to court.  So I
24 don't -- I don't have it broken down by courthouse.  I
25 -- I look at if a thousand go to court, approximately

136

1  200 are possible discharges.                            3:19:45
2    Q.   Okay.  So, let's say out of the 500 at 26th
3  and California, 20% of them are possibly discharged.
4    A.   Again I couldn't say.
5    Q.   Well, that's -- 200 out of a thousand is 20%,
6  so I'm just applying that to any given court.  It
7  doesn't change by court, it's about 20%.                3:20:07
8    A.   Again, counselor, I could have a judge in
9  Markham --
10   Q.   No, no.
11   A.   -- release 50 people --
12   Q.   We're talking about --
13   A.   -- and --
14   Q.   -- approximate.  You saying out of all of the
15 courts approximately 20% are released every day.  And
16 we know there may be differences, but that's a good
17 approximation to use for any given court.  It may be    3:20:30
18 15, may be 22, but in that area, it would be a good
19 estimate of how many are released every day in the
20 criminal court, about 20%.
21   A.   I couldn't answer yes or no.
22   Q.   Well, is it more than one every day?
23   A.   I couldn't answer.
24   Q.   You don't know whether or not more than one
25 person is released every day in the criminal court at

137

1  26th and California?                                    3:20:55
2    A.   Correct.
3    Q.   And who would know that?
4    A.   In our -- in our records we'd be able to
5  tell.
6    Q.   No, but who would be honest enough to tell me
7  if he's working at the Sheriff's Office that at least
8  one person is released every day?
9    A.   I do not --
10        MR. ZECCHIN:  I object to the argumentative
11 when you said "honest".
12   Q.   Do you know anybody?  If you wanted to know
13 the answer to that question and you didn't want to look
14 at records, who would you ask?                          3:21:20
15   A.   I don't know if anyone would give me that
16 answer either.
17   Q.   So, nobody knows how many people are released
18 every day.
19   A.   Correct.
20   Q.   And what records would I look at?  The
21 release records?
22   A.   Yes, sir.
23   Q.   Okay.  So, if I asked you an interrogatory
24 how many people are released every day, you'd at least
25 know what records to look to answer my interrogatory.   3:21:47

138

1    A.   Yes.

2    Q.   Now, how many people are acquitted on any

3 given day?

4    A.   Can you explain?

5    Q.   Not guilty.

6    A.   I'm not aware.

7    Q.   Who would be aware?

8    A.   Again, it would be the documented records.   3:22:08

9    Q.   No, it has to be a person.  I'm the Sheriff

10 of Cook County, I'm going to ask somebody to give me

11 that answer.  Who is the Sheriff going to ask?  You're

12 not going to tell the Sheriff to go look at records.

13 Somebody's going to answer that question.

14    A.   Someone is going to go look at those records

15 --

16    Q.   Okay.

17    A.   -- to prepare a document from.   3:22:29

18    Q.   So then maybe they -- maybe they do that.

19 But who will the Sheriff ask?  You?

20    A.   Probably me.

21    Q.   Okay.  And who will you ask?

22    A.   I would ask my staff in the records office.

23    Q.   Who particularly would you ask?  You wouldn't

24 ask a staff, you would ask a person.   3:22:49

25    A.   I would start with my superintendent.

139

1    Q.   And who is that?

2    A.   Superintendent Queen.

3    Q.   Queen?

4    A.   Queen, yes, sir.

5    Q.   Q-U-E-E-N?

6    A.   Yes, sir.

7    Q.   And if you asked Superintendent Queen to give

8 you an estimate over the last year or so about how many

9 people getting released, he would say to you, "I can't

10 answer that question, I'd have to look at the records

11 for a year or so."  Is that what you'd expect from Mr.

12 Queen?   3:23:15

13    A.   Ms. Queen.

14    Q.   Ms. Queen.  Is that what you'd expect her to

15 say?

16    A.   Yes, sir.

17    Q.   Even though you said give me your best

18 estimate, you've been working there for a long time.  I

19 just want your best estimate.  She wouldn't answer the

20 question?

21    A.   I would say no.

22    Q.   Okay.  Tell me about the process of checking

23 once.  Or is there other reason to hold a person?  Is

24 that by looking at a computer?   3:23:45

25    A.   Correct.  We'd want a full LEADS check.

140

1    Q.   Yes is the answer to my question.

2    MR. ZECCHIN:  Counsel, he can --

3    Q.   You can check whether or not someone has some

4 reason to be detained by simply pressing a button on a

5 computer.  Correct?

6    A.   I'm sorry?

7    Q.   If you want to know whether there is a reason

8 to detain someone because there's some other warrant

9 outstanding or some other charge, you said you could

10 look on the computer.   3:24:17

11    A.   Through a LEADS check, yes.

12    Q.   Well, however you do it.  But you could do it

13 on a computer.

14    A.   Correct.

15    Q.   Okay.  And you input something, someone's

16 name, and you input LEADS check.

17    A.   Correct.

18    Q.   How long does that take?

19    A.   Depending on the individual's sheet, could

20 take anywhere from five minutes to -- if there was

21 anything on the sheet that needed research, could take

22 approximately up to two hours.  Or longer.   3:25:04

23    Q.   But the computer doesn't take two hours.  The

24 computer will tell you in a matter of milliseconds if

25 there is a warrant outstanding.

141

1    A.   Correct.

2    Q.   And the computer will tell you in a matter of

3 milliseconds if there's any reason to hold a guy.

4    A.   Once the computer tells you something, you

5 verify it.   3:25:35

6    Q.   I didn't ask about verification.  I know how

7 long does it take for the computer to tell you if there

8 is any reason to hold this guy, warrants or any other

9 reason, and I just want you to confirm that the

10 computer will give you that information relatively

11 quickly, in milliseconds and certainly within a minute.   3:25:56

12    A.   If the computer is functioning.

13    Q.   Have you experienced non-functional computers

14 recently?

15    A.   Multitudes.

16    Q.   Okay.  Have you ever complained to anybody

17 that you can't protect the rights of the innocent

18 because your computers are not working?

19    MR. ZECCHIN:  Objection, argumentative

20 question.

21    Q.   Have you ever done that?

22    A.   We continuously call the state,

23    Q.   Have you ever told anyone that you are unable

24 to protect the rights of free people because your

25 computers don't work?  Have you ever done that?   3:26:26

142

1    A.   And the process, counselor, is to safeguard
2  again that you cannot release until your --
3    Q.   Listen to my --
4    A.   -- checks --
5    Q.   -- question.
6    A.   -- clear.
7    Q.   Have you ever told anyone in the state, "I
8  can't release innocent people because my computers
9  don't work"?  Have you ever said that or something like
10  that?                                              3:26:49
11    A.   Yes.
12    Q.   Okay.  Who did you tell that to?
13    A.   Personally, I didn't tell it, my staff that
14  would -- makes the calls would've talked to that
15  person.
16    Q.   And not "would have".  Did you ever tell
17  anybody that you can't release an innocent person
18  because your computers are not functioning?  Did you
19  ever do that?
20    A.   No, sir.
21    Q.   Okay.  Do you know of your own personal
22  knowledge whether a particular person said they can't
23  release innocent people because the computers aren't
24  working?  That's not a guess, not would have, that's a  3:27:19
25  particular person who you know said that to the state

143

1  or somebody else at some point in time.
2    A.   No, sir.
3    Q.   So, so far as you know, there have been no
4  complaints to any authorities about the computers not
5  working in order to protect the rights of innocent
6  people.  Correct?                                    3:27:44
7    A.   There's been complaints the computer's not
8  working.
9    Q.   Okay.  So, is it possible that innocent
10  people are being detained because the computers are not
11  working?
12         MR. ZECCHIN:  Objection, Speculation.
13    A.   I can't answer yes to that until I do my
14  check to make sure that person is allowed to leave the
15  institution.                                         3:28:13
16    Q.   Is it possible that innocent people are being
17  held in jail because your computers are not working?
18  Is that possible based on your experience?  Yes or no?
19         MR. ZECCHIN:  Objection, speculation.
20    A.   Can't answer that with a yes or a no.
21    Q.   If the computers are working, it takes
22  milliseconds to find out if there's a warrant.
23  Correct?                                             3:28:41
24    A.   Correct.
25    Q.   If the computers are working, it takes

144

1  milliseconds to find out if there's any other reason to
2  hold someone.
3    A.   Again, the -- the system, the computer system
4  -- system telling us is one part of the follow through
5  of the -- the complete check.                        3:29:06
6    Q.   So the computer system is inaccurate?
7    A.   I would say nothing's foolproof.
8    Q.   But the computer will give you an answer.
9  Whether there's any reason to hold someone who's been
10  acquitted, found not guilty.
11    A.   We -- it's just not that simple, counselor.
12  It's not a yes or a no.  And the computer will also
13  tell you before a release check with an agency or it
14  might say on parole till 2017.  And then again you go   3:29:45
15  into your checks.  You're going to call that agency.
16  Is he on parole, has he violated parole, do you want
17  the subject.  So once the computer shows you something
18  from that, then you go into your checks to rule out any
19  measure that would hold that person in custody so you
20  don't have a wrongful release --                     3:30:08
21    Q.   Right.
22    A.   -- that someone did want him.
23    Q.   But I am sure there are people who computers
24  check out pretty quickly no warrants.  Gotta be some
25  people like that, right?

145

1    A.   And it's -- it's all the same.  It's one --
2  it's one LEADS system.
3    Q.   If a computer says there's no reason to hold
4  anyone, is he immediately released?                  3:30:33
5    A.   No, sir.
6    Q.   So whether the computer is -- says he should
7  be released because there's no reason to hold him or it
8  says we don't know and check on the parole system, you
9  just don't rely on the computer system.
10    A.   We have the -- a multitude of checks that we
11  again thoroughly exhaust before a release.           3:31:00
12    Q.   But the computer system is not accurate.
13    A.   And again I would say nothing's 100%.  I'll
14  just tell you for -- in LEADS itself, a department has
15  three days to enter a -- a warrant into a system.
16    Q.   Mm-hmm.
17    A.   So, in -- in the perfect storm, if you have
18  the department filed something three days ago and in
19  two days it hasn't been on the computer yet or the
20  warrant was served in court and it has not yet been --
21  been removed from the system, he still might show
22  that's wanted on a warrant.  So it's our job also, if   3:31:36
23  we call the police department and they say, no, the
24  warrant's been squashed, then we ask them send us a
25  teletype that that warrant has been handled.  So then

146

1    effectively again, we've safeguarded that person to
2    ensure the warrant was done and we didn't hold him
3    inappropriately, we actually released him.  Based on
4    our call to that department to verify the warrant is
5    squashed.                                        3:31:59
6        Q.   But your --
7        A.   So the -- the computer is still showing live
8    --
9        Q.   I think the word is "quashed", not
10   "squashed".  But --
11       MR. ZECCHIN:  Counsel is correct.
12       Q.   So, it could take up to three days to release
13   an innocent man for the reasons you've just suggested.
14       A.   No, sir.                                3:32:20
15       Q.   Well, you told me that some departments who
16   report to the computer may take three days.
17       A.   Might take the -- for the computer to update.
18   But that --
19       Q.   Right.
20       A.   -- we -- we -- not relying on the computer,
21   we effectuate a call.
22       Q.   What if you --
23       A.   To the department.
24       Q.   What if you can't reach the person?        3:32:40
25       A.   The -- every -- every department is open that

147

1    can check their -- their books to see the status of
2    that warrant, the hold, if the bond is paid.  Any --
3    anything that will tell us what needs to be --
4        Q.   So you could start this process the moment
5    the not guilty happens.
6        A.   Once the paperwork's in records, that's when
7    the process begins.                              3:33:06
8        Q.   The moment the judge says not guilty, you
9    could start this process.
10       A.   No, sir.
11       Q.   Why not?
12       A.   Based upon where that paperwork is until it
13   lands into the records office --
14       Q.   How long does that take?
15       A.   And again, depending where it's coming from,
16   everything that goes through to that paperwork landing.  3:33:35
17       Q.   Well, let's say we're at the Circuit Court --
18   I mean the Criminal Court.  Guy's not guilty.  How long
19   does that paperwork take before it goes to whoever had
20   to make the decision?
21       A.   To -- to make the decision to --
22       Q.   Till it gets to the person who makes the
23   decision.
24       A.   To --
25       Q.   How long does it take?                    3:34:00

148

1        A.   Approximately -- approximately an hour, hour
2    and a half.
3        Q.   Some take longer?
4        A.   It could.
5        Q.   Some take longer.  The answer is yes or no.
6        A.   It could take longer.
7        Q.   So the answer is yes, some do take longer
8    than an hour and a half.
9        A.   Depending on circumstances.
10       Q.   For whatever reason.  Some take longer than
11   two hours.                                       3:34:27
12       MR. ZECCHIN:  He's answered the question.
13   Now you're harassing him.
14       Q.   I like to get a complete clear answer.  Some
15   computer checks take longer than two hours in order to
16   get the paperwork to the person who makes that check.
17   Correct?
18       A.   No, sir.  The -- the computer check comes
19   after the file is being set up.  The computer check is
20   one of the last things we do, as I was just stating
21   earlier, to -- you want to catch the last second
22   possible to make sure a warrant hasn't surfaced --    3:35:03
23       Q.   And that process could take, and usually does
24   take, longer than two hours.
25       A.   To get to that stage of the computer, yes.

149

1        Q.   Okay.  So, you never meet the two-hour timely
2    criteria in your release charges based on what you've
3    just told me, because the process of an acquittal, it
4    getting on down to the appropriate person, the process
5    of updating the computer, calling a guy, that's always
6    going to take more than two hours.                3:35:34
7        A.   Again I couldn't answer that.
8        Q.   Well, what's your best judgment?  Your
9    experience?
10       A.   In my experience, I would say again
11   approximately two hours.
12       Q.   How many take more than two hours?          3:36:00
13       A.   As far as?
14       Q.   Someone going from acquittal to being
15   discharged.  How many take more than two hours?      3:36:34
16       A.   Two hours to -- would you -- are you going
17   back to checking on the computer, counsel, or that's
18   why I was saying as -- as to what.  I don't --
19       Q.   The process which allows you to make a
20   judgment whether the guy should go free or not.
21       A.   That -- that would vary -- it varies daily,
22   it varies on -- on each detainee being checked for a
23   possible.                                        3:37:02
24       Q.   So there's no policy that this all has to be
25   done within two hours.

150

```
1        A.   Couldn't happen.
2        Q.   So there is no policy that this all has to
3   happen within two hours.  You're saying there's no such
4   policy.  And the reason there's no such policy, it's --
5   it's impossible to do within two hours.  Is that
6   correct?                                            3:37:22
7        A.   I'm not saying it's impossible.  But --
8        Q.   Highly improbable.
9        A.   Yes.
10        Q.   Now, where do you get this file that relates
11   to this person?  Because it's more than the computer,
12   isn't it?                                           3:37:55
13        A.   Yes.  In the record offices, there's -- which
14   would -- would be a central hub, there's approximately
15   ten to 12,000 files in one central location.
16        Q.   Okay.  So now I want you to walk me through
17   the process of when you take a file out of that box,
18   the 10,000 files, and where the prisoner, detainee,
19   acquitter, is at that point, and where he is and where
20   the file in until we get to the jail or release.  Can
21   you do that for me?                                 3:38:35
22        A.   As the --
23        Q.   Where's it start?  Who's the first person
24   that takes the file?
25        A.   The -- the actual file?  Or from the process
```

151

```
1   of when the paperwork is delivered from court up to the
2   records office?
3        Q.   Well, first you're saying you have to make
4   the file.  Is there any paperwork in a file before the
5   paperwork comes from the courtroom?                 3:39:04
6        A.   Yes.
7        Q.   What's in the file?
8        A.   In the file is when -- the first day the
9   detainee's remanded from the judge, there's the
10   original court order remanding him.  There's a LEADS
11   printout from --
12        Q.   What's --
13        A.   -- the LEADS --
14        Q.   -- a LEADS printout?
15        A.   The warrants checks.
16        Q.   Okay.
17        A.   There's a classification sheet in there and
18   any other -- any -- any paperwork that came from the
19   courts comes to the Department of Corrections goes in
20   that file.  Stays -- stays with that person from intake
21   till discharge.                                     3:39:45
22        Q.   Well, when the file is sitting along with
23   12,000 files and the prisoner is in jail, what's in the
24   file?
25        A.   From -- from the beginning of his -- what
```

152

```
1   came over from the court on his first day and anything
2   during his stay, any court dates, update admits,
3   anything sent from any other agencies, programs,
4   anything while he is stay is at the Department of
5   Corrections, anything that's applicable -- applicable
6   to that inmate is put in that file.                 3:40:22
7        Q.   And how often are these updated?
8        A.   They're -- they're updated any time the
9   inmate goes to court or anything that transpires within
10   the court dates which get sent to our office goes in
11   the file.
12        Q.   What do you mean, it gets sent to your
13   office?  I'm only talking about stuff that you have in
14   your normal course of business, if someone doesn't do
15   his job and sent it you, then you'd have to take care
16   of that.  I just want to know in a normal course of
17   events what's in the file.  And I think you've told me
18   that.                                               3:40:54
19        A.   Correct.
20        Q.   How about pending cases?  Is that in the
21   file?
22        A.   If -- if he has pending cases --
23        Q.   Other than this one.
24        A.   Correct.  That's -- those are in the file.
25        Q.   So, how quickly do they go in the file?
```

153

```
1   Whenever there is an arrest, that starts a pending
2   case, right?                                        3:41:19
3        A.   When there's an arrest and a remand by the
4   judge, then a file is created.
5        Q.   So, there is no file created until a person
6   appears before a judge.
7        A.   Correct.
8        Q.   Once a judge remands him to the corrections
9   officer or to jail, then the Sheriff opens up a file.  3:41:49
10        A.   Correct.
11        Q.   And does the Sheriff do that at the
12   courtroom?  Because he's part of the Sheriff too.
13        A.   No, sir.
14        Q.   No sir what?
15        A.   It's not done in the courtroom.
16        Q.   Okay.  But the Sheriff's Office is at the
17   courtroom, at the jail, it's still the Sheriff's
18   Office.
19        A.   Correct.
20        Q.   So, when earlier you told me that you didn't
21   know whether they handcuffed them at the courthouse,
22   somebody at the Sheriff's Department would know what
23   the process is about whether they handcuff them at the
24   courthouse.                                         3:42:28
25        A.   Yes.
```

154

```
1     Q.   So there would be some process or procedure
2    that we could follow -- look at, check to see if that
3    was all done.  But there's no other department or
4    organization besides the Sheriff who has control over
5    that detainee.  And the judge can order something.  But
6    outside of that, it's the Sheriff who's responsible for
7    the movement, the detention, the file, the holding,
8    everything in connection with that person.    3:43:06
9     A.   If -- just so everyone's clear, counsel, the
10    -- yes, the -- body, the prisoner and I will say
11    the paperwork, but the clerk is the -- the first person
12    that's in charge of that paperwork.  Once the clerk has
13    completed with the judge's remand, then from the clerk
14    it's transferred to the -- to the deputy.      3:43:32
15    Q.   So the clerk in the courtroom hands it to the
16    deputy.
17    A.   For -- for that court call in that courtroom
18    for that day, when -- when the judge is finished and
19    the clerk completes their paperwork, that bundle is
20    then turned over to the deputy.
21    Q.   So someone who is acquitted at 9:00 in the
22    morning is going to have to wait the whole day before
23    the Sheriff is going to know that.              3:43:54
24    A.   The -- basically when the -- when the judge
25    is finished with his court call, and then the deputy
```

155

```
1    removes prisoners in court that day, process we went
2    through, then they're dropped to the bridge, to the
3    receiving room, and the body moves to the Division and
4    the paperwork filters through and up to the records
5    office.                                         3:44:26
6     Q.   But someone who had some sort of an
7    adjudication from 9 to 9:30 in the morning is going to
8    wait the whole day in that holding cell and maybe
9    longer until this judge is finished with his court day,
10    the Sheriff gets the documents from the clerk and sends
11    it over to the jail.
12    A.   I wouldn't say the whole day.  There's the --
13    the process is happening continuously.          3:44:53
14    Q.   You're sending the files as they occur?
15    A.   No.
16    Q.   So?
17    A.   In -- in segments.
18    Q.   How many are in a segment?
19    A.   I couldn't tell you.
20    Q.   How many times a day does the Sheriff in the
21    courtroom send it to the jail?
22    A.   From Criminal Courts itself, could be --
23    A.   Not could be.                             3:45:19
24    A.   It varies every day.  We might have a trial
25    till midnight.  So that one is going to be one more.
```

156

```
1    You might have five trials, different times, five
2    different pieces of paper come down every 30 minutes.
3    So there's -- that would be ten runs.  So --
4     Q.   So --
5     A.   -- it's not one --
6     Q.   -- particular person's business before that
7    judge is completed, the rule is that his file is taken
8    properly, gathered together, and shipped off to the
9    jail.                                           3:45:52
10    A.   No, sir.
11    Q.   Well, what is the rule?
12    A.   Their -- their specific rule or policy I'm
13    not aware of.
14    Q.   So it's possible that someone who had his
15    court business done in a half an hour who's waiting
16    around until, for some reason, the Sheriff decides to
17    send his files along with other files.  And that could
18    be a whole day.                                 3:46:23
19    A.   It wouldn't be decided, it would be in the
20    process of how they safely --
21    Q.   No, no, I'm --
22    A.   -- dropping --
23    Q.   -- talking about the documents, I'm not
24    talking about the safety of the world.  I'm just
25    talking about the documents.  How often does the
```

157

```
1    Sheriff in a courtroom send completed documents?  If
2    they happen every half hour, does he send them over
3    every half hour?                                3:46:46
4     A.   I'm not aware.
5     Q.   So you don't know how often it is.
6     A.   Correct.
7     Q.   And so far as you know there's no rule that
8    requires a Sheriff's deputy to be timely in connection
9    with sending over completed files to the jail.
10    A.   Correct.
11    Q.   Now, take a look at Exhibit, please, 4.      3:47:34
12    Under "REQUIREMENTS", page 2, Roman III.  It says, in
13    the second sentence, "All releases shall be conducted
14    in strict accordance with standard procedures to ensure
15    proper authorization".  Are those standard procedures
16    all contained in this document?  Or are they in other
17    documents?                                      3:48:10
18    A.   That would be to this document, counsel.
19    Q.   Okay.  So there are no other standard
20    procedures to ensure proper authorization that are not
21    contained in Exhibit 4.  Correct?              3:48:54
22    A.   I would say no standard, but I wouldn't go as
23    far as to say -- couldn't say a staff member doesn't
24    have a practice to again safeguard the -- the --
25    Q.   Well, how would I know what that practice is?
```

158

```
 1   For whatever reason it is.  It might be because he
 2   wants his aunt to go to dinner with him.  We don't know
 3   what that reason is.  And I'm not interested in it.
 4   How would I know whether a particular person is
 5   deviating from plaintiff's Exhibit 4?              3:49:23
 6        A.   If -- if somebody was deviating, we wouldn't
 7   know.
 8        Q.   So you don't even have any process to
 9   determine whether or not someone is following your --
10   plaintiff's Exhibit 4 or deviating from it.
11        A.   That's why our supervisors are in place to
12   ensure that the policy is followed.               3:49:54
13        Q.   Is there a report that the supervisor
14   requires of people regarding following the standard
15   procedures?
16        A.   It's -- it's not a report.  It -- it's all --
17        Q.   The answer is no, there's not a report.
18        A.   Then you would do a disciplinary report.
19        Q.   Well, but that's when you find out that
20   they're not following standard procedures.        3:50:17
21        A.   Correct.
22        Q.   But that would just be happenstance that you
23   found out.  Someone told you or you happen to see it.
24   There's no report that's set up to determine if people
25   are following procedures or not.
```

159

```
 1        MR. ZECCHIN:  Objection, compound question.
 2        A.   No, sir.
 3        Q.   So, whether or not someone is following
 4   plaintiff's Exhibit 4 or not is not something that the
 5   Sheriff monitors in some specific way that you can tell
 6   me.                                               3:50:55
 7        A.   My answer would be in the -- in the
 8   supervisor's role, that's how the policy is enforced.
 9        Q.   But if someone is lying to the supervisor or
10   isn't talking to him or the supervisor is absent that
11   day, there's no report that has to be done that gets
12   done to you to make sure that the standards procedures
13   have been followed each day.                      3:51:24
14        A.   Not a report, but there's never not a
15   supervisor not there, because the supervisor's part of
16   the process.
17        Q.   Okay.  At the end of the day, do these
18   supervisors get together and report to you about what
19   happened that day with respect to the standards or
20   procedures for release of acquitted or not guilty
21   people?
22        A.   No, sir.                                3:51:44
23        Q.   And I take it if it isn't done at the end of
24   the day it's not done at the end of the week or month
25   or any particular period of time.
```

160

```
 1        A.   In regards to someone's deviating from the
 2   policy?
 3        Q.   With respect to a -- someone who has been
 4   found not guilty or acquitted, yes.               3:52:11
 5        A.   And -- and again so I'm sure, counselor, as
 6   far as deviating from this policy?
 7        Q.   Mm-hmm.
 8        A.   It's -- and again, if there was a deviation,
 9   the supervisor would effect disciplinary action.
10        Q.   If he knew about it.
11        A.   Correct.
12        Q.   But there's no process which generates some
13   sort of report and criteria which allows you find out
14   if someone is violating these procedures.  For example,  3:52:37
15   someone doesn't have to report to you at the end of
16   each day "I handled 23 people today and I swear under
17   oath that I followed these procedures" or "I handled 23
18   people today and I didn't follow these procedures" or
19   there's no system in place except by happenstance to
20   find out if these procedures were followed or not.   3:53:00
21        A.   Correct.
22        Q.   Now go to page, please, page 4.  And under   3:53:26
23   "Transportation Responsibilities".  The "Transportation
24   Officers shall separate court documents into four
25   categories".  Do you see that?
```

161

```
 1        A.   Yes, sir.                               3:53:38
 2        Q.   What's the purpose of that?
 3        A.   It -- again it just begins the process of the
 4   paperwork coming back of how it's going to go up to the
 5   records office.                                   3:54:04
 6        Q.   But the body of the person who falls into
 7   each of these four categories, the person himself as
 8   opposed to his records -- you with me?
 9        A.   I'm sorry.
10        Q.   We have the records for the person and we
11   have the person.
12        A.   Correct.
13        Q.   The records are divided into four categories
14   for your paperwork responsibilities.              3:54:32
15        A.   Correct.
16        Q.   But once you find out about possible
17   discharges, you don't start to immediately work on
18   discharging a person who is possibly discharged.  You
19   wait until later in the day until they're in their cell
20   and you got all the documents, etc.  There isn't the --
21   this division into four different categories is not to
22   benefit the early release of someone like Otero but
23   rather to allow you to send paperwork to the four
24   different places.                                 3:55:15
25        A.   Actually, this is -- with the effective
```

162

1    timely release, this begins the process of the
2    paperwork.  So then when it gets to the receiving room,
3    that auditor is reviewing what was -- has been
4    separated.  Hence, when it gets to the records office,
5    the sergeant is reviewing that too, so the process has
6    begun.                                                3:55:37
7        Q.   Well, I know the process has begun.  But by
8    the time it gets to the transportation officer and
9    these four categories are commenced, so your
10   transportation officer is dividing them into four
11   categories --
12       A.   Correct.
13       Q.   How long before that has Mr. Otero been found
14   not guilty?                                           3:56:03
15       A.   I'm not sure.
16       Q.   Well, it would be some time.
17       A.   I -- again I'm not aware from the courts, the
18   time.
19       Q.   Well, when does the transportation officer
20   start his process compared to when the court has made a
21   decision about something?                             3:56:27
22       A.   Just so you're aware, counselor, under this
23   transportation responsibilities goes to I was telling
24   you, the 17 outlying courthouses.  Once transportation
25   picks up from out there.

163

1        Q.   And brings them to court?
2        A.   They bring them to court and then they return
3    them from court.  Those -- those are the ones -- those
4    trans officers are the ones carrying that paperwork
5    back from the outlying courthouse.                    3:56:50
6        Q.   So, the -- the buses arrive with a thousand
7    people.  Or the Criminal Court 500 people.
8        A.   Correct.  Just no bus to Criminal Courts.  To
9    26th Street.  That's a walk through the tunnel.       3:57:10
10       Q.   Okay.  So 500 people have come through the
11   tunnel.
12       A.   Correct.
13       Q.   When does this paperwork division start?  As
14   those people are walking through the tunnel?
15       A.   Correct.
16       Q.   Okay.  And now you have determined that there
17   are some possible discharges.  What happens to those
18   documents?                                            3:57:33
19       A.   Again all categories that are separated, all
20   documents from the receiving room together all go up to
21   the records office.
22       Q.   And then what happens in the records office?
23       A.   Then the supervisor reviews the categories --  3:58:02
24       Q.   Well, he knows what the categories are.
25   There are four of them.  New defendants, possible

164

1    discharges, continued court dates, and special
2    conditions.  They've already been divided into those
3    four categories according to your procedures by the
4    transportation order, because it says he shall separate
5    the court documents.
6        A.   Well, we want another set of eyes to review
7    to ensure again the proper disposition from the judge
8    to, like I said earlier, on what side of the room that
9    paperwork will wind up on.                            3:58:33
10       Q.   So, the transportation officer has put them
11   into four categories, but you don't rely on his work.
12       A.   I want to say we don't rely, we --
13       Q.   You don't end there.
14       A.   Correct.
15       Q.   And we go to the next one, to the "Records
16   Office Responsibilities".  Is that the next thing that
17   someone does with the four categories?                3:58:55
18       A.   Yes --
19       Q.   Or --
20       A.   -- sir.
21       Q.   So, the record office supervisor then takes
22   just category 2 documents or does he take them all?
23       A.   He takes them all.  He or she, I'm sorry.
24       Q.   Okay.  Where does it say that?  From where
25   are you getting that in this process?                 3:59:20

165

1        A.   I'm sorry, the -- the he or the she or --
2        Q.   Well, no, no.  The -- in 1(a), we have these
3    four categories.  Where does it say that he gets all
4    the packets?  Two says the record office shall review
5    all the discharge packets.  What -- what does he do
6    with the rest of the packets?
7        A.   Again it went out to the -- all sides of the
8    room.  Because this -- this -- this GO, counselor, is   3:59:42
9    relating specifically to detainee discharge.  The other
10   ones ranch out in -- inside the office.
11       Q.   And the two-hour limit only begins when the
12   records get to the record office supervisor.           4:00:09
13       A.   I'm -- I'm confused, the two-hour limit.
14       Q.   Well, look at 2(a).  The Record Office
15   Supervisor shall inherit the Cook -- initiate the Cook
16   County Dress and Release form.  And it says he shall
17   contact the Divisional -- all within two hours.  When
18   does that two hours start?                             4:00:30
19       A.   Once as in -- as -- as in 1(a), when the --
20   they initiate the dress and relief -- release form,
21   when that form is filled out, it goes to a person in
22   the records office that then begins the call.          4:00:50
23       Q.   So, the two hours doesn't begin until the
24   record office supervisor gets the documents.
25       A.   Once -- the two-hour window starts when the

166

1   person from records calls the Division.  The Division
2   has two hours to bring the body to the receiving room.    4:01:12
3       Q.   So, there could be several hours before that
4   that happen in the ordinary course of events.  Correct?
5       A.   Correct.
6       Q.   And could that be as much as a day?
7       A.   I -- I won't say a day.
8       Q.   So what do you mean by saying there could be
9   several hours, if it's not a day?    4:01:33
10      A.   Again, based on all the circumstances, I -- I
11  wouldn't be able to give a -- a -- a time limit.  But
12  when you had said a day, I'm -- you -- I'm looking at
13  -- you're saying 24 hours.
14      Q.   But there's nothing in this document that
15  limits any time period except the record office
16  supervisor's making that phone call to the Division
17  commander giving two hours after he gets the documents
18  and reviews them.    4:02:11
19      A.   Correct.  Going back to --
20      Q.   So the answer is yes, there's nothing in the
21  release procedure that requires people to act in a
22  certain time period except for that two-hour window
23  when the records supervisor starts reviewing the
24  packets.
25      A.   No, I would go back to the beginning where

167

1   the requirements and effectively time -- through the
2   whole process.  And part of this process, the Division    4:02:41
3   is responsible to get that body to the receiving room
4   within two hours.  Again as part of the process.
5       Q.   Right.  That two hours is part of the
6   process.  But there's no other time periods at all I've
7   been able to find in this plaintiff's Exhibit 4 that
8   limits the time it takes for anybody to do anything
9   else before the records supervisor.    4:03:06
10      A.   Correct.  Just the supervision of the
11  supervisors.
12      Q.   There's no --
13      A.   Following the --
14      Q.   Well --
15      A.   -- policy.
16      Q.   Well, because there's nobody checking on
17  whether they're doing it efficiently or not.
18          MR. ZECCHIN:  Objection, argumentative.
19      A.   They're checking all the time.
20      Q.   Is there a report that is prepared that would
21  show how long it takes from time to time to get to the
22  record office?    4:03:40
23      A.   To get to -- to the record office?
24      Q.   Yeah.  Number 2 said the record office
25  supervisor shall review all discharge pack -- packets

168

1   to ensure accuracy.  And it says the record officer
2   shall call the Divisional superintendent within two
3   hours.  So I assume that's two hours after he gets his
4   packet.    4:04:06
5       A.   Correct.
6       Q.   There's nothing in this whole process that
7   tells us how long this process should last before that
8   two hours.
9       A.   Correct.
10      Q.   And you don't know of any record or procedure
11  that monitors how long that takes.
12      A.   Correct.    4:04:30
13      Q.   Now go to page 5.  It says, "The Captain
14  assigned", in "e", "to Records, Receiving" -- that's
15  page 5 of plaintiff's Exhibit 4, "shall review this
16  daily log (sic) indicating review by signature, date
17  and time."  What is that log of?    4:05:00
18      A.   It's -- it's the -- the supervisor's looking
19  at the -- it's just what it is, counsel, it's a log
20  that's logged on the arrival times.    4:05:29
21      Q.   Okay.
22      A.   To -- for the supervisor to review.  From the
23  Divisional -- using terminology, bring over from the
24  Division.
25      Q.   Is the two-hour criteria in e(1) the same as

169

1   the two-hour criteria in 2(a)?
2       A.   Yes.    4:05:55
3       Q.   And where do you keep the written reports by
4   the assistant executive director for those two-hour
5   delivery criteria that are not satisfied?
6       A.   There's not a -- the assistant executive
7   director doesn't keep the reports.  The reports remain
8   in the records office.    4:06:24
9       Q.   It says, "The Captain shall submitted a
10  written report to the respective Assistant Executive
11  Director".  Where is that written report kept?
12      A.   It's -- it's if they -- if there -- a
13  situation arises past the two-hour delivery.
14      Q.   Right.
15      A.   Correct.
16      Q.   I assume that's happened some time.
17      A.   I -- I'm -- I would say since -- in my role
18  as the assistant director, I have not received a -- a
19  late arrival.    4:07:08
20      Q.   You haven't received a report about a late
21  arrival.
22      A.   Correct.
23      Q.   So how do you know whether there are any late
24  arrivals if you haven't received any report?
25      A.   Again upon reviewing the discharge times of

170

1  the defendants going out, you can see the times of the
2  -- the time called for and the time arrived.  And the
3  time of discharge.                                    4:07:42
4      Q.   So you review those, and if you see more than
5  a two-hour window, you ask a question.
6      A.   Correct.
7      Q.   When's the last time you asked such a
8  question?
9      A.   As of this date I haven't had to.
10     Q.   Now, the overall purpose of this general
11 order 9.27 is to ensure that someone who shouldn't be
12 released isn't released.  As opposed to the overall    4:08:20
13 person being -- that someone who should be released is
14 released.
15     A.   Can you repeat that, counsel?
16     Q.   Every time I have -- lots of times I have
17 asked you a question, you've always gone into the --
18 the -- what has become a mantra in your testimony, that
19 --                                                     4:08:48
20          MR. ZECCHIN:  Object to the --
21     Q.   -- you're --
22          MR. ZECCHIN:  -- argumentative.
23     Q.   That you are protecting the public from
24 someone who shouldn't be released.  You've said that
25 many times today.

171

1      A.   Correct.
2      Q.   Is that the primary purpose of the discharge
3  procedure, to make sure that someone who shouldn't be
4  released isn't released?  Or is the primary purpose of  4:09:14
5  the discharge procedure to make sure that a person who
6  ought to be released is released?  In other words, the
7  emphasis in my two questions.  Do you understand?
8      A.   Yes.
9      Q.   Which one is it?
10     A.   I would answer both.
11     Q.   Well, read the policy beginning.  It says,
12 "It's the policy of the Cook County of Directions (sic)
13 to discharge or otherwise release inmates or detainee
14 in an effective and efficient manner, utilizing
15 procedures which ensure the security and safety".  It   4:10:00
16 doesn't say to make sure that the Constitutional rights
17 of people who should be released are not violated or it
18 doesn't say to make sure that a certain person's rights
19 to be released after he's found not guilty.  The focus
20 of the policy is to make sure that people who shouldn't
21 be released who could cause some security and safety
22 are not released.                                       4:10:35
23          MR. ZECCHIN:  I object to your question.  You
24 left out the last sentence, the last part of the
25 sentence in "POLICY" --

172

1          MR. CHERRY:  Well, that's for him to tell me.
2  But --
3          MR. ZECCHIN:  Well, I mean, if you're asking
4  about the policy, I think it's only fair you read the
5  whole thing to him.
6          MR. CHERRY:  Well, he can tell me that.  I
7  don't think they go together.
8      Q.   It says, "Ensure safety and security and are
9  in accordance with all legal requirements and
10 conditions."  I read that to mean legal requirements
11 and conditions that ensure safety and security.  I      4:11:00
12 don't see in here where the emphasis of this discharge
13 procedure is to protect an individual's rights.  It's
14 to make sure that the system doesn't release someone
15 who shouldn't be released.  That's how I read this
16 policy.  Am I right?
17     A.   I wouldn't agree with that.
18     Q.   Okay.  Where does it say in this policy that
19 an individual rights -- the individual rights of
20 detainees are to be protected?  It says there should be  4:11:30
21 effective, efficient, and utilize procedures which are
22 to ensure safety and security.  And those procedures
23 also have to be in connection with legal requirements.
24 But you're talking about your procedures.  Where in
25 this policy is the emphasis on someone like Mr. Otero?   4:11:58

173

1      A.   I believe, counselor, in that policy it
2  summed it all up in that -- in regards to all aspects.
3  Safety and security of inmate, institution, the public,
4  effective release, and all within the legal
5  requirements and conditions.
6      Q.   So you're saying the words "and in accordance
7  with all legal requirements and conditions" include the
8  rights of Mr. Otero.  That's where in that policy Mr.    4:12:28
9  Otero's rights are -- are referenced.  In the phrase
10 "in accordance with all legal requirements and
11 conditions."  Is that your testimony?
12     A.   I'm testifying to the policy from the
13 department that envelopes everything into the inmate
14 slash detainee discharge procedure that that policy has
15 followed.                                                4:12:57
16     Q.   Well, but it says they have to be effective.
17     A.   Correct.
18     Q.   And efficient.
19     A.   Correct.
20     Q.   Where does it say they have to protect his
21 rights?  You could be effective and efficient without
22 protecting his rights.
23          MR. ZECCHIN:  It there a question pending?      4:13:39
24          MR. CHERRY:  Yeah.
25     Q.   I said you can be efficient and effective

174

```
1   without protecting Mr. Otero's rights.  You agree with
2   that.
3       A.   And again I would -- I would --
4       Q.   Do you agree with what I said?  You could be
5   efficient and effective without protecting Mr. Otero's
6   rights?
7       A.   Again I would say in the policy that is all
8   encompassed in the policy.                        4:14:01
9       Q.   But you would agree with me that you can have
10  an efficient and effective office without protecting
11  Mr. Otero's rights.
12      MR. ZECCHIN:  Objection, calls for legal
13  conclusion.
14      A.   I would not answer a yes to that, counsel.
15      MR. CHERRY:  If we could take a short break,
16  I'm close to being done.
17      MR. ZECCHIN:  That's fine.
18      RECORDER:  Going off the record at 3:43 p.m.  4:14:40
19          (Off the record)
20      RECORDER:  Going back on the record, 3:49
21  p.m.
22      Q.   You're aware generally that the Sheriff's
23  Office was sued a couple of times before about the
24  detention procedures.
25      A.   I'm unaware, sir.
```

175

```
1       Q.   Well, take -- I want you to take this as a --
2   a given, okay?  I don't want you to quarrel with the  4:15:07
3   two assumptions I'm going to make -- I'm going to ask
4   you a question.  There was a case about unlawful
5   detention in the Sheriff's Office involving a plaintiff
6   Watson and sheriff Sheahan and it was settled in 1998.  4:15:30
7   There was a case by a person named Bullock that was
8   settled in 2011.  So there were two lawsuits, one
9   against your office for the procedures we're talking
10  about.  One was settled in 1998 and one was settled in
11  2011.  I want you to take that as a given to my
12  question.  Okay?                                     4:15:53
13      A.   Yes, sir.
14      Q.   All right.  We have -- now take a look at
15  paragraph -- plaintiff's Exhibit 4.  Do you see that?
16  Plaintiff's Exhibit 4?
17      A.   Yes, sir.
18      Q.   And you see the EFFECTIVE DATE is October
19  15th, 1995?
20      A.   Yes, sir.
21      Q.   Can you tell me, if you know, why these
22  procedures were never revised at any time after the
23  1998 or 2011 case?                                   4:16:31
24      MR. ZECCHIN:  I'm going to object, beyond the
25  scope of his knowledge.  He said he didn't know about
```

176

```
1   these lawsuits.  You can answer if you know.
2       A.   I'm not aware.
3       Q.   You told me earlier that plaintiff's Exhibit
4   4 was not, to your knowledge, ever amended after 1995.
5       MR. ZECCHIN:  Objection.  He never said that.  4:16:54
6       Q.   Were -- is there -- the procedures in
7   plaintiff's Exhibit 4, have they been amended to your
8   knowledge?
9       A.   I'm not aware.
10      Q.   Okay.  So, so far as you know, the procedures
11  for inmate/detainee discharge are the ones that were
12  effective October 15th, 1995, and so far as you know,
13  they have never been amended since then.             4:17:22
14      A.   Correct.
15      Q.   Okay.  If someone has a pending case again
16  them, where would you find that out?  In the computer?
17      A.   It could be both ways.  Or more than one,
18  counselor.  It could -- could be in the computer, could
19  be in his file, or you could even -- from the inmate --
20  inmate himself.  A court can call you.  Multitudes.  4:18:04
21      Q.   Well, when you're checking for pending cases,
22  you look in the computer.  Right?
23      A.   Yes.  I was just trying to explain, though,
24  that the -- the computer we're looking into is what
25  we've fed into our system.
```

177

```
1       Q.   Okay.  So it has all your files.  However
2   updated they are.  But what I'm saying is, if you're
3   going to check on pending cases in the computer, that's
4   a relatively quick operation.                        4:18:34
5       A.   Yes.
6       Q.   And if you're going to check if there are
7   warrants outstanding, that's also a relatively quick
8   operation.
9       A.   As based on looking at the computer, yes.
10      Q.   Now, in these procedures we've talked about a
11  transportation officer.
12      A.   Yes.                                         4:19:03
13      Q.   Does that person have a name at 26th and
14  California?
15      A.   The individuals that drive the buses?
16      Q.   No, the ones who are on page 4 of plaintiff's
17  Exhibit 4, the "Transportation Officers shall separate
18  court documents into four categories".  Who are those
19  people?                                              4:19:30
20      A.   That's the transportation officers.
21      Q.   Those are the bus drivers.
22      A.   Yes, sir.
23      Q.   And so they would change from time to time?
24      A.   There's approximately 116 transportation
25  officers.
```

178

1     Q.   And would there be a transportation officer
2  always assigned to 26th and California or did he move
3  around --
4     A.   It --
5     Q.   -- and go to the different courts sometimes?   4:19:56
6     A.   There's none assigned to 26th and Cal.
7     Q.   So, in the morning a bus driver doesn't know
8  where he's going to drive.
9     A.   At roll call he's given his assignment.
10    Q.   Okay.  And where are the records kept as to
11  who drove buses which days?
12    A.   I believe they would fall -- they -- they
13  fall under the external operations assignment.   4:20:20
14    Q.   So if I asked a question who was the
15  transportation order -- officer who made these four
16  packets on the date Otero was arrested, you would have
17  records that would be able to answer that question.
18    A.   The -- the office would, not under my -- my
19  --
20    Q.   But the Sheriff would.  The --
21    A.   Yes.
22    Q.   -- Sheriff would know.  Okay.  Now, you
23  remember I asked you about how many people are
24  acquitted and released each day and gave me some
25  estimates?   4:20:55

179

1     A.   Yes.
2     Q.   We would be able to know specifically the
3  names of those people by going to the records.
4     A.   I -- I believe so.  If it -- if it's able to
5  be ascertained.
6     Q.   Well, if -- if there is an order releasing
7  someone, there would be a case name and we'd know that
8  we'd be able to determine who was supposed to be
9  released and who was supposed to be detained.   4:21:25
10  Somewhere in the Sheriff's Office it's relatively easy
11  to find out the names of people like Otero who may have
12  similar arguments.
13    A.   From -- from my standpoint, counsel, I won't
14  say it's easy.  I -- I wouldn't be able to --
15    Q.   Well, in any given day, we could list people
16  who were released.  And when we know how many were   4:21:53
17  released, we have court files, we could then look at
18  the files and get the identification of that person.
19    A.   Correct.  That's what I'm saying, if you're
20  able to ascertain a list from whatever date.
21    Q.   The court file would allow us to know how
22  many people are released.  And that would give us the   4:22:19
23  name of that person, correct?
24    A.   Well, if you're -- if you're saying the court
25  file, the court file would be able to tell you who was

180

1  adjudicated in that courtroom.  It wouldn't necessarily
2  be a release.
3     Q.   Well, the file would say whether he was
4  released.
5     A.   The department's file.   4:22:40
6     Q.   Somebody's file, either the courtroom or the
7  department's file, would know the name of the person
8  the other people like Mr. Otero complains he was
9  treated a certain way, other people like him could be
10  ascertained from the Sheriff's files, correct?
11    A.   Again, I'm not sure.   4:23:00
12    Q.   Well, if someone is released like plaintiff's
13  Exhibit 3, because there's a verdict of not guilty,
14  this goes in a file.
15    A.   In the individual's file.
16    Q.   Right.
17    A.   Correct.
18    Q.   So, then a record is made of what happens to
19  this file and eventually we'd be able to find that file
20  in a pile because we're dividing up the piles according
21  to your procedure of discharges, releases, sent back to
22  jail, etc.  So eventually we'd be able to get the names   4:23:36
23  of people, correct?
24    A.   That -- that's what I was referring to, from
25  a particular day, how long ago, I don't know for a base

181

1  if the system would extract what you're looking for.
2     Q.   Well, this goes back to you don't know how
3  long ago -- how long you keep the records.   4:24:17
4     A.   Correct.
5     Q.   Sir, you have a record of who was released
6  yesterday.   4:24:52
7     A.   Yes.
8     Q.   And the day before.
9     A.   Yes.
10    Q.   And going back some time.
11    A.   Yes.
12    MR. CHERRY:  Can you mark this?  As
13  plaintiff's Exhibit -- what's the number?
14       RECORDER:  Five.   4:25:14
15    Q.   I've marked as plaintiff's Exhibit 5 called
16  "Inmate Moves", and it's a multiple document, 17 pages,
17  beginning with 0036 through 0052.  Do you see at the
18  top, this is -- the Inmate Moves of Brian Otero.   4:25:38
19    A.   Yes, sir.
20    Q.   On 7/21/2011, at 19:08, that's 7:08, correct?
21    A.   Yes, sir.
22    Q.   He was in Criminal Court, Division Post 5.
23  Right?
24    A.   He was -- he was -- actually what that's
25  saying is that he left Criminal Court and he was

182

1    scanned at Post 5, which is in a receiving room.    4:26:12

2        Q.   Where --

3        A.   And I'm sorry, Post -- Post O, which is in

4    Division 5.

5        Q.   So that's one of those holding areas.  That's

6    what that refers to.

7        A.   Yes.

8        Q.   And where was he before that?

9        A.   Criminal Courts.

10        Q.   So do I read these -- I thought I read them

11    up, that the -- the lower one is earlier.  So, at 7:08   4:26:44

12    he's in Court Criminal Division Post 5.  That's a

13    holding area?

14        A.   Yes, sir.

15        Q.   And at 8:41, he's -- I'm told that I should

16    read these columns from location to location.  So, at

17    19:08 he was -- he was moved from the Criminal Court to

18    Division Post 5.  Is that fair?             4:27:17

19        A.   Yes, Division 5, Post O.

20        Q.   And where was he before he was in Criminal

21    Court?

22        A.   The -- the prior entry at 8:41, he arrived at

23    Post 5 en route to Criminal Court.

24        Q.   And was he in a holding cell before 19:08?

25    Or how can I tell when he was put in a holding cell?   4:27:56

183

1        A.   I'm -- I'm not aware that you'd be -- be able

2    to.  We -- our -- our scanning procedure starts in the

3    receiving room.

4        Q.   Well, there are earlier ones that are not in

5    the receiving room.  He's in transit, he's in-cell.  So

6    I don't understand what you're saying.  Because --     4:28:30

7        A.   I was saying from -- from court, counselor.

8    You were saying how you know what time he's put in the

9    bullpen.  I -- I scan him back in from court.

10        MR. ZOLNA:  So he was in --

11        MR. ZECCHIN:  I'm going to object --

12        MR. ZOLNA:  Well, can I just ask a question,

13    because I --

14        MR. CHERRY:  Yeah, go ahead.

15        MR. ZOLNA:  -- chronology.

16        MR. ZECCHIN:  That's fine.            4:28:50

17        MR. ZOLNA:  Prior to 7/08, according to this

18    chart, he was somewhere over in the court building.

19    Correct?

20        WITNESS:  Correct.

21        MR. ZOLNA:  And at some point he was placed

22    in the holding cell adjacent or behind the -- the

23    court, the judge's chambers while he was over there?

24        WITNESS:  Again, I'm assuming.  When --

25        MR. ZOLNA:  According to procedure.       4:29:14

184

1        WITNESS:  Correct.

2        MR. ZOLNA:  But that's not timestamped on

3    here.

4        WITNESS:  Correct.

5        MR. ZOLNA:  Okay.  And then he was moved

6    somewhere to the bridge.

7        WITNESS:  Okay.

8        MR. ZOLNA:  According to procedure at least,

9    correct?

10        WITNESS:  Correct.

11        MR. ZOLNA:  But that's not timestamped

12    either.

13        WITNESS:  Correct.

14        MR. ZOLNA:  Okay.  And then he was moved from

15    the bridge over to Division 5, and that's when he --

16    this first timestamp appears, the 19:08.         4:29:34

17        WITNESS:  Correct.

18        MR. ZOLNA:  That's just what I wanted

19    to clarify.

20        Q.   And at the top line, what is "RCDC BONDING"?

21        A.   That -- that is the scanning of leaving the

22    bonding area to discharge.

23        Q.   And that's stamped at 1:34.  And Mr. Otero

24    says he didn't get out at 1:34.  So, what -- what -- if

25    -- if he's correct, that it took another couple of

185

1    hours, if that's true, why would it take another couple

2    of hours to be released?               4:30:08

3        A.   I'm not sure with what time he's giving you.

4    Our -- our records show he was scanned out after

5    discharge procedure at 1:34.

6        Q.   Scanned out of what?

7        A.   When he was discharged out of the system and

8    fingerprinted out, he's scanned and released.     4:30:37

9        Q.   You mean from the building into California

10    Avenue or someplace he was -- that scanning occurs at

11    the exit?

12        A.   It occurs at -- in -- in the receiving room

13    in the basement of Division 5.  Before he gets on an

14    elevator to the first floor to go out the inner locking

15    out, he's scanned right just in proximity of the

16    elevator going up.                 4:31:07

17        Q.   And that's going up to the main floor so he

18    can get out.

19        A.   Correct.

20        Q.   So once he's scanned for your purposes, he's

21    free to leave.

22        A.   He's -- he's been processed out and is en

23    route to exit the facility.             4:31:27

24        Q.   Okay.  What else could prevent him from

25    exiting after he's been scanned at 1:34?

186

1      A. If he had an -- it wouldn't necessarily be
2  from there, counsel, but when he goes back to his cell
3  and he's collecting his property, any kind of legal
4  papers, paperwork, anything that he wants, and when he
5  leaves the basement and goes upstairs, whatever he was
6  arrested with one person when he came in, the money,
7  whatever, there's -- when he comes in, it's all
8  inventoried in. Property section is outside, not     4:32:10
9  outside but -- okay, but outside the secure side of
10  Division 5. And then they are in the lobby of Division
11  5, retrieving their property.
12      Q. So you -- after he's scanned in -- scanned
13  out on this 1:34 time, on the first page of plaintiff's
14  Exhibit 5, that's the last thing that your office needs
15  officially to do and he's free and then it'll just take
16  him some time to change into his dress clothes or his
17  street clothes and get his possessions, etc.?     4:32:55
18      A. I'm sorry --
19      Q. He's scanned in his -- in his jumpsuit,
20  correct?
21      A. No, sir.
22      Q. He's already in his street clothes?
23      A. Yes, sir.
24      Q. When he's scanned?
25      A. Yes, sir.

187

1      Q. And why doesn't have his personal property
2  then at 1:34?
3      A. The personal property, which would be
4  whatever is -- would be considered contraband, it's not
5  allowed on person while incarcerated at the facility.   4:33:19
6      Q. Right. But now he's been scanned out. Why
7  isn't he at that point given his personal property?
8      A. The -- the section for the -- the vast amount
9  of property for 10,000 people is held upstairs in the
10  lobby of Division 5.
11      Q. Okay. So he's scanned out at 1:34, and he's
12  free to leave.
13      A. Again, he's -- he's -- he's scanned out and
14  being escorted to the unsecured side of the facility.   4:33:50
15      Q. Okay. And that shouldn't take very long.
16  Once that happens, he's free to leave.
17      A. At -- at the inner lock of Division 5 is a
18  checkpoint. Prior to Division -- the receiving is in
19  the basement of Division 5. But Division 5 is a
20  separate entity. So before Division 5 releases anyone
21  walking out their door, they're verifying who's leaving
22  their facility.     4:34:14
23      Q. So, this 1:34 where he was scanned complete
24  is not the last time you can detain him. There is yet
25  another -- at least one check that happens where

188

1  they're verifying that he's the right person to be
2  released.
3      A. Actually, two more checks.     4:34:36
4      Q. Two more checks.
5      A. Correct.
6      Q. And that could take another hour and a half.
7      A. I'm -- I'm not sure. All -- again, all
8  depending circumstances, how many property, money.
9      Q. And could you just describe for me what those
10  two other checks are? Because this says, "RCDC
11  BONDING". And he's scanned in. So there are now two
12  checks where there's no scanning. What -- what kind of
13  checks are they?     4:35:02
14      A. I'm sorry, sir?
15      Q. You told me there were two more checks by
16  your office after the scanning on the top line.
17      A. Correct.
18      Q. Those do not appear on the Inmate Moves
19  sheet.
20      A. Correct.
21      Q. Why not?
22      A. That's -- that's a check from the exit point
23  itself to ensure that person is who they are being
24  released out into the community.     4:35:38
25      Q. And is that from the secured area to the

189

1  unsecured area?
2      A. There is a checkpoint -- one checkpoint at
3  the secured area.
4      Q. After the scanner.
5      A. Correct.
6      Q. Okay.
7      A. There's a checkpoint in the lobby of 5 before
8  you exit the front doors of Division 5, if you may.
9      Q. But not in the lobby. Somewhere in a secured
10  area. So there's a secured area back where begins the   4:36:06
11  -- the -- the offices of the building, and then after
12  you get out of that, maybe there's some sensors that
13  you gotta go through if you've coming in. That's
14  another check there before he gets through that, and
15  then there's another one before he gets out of the
16  building?     4:36:31
17      A. Correct.
18      Q. So why aren't you checking everybody who's in
19  the lobby? How do you differentiate between Mr. Otero
20  and everybody else who might be in the lobby? I could
21  be there, for example.
22      A. But you have your ID card, your dress and
23  release form, which is telling that Divisional officer
24  -- he's looking at the face, he's looking at the ID
25  card, and he's looking at the dress and release form,

190

1　that that is the actual person leaving the facility.
2　　　Q.　The front door.　　　　　　　　　4:37:00
3　　　A.　The front door of Division 5.
4　　　Q.　Oh, of Division 5.　So I wouldn't be in that
5　lobby without permission of some kind.
6　　　A.　Correct, if you -- if you were a visitor,
7　official business, seeing a client.
8　　　Q.　So what if I took my badge or he took his
9　badge and I stuck it so that no one could see anything,
10　then somebody would want to know why you don't have a
11　badge, right?　　　　　　　　　　　　　　4:37:35
12　　　A.　You're saying Mr. Otero?
13　　　Q.　Or me.　If I'm there without a badge or he's
14　there without a badge.　I'm trying to figure out why
15　he's checked again and differentiated from other people
16　who would be there when he's no longer in a secured
17　area.
18　　　A.　Well, everybody's checked in the lobby,
19　you're correct.　But again, he's coming from the secure
20　side of the facility.　So before the lobby officer
21　clears anyone coming from the secure side, they're --
22　they're checking to ensure from one point to the other
23　it's the same person leaving the facility.　　4:38:13
24　　　Q.　Now, do you wait until the end of the day for
25　the system to update before you release someone?

191

1　　　A.　I'm not clear on -- on --
2　　　Q.　When you're checking for warrants, for
3　example, do you wait until the end of the day for any
4　given person to see if there were any warrants issued
5　during the day?　　　　　　　　　　　　　4:38:37
6　　　A.　No, we wait -- the -- the last -- the
7　administrative assistant that's -- we call working the
8　pack, preparing the pack, one of their last steps in
9　checking the pack is to run the LEADS on that
10　individual.
11　　　Q.　So that could happen several times a day.
12　　　A.　No, sir.
13　　　Q.　Well, the administrative officer gets the
14　discharge packages more than once a day.　　4:39:04
15　　　A.　I think I'm confused.　They -- they run a
16　LEADS on each person they're --
17　　　Q.　Assigned.
18　　　A.　Correct.
19　　　Q.　Okay.　And they may get a package at 9:00 in
20　the morning.　Or 10:00 in the morning.
21　　　A.　A -- a -- a possible discharge file?
22　　　Q.　Mm-hmm.　　　　　　　　　　　　　4:39:29
23　　　A.　Yes.
24　　　Q.　So, is it within procedure that they could
25　check LEADS and find no warrants at 10:30 and then

192

1　release somebody or start the process to release
2　someone at two-hour limit, or do they wait till the end
3　of the day when the computer's updated before they do
4　anything on a particular file?　　　　　　4:39:52
5　　　A.　It's -- it's -- it's happening at the -- at
6　the same time.　While they're preparing the file and
7　running LEADS, the paperwork is also being updated in
8　the system.　　　　　　　　　　　　　　4:40:20
9　　　Q.　Okay.　And if they get a package at 10:00,
10　what I'm -- is it always true that they wait until the
11　end of the day to see if the computer's been updated,
12　or could a person be released within an hour or two of
13　that paperwork if everything runs smoothly?　4:40:44
14　　　A.　If -- if it helps clarify, the -- whenever
15　paperwork is received in the records office, and the
16　sergeant determines what side of the room it goes on,
17　the administrative assistants -- assistant begins work
18　on that particular individual.
19　　　Q.　Okay.　And when does it end?
20　　　A.　When the last piece of paper is determined
21　which side of the room it goes on.　When it's received
22　into the office.　　　　　　　　　　　　4:41:15
23　　　Q.　I'm not following you.
24　　　A.　If -- like I was saying earlier, if -- if a
25　thousand people went out to court, if -- if a bus came

193

1　back at 11 in the morning and that paperwork is broke
2　down like we discussed and it came up to the records
3　office, that supervisor reviews the paperwork and puts
4　it to work in the room.　And that paperwork is　4:41:39
5　processed and then it will follow through to a
6　discharge.　The -- the calling, the bringing over.
7　Another bus comes in, it -- it happens all the way
8　until the last -- if we send a thousand out to court,
9　until that thousandth person came back, if he was in
10　trial, he came back at 2 in the morning, when that
11　paperwork came to records, either side of the room
12　would update him for trial the next day or a possible
13　release.　　　　　　　　　　　　　　　4:42:07
14　　　Q.　And how late in the day does that paperwork
15　come in?
16　　　A.　The bulk of the paperwork transportation
17　would be into the department by -- depending no -- no
18　breakdowns, nothing out of the ordinary, by 8 p.m., if
19　there's any trials that are still going on.　4:42:30
20　　　Q.　Okay.　So it's unlikely that anyone would get
21　released during daylight hours, right?　This process
22　always, even if you get a discharge package at 9, 10:30
23　in the morning, the process is going to last at least a
24　day.
25　　　A.　No, sir.

```
                                                      194

 1        Q.   Well, you said it's unlikely that you'll get
 2   it done before 8:00 at night.                        4:42:53
 3        A.   Well, it -- you have people in the lobby
 4   continuously bonding people out all day.  So, to
 5   simplify it as -- as the work or the job would come in
 6   to the records office, it's -- it -- the process begins
 7   immediately.
 8        Q.   I know it begins immediately.  I want to know
 9   when it ends in any given day.  Do you wait till the
10   end of the day for updates on the computer for example?  4:43:17
11        A.   No.
12        Q.   So, it's possible that someone could receive
13   a package at 10:00 and if there were nothing in his
14   file be out by 11?  Two?
15        A.   I would say highly -- highly improbable in --
16   in an hour.                                          4:43:41
17        Q.   How about two or three hours?  Three or four
18   hours?
19        A.   It would be possible if there was just one
20   person being done and there was no other work in the
21   room.  If -- if all the work was completed and a person
22   came back from trial, just saying 1 in the morning, and
23   one -- the two pieces of paper came up, the package
24   check was -- back to his Division --                 4:44:11
25        Q.   One in the afternoon you mean, not 1 in the
```

```
                                                      195

 1   morning.
 2        A.   No, 1 in the morning.  From 10, 11 in the
 3   morning to 8 p.m. at night, there's a thousand people
 4   coming in, there's 200 new coming in.  And all this is
 5   being deciphered in the -- in the records office.
 6        Q.   So, it's correct that a packet which starts
 7   in the morning at the office is never going to be
 8   completed that day.                                  4:44:41
 9        A.   Oh yeah -- yes, sir, it'd be -- it'll be
10   completed within that day.
11        Q.   By 5:00?
12        A.   Probably before 5.
13        Q.   Well, so then why isn't that person released
14   by 5:00?
15        A.   They are.  When -- when the pack is complete
16   and the person is called for, and the pack through
17   receiving, body is brought to receiving, is checked,
18   the person's brought out and released.               4:45:11
19        Q.   So, that takes however long it takes based
20   upon the particular circumstances of the case.
21   Correct?
22        A.   Both the case and the circumstances of where
23   the paperwork and the person is coming from --
24        Q.   All of that stuff.
25        A.   Correct.
```

```
                                                      196

 1        Q.   All right.  And you're telling me that that
 2   can happen in two or three hours?                    4:45:42
 3        A.   Again, based on the volume, if you have
 4   nothing going on in the records office and --
 5        Q.   No, no, no.  Realistically, based on a real
 6   day at 26th and California, it doesn't happen in a
 7   couple of hours.
 8        A.   Correct.
 9        Q.   So, it happens however long it takes given
10   the workload.  But if a person is finished with his    4:46:07
11   package by, say, 2:00, he may still not be released
12   that day because that particular clerk has got other
13   things to do and hasn't yet set that package up.
14        A.   If I may, when you say "by that day", what --
15   can you --
16        Q.   Till 5:00.
17        A.   Correct.
18        Q.   Correct?
19        A.   Correct.
20        Q.   And are you working 24 hours a day?        4:46:40
21        A.   Yes, sir.
22        Q.   So, and you -- do you do an update on the
23   computer before you leave -- release someone?  Is that
24   the last thing you do?
25        A.   And if you could clarify "update".
```

```
                                                      197

 1        Q.   Well, let's say you checked the computer for
 2   warrants and there were no warrants, and now you're
 3   going through the paperwork, and you got everything
 4   done.  Do you go back and do an update on the computer
 5   to see if there are any warrants as the last thing to
 6   make sure that there isn't anything that's happened
 7   during the time you're looking at the file?           4:47:18
 8        A.   No, sir.
 9        Q.   So, you look at the warrant file once.
10        A.   Yes.
11        Q.   So a person could be charged within that
12   period of time or there could've been something else
13   that came up.  You wouldn't find it.
14        A.   Correct.
15        Q.   And is there some average time how long it
16   takes to check warrants?  Is that complicated?  It's   4:47:46
17   only -- I -- I take it if it's all on a computer, it's
18   easy to do.  But it gets more complicated if you see it
19   in a file and you got to call someone.
20        A.   Correct.
21        Q.   Thanks very much for your time.
22        A.   Thank you, sir.
23        MR. ZECCHIN:  Yeah, I'd like to ask just one
24   question and maybe take a two-minute break, but just to
25   clarify some of the last questions you're asking about
```

198

1   the ongoing process by which the packets are coming in.    4:48:17
2   BY MR. ZECCHIN:
3       Q.   If a guy comes back and he's being
4   discharged, and the packet is in at 11 in the morning,
5   they're not going to wait on that packet until the rest
6   of the people come back.  They'll start working on it
7   right away I believe is your testimony, correct?
8       A.   Correct.
9       Q.   And if they -- that administrative assistant
10  is working on that packet, finishes it, concludes
11  there's no reason to hold him, then that paperwork will
12  be forwarded so that person could be discharged,
13  correct?                                                    4:48:40
14      A.   Correct.
15      Q.   They're not going to wait on the guy for six
16  hours just because they're going to wait for everybody
17  else to come back, right?
18      A.   Correct.
19          MR. ZECCHIN:  I have no other questions.
20  BY MR. CHERRY:
21      Q.   That's in the real world.  But a given person
22  who has 30 packets may have a different procedure.          4:49:00
23  That person may want to get all of the packets at -- at
24  the same time.  You told me that earlier, that not
25  everyone was following these procedures.  Some people

199

1   have their own procedures, their own practices.  So,
2   what counsel has said, that's what you'd like to
3   happen.  Also based on your experience, the opposite
4   happens, where someone's packet is completed and it's
5   not willfully done unless someone's doing it on
6   purpose.  But it's -- in the normal course of events    4:49:32
7   will not happen immediately.
8       A.   No.  What I was referring to, counsel, was a
9   -- a -- of a person being discharged, a -- an officer
10  or whoever ensuring the -- the -- the release of the
11  person is -- is -- is for certain.  Not that they --   4:49:56
12  they would be holding 30 packs, and that's again the
13  supervisor.  The supervisor that's working the floor
14  wouldn't -- it's -- it's not protocol.  They wouldn't
15  -- they would notice 30 packs sitting up.  That's why
16  the supervisor's role is to -- to break down the work
17  to the people assigned and to ensure that the process
18  is continuously flowing.                                4:50:22
19      Q.   Anything else?  Just last thing.  Is there
20  anything else -- anything you said today that you want
21  to change?  That you can think of.
22      A.   No, sir.
23      Q.   Okay.  Thanks.
24          RECORDER:  Going off the record, 4:25 p.m.
25

200

1               CERTIFICATION
2       I certify that the foregoing is a correct
3       transcript from the record of proceedings
4           in the above-entitled matter.
5
6
7           Christina Kollintzas
8           June 30, 2013
9

# Exhibit 9

# Transcript of the Testimony of
# **ERICA QUEEN**

**Date:** December 12, 2013

**Case:** EDWARD SHULTZ vs. THOMAS DART, SHERIFF OF COOK COUNTY AND COOK COUNTY, ILLINOIS

**TOOMEY REPORTING**
Phone: 312-853-0648
Fax: 312-853-9705
Email: toomeyrep@sbcglobal.net

**ERICA QUEEN**
**December 12, 2013**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

EDWARD SHULTZ,                    )
                                  )
          Plaintiff,              )
                                  )
              vs.                 )   No. 13 C 3641
                                  )
THOMAS DART, SHERIFF OF           )
COOK COUNTY, and COOK             )
COUNTY, ILLINOIS,                 )
                                  )
          Defendants.             )


     This is the deposition of ERICA QUEEN,
called by the Plaintiff for examination, taken
pursuant to the Federal Rules of Civil
Procedure for the United States District Courts
pertaining to the taking of depositions, taken
before PEGGY A. ANDERSON, a Certified Shorthand
Reporter of the State of Illinois, at Richard J.
Daley Center, Suite 500, Chicago, Illinois, on
December 12, 2013, at 11:05 o'clock a.m.

**ERICA QUEEN**
**December 12, 2013**

Page 2

1    A P P E A R A N C E S:

2

3                        THE LAW OFFICES OF:
                        THOMAS G. MORRISSEY

4                        BY:  MR. THOMAS G. MORRISSEY
                             10249 South Western Avenue
5                             Chicago, Illinois  60643

6                             Appeared on behalf of the
                             Plaintiff;
7

8                        THE LAW OFFICES OF:
                        THE COOK COUNTY STATE'S ATTORNEY

9                        BY:  MR. MATTHEW GRUWELL
                             500 Richard J. Daley Center
10                            Chicago, Illinois 60602

11                            Appeared on behalf of the
                             Defendants.
12

13

14

15

16

17

18

19

20

21

22

23

24

**ERICA QUEEN**
**December 12, 2013**

Page 3

1                    I N D E X

WITNESS                                    PAGE

2

ERICA QUEEN

3

DIRECT EXAMINATION BY

4 MR. MORRISSEY:                           5-74

5

6

7

8

                    E X H I B I T S

9

10 MARKED                                  PAGE

11 QUEEN EXHIBIT NOS. 1 - 3                   5

12

13

14

15

16

17

18              * * * * * * *

19

20

21

22

23

24

**ERICA QUEEN**
**December 12, 2013**

Page 4

1                   (WHEREUPON, the witness

2                   was first duly sworn.)

3       MR. GRUWELL:  Before we go on the

4       record, I have got to be out of here at

5       1:00.

6         MR. MORRISSEY:  1:00 o'clock?

7         MR. GRUWELL:  That's what I said to

8       Pat, so I would hope he would relay it to

9       you.

10        MR. MORRISSEY:  Well, then we'll

11      probably end up having to continue it to

12      another date.

13        MR. GRUWELL:  Well, let's just move.

14        MR. MORRISSEY:  We will move but --

15        MR. GRUWELL:  We are a half hour

16      behind.

17        MR. MORRISSEY:  Pardon?

18        MR. GRUWELL:  Well, we are a half

19      hour behind, so let's get going.

20        MR. MORRISSEY:  Well, I was in court.

21      I just got through and came here.  Do you

22      have stickers?

23        THE REPORTER:  I can mark them for

24      you.

**ERICA QUEEN**
**December 12, 2013**

Page 5

1              (WHEREUPON, Queen Exhibit

2              Nos. 1 - 3 were marked for

3              identification.)

4        MR. MORRISSEY:  This is the discovery

5     deposition of Erica Queen taken pursuant to

6     notice and by court order.

7              Ms. Queen, you have been deposed

8     before I'm sure.

9        THE WITNESS:  Yes.

10       MR. MORRISSEY:  You have to answer

11    orally.

12 WHEREUPON:

13              ERICA QUEEN,

14 called as a witness herein, having been first

15 duly sworn, was examined and testified as

16 follows:

17    D I R E C T   E X A M I N A T I O N

18         BY MR. MORRISSEY:

19    Q    In your capacity as a sergeant with

20 the Sheriff's Office, you have been deposed?

21    **A    Yes.**

22    Q    You have been deposed in your

23 capacity as commander at the Sheriff's Office?

24    **A    Yes.**

**ERICA QUEEN**
**December 12, 2013**

Page 6

1     Q    Have you been deposed as a

2  superintendent with the Sheriff's Office?

3     **A    Right now, yes.**

4     Q    This is the first time you have been

5  deposed as superintendent?

6     **A    Yes.**

7     Q    When did you join the Sheriff's

8  Office?

9     **A    1995.**

10     Q    And when you joined, you were a

11  correctional officer?

12     **A    Yes.**

13     Q    And your initial assignment in 1995

14  was where?

15     **A    Division 1.**

16     Q    Were you a tier officer then?

17     **A    Yes.**

18     Q    How long did you remain a tier

19  officer in 19 -- after becoming a correctional

20  officer in 1995?

21     **A    Approximately three years.**

22     Q    And during that entire period of

23  time, you were in Division 1?

24     **A    Yes.**

**ERICA QUEEN**
**December 12, 2013**

Page 7

1    Q    You made sergeant in 1998?

2    **A    Yes.**

3    Q    And where were you assigned as a

4    sergeant?

5    **A    Central kitchen, Division 2 and the**

6    **Discharge Unit.**

7    Q    For what period of time were you a

8    sergeant in the kitchen?

9    **A    I don't recall.**

10   Q    In Division 2, what were your

11   responsibilities?

12   **A    I would oversee the operations of**

13   **certain dorms.**

14   Q    How long did you spend in Division 2?

15   **A    I don't recall.**

16   Q    When did you move to being a sergeant

17   in the Discharge Unit?

18   **A    It was in my first year of being a**

19   **sergeant, I believe.**

20   Q    So that was in 1998?

21   **A    I believe so.**

22   Q    Other than having been deposed by my

23   office over the years, have you been deposed by

24   other attorneys?

ERICA QUEEN
December 12, 2013

Page 8

1      **A      No, sir.**

2      Q      When was the Discharge Unit

3      established?

4      **A      I'm not aware.  I don't know.**

5      Q      For what period of time were you the

6      discharge sergeant in the Discharge Unit?

7      **A      Approximately nine years, I believe,**

8      **nine, ten years.**

9      Q      So that would be approximately 1998

10     to 2008, correct?

11     **A      I believe so.**

12     Q      And last time I deposed you, you were

13     a commander?

14     **A      Yes.**

15     Q      And you were in charge of the RCDC at

16     that time?

17     **A      RCDC and records, yes.**

18     Q      When did you make commander?

19     **A      I believe it was April of 2012.**

20     Q      Between 2008 and 2012, what were your

21     responsibilities?  First of all, between 2008

22     and 2012, what was your title?

23     **A      2008?**

24     Q      Yeah to 2012.

ERICA QUEEN
December 12, 2013

Page 9

1    **A    Lieutenant, I believe.**

2    Q    What were your responsibilities as

3    lieutenant during that period of time?

4    **A    To oversee the receiving room, daily**

5    **operations in the receiving room.**

6    Q    What shift did you work?

7    **A    The afternoon shift.**

8    Q    Was that 3:00 to 11:00?

9    **A    2:00, 2:00 to 10:00.**

10   Q    As a lieutenant between 2008 and

11   2012, did your responsibilities include

12   overseeing the Discharge Unit?

13   **A    Yes.**

14   Q    Between 2008 and 2012 when you were

15   the lieutenant working the afternoon shift in

16   the receiving room, who was the superintendent

17   of receiving?

18   **A    Stanley Janice, I believe.**

19   Q    Janice retired in 2009 or so, '10?

20   To your knowledge, is Stanley Janice retired

21   from the Sheriff's Office?

22   **A    Yes.**

23   Q    Do you know when Mr. Janice retired

24   from --

ERICA QUEEN
December 12, 2013

Page 10

1       A    No, I do not.

2       Q    Who succeeded Stanley Janice as the

3    superintendent of receiving?

4       A    There were several, Superintendent

5    Joseph Brown, Tom Snooks, Carmen DeSadier and

6    then Michael Holmes.

7       Q    What period of time, to your

8    knowledge, was Joseph Brown the superintendent

9    of receiving?

10      A    I don't know.

11      Q    Same question with regard to Tom

12   Snooks?

13      A    I'm not sure.

14      Q    Carmen DeSadier?

15      A    I'm not sure.

16      Q    Michael Holmes?

17      A    I'm not sure when he was placed

18   there.

19      Q    Did you succeed -- Did you follow

20   Michael Holmes as superintendent of receiving?

21      A    Yes.

22      Q    When did you become a superintendent?

23      A    November of 2012.

24      Q    Between 2008 and the present, what

**ERICA QUEEN**
**December 12, 2013**

Page 11

1    had been the responsibilities of the

2    superintendent of receiving?

3          **A     Between 2008 and 2012?**

4          Q     Well, maybe I should rephrase the

5    question.  In 2008, what areas of the jail did

6    Superintendent Janice supervise?

7          **A     I believe it was records and**

8    **receiving.**

9          Q     Has that been true up to the present

10   that the superintendent of receiving also

11   supervises records?

12         **A     Yes, but at one point, they separated**

13   **them; and I believe it was -- I forgot Director**

14   **Hickerson was also the superintendent down**

15   **there, and then DeSadier went to records.**

16         Q     That would be Gary Hickerson?

17         **A     Yes.**

18         Q     He is retired, correct?

19         **A     Yes.**

20         Q     Do you know what period of time Gary

21   Hickerson was the superintendent of records and

22   receiving?

23         **A     I don't.**

24         Q     In May of 2013, you were

ERICA QUEEN
December 12, 2013

Page 12

1    superintendent of records and receiving,

2    correct?

3         A    Yes.

4         Q    Are you familiar with the Cook County

5    Department of Corrections' procedures for

6    discharge of inmates who have received a

7    court-ordered discharge?

8         A    Yes.

9         Q    In May of 2013, were part of your

10   responsibilities to supervise employees

11   responsible for discharging inmates based upon

12   court orders?

13        A    Yes.

14        Q    As a superintendent of records and

15   receiving, who do you report to?

16        A    Director Michael Holmes.

17        Q    Is he an assistant executive director

18   at Cook County Department of Corrections?

19        A    Yes.

20        Q    Is there an executive director of the

21   jail?

22        A    Yes.

23        Q    What is his or her name?

24        A    John Murphy.

**ERICA QUEEN**
**December 12, 2013**

Page 13

 1      Q    Do you know whether or not John
 2  Murphy is acting executive director or the
 3  director?
 4      **A    Acting, I believe.**
 5      Q    Do you know who John Murphy reports
 6  to?
 7      **A    No, I don't.**
 8      Q    Is there a chief of staff for the
 9  Sheriff?
10      **A    Brian Towne.**
11      Q    T-o-w-n-e?
12      **A    I believe so.**
13      Q    Do you know if Mr. Murphy reports to
14  Brian Towne?
15      **A    (Indicating.)**
16      Q    You have to answer orally.
17      **A    No, I don't know who Director Murphy**
18  **reports to, so.**
19      Q    Until the 15 years or so that you
20  have been overseeing the discharge process for
21  inmates with court orders, has there been a
22  material change in the policies and practices
23  at the jail for discharging detainees based
24  upon a court order?

ERICA QUEEN
December 12, 2013

Page 14

1      A      I don't understand the question.

2      Q      Since 1998 to the present, you as a

3   sergeant, lieutenant, commander and now

4   superintendent have overseen the discharge of

5   inmates based upon a court order, correct?

6      A      Correct.

7      Q      In that period of time, has there

8   been any changes in the procedures or practices

9   for discharging inmates based upon a court

10  order?

11             MR. GRUWELL:  I'm going to object to

12         the form.

13  BY THE WITNESS:

14      A      Changes in -- No.

15  BY MR. MORRISSEY:

16      Q      I'm showing you what has been marked

17  as Plaintiff's Exhibit Number 1, and I would

18  ask you to take a look at the document.  It

19  includes a general order effective 10/15/95,

20  General Order 9.27.  It's a ten-page document

21  and, additionally, an amendment, 9.27A,

22  effective 10/15/96 and an additional amendment,

23  9.27B, effective 5/27/03.  Do you see those

24  documents?

ERICA QUEEN
December 12, 2013

Page 15

1      **A      Yes.**

2      Q      Does General Order 9.27 lay out the

3 procedures for discharging inmates based upon

4 an order from a court stating that a person is

5 to be released?

6      **A      Yes, with the different types.**

7      Q      9.27 in addition to laying out the

8 procedures for court-ordered discharges also

9 states the procedure for other types of

10 discharges from the jail, correct?

11     **A      Yes.**

12     Q      What other types of discharges are

13 there from the Cook County Jail?

14     **A      Sentence expires.  Did you want me to**

15 **name these?  Bond paid, I-bonds.**

16     Q      Are the different types of discharges

17 defined by Roman Numeral II-D?

18     **A      Yes.**

19     Q      And there are approximately eight

20 different manners in which an inmate may be

21 discharged from the jail, correct?

22     **A      Seven.  Number 8 they stopped issuing**

23 **AMFs, and I'm not sure when.**

24     Q      So currently there are seven means in

**ERICA QUEEN**
**December 12, 2013**

Page 16

1   which an inmate gets released from the jail,
2   correct?
3       **A    In addition to the sentence expired,**
4   **I didn't see that on here.  When they are**
5   **sentenced to serve time in the Cook County**
6   **Jail.**
7       Q    Well, that's Number 4, isn't it, time
8   served?
9       **A    Yes, sir.**
10      Q    Is there any difference between a
11  court-ordered release and the other six methods
12  of discharge from the jail?
13      **A    A court-ordered release is usually a**
14  **court order handwritten releasing the**
15  **defendant.**
16      Q    My question really is as far as a
17  person -- Strike that.  Is there a unit called
18  the Discharge Unit?
19      **A    Yes.**
20      Q    And has there been a Discharge Unit,
21  to your knowledge, since 1995?
22      **A    To my knowledge, yes.**
23      Q    As a person that's spent most of
24  their career either in the Discharge Unit or

**ERICA QUEEN**
**December 12, 2013**

Page 17

1  supervising the Discharge Unit, are you aware

2  that in approximately 1995 that there was a

3  settlement of a class action case called Watson

4  versus Sheriff involving the discharge of

5  court-ordered inmates?

6      MR. GRUWELL:  I'm going to object to

7      the form, and I'm also going to object to

8      leading at this point in time.

9      MR. MORRISSEY:  This is a deposition

10     and leading questions are permissible.

11  BY THE WITNESS:

12     **A    I'm not sure of the name of the case,**

13  **no.**

14  BY MR. MORRISSEY:

15     Q    You are aware, however, that there

16  was litigation previously in regards to the

17  timely release of inmates from the jail?

18     **A    No, I'm not aware of that.**

19     Q    Are you aware that currently, there

20  is a case pending in federal court in addition

21  to this one in regards to the discharge of

22  inmates based upon court orders?

23     **A    No, I'm not aware.**

24     Q    Specifically, are you aware that

**ERICA QUEEN**
**December 12, 2013**

Page 18

1  there is a class action pending in front of

2  Judge St. Eve challenging the timeliness of the

3  release of inmates based upon court orders?

4          MR. GRUWELL:  Objection, asked and

5      answered.

6  BY THE WITNESS:

7      **A    No, I'm not aware of any pending**

8  **court proceedings.**

9  BY MR. MORRISSEY:

10     Q    Okay.  Are the procedures laid out in

11  this General Order 9.27 followed today in

12  regards to the release of inmates based upon a

13  court order?

14          MR. GRUWELL:  Object to the form.  As

15      far as foundation, when you say "today,"

16      are we talking about today's date,

17      12/12/13.

18          MR. MORRISSEY:  Yes.

19  BY THE WITNESS:

20      **A    I'm sorry.  What was the question?**

21  BY MR. MORRISSEY:

22     Q    The question is General Order 9.27,

23  are those procedures then consistent between

24  19 -- October 15, 1995 up through today's date

**ERICA QUEEN**
**December 12, 2013**

Page 19

1   in regards to the release of inmates based upon

2   a court order?

3       **A      Yes, for the most part.**

4       Q     What differences are there in the

5   current procedures as far as discharging of

6   inmates from the procedures that are laid out

7   in the General Order 9.27?

8       **A      The department doesn't have captains**

9   **any longer.**

10      Q     Are you reading from a certain page?

11      **A      Page 5.**

12      Q     And you are looking at E on page 5?

13      **A      Yes.**

14      Q     At E, it says the captain assigned to

15  Records, Receiving and Classification shall

16  review this log daily indicating review by

17  signature, date and time.

18           In the absence of having a captain

19  now at the jail, whose responsibility is it to

20  review the Records Office log, which is laid

21  out in D on page 5?

22      **A      You said D or E?**

23      Q     Well, let me ask you a preliminary

24  question.  Does the Records Office maintain a

ERICA QUEEN
December 12, 2013

Page 20

1   log in regards to discharges?

2       **A    They maintain a log for D bonds, and**

3   **they maintain a log for when the division is**

4   **called for the discharge.**

5       Q    What do you call that log?

6           MR. GRUWELL:  Object to the form.

7       There were two logs mentioned there.

8   BY MR. MORRISSEY:

9       Q    Is it one log or two?

10      **A    It's two.**

11      Q    The time -- The log which pertains to

12  court discharges is the one that involves when

13  divisions are called, I assume, correct?

14      **A    I'm sorry?**

15      Q    This case involves court-ordered

16  discharges, correct?

17      **A    Okay.**

18      Q    Is there a log in the Records Office

19  that pertains to court-ordered discharges?

20      **A    When they call the division.  The**

21  **receiving room maintains the logbook for all**

22  **discharges going out.**

23      Q    Is that a document that's made in the

24  Records Office --

ERICA QUEEN
December 12, 2013

Page 21

1      **A      No.**

2      Q      -- when the division is called?

3      **A      Yes.**

4      Q      And that's called a --

5      **A      Call log.**

6      Q      Call log.

7      **A      Discharge call log.**

8      Q      To your knowledge, between 1998 and

9   the present, has the Records Office maintained

10  this discharge call log?

11     **A      Since I have worked in Records and**

12  **Receiving, yes.**

13     Q      Where physically is this logbook

14  maintained?

15     **A      Where is it --**

16     Q      Physically kept.

17     **A      By the person that's calling for the**

18  **discharges.**

19     Q      If you, today, wanted to receive --

20  wanted to review this discharge call log from

21  the Records Department, where would you find

22  it, where would you go to find it?

23            MR. GRUWELL:  Object to the form.

24     Again, there is more than one book kept.  I

ERICA QUEEN
December 12, 2013

Page 22

1      mean, we are talking about a lot of books.

2   BY MR. MORRISSEY:

3      Q    Do you understand the question?

4      **A    Yes.  In the -- There's a storage**

5   **area.**

6      Q    Is that storage area in the Records

7   Office?

8      **A    It's outside the Records Office.**

9      Q    And for what period of time are the

10  discharge call logs maintained outside the

11  Records Office in the storage unit?

12     **A    There's several years in there.**

13          MR. MORRISSEY:  I'm going to renew my

14     demand for this record call logbook.

15          MR. GRUWELL:  Well, I believe the

16     testimony is it's called a discharge call

17     log, and I don't think it was specifically

18     requested by that name but we will do our

19     best to find it.  We are going to need

20     specific dates that you want it for as

21     well.

22  BY MR. MORRISSEY:

23     Q    Would you have any trouble finding

24  the discharge call book for the year 2013?

ERICA QUEEN
December 12, 2013

Page 23

1    A    I can look.

2    Q    My question was is it the procedure

3  to keep those discharge call log books for the

4  year 2013 in the storage area outside of the

5  Records Office?

6    A    Yes.

7    Q    Thank you.  Now, you mentioned that

8  the jail no longer has captains.  In the

9  absence of having the title captain, who

10  reviews that book?

11    A    The discharge logbook or the --

12    Q    The discharge call logbook.

13    A    That's maintained in records, not in

14  receiving.  So I would say the shift commander.

15    Q    Going through General Order 9.27

16  again, are there any other changes that you

17  have seen in regards to this order over the

18  period from 1998 to the present?

19    A    No, sir.

20    Q    You said no?

21    A    No, sir.

22    Q    Looking at page 1 of this document

23  under procedures, there's a -- under 2C, it

24  says Internal Audits:  An internal audit of

ERICA QUEEN
December 12, 2013

Page 24

1   this general order shall be conducted in

2   accordance with the established internal audit

3   schedule.

4           To your knowledge, does the Sheriff

5   maintain, conduct internal audits of the

6   discharge procedures?

7           MR. GRUWELL:  Object to the form.

8   BY THE WITNESS:

9       **A    I'm not aware.**

10  BY MR. MORRISSEY:

11      Q    To your knowledge, does the Sheriff's

12  Office conduct any internal audits at the jail?

13      **A    I'm not sure.**

14      Q    To your knowledge, who would have

15  more information in regards to internal audits

16  at the jail?

17      **A    Possibly Ed Dyner.**

18      Q    How do you spell his last name?

19      **A    D-y-n-e-r.**

20      Q    What is his title?

21      **A    I believe it's director.**

22      Q    Of the jail?

23      **A    I think it's OPA that he is over.**

24  **I'm not sure.**

**ERICA QUEEN**
**December 12, 2013**

Page 25

1      Q    Is that the Office of Policy?

2      **A    And Accountability, yes.**

3      Q    Can you give me a definition of what

4  a court-order release is?

5      **A    A court-order release is generated**

6  **from the courts to release somebody from**

7  **custody.**

8      Q    Is there a form that's usually used

9  by the Circuit Court judges to indicate that an

10  inmate is a court-order release?

11     **A    A mittimus.**

12      Q    My question is is there a form?

13     **A    Yes.**

14      Q    A mittimus?

15     **A    Yes.**

16      Q    What is a mittimus?

17     **A    It's a court document.**

18      Q    What, in your experience, is

19  contained on a mittimus?

20     **A    Inmate's name, charge, counts, bond**

21  **amount, next court date.**

22      Q    Do mittimuses also have a space if a

23  person has been discharged on the case they

24  were presented to the court on?

ERICA QUEEN
December 12, 2013

Page 26

1    **A    Yes.**

2    Q    Roman Numeral III says, in part,

3  inmates/detainees are entitled to a timely

4  release when they have posted bond, been

5  granted an AMF, ordered released by the courts,

6  completed a sentence or pending authorized

7  transfer to another agency.

8         In regards to a court-ordered

9  release, what is considered to be the practice

10  at the jail in regards to the timely release of

11  an inmate who has received a court-ordered

12  release?

13    **A    I'm sorry.  What is the practice?**

14    MR. MORRISSEY:  Can you read the

15    question?

16                    (WHEREUPON, the record

17                    was read as requested.)

18    MR. GRUWELL:  Do you understand the

19    question?

20    THE WITNESS:  I don't.

21    MR. MORRISSEY:  All right, I will

22    rephrase it.

23  BY MR. MORRISSEY:

24    Q    What is considered to be timely in

ERICA QUEEN
December 12, 2013

Page 27

1  regards -- a timely release in regards to an

2  inmate who has been ordered released by a

3  judge?

4          MR. GRUWELL:  Object to the form.

5  BY THE WITNESS:

6      **A    Everyone is different.  I would say**

7  **on the average three to four hours.**

8  BY MR. MORRISSEY:

9      Q    Now, the three- or four-hour period,

10  is that from the point in which an inmate has

11  appeared before a judge that he would, on

12  average, be released from the jail within three

13  or four hours?

14      **A    Once he returns to the jail.**

15      Q    So the time period that you are

16  describing on average of three to four hours

17  begins once the detainee comes back to the

18  jail, correct?

19      **A    Once the Records room receives the**

20  **paperwork, it starts the process.**

21      Q    As the person that has overseen the

22  discharge process for court orders for the last

23  15 years, do you personally have knowledge when

24  an inmate may have received an order from a

**ERICA QUEEN**
**December 12, 2013**

Page 28

1  judge that he or she is to be released from

2  custody?

3          MR. GRUWELL:  Do you understand the

4      question?

5          THE WITNESS:  No.

6  BY MR. MORRISSEY:

7      Q    Rephrase it.  In regards to an

8  inmate, given your responsibilities over the

9  last 16 years for discharges, do you -- when

10 you are processing a person for a discharge, do

11 you know whether or not the person was seen by

12 a judge and discharged in the early morning at

13 10:00 a.m. or the late afternoon?

14     **A    No, I wouldn't have that knowledge.**

15     Q    In the last 16 years, to your

16 knowledge, has there been any attempt by the

17 Sheriff for the jail to expedite the timing of

18 inmates being released from the jail on court

19 orders?

20     **A    Yes.**

21     Q    What steps have been taken by the

22 defendants in the last 16 years to expedite

23 court-ordered releases?

24     **A    In the last 16 years?**

ERICA QUEEN
December 12, 2013

Page 29

 1      Q    Yes.

 2      **A    We have staff at the courthouses who**

 3    **evaluate the paperwork for possible discharge,**

 4    **e-mail the name and ID number to the Records**

 5    **Office.  The pack is pulled and prepared and**

 6    **wait for the original documents to arrive.**

 7      Q    Who has been responsible for this

 8    process to your knowledge?

 9           MR. GRUWELL:  Object to the form.

10    BY THE WITNESS:

11      **A    I would say Director Holmes.**

12    BY MR. MORRISSEY:

13      Q    When you referred to Sheriff's

14    employees at the various courthouses, you are

15    referring to the court services department of

16    the Sheriff's Office, correct?

17      **A    No.**

18      Q    Are there members of the correctional

19    staff that are staffed at the court buildings?

20      **A    Yes, sir.**

21      Q    Who is in charge of the correctional

22    staff assigned to outlying court buildings?

23      **A    Superintendent Johnson.**

24      Q    And what division does Superintendent

ERICA QUEEN
December 12, 2013

Page 30

1   Johnson supervise?

2       **A      Receiving and Classification.**

3       Q      Do you share responsibilities with

4   Superintendent Johnson over the receiving room?

5       **A      No.**

6       Q      What areas do you currently --

7       **A      Records.**

8       Q      So currently, you are only

9   supervising records?

10      **A      Correct.**

11      Q      For how long has there just been a

12  superintendent of Records?

13      **A      August, the end of August, they**

14  **appointed me over records.**

15      Q      August of 2013?

16      **A      Yes.**

17      Q      You made superintendent in what --

18      **A      August of --**

19      Q      2012, right?

20      **A      2012, yes.**

21      Q      So between --

22      **A      August of this year.**

23      Q      So between August of 2012 to August

24  of 2013, you had the dual responsibility of

**ERICA QUEEN**
**December 12, 2013**

Page 31

1   both Records and Receiving, correct?

2       **A    Correct.**

3       Q    And in this August, 2013, they split

4   the duties into Receiving and Classifications,

5   which was assumed by --

6       **A    And Trust.**

7       Q    Pardon?

8       **A    And Trust.**

9       Q    Which is now superintendent Johnson's

10  responsibility?

11      **A    Yes, sir.**

12      Q    And your responsibility is records?

13      **A    Yes, sir.**

14      Q    Does Trust now handle the personal

15  property of inmates?

16          MR. GRUWELL:  Objection, relevance.

17  BY MR. MORRISSEY:

18      Q    You mentioned that Superintendent

19  Johnson is in charge of Trust, correct?

20      **A    Receiving, Trust and Class.**

21      Q    What is included in the Trust

22  responsibility?

23      **A    They inventory the clothing and**

24  **property.**

ERICA QUEEN
December 12, 2013

Page 32

1    Q    Essentially the money of inmates,
2  right?
3      **A    Money, yes.**
4    Q    What is Superintendent Johnson's
5  first name?
6      **A    Jeff.**
7    Q    Prior to August of 2013, are you
8  aware of what Jeff Johnson's responsibilities
9  were at the jail?
10      **A    He was my commander over**
11  **classification.**
12    Q    In August of 2013, did the Sheriff
13  begin the process of assigning correctional
14  officers to the outlying court buildings?
15      **A    I'm not sure of the exact date, but I**
16  **believe it was around that time.**
17    Q    To the best of your knowledge, prior
18  to August of 2013, correctional staff was not
19  assigned to 26th and California and to the
20  outlying court buildings?
21      **A    Correct.**
22    Q    This process of e-mailing mittimuses
23  to the Records Department from the court
24  buildings, was that begun in August or

**ERICA QUEEN**
**December 12, 2013**

Page 33

1    September of 2013?

2        **A    No, it was e-mailing the name and ID**

3    **number of the individual that is a possible**

4    **release and that just started yesterday.**

5        Q    We are on the cutting edge here.

6        **A    The staff has been out at the**

7    **courthouses.**

8        Q    How long has the staff, correctional

9    staff, been out at the court buildings?

10       **A    I can't give you an exact date.  It's**

11   **been several months.**

12       Q    So it would have been started in the

13   fall of 2013, correctional staff was placed out

14   at the court buildings?

15       **A    Correct.**

16       Q    As of yesterday, correctional staff

17   assigned to the court buildings has been

18   e-mailing the name and ID of inmates who have

19   possible discharges, correct?

20       **A    Civilian staff is e-mailing, not**

21   **sworn staff.**

22       Q    Are those civilian employees assigned

23   to the Records Department?

24       **A    Yes.**

ERICA QUEEN
December 12, 2013

Page 34

1      Q     So they are working under your

2   supervision?

3      **A     Yes.**

4      Q     Prior to yesterday, what function did

5   the correctional staff have in the outlying

6   court buildings and 26th and California?  Did

7   you get the question?

8      **A     Booking detainees in on the new.**

9      Q     And they have been doing that for two

10  or three months, correct?

11     **A     Several months, yes.**

12     Q     Over the last two or three months

13  when -- did those correctional officers have

14  any input in forwarding information to the

15  Records Department in regards to inmates who

16  were possible releases?

17     **A     No.  They would book the detainees in**

18  **on the new.**

19     Q     When the correctional staff was

20  assigned to the court buildings, to your

21  knowledge, were there any written documents

22  that memorialized what was going on?

23     **A     I can't recall.**

24     Q     How did you become aware that the

**ERICA QUEEN**
**December 12, 2013**

Page 35

1   correctional staff was assigned to court

2   buildings?

3        **A    It was a pilot program.**

4        Q    Do you know whether or not -- Strike

5   that.  Generally, does OPA, Office of Policy

6   and Accountability, have a responsibility for

7   pilot programs?

8        **A    Yes.**

9        Q    Did the OPA, and I will refer to it

10  as OPA, develop a pilot program for placing

11  correctional staff in the court buildings?

12       **A    I believe so, yes.**

13       Q    Also, did OPA develop a pilot program

14  for placing clerical staff in the court

15  buildings to forward information from the court

16  buildings to records about possible releases on

17  court orders?

18       **A    No.**

19       Q    Is there a pilot program -- Strike

20  that.  Are there any documents that reflect

21  this pilot program of placing correctional

22  officers in court buildings?

23       **A    Yes.**

24       Q    And what is that document called?

ERICA QUEEN
December 12, 2013

Page 36

1      **A     I'm not sure of the name of the**
2      **draft.**
3      Q     Were you sent a copy of the draft of
4      the pilot program?
5      **A     Yes.**
6      Q     To your knowledge, would Mr. Towne
7      have received a copy of that pilot program?
8      **A     I'm not sure.**
9      Q     Mr. John Murphy, would he have
10     received a copy of the pilot program?
11     **A     I'm not sure.**
12     Q     Do you have a copy of the pilot
13     program?
14     **A     Yes, somewhere.**
15          MR. MORRISSEY:  I will make a demand
16          for a copy of the pilot program and any
17          pilot program that may reflect the process
18          of transmitting information in regards to
19          court-ordered releases.
20     BY MR. MORRISSEY:
21     Q     In regards to placing civilian
22     employees in the court buildings to e-mail
23     information about potential court-ordered
24     releases, who developed that program?

ERICA QUEEN
December 12, 2013

Page 37

1      A     I would have to say Director Holmes.

2      Q     How did you become aware of this new

3  procedure for communicating court orders from

4  the court building to the Records Office?

5      A     How did I become aware of it?

6      Q     Yeah.

7      A     From Director Holmes.

8      Q     When?

9      A     I don't recall the exact date.

10     Q     Pardon?

11     A     I don't recall the date.

12     Q     Was it in the last month?

13     A     It's been several months.

14     Q     Did you go to any meetings in regards

15  to developing a procedure for conveying

16  court-ordered releases from the court building

17  to the Records Office?

18     A     Yes.

19     Q     When was the first meeting that you

20  attended in regards to that?

21     A     I don't recall.

22     Q     When you are asked to go to a

23  department meeting, do you receive an e-mail in

24  regards to it?

ERICA QUEEN
December 12, 2013

```
                                               Page 38
 1        A     Sometimes, yes.
 2        Q     Do you know whether or not you
 3    received an e-mail communication in regards to
 4    the first meeting you went to in regards to
 5    developing the process to convey information
 6    from the court buildings to the Records Office
 7    concerning court releases?
 8        A     Yes.
 9        Q     When was that?
10        A     I don't recall.
11        Q     How many meetings have you attended
12    in regards to developing this process?  And by
13    this process, my questions all deal with
14    conveying information from the court buildings
15    to the Records Office about court releases.
16        A     I'm sorry.  What was the question?
17    How many?
18        Q     Yeah.
19        A     Approximately a dozen.
20        Q     Where are the meetings held?
21        A     In Bob McInerney's office.
22        Q     Who is Bob McInerney?
23        A     He oversees the IT department.
24        Q     The first meeting that you attended
```

**ERICA QUEEN**
**December 12, 2013**

Page 39

1   several months ago, who was in attendance?

2        A    I can't recall who was in attendance

3   the first meeting I went to.  Usually Jennifer

4   Black, Bob McInerney, Keith Morrison, Jamie

5   Barica.

6        Q    Jamie, how do you spell the last

7   name?

8        A    Barica.

9        Q    How do you spell it?

10       A    B-a-r-i-c-a, I'm not quite sure of

11   the spelling.  Jeff Johnson, Keith Morrison,

12   Charles Luna.  Did I say Director Holmes?

13       Q    No.  Has John Murphy been at any of

14   these meetings?

15       A    I believe he's been to a couple, yes.

16       Q    Brian Towne?

17       A    No, I haven't seen him.

18       Q    Tom Dart?

19       A    No.

20       Q    George Vournazos?

21       A    (Indicating.)

22       Q    Anybody from the legal staff of the

23   Sheriff been present at these meetings?

24       A    Not to my knowledge.

**ERICA QUEEN**
**December 12, 2013**

Page 40

1    Q    The process that began yesterday
2  involves what?  Tell me the step-by-step
3  process.
4       **A    That the AA --**
5            MR. GRUWELL:  Can we go off the
6       record for one minute.
7                        (WHEREUPON, a short break
8                        was had.)
9                        (WHEREUPON, the record was
10                        read as requested)
11  BY THE WITNESS:
12      **A    The administrative assistant will**
13  **review the paperwork; and if it appears to be a**
14  **possible discharge will e-mail the name and ID**
15  **number to the Records Office.**
16  BY MR. MORRISSEY:
17      Q    Each person that leaves the jail to
18  go to court is required to return with a
19  mittimus, correct?
20      **A    Correct.**
21      Q    The AAs that are assigned to the
22  court buildings are asked now to review the
23  mittimuses for inmates returning to the jail,
24  correct?

ERICA QUEEN
December 12, 2013

Page 41

1      A      Correct.

2      Q      And I assume if there is a notation

3   on the mittimus reflecting a possible

4   discharge, he or she then forwards that

5   information to records, correct?

6      A      Correct.

7      Q      Is there a form that the

8   administrative assistants use now to forward

9   the information?

10     A      A form?

11     Q      Or is there a document that they use?

12     A      They e-mail it on a -- It's just on a

13  spreadsheet.

14     Q      And are the AAs, administrative

15  assistants, assigned there during court hours?

16     A      Yes.

17     Q      Where physically are the

18  administrative assistants in the court

19  buildings located?

20     A      Different areas of the courthouses.

21     Q      Are there holding cells for inmates

22  in the court buildings?

23     A      Yes.

24     Q      After an inmate -- Strike that.  Are

**ERICA QUEEN**
**December 12, 2013**

Page 42

1    you familiar with the holding areas in the
2    court buildings?
3    **A    Not all of them, no.**
4    Q    Are you familiar with some of them?
5    **A    I have seen Skokie and criminal**
6    **courts.**
7    Q    Pardon?
8    **A    And the criminal court building.**
9    Q    So at 26th and Cal?
10   **A    Yeah.**
11   Q    Any other court buildings?
12   **A    Rolling Meadows and Markham, yep.**
13   Q    In the last few months, have you
14   visited those four court buildings in
15   anticipation of this new process?
16   **A    Yes.**
17   Q    Did any other representatives of the
18   Sheriff go with you to view these court
19   buildings?
20   **A    Lieutenant Luna, Bob McInerney, James**
21   **Barica.**
22   Q    You mentioned that Bob --
23   **A    Director Holmes, Kevin Conley.   I**
24   **believe that's it.**

ERICA QUEEN
December 12, 2013

Page 43

1    Q    Kevin Conley is with court services?

2    **A    Correct.**

3    Q    John Vernaca (phonetic), is he with

4    corrections?

5    **A    Who is that?**

6    Q    John Vernaca?

7    **A    Jamie Barica?**

8    Q    Is that a woman or a man?

9    **A    Female.**

10   Q    What unit of the Sheriff's Office is

11   Jamie with?

12   **A    The IT.**

13   Q    And you mentioned Bob is also with

14   IT, correct?

15   **A    Yes.**

16   Q    On how many different occasions did

17   this group of Sheriff's employees go to the

18   court buildings?

19   **A    Once that I can recall.**

20   Q    For instance, in Markham, is there a

21   location now where the assistant --

22   administrative assistant is positioned or

23   located.

24   **A    She's there.  I'm not sure where**

**ERICA QUEEN**
**December 12, 2013**

Page 44

1    she's at.  I have Lieutenant Luna overseeing

2    all the staff in all the courthouses.

3        Q    My general question is is there a

4    general location in the court buildings where

5    the court documents, the mittimuses, are

6    brought to after an inmate goes to court?

7        A    Yeah, they are dropped down to the

8    holding area prior -- with the inmate.

9        Q    So in most court buildings, there are

10   holding areas where the inmates are stationed

11   before they are bused back or transported back

12   to the jail, correct?

13       A    Correct.

14       Q    And in that area -- Strike that.  Are

15   there -- Is there a unit at the jail that's

16   called the Transportation Unit?

17       A    Yes.

18       Q    And who is in charge or the

19   superintendent of the Transportation Unit?

20       A    Daryl Howell.

21       Q    Under the new procedure, after the

22   Records Department receives the e-mail from an

23   administrative assistant in the court building

24   alerting them that a person is a possible

**ERICA QUEEN**
**December 12, 2013**

Page 45

1    discharge, what, if anything, does the Records

2    Office do?

3        **A    They pull the pack, put it in**

4    **chronological order, turn it over to the**

5    **supervisor and wait for the original documents**

6    **to come in.**

7        Q    Has the Sheriff's Office done any

8    tests in regards to this process before

9    implementing it yesterday?

10        **A    A test to -- The discharge process?**

11        Q    Yeah.

12        **A    No.**

13        Q    Why did the Sheriff implement this

14    new process?

15        **A    Which process, staffing at the**

16    **courthouses or discharges?**

17        Q    This process of e-mailing information

18    from the courthouses to the Records Department

19    in regards to potential court discharges?

20            MR. GRUWELL:  I'm going to object to

21        the form.

22    BY THE WITNESS:

23        **A    Director Holmes wanted that task**

24    **completed, so I initiated it with Lieutenant**

**ERICA QUEEN**
**December 12, 2013**

Page 46

1    **Luna.**

2    BY MR. MORRISSEY:

3        Q    Do you know did Director Holmes tell

4    you why he wanted to begin this process of

5    e-mailing information from the courthouses

6    about potential discharges to records?

7        **A    No.**

8        Q    Let's go back to Exhibit Number 1.

9    In regards to the release of court-ordered

10   inmates, does 9.27, 2, reflect that process?

11       **A    Yes, for the most part.  Yes.**

12       Q    Now, you mentioned that there was a

13   transportation department for those inmates

14   that go to the outlying courthouses to be

15   returned to the jail, correct?

16       **A    Correct.**

17       Q    Do the officers assigned to the

18   Transportation Unit have a responsibility

19   concerning mittimuses?

20       **A    They are to ensure that they have a**

21   **mitt for each individual that goes to court.**

22       Q    And I'm going to be asking you

23   questions about the policy and practice for

24   court-ordered discharges prior to yesterday; do

**ERICA QUEEN**
**December 12, 2013**

Page 47

1   you understand that?

2       **A     Okay.**

3       Q     Do you know whether or not the

4   officers that transport inmates back and forth

5   to the jail via buses keep any records in

6   regards to when an inmate is brought back to

7   the jail?

8       **A     Yes.**

9       Q     What are those records called?

10      **A     I believe they are called**

11  **transportation run sheets.**

12      Q     To your knowledge, does the Sheriff

13  maintain -- Strike that.  If an inmate on

14  May 8th was transported to and from the jail

15  through a court building, would the

16  transportation office maintain a record of the

17  time the inmate left the jail to go to the

18  Bridgeview courthouse, for instance?

19      **A     I'm not sure.**

20      Q     If an inmate was brought back to the

21  jail from the Bridgeport courthouse, would the

22  transportation sheet reflect the time in which

23  the inmate came back to the jail?

24      **A     I'm not sure if they placed times on**

ERICA QUEEN
December 12, 2013

Page 48

1   **their run sheets.**

2       Q    Do you know where those

3   transportation sheets are maintained?

4       **A    In transportation.**

5       Q    Do you know what the practice of the

6   jail is as far as maintaining transportation

7   sheets?

8       **A    I'm not sure how they store them.**

9       Q    Do you know for what period of time

10  the jail in general keeps logs and sheets

11  regarding inmates?

12      **A    Isn't it supposed to be seven years**

13  **or ten years?  I'm not sure.**

14      Q    In your understanding of the

15  recordkeeping at the jail, would it be fair to

16  say that transportation sheets from April and

17  May of 2013 are still maintained by the jail?

18      **A    Yes.**

19      Q    And the superintendent of the

20  Transportation Unit, Donald Howell --

21      **A    Daryl.**

22      Q    -- Daryl Howell should have knowledge

23  where those transportation sheets are from

24  April and May of 2013?

ERICA QUEEN
December 12, 2013

Page 49

1     **A     I don't know if he would have that**
2  **knowledge.**
3              MR. MORRISSEY:  We are again going to
4         ask for all transportation records to the
5         Bridgeview courthouse from the period of
6         time from April to -- April 17th, 2013
7         through May 30th, 2013, which was
8         memorialized in a letter on November 5th,
9         2013.
10  BY MR. MORRISSEY:
11     Q     When an inmate comes back to the jail
12  from, let's say, the Bridgeview courthouse in
13  May of 2013, where were they brought?
14     **A     To the receiving room.**
15     Q     At some point this year or last year,
16  there was a new building brought online at the
17  jail, correct?
18     **A     Correct.**
19     Q     And what is that building called?
20     **A     RTU.**
21     Q     And what does RTU stand for?
22     **A     RTU 08.**
23     Q     What does RTU stand for?
24     **A     I'm drawing a blank.**

**ERICA QUEEN**
**December 12, 2013**

Page 50

1          MR. GRUWELL:  Do you not know?  It's
2     okay.
3     BY THE WITNESS:
4          **A    I don't know.**
5     BY MR. MORRISSEY:
6          Q    And it's referred to as 08 now?
7          **A    Uh-huh.**
8          Q    You have to answer yes or no.
9          **A    Yes.**
10         Q    When did this building, 08, come
11    online or become used?
12         **A    I believe it was in July.**
13         Q    July of 2013?
14         **A    Yes.**
15         Q    If this case occurred -- If
16    Mr. Schultz was brought back to the jail on
17    May 8th, 2013, where would he have gone after
18    getting off the bus from Bridgeview?
19         **A    To the old receiving room.**
20         Q    And the old receiving room is in
21    Division 5, correct?
22         **A    Correct.**
23         Q    The basement, correct?
24         **A    Correct.**

ERICA QUEEN
December 12, 2013

Page 51

1     Q    In May of 2005, where was the
2 Discharge Unit located?
3     **A    May of 2005?**
4     Q    No, I'm sorry.  What am I saying?
5 May of 2013, where was the Discharge Unit
6 physically located?
7     **A    In Division 5 basement.**
8     Q    Is it currently in that location?
9     **A    Yes.**
10    Q    Has it been in that location since
11 1998 to the present?
12    **A    Yes, in the basement of 5.**
13    Q    In May of 2013, is there an area that
14 buses come into the jail?
15    **A    Yes.**
16    Q    Where is that located?
17    **A    Back dock of Division 5.**
18    Q    Was there a process in which the bus
19 drivers, the correctional officers that drove
20 the bus, would maintain possession of the
21 mittimuses for the inmates on the bus?
22    **A    Was there a process?**
23    Q    Yes.
24    **A    That they had a mittimus for each**

ERICA QUEEN
December 12, 2013

Page 52

1  person on the bus.

2       Q    After the inmates got off the bus at

3  the jail at the loading dock, were the inmates

4  brought into the receiving area?

5       A    Yes.

6       Q    And were they placed in the return

7  bullpens in the receiving area?

8       A    Yes.

9       Q    What, if anything, would the

10 correctional officers do with the mittimuses

11 for the inmates that were coming back from the

12 jail from court?

13      A    They would check them off to ensure

14 that they had paperwork for each individual

15 that left.

16      Q    By paperwork, you mean the

17 mittimuses, right?

18      A    Mittimus paperwork for each detainee

19 that was brought back.

20      Q    When they were brought back to the

21 jail to the receiving room, what, if anything,

22 would the correctional officers who were

23 providing security on the bus do with the

24 mittimuses?

ERICA QUEEN
December 12, 2013

1     **A      They would turn them over to the**
2  **receiving staff.**
3         Q     Was there an area in the receiving
4  area where these mittimuses were placed?
5         **A      In the tunnel.**
6         Q     Was there a desk or some --
7         **A      Yes.**
8         Q     Where in the tunnel were the
9  mittimuses placed?
10        **A      On the desk.**
11        Q     In the Discharge Unit area?
12        **A      No, in the tunnel.**
13        Q     There's tunnels running throughout
14  the complex, right?
15        **A      In the receiving room.**
16        Q     Were the mittimuses sorted out at any
17  point by the bus drivers?
18        **A      No.  Receiving staff and the**
19  **Discharge Unit would retrieve the paperwork.**
20        Q     Was it the responsibility of --
21  Strike that.  In May of 2013, on the afternoon
22  shift, how many correctional officers and
23  supervisors were assigned to the Discharge
24  Unit?

ERICA QUEEN
December 12, 2013

Page 54

1      **A      Staff is usually three to four**

2   **officers and one supervisor on the morning**

3   **shift; and then the afternoon shift, two**

4   **supervisors and about four officers, I believe.**

5      Q      That would be assigned to the

6   Discharge Unit?

7      **A      Correct.**

8      Q      In May of 2013, what were the names

9   of the supervisors on the afternoon shift?

10     **A      I believe it would be Sergeant Elliot**

11  **Green and John Stazack (phonetic).**

12     Q      What time of the day would these two

13  supervisors come into work?

14     **A      5:00 o'clock.**

15     Q      5:00 p.m.?

16     **A      Yes, 5:00 to 1:00.**

17     Q      The supervisors that are on the day

18  shift, what were their names in May of 2013?

19     **A      There are several supervisors.**

20  **Sergeant Gambino.**

21     Q      Sergeant?

22     **A      Gambino.**

23     Q      How do you spell it?

24     **A      G-a-m-b-i-n-o, Sergeant McKinney,**

ERICA QUEEN
December 12, 2013

Page 55

1  **Sergeant Monroe.**

2      Q    And their work assignment would be --

3  Their daily rotation would begin at what time?

4      **A    6:00 to 2:00.**

5      Q    Were there any supervisors on duty

6  between 3:00 p.m. and 5:00 p.m.?

7      **A    Yes.**

8      Q    In the Discharge Unit?

9      **A    The receiving supervisors, which**

10 **would be Sergeant -- in May, it was probably**

11 **Sergeant Cintron.  I can't remember when they**

12 **moved to 5:00 to 1:00.  So it might have been**

13 **Sergeant Cintron and Sergeant Green on the**

14 **afternoon shift.**

15     Q    When would the correctional staff

16 work in the Discharge Unit?

17     **A    The receiving officers would,**

18 **2:00 o'clock, 2:00 to 10:00.**

19     Q    2:00 to 10:00?

20     **A    Yes.**

21     Q    Were there any correctional officers

22 assigned to the Discharge Unit prior to 2:00 p.m.?

23     **A    Yes, the 6:00 to 2:00.**

24     Q    And there would always be at least

**ERICA QUEEN**
**December 12, 2013**

Page 56

1   four correctional officers in the Discharge

2   Unit between 2:00 p.m. and 10:00 p.m.?

3       **A    Yes.**

4       Q    Would there be correctional officers

5   assigned to the Discharge Unit after 10:00 p.m.?

6       **A    Yes.**

7       Q    And what shift would they work?

8       **A    They would be on overtime.  We would**

9   **assign a midnight officer over there.  They**

10  **would work overtime.**

11      Q    Is it your testimony that the

12  Discharge Unit would take possession of the

13  mittimuses after they came back from court

14  proceedings?

15      **A    Correct.**

16      Q    So the -- And then the Discharge Unit

17  officers were responsible for sorting those

18  mittimuses into different stacks based upon

19  whether or not the inmate was a new inmate, a

20  possible discharge or may have a continued

21  court date, correct?

22      **A    The new paperwork would be separated**

23  **by the Transportation Unit.  The court return**

24  **and possible discharges would be separated by**

**ERICA QUEEN**
**December 12, 2013**

Page 57

1  the Discharge Unit.

2      Q    What would happen with the mittimuses

3  that were separated for possible -- separated

4  into a pile for possible discharges?

5      **A    All the paperwork would be taken up**

6  **to records.**

7      Q    And that would be done by an officer

8  that was assigned to the Discharge Unit?

9      **A    Correct.**

10      Q    Would there be any record or document

11  or log reflecting when the possible discharge

12  mittimuses were brought to records?

13      **A    Not a written document, no.**

14      Q    In May of 2013, what was the process

15  in the Records Department after the documents

16  which are marked as possible discharges are

17  brought into that office?

18      **A    What is the process?**

19      Q    Yes.

20      **A    It's separated equally and assigned**

21  **to an AA to process the pack for discharge.**

22      Q    In May of 2013, how many

23  administrative assistants were assigned to

24  records during the period between 12:00 p.m. in

**ERICA QUEEN**
**December 12, 2013**

Page 58

1    the afternoon and midnight?

2         A    How many AAs were assigned to --

3         Q    Records.

4         A    To records?

5         Q    Right.

6         A    I'm not understanding the question.

7    I'm thinking to hard probably.

8         Q    Records is located on the first floor

9    of Division 5?

10        A    Correct.

11        Q    In May of 2013, how many

12   administrative assistants were assigned to

13   records approximately?

14        A    I would say approximate --

15   approximately 40, all three shifts.

16        Q    What are the different shifts in the

17   records?

18        A    7:00 to 3:00, 3:00 to 11:00, 11:00 to

19   7:00.

20        Q    Are there records AAs that are

21   assigned to the discharge of inmates?

22        A    Yes.

23        Q    When do they generally work, what

24   shifts?

ERICA QUEEN
December 12, 2013

Page 59

1      A      7:00 to 3:00 and 3:00 to 11:00 and
2  11:00 to 7:00.
3      Q      How many administrative assistants on
4  the 7:00 to 3:00 shift are assigned to work on
5  possible discharges, court possible discharges
6  in May of 2013?
7      A      On the 7:00 to 3:00 shift, probably
8  would have been one or two.
9      Q      On the 3:00 to 11:00, how many
10 administrative assistants?
11     A      Four to five.
12     Q      Is it true that most of the review of
13 possible court discharges occur on the 3:00-to-
14 11:00 shift?
15     A      Correct.
16     Q      Generally speaking, do most of the
17 inmates that have gone to court each day return
18 to the jail after 2:00 p.m.?
19     A      Correct.
20     Q      What does an administrative assistant
21 in the Records Department do as far as
22 processing an inmate for a possible court
23 discharge?  Walk me through the process.
24     A      She receives the paperwork.

ERICA QUEEN
December 12, 2013

Page 60

1    Q    By "paperwork" you mean the mittimus?

2    **A    The mittimus, pulls the file, reviews**

3    **the content of the file, reviews the leads to**

4    **ensure there is no active warrant, places the**

5    **packet in chronological order, updates the**

6    **information into the jail management system,**

7    **ensures that all cases have been adjudicated**

8    **and forwards that pack to an auditor.**

9    Q    Does each inmate at the jail have a

10   file in the Records Office?

11   **A    Yes.**

12   Q    And that's what you refer to as a

13   pack, correct?

14   **A    Yes.**

15   Q    So there should be a file for the --

16   for the Plaintiff in this case if he was an

17   inmate at the jail, Mr. Schultz?

18   **A    Correct.**

19   Q    And if he was released in May of

20   2013, would the Records Department have a copy

21   of that file?

22   **A    Not the Records Department.  If he**

23   **was released, it would be sent to old records.**

24   Q    Is there an Old Records Unit at the

**ERICA QUEEN**
**December 12, 2013**

Page 61

1  jail?

2      **A    Yes.**

3      Q    For a person that was released in May

4  of 2013, would Old Records have his or her

5  file?

6      **A    That's where the files are sent.**

7      Q    And who is in charge right now of Old

8  Records?

9      **A    I oversee the employees there.**

10     Q    So if a person was released in May of

11 2013, you could direct your employees to pull

12 Mr. Schultz' file?

13     **A    Correct.**

14     Q    That would be his physical file,

15 correct?

16     **A    Correct.**

17         MR. MORRISSEY:  Again, we are going

18     to make a demand for Mr. Schultz' physical

19     file from the jail.

20         MR. GRUWELL:  Can I cut in here for a

21     second?

22         MR. MORRISSEY:  Sure.

23         MR. GRUWELL:  Can we go off the

24     record for a moment?

ERICA QUEEN
December 12, 2013

```
                                             Page 62
 1                    (WHEREUPON, a discussion
 2                    was had off the record.)
 3           MR. GRUWELL:  Back on the record.
 4    BY MR. MORRISSEY:
 5       Q    A packet or a file for an inmate at
 6    the jail would include all the mittimuses
 7    entered, correct?
 8       A    Yes.
 9       Q    It would perhaps have the rap sheet
10    for the individual?
11       A    Correct.
12       Q    It would have all court documents in
13    the possession of the Sheriff, correct, for the
14    inmate?
15       A    Correct.
16       Q    When an administrative assistant
17    reviews a mittimus and the packet for potential
18    court discharges, what, if any, record does
19    that administrative assistant make?
20       A    What record do they make?
21       Q    Yeah.
22       A    They enter the information into the
23    jail management system.
24       Q    That's the IMACS system?
```

ERICA QUEEN
December 12, 2013

Page 63

1    **A      Yes.**

2    Q      Does he or she make any other

3    documents such as a Dress and Release document?

4    **A      Yes.**

5    Q      So the administrative assistant fills

6    out a Dress and Release Form?

7    **A      Yes.**

8    Q      What information is placed on the

9    Dress and Release Form by the administrative

10   assistant?

11   **A      Name, date, ID number what type of**

12   **discharge.**

13   Q      Does the administrative assistant

14   mark on the Dress and Release Form the time

15   that they process the inmate's packet?

16   **A      Not to my knowledge.**

17   Q      Is there any record reflecting when

18   the administrative assistant reviews the packet

19   for a possible discharge?

20   **A      I'm sorry.  Is there --**

21   Q      Any record of the time in which the

22   administrative assistant reviews the Dress and

23   Release -- Strike that.

24            Is there any record reflecting when

Page 64

1   the administrative assistant reviews the file

2   to determine if a person with a mittimus is a

3   possible court discharge?

4        **A    It's time stamped when it enters**

5   **Records.  The jail management system should**

6   **have a time on it when they change the**

7   **disposition, and the outside of the Dress and**

8   **Release has a time on it when the division was**

9   **called.**

10       Q    You said that a document is time

11  stamped when it enters records.  Is that the

12  mittimus?

13       **A    Yes.**

14       Q    So somebody within records time

15  stamps the mittimus, correct?

16       **A    Correct.**

17       MR. MORRISSEY:  We are going to make

18       a demand again for the mittimus that was

19       issued for the release of Mr. Schultz.

20  BY MR. MORRISSEY:

21       Q    You mentioned that there's some other

22  document that's time stamped other than the

23  Dress and Release?

24       **A    I believe that the IMACS system would**

**ERICA QUEEN**
**December 12, 2013**

Page 65

1   **reflect the time the updated information was**

2   **entered.**

3       Q    So the administrative assistant

4   updates the IMACS system after he or she

5   reviews the mittimus, correct?

6       **A    Correct.**

7       Q    And IMACS should reflect that time,

8   correct?

9       **A    (Indicating.)**

10      Q    Now, you mentioned that the Dress and

11  Release document and the packet is given to an

12  internal auditor in the Records Department?

13      **A    Yes.**

14      Q    How many auditors are there in the

15  Records Department?

16      **A    Currently?  I'm not sure.**

17  **Approximately four on the day shift, eight to**

18  **ten on the afternoon shift.**

19      Q    Are they correctional officers?

20      **A    No.**

21      Q    Civilians?

22      **A    Yes.**

23      Q    What is the function of an auditor in

24  regards to a court-ordered release?  What do

**ERICA QUEEN**
**December 12, 2013**

Page 66

1     they do?

2          **A     They review all the documents.**

3          Q     Does the auditor make any entry to

4     reflect that he or she has reviewed the pack to

5     determine if the AA is accurately reflecting

6     the person should be released?

7          **A     They stamp the back of the pack.**

8          Q     Is there a folder for the pack for

9     each prisoner?

10         **A     Yes.**

11         Q     Does the auditor fill out any portion

12    of the Dress and Release Form?

13         **A     No.**

14         Q     What happens after the auditor time

15    stamps his or her review of the physical

16    documents on the file?

17         **A     It's given to a supervisor, and they**

18    **review it.**

19         Q     Supervisor that works within Records?

20         **A     Yes.**

21         Q     How many supervisors are in Records?

22         **A     Currently?**

23         Q     In May of 2013.

24         **A     Five lieutenants and three to four**

**ERICA QUEEN**
**December 12, 2013**

Page 67

1  sergeants.

2      Q    Can you give me the names of the

3  lieutenants in May of 2013?

4      **A    Lieutenant Collins, Lieutenant Luna,**

5  **Lieutenant Nicky Lewis, Lieutenant Angie Lewis,**

6  **I'm not sure about Lieutenant Calvin, if she**

7  **was there at that particular time.**

8      Q    What does a lieutenant do in regards

9  to the release of inmates based on a court

10 order?

11     **A    A lieutenant doesn't have anything to**

12 **do with the release unless there is a problem.**

13     Q    Do sergeants have any process in

14 reviewing the court file?

15     **A    The same one as the auditor and the**

16 **administrative assistant.**

17     Q    So they review it, again, the

18 sergeant reviews the file?

19     **A    Yes.**

20     Q    Do they make any note or log

21 reflecting that they've reviewed the records of

22 an inmate who is ready to be released on a

23 court order?

24     **A    They sign the Dress and Release.**

ERICA QUEEN
December 12, 2013

Page 68

1    Q    Does the sergeant on the Dress and
2  Release reflect on the form what time he or she
3  reviewed the form?
4    **A    I know some do and some don't.**
5    Q    What happens after the sergeant
6  reviews the pack for a person to be released on
7  a court order?
8    **A    The pack would get -- The division**
9  **would be called.**
10   Q    Is there any record maintained in the
11 Records Office to reflect that the division has
12 been called and the time that the division is
13 called?
14   **A    Yes, a logbook.**
15   Q    What is that logbook called?
16   **A    Call logbook.**
17   Q    Is that call logbook maintained in
18 the Records Office?
19   **A    Yes.**
20   Q    And for what period of time are those
21 logbooks open for?
22      MR. GRUWELL:  Can we go off the
23   record for one moment?
24

ERICA QUEEN
December 12, 2013

Page 69

1       (WHEREUPON, a discussion

2       was had off the record.)

3 BY MR. MORRISSEY:

4  Q Let me jump to some questions.  The

5 call logbook is maintained by the Records

6 Office, correct?

7  **A Correct.**

8  Q On the Dress and Release Form, the

9 time a division is called is reflected on the

10 form, correct?

11  **A And who they spoke to, yes.**

12  Q Is there any record maintained at the

13 jail when the inmate is brought back to the

14 receiving room to be processed out for a

15 court-ordered release.

16  **A I'm sorry.  Can you ask it again?**

17  Q Yes.  At some point in time for a

18 court-ordered release, the inmate is brought

19 back in May of 2013 to the receiving room,

20 correct?

21  **A Correct.**

22  Q Is there any record reflecting when

23 the inmate is transported back to the receiving

24 room prior to the release?

**ERICA QUEEN**
**December 12, 2013**

Page 70

1      **A      I believe it would be entered into**
2    **the IMACS system when he returned from court.**
3      Q     So the IMACS system internally in the
4    jail reflects the time the inmate comes back
5    from court, correct?
6      **A      If, in fact, they were scanning the**
7    **IDs at the time of return, yes.**
8      Q     And the IMACS system, if the inmate
9    was scanned, should reflect the time the inmate
10   left the receiving room and went back to his or
11   her housing unit, correct?
12     **A      Correct.**
13     Q     And the IMACS system should reflect
14   the time when the inmate was brought back to
15   the receiving room for final discharge,
16   correct?
17     **A      If, in fact, the ID was scanned.**
18     Q     When an inmate is physically walked
19   out up the staircase to go through the
20   interlock to be released into the lobby, is
21   there a physical logbook for discharges?
22     **A      Yes.**
23     Q     What is that called?
24     **A      Discharge log.**

ERICA QUEEN
December 12, 2013

Page 71

 1    Q    What information is put in the
 2  discharge logbook?
 3    **A    Name, ID, time.  I believe the name**
 4  **of the person that's bringing them up.**
 5    Q    The type of discharge?
 6    **A    Yes, and the type of discharge.**
 7    Q    How long are those discharge logbooks
 8  maintained?
 9    **A    In Division 5?**
10    Q    Yeah.
11    **A    I'm not sure.**
12    Q    Is it a Division 5 discharge logbook?
13    **A    Yes.**
14    Q    It's not a Records logbook?
15    **A    Correct.**
16    Q    And that's maintained in the regular
17  course of business, correct?
18    **A    Correct.**
19    Q    And you have reviewed discharge
20  logbooks, you've seen them?
21    **A    Yes.**
22    Q    And based upon your understanding at
23  the jail, those records are maintained either
24  within the division or in storage for about

ERICA QUEEN
December 12, 2013

Page 72

1   seven years, correct?

2        **A    Correct.**

3        Q    In addition, when a person is

4   released finally, walks out of the interlock to

5   be discharged, is there an entry made into the

6   IMACS system?

7        **A    When he's -- yes, he's discharged out**

8   **of IMACS.**

9        Q    So who does that process in the IMACS

10  system?

11       **A    The discharge officers.**

12       Q    And that's the person that's working

13  the interlock?

14       **A    No.**

15       Q    What officer does that?

16       **A    In receiving, the discharge officer.**

17       Q    And what type of information is

18  entered in IMACS when an inmate is released?

19       **A    The type of discharge.**

20       Q    So if a person was discharged based

21  upon a court order, that would be entered into

22  the IMACS system?

23       **A    Correct.**

24       Q    And the time that the person got out

**ERICA QUEEN**
**December 12, 2013**

Page 73

1   would automatically be entered into the IMACS

2   system?

3           **A       Correct.**

4               MR. MORRISSEY:  We are going to make

5           a demand and we have made a demand for the

6           discharge logbooks, which from November of

7           2012 to June of 2013.  In addition, we are

8           going to make a demand for the IMACS

9           discharge information for prisoners from

10          November of 2012 through June of 2013 for

11          people that were discharged from the jail

12          based upon court-ordered discharges.

13  BY MR. MORRISSEY:

14      Q    In addition to the documents we have

15  talked about previously, what other documents,

16  to your knowledge, are maintained by the

17  Discharge Unit when an inmate is released on a

18  court order?

19          **A       Can you repeat the question?**

20      Q    Yeah.  We've talked about various

21  documents, Dress and Release Forms, the call

22  logbooks, the discharge logbooks, the IMACS

23  system in regards to people that have been

24  discharged from the jail.

ERICA QUEEN
December 12, 2013

Page 74

1    My question is solely now in regards

2  to the Discharge Unit.  What documentation is

3  made by the discharge officers when a person is

4  released based upon a court order?

5    **A    They enter the information into the**

6  **IMACS system.  They don't maintain any of the**

7  **documents.**

8    Q    Okay.

9    **A    They enter the information into the**

10  **logbook.**

11    MR. MORRISSEY:  I'm going to continue

12    the dep.  The State's Attorney has

13    reflected that he has an outside

14    appointment at 1:00 o'clock.  We have just

15    scratched the surface in regards to the

16    discharge process.  Superintendent, when

17    after the holidays, would you be available

18    to continue your deposition?

19    THE WITNESS:  I'm not sure.

20    MR. MORRISSEY:  What are your normal

21    work hours?

22    THE WITNESS:  8:00 to 10:00.

23    MR. MORRISSEY:  8:00 in the morning

24    to 10:00 at night?

**ERICA QUEEN**
**December 12, 2013**

Page 75

1          THE WITNESS:  Uh-huh.

2          MR. MORRISSEY:  That gives us a lot

3      of time.

4          MR. GRUWELL:  We can figure it out.

5          THE WITNESS:  I have to check my

6      calendar.

7          MR. MORRISSEY:  All right.  Check

8      your calendar.  Week of January 6th I would

9      like to continue the deposition, okay?

10         THE WITNESS:  Okay.

11         MR. MORRISSEY:  So when it's

12     convenient during that week, we will

13     reconvene; is that understood?

14         MR. GRUWELL:  Okay, well, assuming

15     schedules can line up.  I mean, that's why

16     we are checking calendars.  So that's what

17     we will talk about.  Absolutely.

18         MR. MORRISSEY:  All right, thanks.

19         THE REPORTER:  Do you need this

20     written, Tom?

21         MR. MORRISSEY:  Pardon?

22         THE REPORTER:  Do you need this

23     written?

24         MR. MORRISSEY:  Yes.

**ERICA QUEEN**
**December 12, 2013**

Page 76

1      THE REPORTER:  Do you need a copy?

2      MR. GRUWELL:  Yes.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**ERICA QUEEN**
**December 12, 2013**

Page 77

1   STATE OF ILLINOIS )
                         )  ss:
2   COUNTY OF C O O K )

3            I, Peggy A. Anderson, a Certified

4   Shorthand Reporter in the State of Illinois do

5   hereby certify:

6            That previous to the commencement of

7   the examination of the witness, the witness was

8   duly sworn to testify the whole truth

9   concerning the matters herein;

10           That the foregoing deposition

11  transcript was reported stenographically by me,

12  was thereafter reduced to typewriting under my

13  personal direction, and constitutes a true

14  record of the testimony given and the

15  proceedings had;

16           That the said deposition was taken

17  before me at the time and place specified;

18           That the said deposition was

19  adjourned as stated herein;

20           That I am not a relative or employee

21  or attorney or counsel, nor a relative or

22  employee of such attorney or counsel for any of

23  the parties hereto, nor interested directly or

24  indirectly in the outcome of this action.

**ERICA QUEEN**
**December 12, 2013**

Page 78

1           IN WITNESS WHEREOF, I do hereunto set

2     my hand at Chicago, Illinois, this _____ day

3     of _____, 2013.

4

5

6

7           _____

8           Peggy A. Anderson

9           Certified Shorthand Reporter

10          License No. 084-003813

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**ERICA QUEEN**
**December 12, 2013**

## A

**aa** 40:4 57:21 66:5
**aas** 40:21 41:14 58:2 58:20
**absence** 19:18 23:9
**absolutely** 75:17
**accountabi...** 25:2 35:6
**accurately** 66:5
**acting** 13:2,4
**action** 17:3 18:1 77:24
**active** 60:4
**addition** 15:7 16:3 17:20 72:3 73:7 73:14
**additional** 14:22
**additionally** 14:21
**adjourned** 77:19
**adjudicated** 60:7
**administra...** 40:12 41:8 41:14,18 43:22 44:23 57:23 58:12 59:3,10,20 62:16,19 63:5,9,13 63:18,22 64:1 65:3 67:16
**afternoon** 9:7 9:15 28:13 53:21 54:3

54:9 55:14 58:1 65:18
**agency** 26:7
**ago** 39:1
**alerting** 44:24
**amendment** 14:21,22
**amf** 26:5
**amfs** 15:23
**amount** 25:21
**anderson** 1:15 77:3 78:8
**angie** 67:5
**answer** 5:10 13:16 50:8
**answered** 18:5
**anticipation** 42:15
**anybody** 39:22
**appeared** 2:6 2:11 27:11
**appears** 40:13
**appointed** 30:14
**appointment** 74:14
**approximate** 58:14
**approxima...** 6:21 8:7,9 15:19 17:2 38:19 58:13 58:15 65:17
**april** 8:19 48:16,24 49:6,6
**area** 22:5,6 23:4 44:8

44:14 51:13 52:4,7 53:3 53:4,11
**areas** 11:5 30:6 41:20 42:1 44:10
**arrive** 29:6
**asked** 18:4 37:22 40:22
**asking** 46:22
**assign** 56:9
**assigned** 7:3 19:14 29:22 32:19 33:17 33:22 34:20 35:1 40:21 41:15 46:17 53:23 54:5 55:22 56:5 57:8,20,23 58:2,12,21 59:4
**assigning** 32:13
**assignment** 6:13 55:2
**assistant** 12:17 40:12 43:21,22 44:23 59:20 62:16,19 63:5,10,13 63:18,22 64:1 65:3 67:16
**assistants** 41:8,15,18 57:23 58:12 59:3,10
**assume** 20:13 41:2
**assumed** 31:5
**assuming** 75:14

**attempt** 28:16
**attendance** 39:1,2
**attended** 37:20 38:11 38:24
**attorney** 2:8 74:12 77:21 77:22
**attorneys** 7:24
**audit** 23:24 24:2
**auditor** 60:8 65:12,23 66:3,11,14 67:15
**auditors** 65:14
**audits** 23:24 24:5,12,15
**august** 30:13 30:13,15,18 30:22,23,23 31:3 32:7 32:12,18,24
**authorized** 26:6
**automatica...** 73:1
**available** 74:17
**avenue** 2:4
**average** 27:7 27:12,16
**aware** 8:4 17:1,15,18 17:19,23,24 18:7 24:9 32:8 34:24 37:2,5

## B

**b** 3:8
**back** 27:17 44:11,11 46:8 47:4,6 47:20,23 49:11 50:16 51:17 52:11 52:19,20 56:13 62:3 66:7 69:13 69:19,23 70:4,10,14
**barica** 39:5,8 39:10 42:21 43:7
**based** 12:11 13:23 14:5 14:9 15:3 17:22 18:3 18:12 19:1 56:18 67:9 71:22 72:20 73:12 74:4
**basement** 50:23 51:7 51:12
**becoming** 6:19
**began** 40:1
**begins** 27:17
**begun** 32:24
**behalf** 2:6,11
**believe** 7:19 7:21 8:7,11 8:19 9:1,18 11:7,13 13:4,12 22:15 24:21 32:16 35:12 39:15 42:24 47:10 50:12 54:4,10 64:24 70:1 71:3

**best** 22:19 32:17
**black** 39:4
**blank** 49:24
**bob** 38:21,22 39:4 42:20 42:22 43:13
**bond** 15:15 25:20 26:4
**bonds** 20:2
**book** 21:24 22:24 23:10 34:17
**booking** 34:8
**books** 22:1 23:3
**break** 40:7
**brian** 13:10 13:14 39:16
**bridgeport** 47:21
**bridgeview** 47:18 49:5 49:12 50:18
**bringing** 71:4
**brought** 44:6 47:6,20 49:13,16 50:16 52:4 52:19,20 57:12,17 69:13,18 70:14
**brown** 10:5,8
**building** 37:4 37:16 42:8 44:23 47:15 49:16,19 50:10
**buildings** 29:19,22 32:14,20,24 33:9,14,17 34:6,20

**ERICA QUEEN**
**December 12, 2013**

35:2,11,15
35:16,22
36:22 38:6
38:14 40:22
41:19,22
42:2,11,14
42:19 43:18
44:4,9
**bullpens** 52:7
**bus** 50:18
51:18,20,21
52:1,2,23
53:17
**bused** 44:11
**buses** 47:5
51:14
**business**
71:17

**C**

**c** 1:5 2:1 5:17
77:2
**cal** 42:9
**calendar**
75:6,8
**calendars**
75:16
**california**
32:19 34:6
**call** 20:5,20
21:5,6,7,10
21:20 22:10
22:14,16,24
23:3,12
68:16,17
69:5 73:21
**called** 1:11
5:14 16:17
17:3 20:4
20:13 21:2
21:4 22:16
35:24 44:16
47:9,10
49:19 64:9

68:9,12,13
68:15 69:9
70:23
**calling** 21:17
**calvin** 67:6
**cant** 33:10
34:23 39:2
55:11
**capacity** 5:19
5:23
**captain** 19:14
19:18 23:9
**captains** 19:8
23:8
**career** 16:24
**carmen** 10:5
10:14
**case** 17:3,12
17:20 20:15
25:23 50:15
60:16
**cases** 60:7
**cells** 41:21
**center** 1:17
2:9
**central** 7:5
**certain** 7:13
19:10
**certified** 1:15
77:3 78:9
**certify** 77:5
**challenging**
18:2
**change** 13:22
64:6
**changes** 14:8
14:14 23:16
**charge** 8:15
25:20 29:21
31:19 44:18
61:7
**charles** 39:12
**check** 52:13
75:5,7

**checking**
75:16
**chicago** 1:17
2:5,10 78:2
**chief** 13:8
**chronologi...**
45:4 60:5
**cintron** 55:11
55:13
**circuit** 25:9
**civil** 1:12
**civilian** 33:20
33:22 36:21
**civilians**
65:21
**class** 17:3
18:1 31:20
**classification**
19:15 30:2
32:11
**classificati...**
31:4
**clerical** 35:14
**clothing**
31:23
**collins** 67:4
**come** 45:6
50:10 51:14
54:13
**comes** 27:17
49:11 70:4
**coming** 52:11
**commander**
5:23 8:13
8:18 14:3
23:14 32:10
**commence...**
77:6
**communica...**
37:3
**communica...**
38:3
**completed**
26:6 45:24

**complex**
53:14
**concerning**
38:7 46:19
77:9
**conduct** 24:5
24:12
**conducted**
24:1
**conley** 42:23
43:1
**considered**
26:9,24
**consistent**
18:23
**constitutes**
77:13
**contained**
25:19
**content** 60:3
**continue** 4:11
74:11,18
75:9
**continued**
56:20
**convenient**
75:12
**convey** 38:5
**conveying**
37:15 38:14
**cook** 1:7,7
2:8 12:4,18
15:13 16:5
**copy** 36:3,7
36:10,12,16
60:20 76:1
**correct** 8:10
11:18 12:2
14:5,6
15:10,21
16:2 20:13
20:16 27:18
29:16 30:10
31:1,2,19

32:21 33:15
33:19 34:10
40:19,20,24
41:1,5,6
43:2,14
44:12,13
46:15,16
49:17,18
50:21,22,23
50:24 54:7
56:15,21
57:9 58:10
59:15,19
60:13,18
61:13,15,16
62:7,11,13
62:15 64:15
64:16 65:5
65:6,8 69:6
69:7,10,20
69:21 70:5
70:11,12,16
71:15,17,18
72:1,2,23
73:3
**correctional**
6:11,19
29:18,21
32:13,18
33:8,13,16
34:5,13,19
35:1,11,21
51:19 52:10
52:22 53:22
55:15,21
56:1,4
65:19
**corrections**
12:5,18
43:4
**counsel** 77:21
77:22
**counts** 25:20
**county** 1:7,7

2:8 12:4,18
15:13 16:5
77:2
**couple** 39:15
**course** 71:17
**court** 1:1
4:20 5:6
12:12 13:21
13:24 14:5
14:9 15:4
16:14 17:20
17:22 18:3
18:8,13
19:2 20:12
25:9,17,21
25:24 27:22
28:18 29:15
29:19,22
32:14,20,23
33:9,14,17
34:6,20
35:1,11,14
35:15,17,22
36:22 37:3
37:4,16
38:6,7,14
38:15 40:18
40:22 41:15
41:18,22
42:2,8,11
42:14,18
43:1,18
44:4,5,6,9
44:23 45:19
46:21 47:15
52:12 56:13
56:21,23
59:5,13,17
59:22 62:12
62:18 64:3
67:9,14,23
68:7 70:2,5
72:21 73:18
74:4

**ERICA QUEEN**
**December 12, 2013**

courthouse 47:18,21 49:5,12

courthouses 29:2,14 33:7 41:20 44:2 45:16 45:18 46:5 46:14

courtorder 25:4,5,10

courtordered 12:7 15:8 16:11,13 17:5 20:15 20:19 26:8 26:11 28:23 36:19,23 37:16 46:9 46:24 65:24 69:15,18 73:12

courts 1:13 25:6 26:5 42:6

criminal 42:5 42:8

current 19:5

currently 15:24 17:19 30:6,8 51:8 65:16 66:22

custody 25:7 28:2

cut 61:20

cutting 33:5

**D**

d 3:1 5:17 19:21,22 20:2

daily 9:4 19:16 55:3

daley 1:17

2:9

dart 1:6 39:18

daryl 44:20 48:21,22

date 4:12 18:16,24 19:17 25:21 32:15 33:10 37:9,11 56:21 63:11

dates 22:20

day 54:12,17 59:17 65:17 78:2

deal 38:13

december 1:18

defendant 16:15

defendants 1:8 2:11 28:22

defined 15:17

definition 25:3

demand 22:14 36:15 61:18 64:18 73:5,5,8

dep 74:12

department 12:5,18 19:8 21:21 29:15 32:23 33:23 34:15 37:23 38:23 44:22 45:18 46:13 57:15 59:21 60:20 60:22 65:12 65:15

deposed 5:7 5:20,22 6:1

6:5 7:22,23 8:12

deposition 1:10 5:5 17:9 74:18 75:9 77:10 77:16,18

depositions 1:14

desadier 10:5 10:14 11:15

describing 27:16

desk 53:6,10

detainee 27:17 52:18

detainees 13:23 26:3 34:8,17

determine 64:2 66:5

develop 35:10,13

developed 36:24

developing 37:15 38:5 38:12

didnt 16:4

difference 16:10

differences 19:4

different 15:6,16,20 27:6 41:20 43:16 56:18 58:16

direct 3:3 61:11

direction 77:13

directly 77:23

director 11:13 12:16 12:17,20 13:2,3,17 24:21 29:11 37:1,7 39:12 42:23 45:23 46:3

discharge 7:6 7:17 8:2,6,6 9:12 12:6,7 13:20 14:4 16:12,18,20 16:24 17:1 17:4,21 20:4 21:7 21:10,20 22:10,16,24 23:3,11,12 24:6 27:22 28:10 29:3 40:14 41:4 45:1,10 51:2,5 53:11,19,23 54:6 55:8 55:16,22 56:1,5,12 56:16,20 57:1,8,11 57:21 58:21 59:23 63:12 63:19 64:3 70:15,24 71:2,5,6,7 71:12,19 72:11,16,19 73:6,9,17 73:22 74:2 74:3,16

discharged 15:21 25:23 28:12 72:5 72:7,20

73:11,24

discharges 15:8,10,12 15:16 20:1 20:12,16,19 20:22 21:18 28:9 33:19 45:16,19 46:6,24 56:24 57:4 57:16 59:5 59:5,13 62:18 70:21 73:12

discharging 12:11 13:23 14:9 15:3 19:5

discovery 5:4

discussion 62:1 69:1

disposition 64:7

district 1:1,1 1:13

division 1:2 6:15,23 7:5 7:10,14 20:3,20 21:2 29:24 50:21 51:7 51:17 58:9 64:8 68:8 68:11,12 69:9 71:9 71:12,24

divisions 20:13

dock 51:17 52:3

document 14:18,20 20:23 23:22 25:17 35:24

41:11 57:10 57:13 63:3 64:10,22 65:11

documenta... 74:2

documents 14:24 29:6 34:21 35:20 44:5 45:5 57:15 62:12 63:3 66:2 66:16 73:14 73:15,21 74:7

doesnt 19:8 67:11

doing 34:9

donald 48:20

dont 7:9,15 8:4 10:10 11:23 13:7 13:17 14:1 22:17 26:20 37:9,11,21 38:10 49:1 50:4 68:4 74:6

dorms 7:13

dozen 38:19

draft 36:2,3

drawing 49:24

dress 63:3,6 63:9,14,22 64:7,23 65:10 66:12 67:24 68:1 69:8 73:21

drivers 51:19 53:17

dropped 44:7

drove 51:19

dual 30:24

**ERICA QUEEN**
**December 12, 2013**

**duly** 4:2 5:15
77:8
**duties** 31:4
**duty** 55:5
**dyner** 24:17
24:19

**E**

**e** 2:1,1 3:1,8
5:17,17
19:12,14,22
**early** 28:12
**eastern** 1:2
**ed** 24:17
**edge** 33:5
**edward** 1:3
**effective**
14:19,22,23
**eight** 15:19
65:17
**either** 16:24
71:23
**elliot** 54:10
**email** 29:4
36:22 37:23
38:3 40:14
41:12 44:22
**emailing**
32:22 33:2
33:18,20
45:17 46:5
**employee**
77:20,22
**employees**
12:10 29:14
33:22 36:22
43:17 61:9
61:11
**ensure** 46:20
52:13 60:4
**ensures** 60:7
**enter** 62:22
74:5,9
**entered** 62:7

65:2 70:1
72:18,21
73:1
**enters** 64:4
64:11
**entire** 6:22
**entitled** 26:3
**entry** 66:3
72:5
**equally** 57:20
**erica** 1:10 3:2
5:5,13
**essentially**
32:1
**established**
8:3 24:2
**evaluate** 29:3
**eve** 18:2
**exact** 32:15
33:10 37:9
**examination**
1:11 3:3
77:7
**examined**
5:15
**executive**
12:17,20
13:2
**exhibit** 3:11
5:1 14:17
46:8
**expedite**
28:17,22
**experience**
25:18
**expired** 16:3
**expires** 15:14

**F**

**fact** 70:6,17
**fair** 48:15
**fall** 33:13
**familiar** 12:4
42:1,4

**far** 16:16
18:15 19:5
48:6 59:21
**federal** 1:12
17:20
**female** 43:9
**figure** 75:4
**file** 60:2,3,10
60:15,21
61:5,12,14
61:19 62:5
64:1 66:16
67:14,18
**files** 61:6
**fill** 66:11
**fills** 63:5
**final** 70:15
**finally** 72:4
**find** 21:21,22
22:19
**finding** 22:23
**first** 4:2 5:14
6:4 7:18
8:21 32:5
37:19 38:4
38:24 39:3
58:8
**five** 59:11
66:24
**floor** 58:8
**folder** 66:8
**follow** 10:19
**followed**
18:11
**follows** 5:16
**foregoing**
77:10
**forgot** 11:13
**form** 14:12
17:7 18:14
20:6 21:23
24:7 25:8
25:12 27:4
29:9 41:7

41:10 45:21
63:6,9,14
66:12 68:2
68:3 69:8
69:10
**forms** 73:21
**forth** 47:4
**forward**
35:15 41:8
**forwarding**
34:14
**forwards**
41:4 60:8
**foundation**
18:15
**four** 27:7,13
27:16 42:14
54:1,4 56:1
59:11 65:17
66:24
**fourhour**
27:9
**front** 18:1
**function** 34:4
65:23

**G**

**g** 2:3,4
**gambino**
54:20,22,24
**gary** 11:16,20
**general** 14:19
14:20 15:2
18:11,22
19:7 23:15
24:1 44:3,4
48:10
**generally**
35:5 58:23
59:16
**generated**
25:5
**george** 39:20
**getting** 50:18

**give** 25:3
33:10 67:2
**given** 28:8
65:11 66:17
77:14
**gives** 75:2
**go** 4:3 21:22
37:14,22
40:5,18
42:18 43:17
46:8,14
47:17 61:23
68:22 70:19
**goes** 44:6
46:21
**going** 4:19
14:11 17:6
17:7 20:22
22:13,19
23:15 34:22
45:20 46:22
49:3 61:17
64:17 73:4
73:8 74:11
**granted** 26:5
**green** 54:11
55:13
**group** 43:17
**gruwell** 2:9
4:3,7,13,15
4:18 14:11
17:6 18:4
18:14 20:6
21:23 22:15
24:7 26:18
27:4 28:3
29:9 31:16
40:5 45:20
50:1 61:20
61:23 62:3
68:22 75:4
75:14 76:2

**H**

**h** 3:8
**half** 4:15,18
**hand** 78:2
**handle** 31:14
**handwritten**
16:14
**happen** 57:2
**happens**
66:14 68:5
**hard** 58:7
**havent** 39:17
**held** 38:20
**hereto** 77:23
**hereunto**
78:1
**hes** 39:15
72:7,7
**hickerson**
11:14,16,21
**holding**
41:21 42:1
44:8,10
**holidays**
74:17
**holmes** 10:6
10:16,20
12:16 29:11
37:1,7
39:12 42:23
45:23 46:3
**hope** 4:8
**hour** 4:15,19
**hours** 27:7,13
27:16 41:15
74:21
**housing**
70:11
**howell** 44:20
48:20,22

**I**

**ibonds** 15:15
**id** 29:4 33:2
33:18 40:14

**ERICA QUEEN**
**December 12, 2013**

63:11 70:17
71:3
**identificati...**
5:3
**ids** 70:7
**iid** 15:17
**iii** 26:2
**illinois** 1:1,7
1:16,17 2:5
2:10 77:1,4
78:2
**im** 5:8 8:4
10:13,15,17
14:11,16
15:23 17:6
17:7,12,18
17:23 18:7
18:20 20:14
22:13 24:9
24:13,24
26:13 32:15
36:1,8,11
38:16 39:10
43:24 45:20
46:22 47:19
47:24 48:8
48:13 49:24
51:4 58:6,7
63:20 65:16
67:6 69:16
71:11 74:11
74:19
**imacs** 62:24
64:24 65:4
65:7 70:2,3
70:8,13
72:6,8,9,18
72:22 73:1
73:8,22
74:6
**implement**
45:13
**implementi...**
45:9

**include** 9:11
62:6
**included**
31:21
**includes**
14:19
**indicate** 25:9
**indicating**
13:15 19:16
39:21 65:9
**indirectly**
77:24
**individual**
33:3 46:21
52:14 62:10
**information**
24:15 34:14
35:15 36:18
36:23 38:5
38:14 41:5
41:9 45:17
46:5 60:6
62:22 63:8
65:1 71:1
72:17 73:9
74:5,9
**initial** 6:13
**initiated**
45:24
**inmate** 15:20
16:1 25:10
26:11 27:2
27:10,24
28:8 41:24
44:6,8 47:6
47:13,17,20
47:23 49:11
56:19,19
59:22 60:9
60:17 62:5
62:14 67:22
69:13,18,23
70:4,8,9,14
70:18 72:18

73:17
**inmates** 12:6
12:11 13:21
14:5,9 15:3
17:5,17,22
18:3,12
19:1,6
25:20 26:3
28:18 31:15
32:1 33:18
34:15 40:23
41:21 44:10
46:10,13
47:4 48:11
51:21 52:2
52:3,11
58:21 59:17
63:15 67:9
**input** 34:14
**instance**
43:20 47:18
**interested**
77:23
**interlock**
70:20 72:4
72:13
**internal**
23:24,24
24:2,5,12
24:15 65:12
**internally**
70:3
**inventory**
31:23
**involves**
20:12,15
40:2
**involving**
17:4
**isnt** 16:7
48:12
**issued** 64:19
**issuing** 15:22

| J |
| --- |

**j** 1:16 2:9
**jail** 11:5
12:21 13:23
15:10,13,21
16:1,6,12
17:17 19:19
23:8 24:12
24:16,22
26:10 27:12
27:14,18
28:17,18
32:9 40:17
40:23 44:12
44:15 46:15
47:5,7,14
47:17,21,23
48:6,10,15
48:17 49:11
49:17 50:16
51:14 52:3
52:12,21
59:18 60:6
60:9,17
61:1,19
62:6,23
64:5 69:13
70:4 71:23
73:11,24
**james** 42:20
**jamie** 39:4,6
43:7,11
**janice** 9:18
9:19,20,23
10:2 11:6
**january** 75:8
**jeff** 32:6,8
39:11
**jennifer** 39:3
**john** 12:24
13:1,5 36:9
39:13 43:3
43:6 54:11
**johnson**

29:23 30:1
30:4 31:19
39:11
**johnsons**
31:9 32:4,8
**join** 6:7
**joined** 6:10
**joseph** 10:5,8
**judge** 18:2
27:3,11
28:1,12
**judges** 25:9
**july** 50:12,13
**jump** 69:4
**june** 73:7,10

| K |
| --- |

**k** 77:2
**keep** 23:3
47:5
**keeps** 48:10
**keith** 39:4,11
**kept** 21:16,24
**kevin** 42:23
43:1
**kitchen** 7:5,8
**know** 8:4
9:23 10:10
11:20 13:1
13:5,13,17
28:11 35:4
38:2 46:3
47:3 48:2,5
48:9 49:1
50:1,4 68:4
**knowledge**
9:20 10:8
16:21,22
21:8 24:4
24:11,14
27:23 28:14
28:16 29:8
32:17 34:21
36:6 39:24

47:12 48:22
49:2 63:16
73:16

| L |
| --- |

**laid** 18:10
19:6,20
**late** 28:13
**law** 2:2,7
**lay** 15:2
**laying** 15:7
**leading** 17:8
17:10
**leads** 60:3
**leaves** 40:17
**left** 47:17
52:15 70:10
**legal** 39:22
**letter** 49:8
**lewis** 67:5,5
**license** 78:10
**lieutenant**
9:1,3,10,15
14:3 42:20
44:1 45:24
67:4,4,5,5,6
67:8,11
**lieutenants**
66:24 67:3
**line** 75:15
**litigation**
17:16
**loading** 52:3
**lobby** 70:20
**located** 41:19
43:23 51:2
51:6,16
58:8
**location**
43:21 44:4
51:8,10
**log** 19:16,20
20:1,2,3,5,9
20:11,18

**ERICA QUEEN**
**December 12, 2013**

| | | | | | |
|---|---|---|---|---|---|
| 21:5,6,7,10 | 21:9,14 | 39:3 | **month** 37:12 | 5:17 | 18:14 20:6 |
| 21:20 22:17 | 22:10 23:13 | **meetings** | **months** 33:11 | **name** 12:23 | 21:23 24:7 |
| 23:3 57:11 | 48:3,17 | 37:14 38:11 | 34:10,11,12 | 15:15 17:12 | 27:4 29:9 |
| 67:20 70:24 | 68:10,17 | 38:20 39:14 | 37:13 39:1 | 22:18 24:18 | 45:20 |
| **logbook** | 69:5,12 | 39:23 | 42:13 | 25:20 29:4 | **objection** |
| 20:21 21:13 | 71:8,16,23 | **members** | **morning** | 32:5 33:2 | 18:4 31:16 |
| 22:14 23:11 | 73:16 | 29:18 | 28:12 54:2 | 33:18 36:1 | **occasions** |
| 23:12 68:14 | **maintaining** | **memorializ...** | 74:23 | 39:7 40:14 | 43:16 |
| 68:15,16,17 | 48:6 | 34:22 49:8 | **morrison** | 63:11 71:3 | **occur** 59:13 |
| 69:5 70:21 | **maintains** | **mentioned** | 39:4,11 | 71:3 | **occurred** |
| 71:2,12,14 | 20:21 | 20:7 23:7 | **morrissey** 2:3 | **names** 54:8 | 50:15 |
| 74:10 | **man** 43:8 | 31:18 42:22 | 2:4 3:4 4:6 | 54:18 67:2 | **oclock** 1:18 |
| **logbooks** | **management** | 43:13 46:12 | 4:10,14,17 | **need** 22:19 | 4:6 54:14 |
| 68:21 71:7 | 60:6 62:23 | 64:21 65:10 | 4:20 5:4,10 | 75:19,22 | 55:18 74:14 |
| 71:20 73:6 | 64:5 | **methods** | 5:18 14:15 | 76:1 | **october** 18:24 |
| 73:22,22 | **manners** | 16:11 | 17:9,14 | **new** 34:8,18 | **office** 5:20,23 |
| **logs** 20:7 | 15:20 | **michael** 10:6 | 18:9,18,21 | 37:2 42:15 | 6:2,8 7:23 |
| 22:10 48:10 | **mark** 4:23 | 10:16,20 | 20:8 22:2 | 44:21 45:14 | 9:21 19:20 |
| **long** 6:18 | 63:14 | 12:16 | 22:13,22 | 49:16 56:19 | 19:24 20:18 |
| 7:14 30:11 | **marked** 3:10 | **midnight** | 24:10 26:14 | 56:22 | 20:24 21:9 |
| 33:8 71:7 | 5:2 14:16 | 56:9 58:1 | 26:21,23 | **nicky** 67:5 | 22:7,8,11 |
| **longer** 19:9 | 57:16 | **minute** 40:6 | 27:8 28:6 | **night** 74:24 | 23:5 24:12 |
| 23:8 | **markham** | **mitt** 46:21 | 29:12 31:17 | **nine** 8:7,8 | 25:1 29:5 |
| **look** 14:18 | 42:12 43:20 | **mittimus** | 36:15,20 | **normal** 74:20 | 29:16 35:5 |
| 23:1 | **material** | 25:11,14,16 | 40:16 46:2 | **northern** 1:1 | 37:4,17 |
| **looking** 19:12 | 13:22 | 25:19 40:19 | 49:3,10 | **nos** 3:11 5:2 | 38:6,15,21 |
| 23:22 | **matters** 77:9 | 41:3 51:24 | 50:5 61:17 | **notation** 41:2 | 40:15 43:10 |
| **lot** 22:1 75:2 | **matthew** 2:9 | 52:18 60:1 | 61:22 62:4 | **note** 67:20 | 45:2,7 |
| **luna** 39:12 | **mcinerney** | 60:2 62:17 | 64:17,20 | **notice** 5:6 | 47:16 57:17 |
| 42:20 44:1 | 38:22 39:4 | 64:2,12,15 | 69:3 73:4 | **november** | 60:10 68:11 |
| 46:1 67:4 | 42:20 | 64:18 65:5 | 73:13 74:11 | 10:23 49:8 | 68:18 69:6 |
| | **mcinerneys** | **mittimuses** | 74:20,23 | 73:6,10 | **officer** 6:11 |
| ——— **M** ——— | 38:21 | 25:22 32:22 | 75:2,7,11 | **number** | 6:16,19,20 |
| **m** 1:18 5:17 | **mckinney** | 40:23 44:5 | 75:18,21,24 | 14:17 15:22 | 56:9 57:7 |
| 28:13 54:15 | 54:24 | 46:19 51:21 | **move** 4:13,14 | 16:7 29:4 | 72:15,16 |
| 55:6,6,22 | **meadows** | 52:10,17,24 | 7:16 | 33:3 40:15 | **officers** 32:14 |
| 56:2,2,5 | 42:12 | 53:4,9,16 | **moved** 55:12 | 46:8 63:11 | 34:13 35:22 |
| 57:24 59:18 | **mean** 22:1 | 56:13,18 | **murphy** | **numeral** | 46:17 47:4 |
| **maintain** | 52:16 60:1 | 57:2,12 | 12:24 13:2 | 15:17 26:2 | 51:19 52:10 |
| 19:24 20:2 | 75:15 | 62:6 | 13:5,13,17 | | 52:22 53:22 |
| 20:3 24:5 | **means** 15:24 | **moment** | 36:9 39:13 | ——— **O** ——— | 54:2,4 |
| 47:13,16 | **meeting** | 61:24 68:23 | | **o** 5:17 77:2,2 | 55:17,21 |
| 51:20 74:6 | 37:19,23 | **money** 32:1,3 | ——— **N** ——— | **object** 14:11 | 56:1,4,17 |
| **maintained** | 38:4,24 | **monroe** 55:1 | **n** 2:1 3:1 5:17 | 17:6,7 | 65:19 72:11 |

**ERICA QUEEN**
**December 12, 2013**

74:3
offices 2:2,7
okay 18:10
20:17 47:2
50:2 74:8
75:9,10,14
old 50:19,20
60:23,24
61:4,7
once 27:14,17
27:19 43:19
online 49:16
50:11
opa 24:23
35:5,9,10
35:13
open 68:21
operations
7:12 9:5
orally 5:11
13:16
order 5:6
13:24 14:5
14:10,19,20
15:2,4
16:14 18:11
18:13,22
19:2,7
23:15,17
24:1 27:24
45:4 60:5
67:10,23
68:7 72:21
73:18 74:4
ordered 26:5
27:2
orders 12:12
13:21 17:22
18:3 27:22
28:19 35:17
37:3
original 29:6
45:5
outcome

77:24
outlying
29:22 32:14
32:20 34:5
46:14
outside 22:8
22:10 23:4
64:7 74:13
oversee 7:12
9:4 61:9
overseeing
9:12 13:20
44:1
overseen 14:4
27:21
oversees
38:23
overtime
56:8,10

_____
**P**
p 2:1,1 54:15
55:6,6,22
56:2,2,5
57:24 59:18
pack 29:5
45:3 57:21
60:8,13
66:4,7,8
68:6,8
packet 60:5
62:5,17
63:15,18
65:11
page 3:1,10
19:10,11,12
19:21 23:22
paid 15:15
paperwork
27:20 29:3
40:13 52:14
52:16,18
53:19 56:22
57:5 59:24

60:1
pardon 4:17
31:7 37:10
42:7 75:21
part 12:9
19:3 26:2
46:11
particular
67:7
parties 77:23
pat 4:8
peggy 1:15
77:3 78:8
pending
17:20 18:1
18:7 26:6
people 73:11
73:23
period 6:22
7:7 8:5 9:3
10:7 11:20
14:7 22:9
23:18 27:9
27:15 48:9
49:5 57:24
68:20
permissible
17:10
person 15:4
16:17,23
21:17 25:23
27:21 28:10
28:11 40:17
44:24 52:1
61:3,10
64:2 66:6
68:6 71:4
72:3,12,20
72:24 74:3
personal
31:14 77:13
personally
27:23
pertaining

1:14
pertains
20:11,19
phonetic 43:3
54:11
physical
61:14,18
66:15 70:21
physically
21:13,16
41:17 51:6
70:18
pile 57:4
pilot 35:3,7
35:10,13,19
35:21 36:4
36:7,10,12
36:16,17
place 77:17
placed 10:17
33:13 47:24
52:6 53:4,9
63:8
places 60:4
placing 35:10
35:14,21
36:21
plaintiff 1:4
1:11 2:6
60:16
plaintiffs
14:17
point 11:12
17:8 27:10
49:15 53:17
69:17
policies 13:22
policy 25:1
35:5 46:23
portion 66:11
positioned
43:22
possession
51:20 56:12

62:13
possible 29:3
33:3,19
34:16 35:16
40:14 41:3
44:24 56:20
56:24 57:3
57:4,11,16
59:5,5,13
59:22 63:19
64:3
possibly
24:17
posted 26:4
potential
36:23 45:19
46:6 62:17
practice 26:9
26:13 46:23
48:5
practices
13:22 14:8
preliminary
19:23
prepared
29:5
present 10:24
11:9 14:2
21:9 23:18
39:23 51:11
presented
25:24
previous 77:6
previously
17:16 73:15
prior 32:7,17
34:4 44:8
46:24 55:22
69:24
prisoner 66:9
prisoners
73:9
probably
4:11 55:10

58:7 59:7
problem
67:12
procedure
1:13 15:9
23:2 37:3
37:15 44:21
procedures
12:5 14:8
15:3,8
18:10,23
19:5,6
23:23 24:6
proceedings
18:8 56:14
77:15
process 13:20
27:20,22
29:8 32:13
32:22 36:17
38:5,12,13
40:1,3
42:15 45:8
45:10,14,15
45:17 46:4
46:10 51:18
51:22 57:14
57:18,21
59:23 63:15
67:13 72:9
74:16
processed
69:14
processing
28:10 59:22
program
35:3,10,13
35:19,21
36:4,7,10
36:13,16,17
36:24
programs
35:7
property

ERICA QUEEN
December 12, 2013

31:15,24
**providing**
  52:23
**pull** 45:3
  61:11
**pulled** 29:5
**pulls** 60:2
**pursuant**
  1:12 5:5
**put** 45:3 71:1

**Q**

**queen** 1:10
  3:2,11 5:1,5
  5:7,13
**question**
  10:11 11:5
  14:1 16:16
  18:20,22
  19:24 22:3
  23:2 25:12
  26:15,19
  28:4 34:7
  38:16 44:3
  58:6 73:19
  74:1
**questions**
  17:10 38:13
  46:23 69:4
**quite** 39:10

**R**

**r** 2:1 5:17
**rap** 62:9
**rcdc** 8:15,17
**read** 26:14,17
  40:10
**reading**
  19:10
**ready** 67:22
**really** 16:16
**recall** 7:9,15
  34:23 37:9
  37:11,21

38:10 39:2
  43:19
**receive** 21:19
  37:23
**received** 12:6
  26:11 27:24
  36:7,10
  38:3
**receives**
  27:19 44:22
  59:24
**receiving** 9:4
  9:5,16,17
  10:3,9,20
  11:2,8,10
  11:22 12:1
  12:15 19:15
  20:21 21:12
  23:14 30:2
  30:4 31:1,4
  31:20 49:14
  50:19,20
  52:4,7,21
  53:2,3,15
  53:18 55:9
  55:17 69:14
  69:19,23
  70:10,15
  72:16
**reconvene**
  75:13
**record** 4:4
  22:14 26:16
  40:6,9
  47:16 57:10
  61:24 62:2
  62:3,18,20
  63:17,21,24
  68:10,23
  69:2,12,22
  77:14
**recordkeep...**
  48:15
**records** 8:17

11:7,11,15
  11:21 12:1
  12:14 19:15
  19:20,24
  20:18,24
  21:9,11,21
  22:6,8,11
  23:5,13
  27:19 29:4
  30:7,9,12
  30:14 31:1
  31:12 32:23
  33:23 34:15
  35:16 37:4
  37:17 38:6
  38:15 40:15
  41:5 44:22
  45:1,18
  46:6 47:5,9
  49:4 57:6
  57:12,15,24
  58:3,4,8,13
  58:17,20
  59:21 60:10
  60:20,22,23
  60:24 61:4
  61:8 64:5
  64:11,14
  65:12,15
  66:19,21
  67:21 68:11
  68:18 69:5
  71:14,23
**reduced**
  77:12
**refer** 35:9
  60:12
**referred**
  29:13 50:6
**referring**
  29:15
**reflect** 35:20
  36:17 46:10
  47:22 65:1

65:7 66:4
  68:2,11
  70:9,13
**reflected** 69:9
  74:13
**reflecting**
  41:3 57:11
  63:17,24
  66:5 67:21
  69:22
**reflects** 70:4
**regard** 10:11
**regarding**
  48:11
**regards**
  17:16,21
  18:12 19:1
  20:1 23:17
  24:15 26:8
  26:10 27:1
  27:1 28:7
  34:15 36:18
  36:21 37:14
  37:20,24
  38:3,4,12
  45:8,19
  46:9 47:6
  65:24 67:8
  73:23 74:1
  74:15
**regular** 71:16
**relative** 77:20
  77:21
**relay** 4:8
**release** 16:11
  16:13 17:17
  18:3,12
  19:1 25:4,5
  25:6,10
  26:4,9,10
  26:12 27:1
  33:4 46:9
  63:3,6,9,14
  63:23 64:8

64:19,23
  65:11,24
  66:12 67:9
  67:12,24
  68:2 69:8
  69:15,18,24
  73:21
**released** 15:5
  16:1 26:5
  27:2,12
  28:1,18
  60:19,23
  61:3,10
  66:6 67:22
  68:6 70:20
  72:4,18
  73:17 74:4
**releases**
  28:23 34:16
  35:16 36:19
  36:24 37:16
  38:7,15
**releasing**
  16:14
**relevance**
  31:16
**remain** 6:18
**remember**
  55:11
**renew** 22:13
**repeat** 73:19
**rephrase**
  11:4 26:22
  28:7
**report** 12:15
**reported**
  77:11
**reporter** 1:16
  4:23 75:19
  75:22 76:1
  77:4 78:9
**reports** 13:5
  13:13,18
**representat...**

42:17
**requested**
  22:18 26:17
  40:10
**required**
  40:18
**responsibil...**
  7:11 8:21
  9:2,11 11:1
  12:10 28:8
  30:3 32:8
**responsibil...**
  19:19 30:24
  31:10,12,22
  35:6 46:18
  53:20
**responsible**
  12:11 29:7
  56:17
**retired** 9:19
  9:20,23
  11:18
**retrieve**
  53:19
**return** 40:18
  52:6 56:23
  59:17 70:7
**returned**
  46:15 70:2
**returning**
  40:23
**returns** 27:14
**review** 19:16
  19:16,20
  21:20 40:13
  40:22 59:12
  66:2,15,18
  67:17
**reviewed**
  66:4 67:21
  68:3 71:19
**reviewing**
  67:14
**reviews**

ERICA QUEEN
December 12, 2013

60:3 62:17
63:18,22
64:1 65:5
67:18 68:6
**richard** 1:16
2:9
**right** 6:3
26:21 30:19
32:2 52:17
53:14 58:5
61:7 75:7
75:18
**rolling** 42:12
**roman** 15:17
26:2
**room** 9:4,5
9:16 20:21
27:19 30:4
49:14 50:19
50:20 52:21
53:15 69:14
69:19,24
70:10,15
**rotation** 55:3
**rtu** 49:20,21
49:22,23
**rules** 1:12
**run** 47:11
48:1
**running**
53:13

——————
**S**
**s** 2:1 3:8
**saying** 51:4
**says** 19:14
23:24 26:2
**scanned** 70:9
70:17
**scanning**
70:6
**schedule** 24:3
**schedules**
75:15

**schultz** 50:16
60:17 61:12
61:18 64:19
**scratched**
74:15
**second** 61:21
**security**
52:23
**see** 14:23
16:4
**seen** 23:17
28:11 39:17
42:5 71:20
**sent** 36:3
60:23 61:6
**sentence**
15:14 16:3
26:6
**sentenced**
16:5
**separated**
11:12 56:22
56:24 57:3
57:3,20
**september**
33:1
**sergeant** 5:19
7:1,4,8,16
7:19 8:6
14:3 54:10
54:20,21,24
55:1,10,11
55:13,13
67:18 68:1
68:5
**sergeants**
67:1,13
**serve** 16:5
**served** 16:8
**services**
29:15 43:1
**set** 78:1
**settlement**
17:3

**seven** 15:22
15:24 48:12
72:1
**share** 30:3
**sheet** 47:22
62:9
**sheets** 47:11
48:1,3,7,10
48:16,23
**sheriff** 1:6
13:9 17:4
24:4 28:17
32:12 39:23
42:18 45:13
47:12 62:13
**sheriffs** 5:20
5:23 6:2,7
9:21 24:11
29:13,16
43:10,17
45:7
**shes** 43:24
44:1
**shift** 9:6,7,15
23:14 53:22
54:3,3,9,18
55:14 56:7
59:4,7,14
65:17,18
**shifts** 58:15
58:16,24
**short** 40:7
**shorthand**
1:15 77:4
78:9
**showing**
14:16
**shultz** 1:3
**sign** 67:24
**signature**
19:17
**sir** 8:1 16:9
23:19,21
29:20 31:11

31:13
**six** 16:11
**skokie** 42:5
**snooks** 10:5
10:12
**solely** 74:1
**somebody**
25:6 64:14
**sorry** 18:20
20:14 26:13
38:16 51:4
63:20 69:16
**sorted** 53:16
**sorting** 56:17
**south** 2:4
**space** 25:22
**speaking**
59:16
**specific** 22:20
**specifically**
17:24 22:17
**specified**
77:17
**spell** 24:18
39:6,9
54:23
**spelling**
39:11
**spend** 7:14
**spent** 16:23
**split** 31:3
**spoke** 69:11
**spreadsheet**
41:13
**ss** 77:1
**st** 18:2
**stacks** 56:18
**staff** 13:8
29:2,19,22
32:18 33:6
33:8,9,13
33:16,20,21
34:5,19
35:1,11,14

39:22 44:2
53:2,18
54:1 55:15
**staffed** 29:19
**staffing**
45:15
**staircase**
70:19
**stamp** 66:7
**stamped** 64:4
64:11,22
**stamps** 64:15
66:15
**stand** 49:21
49:23
**stanley** 9:18
9:20 10:2
**started** 33:4
33:12
**starts** 27:20
**state** 1:16
77:1,4
**stated** 77:19
**states** 1:1,13
2:8 15:9
74:12
**stating** 15:4
**stationed**
44:10
**stazack** 54:11
**stenograph...**
77:11
**stepbystep**
40:2
**steps** 28:21
**stickers** 4:22
**stopped**
15:22
**storage** 22:4
22:6,11
23:4 71:24
**store** 48:8
**strike** 16:17
35:4,19

41:24 44:14
47:13 53:21
63:23
**succeed**
10:19
**succeeded**
10:2
**suite** 1:17
**superinten...**
6:2,5 9:16
10:3,4,8,20
10:22 11:2
11:6,10,14
11:21 12:1
12:14 14:4
29:23,24
30:4,12,17
31:9,18
32:4 44:19
48:19 74:16
**supervise**
11:6 12:10
30:1
**supervises**
11:11
**supervising**
17:1 30:9
**supervision**
34:2
**supervisor**
45:5 54:2
66:17,19
**supervisors**
53:23 54:4
54:9,13,17
54:19 55:5
55:9 66:21
**supposed**
48:12
**sure** 5:8
10:13,15,17
15:23 17:12
24:13,24
32:15 36:1

**ERICA QUEEN**
**December 12, 2013**

36:8,11
39:10 43:24
47:19,24
48:8,13
61:22 65:16
67:6 71:11
74:19
**surface** 74:15
**sworn** 4:2
5:15 33:21
77:8
**system** 60:6
62:23,24
64:5,24
65:4 70:2,3
70:8,13
72:6,10,22
73:2,23
74:6

**T**

**t** 3:8 5:17,17
**take** 14:18
56:12
**taken** 1:11,14
5:5 28:21
57:5 77:16
**talk** 75:17
**talked** 73:15
73:20
**talking** 18:16
22:1
**task** 45:23
**tell** 40:2 46:3
**ten** 8:8 48:13
65:18
**tenpage**
14:20
**test** 45:10
**testified** 5:15
**testify** 77:8
**testimony**
22:16 56:11
77:14

**tests** 45:8
**thank** 23:7
**thanks** 75:18
**thats** 4:7 16:7
16:23 20:23
21:4,17
23:13 25:8
42:24 44:15
60:12 61:6
62:24 64:22
71:4,16
72:12,12
75:15,16
**theres** 22:4
22:12 23:23
53:13 64:21
**theyve** 67:21
**think** 22:17
24:23
**thinking** 58:7
**thomas** 1:6
2:3,4
**three** 6:21
27:7,9,12
27:16 34:10
34:12 54:1
58:15 66:24
**tier** 6:16,18
**time** 6:4,23
7:7 8:5,12
8:16 9:3
10:7 11:20
14:7 16:5,7
17:8 19:17
20:11 22:9
27:15 32:16
47:17,22
48:9 49:6
54:12 55:3
63:14,21
64:4,6,8,10
64:14,22
65:1,7
66:14 67:7

68:2,12,20
69:9,17
70:4,7,9,14
71:3 72:24
75:3 77:17
**timeliness**
18:2
**timely** 17:17
26:3,10,24
27:1
**times** 47:24
**timing** 28:17
**title** 8:22 23:9
24:20
**today** 18:11
18:15 21:19
**todays** 18:16
18:24
**tom** 10:5,11
39:18 75:20
**towne** 13:10
13:11,14
36:6 39:16
**transcript**
77:11
**transfer** 26:7
**transmitting**
36:18
**transport**
47:4
**transportat...**
44:16,19
46:13,18
47:11,16,22
48:3,4,6,16
48:20,23
49:4 56:23
**transported**
44:11 47:14
69:23
**trouble** 22:23
**true** 11:9
59:12 77:13
**trust** 31:6,8

31:14,19,20
31:21
**truth** 77:8
**tunnel** 53:5,8
53:12
**tunnels** 53:13
**turn** 45:4
53:1
**two** 20:7,9,10
34:9,12
54:3,12
59:8
**type** 63:11
71:5,6
72:17,19
**types** 15:6,9
15:12,16
**typewriting**
77:12

**U**

**uhhuh** 50:7
75:1
**understand**
14:1 22:3
26:18 28:3
47:1
**understand...**
48:14 58:6
71:22
**understood**
75:13
**unit** 7:6,17
8:2,6 9:12
16:17,18,20
16:24 17:1
22:11 43:10
44:15,16,19
46:18 48:20
51:2,5
53:11,19,24
54:6 55:8
55:16,22
56:2,5,12

56:16,23
57:1,8
60:24 70:11
73:17 74:2
**united** 1:1,13
**updated** 65:1
**updates** 60:5
65:4
**use** 41:8,11
**usually** 16:13
25:8 39:3
54:1

**V**

**various** 29:14
73:20
**vernaca** 43:3
43:6
**versus** 17:4
**view** 42:18
**visited** 42:14
**vournazos**
39:20
**vs** 1:5

**W**

**wait** 29:6
45:5
**walk** 59:23
**walked** 70:18
**walks** 72:4
**want** 15:14
22:20
**wanted** 21:19
21:20 45:23
46:4
**warrant** 60:4
**watson** 17:3
**week** 75:8,12
**went** 11:15
38:4 39:3
70:10
**western** 2:4
**weve** 73:20

**whereof** 78:1
**witness** 3:1
4:1 5:9,14
14:13 17:11
18:6,19
24:8 26:20
27:5 28:5
29:10 40:11
45:22 50:3
74:19,22
75:1,5,10
77:7,7 78:1
**woman** 43:8
**work** 9:6
54:13 55:2
55:16 56:7
56:10 58:23
59:4 74:21
**worked**
21:11
**working** 9:15
34:1 72:12
**works** 66:19
**wouldnt**
28:14
**written** 34:21
57:13 75:20
75:23

**X**

**x** 3:1,8 5:17

**Y**

**yeah** 8:24
37:6 38:18
42:10 44:7
45:11 62:21
71:10 73:20
**year** 7:18
22:24 23:4
30:22 49:15
49:15
**years** 6:21
7:23 8:7,8

**ERICA QUEEN**
**December 12, 2013**

13:19 22:12
27:23 28:9
28:15,22,24
48:12,13
72:1
**yep** 42:12
**yesterday**
33:4,16
34:4 40:1
45:9 46:24
**youve** 71:20

**Z**

**0**
**00** 4:5,6 9:8,8
9:9,9,9
28:13 54:14
54:15,16,16
55:4,4,6,6
55:12,12,18
55:18,18,19
55:19,22,23
55:23 56:2
56:2,5
57:24 58:18
58:18,18,18
58:18,19
59:1,1,1,1,2
59:2,4,4,7,7
59:9,9,14
59:18 74:14
74:22,22,23
74:24
**00to** 59:13
**03** 14:23
**05** 1:18
**08** 49:22 50:6
50:10
**084003813**
78:10

**1**
**1** 3:11 4:5,6

5:2 6:15,23
14:17 23:22
46:8 54:16
55:12 74:14
**10** 9:9,19
14:19,22
28:13 55:18
55:19 56:2
56:5 74:22
74:24
**10249** 2:4
**11** 1:18 9:8
58:18,18
59:1,2,9,14
**12** 1:18 18:17
18:17 57:24
**13** 1:5 18:17
**15** 13:19
14:19,22
18:24 27:23
**16** 28:9,15,22
28:24
**17th** 49:6
**19** 6:19 18:24
**1995** 6:9,13
6:20 16:21
17:2 18:24
**1998** 7:1,20
8:9 14:2
21:8 23:18
51:11

**2**
**2** 7:5,10,14
9:9,9 46:10
55:4,18,18
55:19,22,23
56:2 59:18
**2005** 51:1,3
**2008** 8:10,20
8:21,23
9:10,14
10:24 11:3
11:5

**2009** 9:19
**2012** 8:19,20
8:22,24
9:11,14
10:23 11:3
30:19,20,23
73:7,10
**2013** 1:18
11:24 12:9
22:24 23:4
30:15,24
31:3 32:7
32:12,18
33:1,13
48:17,24
49:6,7,9,13
50:13,17
51:5,13
53:21 54:8
54:18 57:14
57:22 58:11
59:6 60:20
61:4,11
66:23 67:3
69:19 73:7
73:10 78:3
**26th** 32:19
34:6 42:9
**27** 14:20,23
15:2,7
18:11,22
19:7 23:15
46:10
**27a** 14:21
**27b** 14:23
**2c** 23:23

**3**
**3** 3:11 5:2 9:8
55:6 58:18
58:18 59:1
59:1,4,7,9
59:13
**30th** 49:7

**3641** 1:5

**4**
**4** 16:7
**40** 58:15

**5**
**5** 3:11 14:23
19:11,12,21
50:21 51:7
51:12,17
54:14,15,16
55:6,12
58:9 71:9
71:12
**500** 1:17 2:9
**574** 3:4
**5th** 49:8

**6**
**6** 55:4,23
**60602** 2:10
**60643** 2:5
**6th** 75:8

**7**
**7** 58:18,19
59:1,2,4,7

**8**
**8** 15:22 74:22
74:23
**8th** 47:14
50:17

**9**
**9** 14:20,21,23
15:2,7
18:11,22
19:7 23:15
46:10
**95** 14:19
**96** 14:22

# Exhibit 10

ORIGINAL TRANSCRIPT

Page 1

1  IN THE UNITED STATES DISTRICT COURT FOR

2      THE NORTHERN DISTRICT OF ILLINOIS

3            EASTERN DIVISION

4  - - - - - - - - - - - - - - -x

5  EDWARD SHULTZ,

6                     Plaintiff,

7        -against-   No. 13-cv-3641

8  THOMAS DART, SHERIFF OF COOK COUNTY, COOK

   COUNTY, ILLINOIS, CORRECTIONAL OFFICER

9  DOMINGUEZ (STAR 7807), and SERGEANT BRUCE

   VILLANOVA (STAR 1162),

10

                     Defendants.

11

   - - - - - - - - - - - - - - -x

12

                     1250 Broadway

13                   New York, New York

14                   June 19, 2015

                     11:30 a.m.

15

16    EXAMINATION BEFORE TRIAL of SHEILA

17  VAUGHAN, an Expert Non-Party Witness for

18  the Plaintiff in the above-entitled

19  action, held at the above time and place,

20  taken before Jacqueline Gandolfo, a Notary

21  Public of the State of New York, pursuant

22  to Court Order and Agreement of all

23  Parties and Stipulations between Counsel.

24            *       *       *

Page 2

1  APPEARANCES:
2
3  PATRICK MORRISSEY THOMAS G. MORRISSEY, LTD
    Attorneys for Plaintiff
4      10150 South Western Avenue
        Rear Suite
5      Chicago, Illinois 60616
6  BY: PATRICK MORRISSEY, ESQ.
7
8
9  STATE'S ATTORNEY COOK COUNTY, ILLINOIS
    Attorney for Defendants
10     500 Daley Center
        66 West Washington
11     Chicago, Illinois 60602
12  BY: ANTHONY E. ZECCHIN, ASSISTANT
        STATE'S ATTORNEY
13
14
15          *   *   *
16
17
18
19
20
21
22
23
24

Page 3

1  S H E I L A   V A U G H A N, the Witness
2  herein, having first been duly sworn by
3  the Notary Public, was examined and
4  testified as follows:
5  EXAMINATION BY
6  MR. ZECCHIN:
7      Q.   What is your name?
8      A.   Sheila Vaughan.
9      Q.   Where do you reside?
10     A.   162-21 Powells Cove Boulevard,
11  White Stone, New York 11357.
12         MR. ZECCHIN: This is the
13  deposition of Sheila Vaughan who has
14  been designated as a witness by the
15  Plaintiff Edward Schultz under Federal
16  Rule of Civil Procedure 26 A 2.
17         Present are myself, Anthony
18  Assistant State's Attorney Anthony
19  Zecchin, Patrick Morrissey attorney
20  for Plaintiff, Ms. Vaughan and the
21  court reporter.
22         This deposition is being taken
23  pursuant to agreement of the parties
24  and Court Order and is governed by the

Page 4

1      Federal Rules of Civil Procedure and
2      local rules of the Northern District
3      of Illinois.
4      Q.   Ms. Vaughan, have you ever been
5  deposed before?
6      A.   Yes.
7      Q.   About how many times?
8      A.   About ten.
9      Q.   Of those ten times, how many
10  were in relation to your occupation or
11  your profession?
12     A.   All of them.
13     Q.   So you are familiar with the
14  rules of deposition. I'll just go over
15  them so it's clear on the record. Okay?
16     A.   Yes.
17     Q.   You are under oath and sworn to
18  tell the truth. You understand that,
19  right?
20     A.   Yes.
21     Q.   Are you prepared to answer the
22  questions truthfully and honestly today
23  and there is nothing preventing from
24  understanding my questions and giving

Page 5

1  truthful answers?
2      A.   There's nothing preventing me.
3      Q.   You are not on any medication or
4  any other type of substance that would
5  prevent you from telling the truth?
6      A.   No.
7      Q.   When I ask you some questions
8  today, there may be times when I ask it in
9  a way that you don't understand. I ask
10  that if you don't understand the question,
11  just let me know and I will try to
12  rephrase it more clearly. If you do
13  answer the question, I will assume that
14  you understood how it's been asked to you.
15  Okay?
16     A.   Yes.
17     Q.   All of your answers must be
18  verbal and out loud. No ah-hahs or
19  uh-huhs or nodding the head or shaking
20  your head just for the court reporter's
21  benefit.
22     A.   I understand.
23     Q.   Also, this dovetails to what
24  just happened, sometimes you may

Page 6

1 anticipate where my question is going and
2 you start to answer before I finish and it
3 just makes for more of a choppy
4 transcript. If you could just try to wait
5 for me to finish my question before you
6 start answering and I will likewise, of
7 course, try to let you finish your answer
8 completely before I move on to the next
9 question. Do you understand?
10    A. Yes.
11    Q. If you need to take a break or
12 anything for any reason, if you want to
13 take a break, as you probably recall, if I
14 have asked you a question, that question
15 has to be answered before we take a break.
16 Okay?
17    A. Okay.
18    Q. Are there any questions that you
19 have?
20    A. No.
21    Q. Are you currently employed?
22    A. Yes.
23    Q. How are you employed?
24    A. Curnyn Consultants.

Page 7

1    Q. How do you spell Curnyn?
2    A. C-U-R-N-Y-N.
3    Q. What is your title with Curnyn
4 Consultants?
5    A. President.
6    Q. Do you have any employees?
7    A. I hire people as I need them.
8    Q. So you are the principle of the
9 company?
10    A. Yes.
11    Q. How long have you been at Curnyn
12 Consultants?
13    A. Since 1995.
14    Q. What is your educational
15 background?
16    A. I have a Batchelor's Degree in
17 Criminal Justice.
18    Q. Where did you get that from?
19    A. John Jay College.
20    Q. Is that here in New York?
21    A. Yes.
22    Q. When did you receive your
23 degree?
24    A. 1994.

Page 8

1    Q. Prior to being employed by
2 Curnyn Consultants or starting Curnyn
3 Consultants, what was your employment
4 prior to that?
5    A. New York City Department of
6 Correction.
7    Q. How long were you there for?
8    A. Twenty-two years.
9    Q. Can you briefly tell me all the
10 titles that you held while you were with
11 the New York City Department of
12 Correction?
13    A. I started in the Department of
14 Corrections in 1978 as a corrections
15 officer. Approximately three years later
16 I was promoted to captain.
17      As a corrections officer I was
18 responsible for supervising inmates in the
19 housing areas, intake, recreation, medical
20 facilities, all aspects of a detention and
21 sentence facility because we had county
22 sentenced inmates.
23      As a captain I worked as a
24 supervisor of correction officers doing

Page 9

1 things such as discharging inmates,
2 working in the intake area. As the
3 supervisor of the area, I then went to
4 what the department of correction calls
5 the compliance unit where we were tasked
6 with inspecting facilities for their
7 compliance with the Board of Correction
8 minimum standards of New York City, State
9 and Federal Consent Decrees. I did that
10 for about four years.
11      I was then promoted to deputy
12 warden. I worked as the deputy warden in
13 the various disciplines in New York City.
14 Deputy warden is the rank below warden and
15 they are designated to be in charge of
16 security, administration and program.
17      I worked in all three areas in
18 various facilities, Rikers' Island and
19 some borough facilities. I was promoted
20 to warden in 1991 I believe. I was the
21 warden of the facilities. Again, on
22 Rikers Island there are about thirteen
23 facilities that comprise New York City
24 Department of Correction. I worked in

3 (Pages 6 - 9)

Page 10

1 about four of those different facilities,
2 women's prison at some point I had
3 adolescence which is sixteen to twenty.
4 It is now sixteen to eighteen here in New
5 York City. And the men's maximum security
6 facility.
7    Q.   You were a corrections officer
8 based on the numbers until about to 1981
9 and then you were promoted to captain?
10   A.   Yes.
11   Q.   When you were a corrections
12 officer, did you say you were involved in
13 the discharge procedure as a correctional
14 officer.
15      MR. MORRISSEY: I think that's a
16 mischaracterization of testimony.
17   A.   What I meant to say was that I
18 worked in the intake as a corrections
19 officer preparing inmates for discharge at
20 times. I did not actually sign inmates
21 out. That was the supervisor's
22 responsibility.
23   Q.   Was that when you were an
24 officer, a captain or both?

Page 11

1    A.   As an officer I worked intake
2 where we would search and prepare inmates
3 who were being discharged after their
4 court appearances. And as a supervisor, I
5 would sign them out. I would actually do
6 the actual pedigree and authorization to
7 exit the facility.
8       I just want to clarify that I
9 stopped at warden. I was subsequently
10 promoted to assistant chief and deputy
11 chief in the department. As deputy chief
12 I oversaw all of the operations on Rikers
13 Island on a day-to-day basis.
14   Q.   Is deputy chief higher than a
15 warden?
16   A.   Yes.
17   Q.   By what you just testified to,
18 it seems two steps higher than the warden?
19   A.   Yes.
20   Q.   Again, just trying to get the
21 time line correct. In 1985, is that when
22 you were moved or promoted to the
23 compliance unit?
24   A.   Yes.

Page 12

1    Q.   So for the majority of your
2 career you were supervisor you weren't
3 doing the line corrections officer stuff
4 as much as you were doing the supervisory
5 role of a captain and a deputy warden?
6    A.   Correct.
7    Q.   Today your attorney provided me
8 with an updated curriculum vitae of yours.
9 Apparently the only change I can see is
10 the addition of the subsequent cases that
11 you have been retained on as an expert, is
12 that fair to say?
13   A.   Yes.
14   Q.   Other than that, this remains as
15 it was with the expert record in this
16 case?
17   A.   Yes.
18   Q.   Looking over your duties that
19 are listed in the curriculum vitae, they
20 appear to be more in line with the
21 supervisor's responsibilities including
22 recruitment, investigation, assignment of
23 officers and overtime control?
24   A.   When I was in charge of

Page 13

1 administration -- I just want to clarify
2 one thing. I don't know if the to the CV
3 that you got listed that I am certified by
4 the Department of Justice as an PREA
5 auditor. PREA is Prison Rape Elimination
6 Act. I just wanted to point that out.
7    Q.   It is not on here?
8    A.   No.
9    Q.   Thank you for clarifying that.
10 When did you ultimately leave the New York
11 Department of Correction?
12   A.   In 2001.
13   Q.   Why did you decide to leave?
14   A.   I retired.
15   Q.   Based on your retirement date,
16 you were doing consulting at the same time
17 that you were also working for the
18 department of correction?
19   A.   Yes, I was.
20   Q.   So when is the last time when
21 you were with the department of correction
22 that you were involved in the day-to-day
23 operations of discharge in the New York
24 Department of Correction?

4 (Pages 10 - 13)

Page 14

1   A.   Overseeing it as a division
2   chief, I would have been involved with
3   that to the end. I would have been
4   responsible had there been problems with
5   the discharge procedure, timely
6   discharges.
7        In my time as a deputy chief, I
8   had issues with overcrowding in Rikers
9   Island. So the discharge procedure became
10  very important to ensure that we had bed
11  space if there was any admission. We had
12  clocks in New York to see how quickly we
13  could house inmates.
14  Q.   So you said that even up to when
15  you were the deputy chief you were still
16  involved. Did you have subordinates that
17  were in charge of the day-to-day
18  operations that you would rely on in order
19  to make sure that the system that was in
20  place was in fact executed properly?
21  A.   Yes.
22  Q.   How many layers below you did
23  that go down to?
24  A.   That would have gone down to the

Page 15

1   captains in the intake areas in the
2   facilities that I supervised. So it would
3   be captains, assistant deputy warden,
4   deputy wardens, wardens, assistant chief.
5   I was the deputy chief.
6   Q.   At the time you were speaking
7   about, would the captain be the rank one
8   above the correctional officer?
9   A.   Yes, the captain is the first
10  line of supervisor.
11  Q.   So the implementation and
12  execution of discharge procedures went all
13  the way down to the captain?
14  A.   Yes.
15  Q.   What professional organizations
16  do you belong to?
17  A.   I belong to the American
18  Correctional Association.
19  Q.   Just as a member or were you on
20  the board?
21  A.   Just a member and also the
22  International Prison and Correctional
23  Association, IPCA?
24  Q.   Do you subscribe or read any

Page 16

1   trade publications for corrections?
2   A.   Yes, I do. I read Correction
3   Law Reporter. It just came in the mail
4   yesterday, that's why I have it with me.
5   Q.   In the course of your
6   consulting, do you ever provide training
7   to correctional or law enforcement staff?
8   A.   No, I can't say that I have done
9   that.
10  Q.   I am going to ask you some
11  questions about the New York Department of
12  Corrections and obviously the time frame I
13  am speaking about is going to be from 1978
14  to 2001. How many court houses are there
15  that hear criminal matters in New York
16  City -- or New York State I should say?
17  A.   I would only know the city.
18  Q.   Okay.
19  A.   But there is one in every
20  borough. There's one in Staten Island.
21  There's one in Manhattan. There's one in
22  Queens. There's one in Brooklyn and
23  there's one in the Bronx. That's five.
24  Q.   In Rikers Island, do they house

Page 17

1   all detainees or is that a certain
2   classification?
3   A.   They house all detainees and
4   inmates sentenced to county time up to a
5   year.
6   Q.   What was the average population
7   on Rikers Island?
8   A.   When I started in 1978 it was
9   about 5,000. It reached a peak of over
10  22,000 at one point in the '90s. When I
11  left it was starting to go down, so more
12  like 20,000.
13  Q.   What is the acceptable capacity
14  at Rikers Island?
15  A.   I couldn't tell you. That
16  includes the borough facility, the 22,000.
17  We had a facility at the time when I left
18  we had an operating facility in Manhattan
19  House -- in Manhattan. An operating
20  facility in Brooklyn. One in the Bronx.
21  One in Queens. Now the one in the Bronx
22  is closed. And I'm not sure -- I believe
23  the one in Queens is closed. I'm not sure
24  about Brooklyn. It closed and it may have

5 (Pages 14 - 17)

Page 18

1 opened up again.
2    Q.   Can you just clarify what you
3 mean by operating facility?
4    A.   That's what I meant because I
5 thought we were talking about the fact
6 that some are closed now, so these were
7 facilities that held all detainees and
8 since they were close to or connected to
9 the criminal court buildings in the
10 boroughs, they would house inmates who
11 were on trial or new admissions who came
12 in from their court facility. And that
13 was to reduce the transportation off
14 Rikers Island to the court facility.
15    Q.   So at that time there was not
16 only detainees who were living or being
17 housed in Rikers Island, but also in four
18 additional locations so kind of mini
19 jails?
20    A.   Yes, and during the height of
21 our population explosion, we also had
22 prison barges. They housed prisoners on
23 both the east side and west side of
24 Manhattan. We also turned a couple of

Page 19

1 homeless shelters into secure facilities.
2 One was on Wards Island and one in
3 Brooklyn to deal with the population
4 explosion.
5    Q.   Are there any courtrooms on
6 Rikers Island itself?
7    A.   No.
8    Q.   Were you ever sued in an
9 individual capacity when you worked with
10 the department of corrections?
11    A.   My name was on a lawsuit, yes.
12    Q.   Do you remember how many of
13 those times you were sued individually
14 versus obviously in your official capacity
15 of deputy, warden, captain?
16    A.   No.
17    Q.   Did you ever testify in a case
18 where you were sued in an individual
19 capacity with the department of
20 correction?
21    A.   No.
22    Q.   I'm going to show you your
23 statement of vitae that you provided
24 today. We discussed it a little bit

Page 20

1 earlier, but I'm going to have it marked
2 as Exhibit 1.
3        [The document was hereby marked
4 as Defendants' Exhibit 1 for
5 identification, as of this date.]
6    Q.   Ms. Vaughan, is that the updated
7 version of your curriculum vitae that you
8 provided today?
9    A.   Yes.
10    Q.   Again, it is accurate and
11 everything contained in it is true?
12    A.   Yes.
13    Q.   In the course of your
14 consultation as an expert, how many times
15 have you testified for a plaintiff?
16    A.   Approximately I'll say eight
17 times.
18    Q.   So the balance would be for the
19 defendant or in some other capacity?
20    A.   Well --
21    Q.   Let me rephrase the question.
22        For example, what I am saying
23 is, if you were retained by the plaintiff
24 or the defendant, appointed by the

Page 21

1 governmental body to sit or do something
2 like an ombudsman, have you ever been
3 retained as an expert in a neutral
4 capacity?
5        MR. MORRISSEY: Objection to the
6    form of the question.
7    Q.   For example, you brought up that
8 you were appointed by the Department of
9 Justice as a certified PREA auditor. That
10 would be something that I am referring to.
11 Were there any other instances where you
12 were not for a party, but for a different
13 body that involved perhaps litigation or
14 some type of correctional capacity?
15    A.   To clarify, 1 underwent
16 training. 1 wasn't appointed. I was just
17 certified by the Defendant of Justice. I
18 cannot recollect serving in that capacity.
19    Q.   How many times -- based on your
20 earlier circum vitae -- that you've been
21 retained twenty-three times and an
22 additional four are on this new CV that
23 you provided today; is that accurate at
24 this time?

6 (Pages 18 - 21)

Page 22

1   A.   Yes.
2   Q.   Of those twenty-seven times, how
3 many times have you been deposed?
4   A.   I think I mentioned before ten.
5   Q.   Have you ever been called to
6 testify at trial to be an active witness?
7   A.   Yes.
8   Q.   Which cases?
9   A.   A case concerning lock-down
10 procedures in Chicago.  In a case in New
11 York concerning female uni forms.  That's
12 all that I can recall.
13   Q.   Two times you've testified at
14 trial or some type of hearing?
15   A.   At a hearing there have been
16 cases that I -- in front of an
17 administrative person -- I did that with
18 some cases having to do with the
19 employment in the New York City Department
20 of Correction for certain levels of
21 officers.  And I did testify at a hearing
22 against correctional officers for abuse of
23 sick leave.
24   Q.   The two times that you've

Page 23

1 testified in lawsuits that were not
2 involved in labor issues; is that
3 accurate?
4   A.   Yes, that is accurate.
5   Q.   Have you ever been disqualified
6 as an expert?
7   A.   No.
8   Q.   Has your expert opinion ever
9 been subject to a hearing pursuant to
10 Daubert?
11     MR. MORRISSEY:  If you know.
12   A.   To my knowledge, no.
13     MR. ZECCHIN:  This will be
14   Exhibit 2.
15     [The document was hereby marked
16   as Defendants' Exhibit 2 for
17   identification, as of this date.]
18   Q.   Ms. Vaughan, Im going to ask you
19 to take a look at what has been marked as
20 Exhibit 2 for identification.  Can you
21 take a quick read through it to scan it
22 and let me know if you recognize this
23 document.
24   A.   Yes.

Page 24

1   Q.   Is this the expert report that
2 you provided in connection with the
3 lawsuit of Schultz versus Dart et al that
4 you are being deposed on today?
5   A.   Yes.
6   Q.   Is it a complete report that you
7 provided?
8   A.   Yes.
9     MR. ZECCHIN:  We will mark this
10   as Exhibit 3.
11     [The document was hereby marked
12   as Defendants' Exhibit 3 for
13   identification, as of this date.]
14   Q.   Ms. Vaughan, have you ever seen
15 this document?
16   A.   Yes.
17   Q.   Pursuant to that document, did
18 you bring any documents that are in
19 response to this deposition?
20   A.   I brought my notes and my
21 resume.
22   Q.   You were given a copy of this?
23   A.   I was given a copy of this
24 yesterday at about 2:00 and I was sitting

Page 25

1 on a flight and I got home at 9:00 last
2 night.
3   Q.   So the documents that you have
4 in response are the notes that you have
5 and the new CV, correct?
6     MR. MORRISSEY:  For the record,
7   this was given a day or two ago.
8     MR. ZECCHIN:  It was emailed to
9   you and Thomas Morrissey on Wednesday?
10     MR. MORRISSEY:  Correct.  So we
11   have a meeting next week to settle on
12   several of the issues that are
13   objectionable.
14     MR. ZECCHIN:  We'll take it up
15   at that time.
16   Q.   I will leave Exhibit 2 in front
17 of you because I will be referring to it
18 and it will be easier.  Okay?
19   A.   Yes.
20   Q.   You were retained by Thomas
21 Morrissey and Associates, Ltd. in
22 connection with this case, correct?
23   A.   Correct.
24   Q.   And you stated in your report

7 (Pages 22 - 25)

Page 26

1 that your fee is $150 per hour; is that
2 correct?
3    A.   Correct.
4    Q.   Is that your standard fee?
5    A.   Yes.
6    Q.   Is there any other compensation
7 or bonus that you receive in connection
8 with this case?
9    A.   No.
10    Q.   Is there anything else that was
11 offered or promised to you for providing
12 expert testimony in this case?
13    A.   No.
14    Q.   Do you have a contract or any
15 other agreement with Mr. Morrissey for
16 business or professional service beyond
17 this case?
18    A.   No -- I take that back.  There
19 are other cases at the present time that I
20 am involved in with Mr. Morrissey.
21    Q.   Beyond the cases that you have
22 listed on the curriculum vitae?
23    A.   No.
24    Q.   Does this report contain all the

Page 27

1 opinions that you have rendered in this
2 case?
3    A.   Yes.
4    Q.   I stand corrected, Ms. Vaughan,
5 it looks like there are three additional
6 cases, so that would be a total of
7 twenty-six times that you have been
8 retained.  Does that sound about right?
9    A.   Yes.
10    Q.   In connection with the
11 twenty-six times, it appears six of those
12 were in connection with lawsuits involving
13 Cook County Department of Corrections; is
14 that accurate?
15    A.   That sounds right.
16    Q.   Besides Mr. Morrissey, have you
17 been retained by any other attorneys in
18 connection with those cases?
19       MR. MORRISSEY:  Objection to the
20 form.
21    A.   No.
22    Q.   Have you ever been retained by
23 Mr. Flaksman (phonetic) in any of those
24 cases.

Page 28

1    A.   I would say indirectly.  Perhaps
2 it was always with Mr. Morrissey that I
3 was retained.
4    Q.   In all six of the cases that
5 you've been involved in with Cook County
6 Mr. Morrissey retained you?
7    A.   Yes.
8    Q.   Two of those cases that you
9 referenced, Watson versus Sheahan and
10 Bullock versus Sheahan, those both
11 involved discharging of detainees in Cook
12 County Jail, correct?
13    A.   Yes.
14    Q.   The Watson case, do you remember
15 what year it was that you were retained?
16    A.   Very early on.  I believe it was
17 before I left the department of
18 corrections.
19    Q.   Does 1997 sound about right?
20    A.   It does.
21    Q.   With the Bullock case, do you
22 recall when that was?
23    A.   I can refer to my resume.
24    Q.   It says 2005 would that seem

Page 29

1 accurate?
2    A.   Yes.
3    Q.   Do you remember anything
4 particular about those cases?
5    A.   I know I put bullets on my
6 resume to -- with my understanding with
7 Watson, what I recall it having to do with
8 the fact that inmates were being released
9 several hours after they were returned to
10 the Cook County facility.  With Bullock,
11 it was a similar case, but I cannot recall
12 the particulars at this time.
13    Q.   Do you remember if either or
14 both of those cases involved strip
15 searches in connection with those cases?
16    A.   Those cases, no, I don't recall
17 that.
18    Q.   Are you aware that Mr. Shultz's
19 claim doesn't involve any type of strip
20 search allegations?
21    A.   Yes, I am.
22    Q.   Did you submit a written expert
23 report in either Watson or Bullock?
24    A.   I know I did in Bullock.  I'm

8 (Pages 26 - 29)

Page 30

1 pretty sure I did in Watson.
2    Q.   And you still have copies of
3 those expert reports?
4    A.   Bullock, yes. Watson, I don't
5 know.
6    Q.   So other than for Bullock and
7 Watson, have you ever testified or been
8 retained as an expert in the discharge
9 procedure for any correctional facility?
10    A.   No.
11    Q.   In reviewing the documentation
12 for this case provided to you, did you
13 ever consult the Illinois administrative
14 codes or the county jail standards?
15    A.   No.
16    Q.   Does New York have a stature or
17 code regarding jail standards?
18    A.   Yes.
19    Q.   Are you familiar with any of the
20 consent decrees that have been utilized or
21 been implemented regarding the Illinois
22 County Department of Corrections?
23    A.   No.
24    Q.   And if you know, what is the

Page 31

1 fact of Illinois County Jail Standards
2 Act? Do you know what the implications
3 are?
4    A.   No.
5    Q.   You said you are a member of the
6 American Correctional Association. Do you
7 know if they also certify correctional
8 facilities?
9    A.   Yes, they do.
10    Q.   Are you aware if the Cook County
11 Department of Corrections is certified by
12 the ACA from 2010 to 2013?
13    A.   I am.
14    Q.   Were they?
15    A.   I don't know the years that Cook
16 County was certified, but I do know that
17 Cook County was in fact certified at some
18 point.
19    Q.   I want to go through for
20 simplicity sake what you have written in
21 your report is what you relied on. And if
22 there is anything that I say that is
23 incorrect, feel free to stop me. Okay?
24    A.   Yes.

Page 32

1    Q.   Your report states that you
2 considered the following: Officer's
3 Living Unit Log for May 8, 2013. The
4 Incident Report Number 130086405. The
5 Offense/Incident report relating to the
6 May 8, 2013 incident. CIID Incident
7 Report. A Nursing Note from May 8, 2013
8 for Mr. Shultz. A Cook County Department
9 of Corrections General Order of 9.27 dated
10 10/15/95. Plaintiff Mr. Shultz's Dress
11 and Release form and a recording of
12 Plaintiff Edward Shultz's call that was
13 made on May 8, 2013 and the log that
14 reflected the time and duration of the
15 call. The deposition of testimony of
16 Erica Queen, Michael Holmes, Sheriff Dart,
17 Officer Anson, Sergeant Villanova and
18 Officer Dominguez and incident reports
19 relating to the Division 2 W Dorm.
20       MR. MORRISSEY: For the record,
21    are you reading her report?
22       MR. ZECCHIN: Yes.
23       MR. MORRISSEY: It's on page 2
24    of the report?

Page 33

1       MR. ZECCHIN: Yes and Ms.
2    Vaughan, you are welcome to look at
3    this to make sure I wasn't missing
4    anything.
5    A.   (Witness complies). Yes.
6    Q.   So that was the list?
7    A.   That list is complete. For some
8 reason something in there -- but I
9 realized I did read Director Michael
10 Holmes deposition. When you said the name
11 I was surprised.
12    Q.   You did review that?
13    A.   Yes.
14    Q.   Is there anything else that you
15 reviewed in connection with generating
16 this report?
17    A.   Not that I recall, no.
18    Q.   Did you review any correctional
19 standards or credences on correctional
20 practices in connection with generating
21 this report?
22    A.   No.
23    Q.   Before we get into your
24 individual opinions that you rendered in

9 (Pages 30 - 33)

Page 34

1 this case, I would like to ask you a few
2 general questions.
3      Do you take issue with the fact
4 that there is actually an administrative
5 process for discharging detainees from the
6 department of corrections?
7    A.   No.
8    Q.   So in other words, it is
9 appropriate for the sheriff to have a
10 practice or policy to take people who are
11 in custody and to discharge them out of
12 custody?
13    A.   Yes.
14    Q.   Do you agree that it could take
15 time to do that given factors like the
16 number of people being processed in a day
17 or a number of detainees returned at one
18 time or other factors that may be beyond
19 the control of the sheriff or the
20 department of correction?
21    A.   Yes.
22    Q.   And do you also agree that if a
23 detainee has a mental illness or medical
24 issues that it may in fact take longer to

Page 35

1 discharge or properly discharge them to
2 make sure that they are appropriately
3 suited to be released?
4    A.   I don't understand the question.
5    Q.   Let me rephrase.  Would you
6 agree that it is permissible that
7 additional steps may be taken to discharge
8 someone with a mental illness or medical
9 condition that may require additional
10 assistance before being discharged?
11    A.   Yes.
12    Q.   Page 3 of your report.  The
13 first opinion reached states, "Most, if
14 not all, administrative steps necessary to
15 determine whether a detainee had any other
16 court holds could be completed before a
17 court appearance."  Is that accurately
18 read?
19    A.   Yes.
20    Q.   What is the basis for that
21 opinion?
22    A.   My experience in New York City.
23    Q.   Are there any known or accepted
24 correctional standards that dictate or

Page 36

1 recommend that certain steps should be
2 done prior to the detainee going to court
3 to prepare the detainee for being
4 discharged?
5    A.   Not I that I am aware of, no.
6    Q.   A follow up to an earlier
7 question, there is not a problem with the
8 jail personnel reviewing records before
9 discharging someone is there?
10    A.   No.
11    Q.   If a person is not set for trial
12 or not set for a pretrial motion that
13 would result in the case being dismissed,
14 is it your position still that that person
15 should have their paperwork reviewed as a
16 possible discharge?
17    A.   (No response was given.)
18    Q.   Would you like me to rephrase
19 the question?
20    A.   Yes.
21    Q.   Do you believe that every person
22 going to court on a daily basis should
23 have their paperwork reviewed in the event
24 that they are discharged?

Page 37

1    A.   My experience was that in New
2 York City we did that.  We did that in
3 order to minimize the number of inmates
4 who needed to return to Rikers.  We did
5 that because we wanted to minimize the
6 amount of time that we held people in
7 custody.  So in many cases it was simple
8 because we in New York City maintain
9 inmate records that are transported with
10 the inmate and those records are
11 inclusive.  They hold all outstanding
12 commitments on a particular inmate.  A
13 quick view by the correction officer and
14 that's who did the initial review, or the
15 civilian in the general office, would
16 indicate whether or not the person had any
17 other holds on them.  If they had no other
18 holds that would be readily apparent by
19 this paperwork and for those people it's
20 possible to identify this person as if
21 they get cut lose from court today, they
22 can by discharged pending a review by the
23 supervisor in the court facility.
24    Q.   How many people would go to

10 (Pages 34 - 37)

Page 38

1 court on a daily basis when you were with
2 the department of correction?
3    A.   Depending on the population, we
4 would produce about twenty percent of the
5 population daily.
6    Q.   What would that be --
7    A.   In a facility of 1,500 inmates
8 we would produce about 600 to court.
9    Q.   And Cook County -- I'm sure you
10 were aware that we send 1,000 people a day
11 to court?
12    A.   Yes.
13    Q.   Is it your position that every
14 one of the those 1,000 people should have
15 their paperwork reviewed every time they
16 go to court to determine if they can be
17 released on the chance that they get
18 released from custody that day?
19    A.   I'm telling you that one
20 facility on Rikers Island produces 300
21 inmates to court.  We would put out
22 probably similar numbers to court on a
23 daily basis and New York City did do that.
24    Q.   So is your answer to that that

Page 39

1 you think that every detainee going to
2 court should have their paperwork reviewed
3 prior to going to court in the event that
4 the judge decides to dismiss the case or
5 they are found not guilty?
6    A.   New York City did it because
7 they wanted to minimize the liability of
8 transporting detainees to court rather
9 then transport them back to Rikers Island.
10 We found that to be an efficient way to
11 deal with the population that we had.  So
12 we proceeded to do it that way.
13    Q.   So is it your position that Cook
14 County Department of Corrections should
15 review each of those 1,000 detainees who
16 are going to court on a daily basis, their
17 packs should be reviewed that are going to
18 court in order to determined if they are
19 released that day or if the court happens
20 to release them?
21    A.   I think that Cook County should
22 consider looking into whether or not that
23 is feasible and operational and efficient
24 for them to do that.

Page 40

1    Q.   So is it your opinion that if it
2 was feasible they should consider it?
3    A.   Yes.
4    Q.   Are you aware given the 1,000
5 people being sent to and from court every
6 day, do you have any basis or do you have
7 any information that you can testify to as
8 to how many additional staff persons would
9 be required to review the documents?
10    A.   No, I don't.
11    Q.   Do you have any estimate as to
12 how long it would take to review that many
13 documents on a daily basis?
14    A.   No.
15    Q.   And you would agree with me,
16 wouldn't you, that every person's pack is
17 going to be different?  If someone is
18 there for a week, it's going to be small.
19 If someone is there for three years it
20 could be a voluminous pack?
21    A.   I'm simply saying to review it
22 for outstanding commitments.  I am not
23 saying that their infractions or their
24 medical history or anything else has to be

Page 41

1 reviewed.  It's simply whether or not they
2 have other outstanding cases that have to
3 be answered to.
4       So a person with only one case
5 would be able to be identified as a
6 possible discharge.  Once you see that
7 they've got another case or another court
8 day, that person is not.  It is not an
9 exhausted review.  It's in my mind, it
10 appeared when we started it that it might
11 be burdensome, but once staff became
12 familiar that it is not a big problem.
13    Q.   In the New York Department of
14 Correction did they have a notation in the
15 document whether something was set for
16 trial or set for a hearing or anything of
17 that sort?
18    A.   In New York City as I mentioned
19 all of the outstanding commitments on a
20 particular inmate were attached in one
21 document.  So they may have had cases in
22 Brooklyn, cases in the Bronx, cases in
23 Manhattan, all of that would be attached
24 to his accompanying card, that entire pack

11 (Pages 38 - 41)

Page 42

1 accompanied the inmate. The officer held
2 it wherever the inmate went. If the
3 inmate went to the hospital, that went
4 with him. It was always together, all of
5 the outstanding cases. So whatever
6 position or whatever status a particular
7 case had was written on that document.
8    Q.   Who generated the court
9 paperwork after the detainee was in court
10 for something?
11   A.   The court clerk would write on
12 the card and the card would be attached to
13 the paperwork.
14       MR. MORRISSEY: Can we take a
15   quick break?
16       MR. ZECCHIN: Sure.
17       (A recess was taken.)
18   Q.   Ms. Vaughan, if I were to
19 represent to you that the paperwork coming
20 back from the court in Cook County did not
21 contain the case set for trial or if there
22 was pretrial motion, would you agree that
23 that would be a factor that would result
24 in a more burdensome review of their

Page 43

1 documentation?
2    A.   My position is simply whether or
3 not there is an outstanding court date.
4 Whatever that court date requires as far
5 as whether it's pretrial or trial, I am
6 simply saying that if an inmate has one
7 case and goes to court and is discharged
8 on that case the he is a potential
9 discharge. If the inmate has another
10 case, whatever he has to do, he has
11 another court date, then he can't be
12 discharged even if he was cut lose on the
13 case that he was going to today. If he
14 has a court date in three days, he has to
15 come back and be held in custody.
16   Q.   I believe I asked you this
17 already, but you have no opinion as to how
18 many additional staff persons would be
19 required to review every person going to
20 court to review paperwork or how long it
21 would take?
22   A.   That's correct.
23   Q.   Are you aware of how many of the
24 1,000 people approximately that go to

Page 44

1 court every day, how many are actually
2 discharged on a daily basis?
3    A.   In Cook County?
4    Q.   Yes.
5    A.   I can guesstimate that it's
6 probably 2- to 300 hundred because my
7 understanding it's about how many new
8 admissions you get in.
9    Q.   To your knowledge, does that
10 include people who are going to be
11 released on bond or set for a pretrial
12 program?
13   A.   To my knowledge that does
14 include those people.
15   Q.   Do you have any knowledge of how
16 many of those people that go to court are
17 found not guilty or people who go to court
18 and are time considered served?
19   A.   No.
20   Q.   In this case Mr. Shultz went to
21 the Bridgeview Courthouse. When they got
22 there he was given a sentence of time
23 considered served. Are you aware of that?
24   A.   Yes.

Page 45

1    Q.   In that case, is it fair to say
2 that nobody would know that he was going
3 to be a discharge that day based on the
4 status of his case; fair to say?
5        MR. MORRISSEY: Objection to the
6   form of the question. You can answer.
7    A.   My question is, when you say no
8 one, who are you referring to?
9    Q.   The sheriff's personnel.
10       MR. MORRISSEY: Before he went
11   to court or after?
12       MR. ZECCHIN: Before.
13   A.   Before he goes to court they
14 would not know that he was being
15 discharged, yes.
16   Q.   One other question regarding the
17 paperwork that is being reviewed. If
18 there is certain courtroom documentation
19 provided by the courtroom deputy and it's
20 illegible or there is conflicting
21 information in there or perhaps not all of
22 the counts are disposed of on the mittimus
23 that comes back to the courtroom deputy,
24 would you agree that that would then

12 (Pages 42 - 45)

Page 46

1  probably cause an issue with processing
2  that paperwork effectively and accurately?
3      A.  Yes.
4      Q.  And that would require
5  additional time to be invested to
6  determine what the courtroom deputy meant
7  and ultimately what the judge meant to
8  happen in this case?
9      A.  Yes.
10     Q.  If the amount of bad information
11 that is coming from the courtroom deputy
12 was thirty percent, do you consider that
13 substantial?
14     MR. MORRISSEY:  Objection to
15 form.  You can answer.
16     A.  Yes.
17     Q.  So any number higher than thirty
18 would also be substantial, correct?
19     A.  Correct.
20     Q.  And that would ultimately affect
21 how easy or feasible it would be to
22 process someone's paperwork?
23     A.  Yes.
24     Q.  I would like to ask you some

Page 47

1  questions about the LEADS check that is
2  done.
3      A.  Yes.
4      Q.  Is there LEADS in New York as
5  well?
6      A.  No.
7      Q.  What is the equivalent in New
8  York?
9      A.  NYSPIN, N-Y-S-P-I-N.
10     Q.  But you are aware of what the
11 LEADS check is in Illinois?
12     A.  Yes, I believe that's for
13 outstanding warrants in a case in the
14 state of Illinois.
15     Q.  And also any holds that might be
16 on a person?
17     A.  Yes.
18     Q.  Are you familiar with NCIS or
19 NCIA?
20     A.  No.
21     Q.  It's a national database that's
22 consulted.
23     A.  That is something that I'm not
24 aware of but was in progress when I left

Page 48

1  the department.
2      Q.  You state in your report that a
3  LEADS check takes milliseconds.  Do you
4  remember is that part of the record?
5      A.  Yes.
6      Q.  Do you remember the context of
7  that statement?
8      A.  I believe if I recollect it was
9  from Erica Queen's deposition, but I'm not
10 certain.  It was from a deposition.
11     Q.  What I was asking was if you
12 remember the context that that was being
13 stated?
14     A.  I believe the question was asked
15 how long does it take to do a LEADS check
16 and the answer came back that it was
17 milliseconds.
18     Q.  If you remember would the
19 context be more likely that it was to
20 actually get a response rather than to
21 actually review and determine if a person
22 has any additional holds taking
23 milliseconds?
24     A.  I don't have a specific answer

Page 49

1  to that question how long.
2      Q.  Have you ever seen a LEADS
3  report out of Illinois?
4      A.  No, not to my recollection.
5      Q.  So you are not aware of what the
6  contents of a LEADS report are other than
7  warrants or holds?
8      A.  Warrants or holds, yes.
9      Q.  Going back to what you were
10 talking about in New York how they would
11 check for other cases that a person may
12 have, would they also run an NYSPIN check?
13     A.  NYSPIN is done when a person is
14 first admitted to the department of
15 correction.  That's a history of arrests,
16 it's a rap sheet.  So before you discharge
17 a person, it would not be necessary to
18 check that because you have all the cases
19 once that is done.
20     Q.  What would be done in New York
21 to check if someone had a warrant that was
22 just issued for them or there was a hold
23 out in another jurisdiction?  How would
24 you check that?

13 (Pages 46 - 49)

Page 50

1    A.   To my knowledge, the computer
2 system that operates the New York City
3 Department of Correction would be checked
4 and that would be part of what was checked
5 prior to the inmate going to court.
6    Q.   In order to run -- would you
7 agree that running that report is
8 important to know if there is some other
9 reason that a person is being held other
10 than some other pending case?
11    A.   Yes.
12    Q.   So for those 1,000 people going
13 to court in Cook County you would have to
14 run a LEADS check in order to determine if
15 there were any warrants and holds,
16 correct?
17    A.   You would only have to run a
18 LEADS check on the people who only had
19 that one particular court case. Each
20 check would not be done on 1,000 people
21 going to court. If a person has more than
22 one case, there is no reason to do a LEADS
23 check because he has a subsequent court
24 appearance scheduled and there is a

Page 51

1 legitimate hold on that person because he
2 has another court case. If he only has
3 the one court case, and he is appearing in
4 court today, that would be the person that
5 I would target to run a LEADS check.
6    Q.   They wouldn't check in case
7 there was other case in another
8 jurisdiction or other warrants in other
9 jurisdictions?
10    A.   If a person only has the one
11 case that he is going to court on on that
12 particular day and if in fact he was going
13 to get a sentence for time served or to be
14 cut loose from court, that's the person
15 that I would want to do a LEADS check on.
16 Not anyone who has additional cases.
17 Because people who have additional cases
18 in addition to the court appearance on
19 that particular day, they have to come
20 back because they have another court
21 appearance.
22    Q.   So they would run a LEADS check
23 for a warrant check on people being
24 discharged from court that day?

Page 52

1    MR. MORRISSEY: You are
2 mischaracterizing her testimony.
3    A.   I am simply saying people who
4 have only one case and they are appearing
5 in court on that one case, those are the
6 people that would be checked to see if
7 they have any other holds and those are
8 the people who would be designated as
9 possible discharges. But only those
10 people. If they have other cases, no one
11 looks at them. Once I look at their
12 paperwork and they have another case,
13 they're just pushed to the side and they
14 go to court because I know I have a
15 legitimate hold on that person.
16    Q.   So the review of documents prior
17 to the person going to court would be
18 limited to see if they had another case?
19    A.   Correct.
20    Q.   What would be the way that you
21 check in New York if a person had warrants
22 or holds; where would that come up; what
23 type of database?
24    A.   If a person has a warrant or a

Page 53

1 hold actually served on the department of
2 correction, so the warrant or hold should
3 be in the computer system.
4    Q.   What is the name of the computer
5 system?
6    A.   Just an internal computer
7 system. To my knowledge there is no name
8 for the inmates' records computer system.
9    Q.   When you say served, do you mean
10 let's say there's a hold out of
11 Philadelphia, they have to serve that hold
12 or warrant on the department of
13 correction?
14    A.   Yes.
15    Q.   Would they do that via personal
16 service or do they input into the database
17 that you are referring to?
18    A.   They could not input it into the
19 department of correction, but if they
20 needed to serve it because they found out
21 that they have that person in custody,
22 they could email it to the department of
23 correction. Because once it is served on
24 the department, the department has a legal

14 (Pages 50 - 53)

1 responsibility to produce that person. I
2 have served those in my time in the
3 correction department before we had
4 computers. What it would take to review a
5 folder to see if someone had in fact filed
6 a warrant without registering it with the
7 paperwork.
8    Q.   So it is incumbent out of the
9 jurisdiction to see if you can enforce the
10 warrant to serve? It's not just an input
11 in the system where you would have to go
12 and check?
13    A.   To my knowledge when I left the
14 department, no, they had to serve it.
15    Q.   Are you aware of who maintains
16 the LEADS in Illinois?
17    A.   No.
18    Q.   Are you aware if LEADS provide
19 to real time updates for warrants or holds
20 placed in the computer system?
21    A.   No.
22    Q.   If I would represent to you that
23 without a real time update, the agency
24 seeking to determine if there is a warrant

1 or hold actually has to run that person
2 again, would that make it again more
3 difficult for the correction facility to
4 know if that person is entitled to
5 release?
6    A.   I don't understand the question.
7    Q.   In your case you said the body
8 seeking to enforce serve on the department
9 of correction in New York?
10    A.   Yes.
11    Q.   In Illinois what I am saying is
12 there is not a ping, if you will, when the
13 jurisdiction puts a warrant out on
14 somebody. The agency holding the person
15 would have to go and manually run that
16 person's name and the social security
17 number to know if there were any holds.
18 Would that add to the difficulty or
19 feasibility of running their background?
20    A.   What I understand you to say is
21 that doing a LEADS check on someone the
22 night before is not up to date and needs
23 to be done again whether that is at the
24 court facility or if that person comes

1 back to Cook County. In order to be
2 accurate because from what you're saying
3 once someone puts the warrant into the
4 LEADS system then Cook County has an
5 obligation to hold that person.
6 Therefore, they are responsible to ensure
7 that it's updated periodically. At the
8 moment of discharge they can verify that
9 the LEADS system is clean, they have no
10 holds, then, yes, I agree that they have
11 to do that at the moment of discharge.
12    Q.   Yes, that's what I was asking.
13 You agree that warrants or holds can
14 appear at any time and there is no set
15 schedule for which a jurisdiction has to
16 submit to LEADS database or notify that
17 there is an issue or a warrant or hold?
18    A.   I agree that they have to serve
19 the warrant while the jurisdiction has the
20 person in custody. If the jurisdiction
21 loses the person and the warrant is
22 subsequently served -- which I've had
23 experienced -- the jurisdiction is no
24 longer responsible because they have

1 followed the law and released the person
2 in accordance with the document at that
3 time.
4    Q.   What I was really asking you is,
5 a jurisdiction can get a grand jury or a
6 warrant issued by a judge in anther
7 jurisdiction at any given time?
8    A.   Yes.
9    Q.   Therefore, until that LEADS that
10 no other jurisdiction would know about?
11    A.   Yes.
12    Q.   I think you will agree with me
13 that a sheriff has the responsibility to
14 release people in a timely manner, but
15 also to make sure he doesn't release the
16 wrong person?
17    A.   Yes, I agree.
18    Q.   That would include insuring that
19 no warrants or holds have been lodged
20 against that person prior to their being
21 discharged?
22    A.   Yes.
23    Q.   Is it fair to say that obviously
24 if someone goes to court and the day of

15 (Pages 54 - 57)

Page 58

1 court they have a clean record for other
2 cases and they have a warrant issued the
3 next day, that person would not then be
4 entitled to release, correct?
5    A.   Correct.
6    Q.   If the system did not in fact
7 notify the county, the only way to find
8 that out would be to run that person's
9 name again?
10   A.   Yes.
11   Q.   In your report on page 4 you
12 state that the best practice would be to
13 do these LEADS the day before. Please
14 take a quick look at that.
15   A.   (Witness complies).  Yes.
16   Q.   Is that again based on
17 experience or is there a standard
18 guideline that you are referring to?
19   A.   It is based on my experience.
20   Q.   In this case with Mr. Shultz,
21 you have no reason to believe there was an
22 intentional delay in releasing him from
23 Cook County Jail, do you?
24   A.   No.

Page 59

1    Q.   How long has New York been doing
2 the prescreening for detainees?
3    A.   They were doing it approximately
4 two or three years before I left, so I'll
5 say 1998, '99.
6    Q.   In your case you said earlier
7 that the department of correction has to
8 be served with a warrant with a hold and
9 that's how they would know about it?
10   A.   Yes.
11   Q.   So would they review literally
12 every single person who would be going to
13 court that day their paperwork to see if
14 they had another case they were looking
15 at?
16       MR. MORRISSEY: Objection.
17   A.   Only the people who had one
18 case.
19   Q.   So they would still have to
20 check to make sure that the person had
21 just one case before they went the extra
22 step to review the paperwork or they just
23 literally checked if there was one case
24 and if that was the case they're done?

Page 60

1    A.   When you say check, you mean
2 check the computer?
3    Q.   Yes.
4    A.   Yes.
5    Q.   They wouldn't review prior
6 mittimuses that were retrieved by the
7 court, they would just check the computer
8 for any other pending cases?
9    A.   What you call mittimus, we call
10 commitments.  Any active commitments
11 require additional review attached to the
12 paperwork.  It would be right there, so
13 they would see that.
14       Also, had the warrant been
15 served, that should be attached.  And in
16 fact with a warrant in New York City, the
17 person has to be produced in court the
18 next day to turn that into a commitment.
19 So it would be attached to the paperwork.
20       The review of the computer
21 records would be done again at the court
22 facility prior to the discharge.  As you
23 have pointed out that something could
24 happen at any time, so in addition to the

Page 61

1 records being reviewed at the housing
2 facility the night before prior to the
3 supervisor of the court facility
4 discharging somebody, they would check the
5 computer to see that there was nothing
6 else.
7    Q.   Would the review prior to court
8 also consist of reviewing those commitment
9 papers?
10   A.   Yes, and then the only
11 commitment papers that would be attached
12 would be the active ones.  So a person
13 with more than one commitment would be put
14 into -- send them to court and bring them
15 back.  A person with only one commitment
16 would be a possible discharge.
17   Q.   To the extent that you know, how
18 many people would there be then being
19 reviewed on a daily basis going to court
20 that fit the criteria you just stated?
21   A.   I could not tell you.  Each
22 facility is different.  Depending on the
23 classification of the inmate.  In minimum
24 security facilities there would be a good

16 (Pages 58 - 61)

Page 62

1  number and in maximum facilities very few.
2      Q.   After a detainee let's say gets
3  a court ordered discharge and they walk,
4  where are they actually held when the
5  judge says time considered served or not
6  guilty?
7      A.   They are brought from the
8  courtroom back to the holding pens behind
9  the courtroom and the supervisor is
10 notified.  In some cases the person is
11 just let go out of the courtroom.
12     Q.   Is that person who is considered
13 time considered served or not guilty
14 separated from the other detainees who are
15 in the holding pen that still have court
16 that day or still have appearances to be
17 made in the courtroom?
18     A.   If they are brought back in the
19 holding pens behind the courtroom, they
20 would be placed in the pen perhaps with
21 other inmates, perhaps by themselves
22 depending on what space is available.  But
23 they would be processed for release.  The
24 supervisor would be notified and they

Page 63

1  could walk back out through the courtroom.
2      Q.   Did you ever have any issues
3  with a detainee who was found not guilty
4  for example having an altercation with a
5  victim and they exited the courtroom and
6  they were met by the victim's family on
7  the outside?
8      A.   Not that I am aware of.
9      Q.   So to go back to make sure that
10 I understood.  After a person -- let's say
11 the third person on the court call that
12 day and the judge says, time served, that
13 person would then be brought back in the
14 holding cell behind the courtroom where he
15 would remain with the other detainees who
16 still have to appear that day?
17     A.   That could happen but more
18 likely he would just walk out of the
19 courtroom because the clerk in the
20 courtroom would have the documents from
21 the department of correction saying that
22 this person's case is adjudicated and this
23 person is free to go.
24     Q.   What would they do with the

Page 64

1  person's personal property that was in
2  their cell?
3      A.   The officer in the housing area
4  where the inmate was housed would
5  eventually be notified once the court
6  notifies the housing facility of the CNR,
7  Court No Return.  The officer would pack
8  up the belongings, make an inventory of
9  what is there.  And the property would be
10 stored in the clothes box for
11 approximately thirty days if the inmate
12 wants to come back and get it.  His
13 valuable property, his wallet, ID, his
14 money would be at the facility.
15         He would be given car fare at
16 the court facility.  He could choose to go
17 back to Rikers that day or subsequently.
18 The inmates are given receipts for their
19 property.  On the back of the receipt it
20 states how long the department will hold
21 the property.
22     Q.   So let's say someone is not
23 walking out the door and they're being
24 held in the back while other matters get

Page 65

1  taken care of.  I think you said earlier
2  that that person could be housed with the
3  other detainees who still have court dates
4  or if space permitted they perhaps could
5  be held in a separate cell?
6      A.   Yes.
7      Q.   You also stated that the process
8  in New York -- your language in your
9  report said that the process consumes
10 resources.  Do you know that part of your
11 report?
12     A.   Yes.
13     Q.   Can you explain by what you mean
14 consumes resources?
15     A.   It's another step that the
16 officers or the civilians in the general
17 office have to do.  As you mentioned they
18 do have to separate the ones who are
19 possible discharges.  They have to fill
20 out a form and attach that to the
21 paperwork certifying that there are no
22 other holds.
23     Q.   Is there any additional staff
24 that's required to implement this program,

17 (Pages 62 - 65)

Page 66

1 or are you saying that there are
2 additional responsibilities put on the
3 already assigned staff?
4    A.   Additional responsibilities put
5 on the already assigned staff.
6    Q.   In the event that this would be
7 implemented for the prescreening to take
8 place, again you couldn't provide any
9 testimony as to how much salary or
10 overtime or benefits would have to be
11 provided or required by the additional
12 resources?
13    A.   That is correct.
14    Q.   In your report you also stated
15 that this procedure reduces liability --
16 this is again on page 4 -- was there any
17 lawsuits that were filed that spurred this
18 change of procedure or what do you mean by
19 reduces liability?
20    A.   Not to my knowledge, but that
21 may have been why the commissioner of
22 corrections looked to implement this
23 because of the potential. Or we may have
24 been sued perhaps by an inmate involved in

Page 67

1 a car accident on the way back to Rikers
2 Island or for some other incident that
3 occurred.
4    Q.   Now I'll move on to your second
5 opinion that you rendered in this case.
6 And that's, "That Cook County Correction
7 has space to hold inmates who are possible
8 discharges outside of living units while
9 their status is verified." What is your
10 basis for that opinion?
11    A.   On my walk through of the Cook
12 County facilities I was made aware of
13 various holding pens prior to when the
14 inmate would travel from being received
15 back into Cook County until he got to his
16 living unit. That there were holding pens
17 available in Division 5 and in the
18 dormitory, I believe the first floor of
19 the dormitory where he lived.
20    Q.   Are there any known or accepted
21 correctional standards that dictate or
22 recommend that detainees who are possible
23 discharges should be segregated from the
24 inmates who still have pending cases?

Page 68

1    A.   Not to my knowledge.
2    Q.   You are aware of the
3 classification procedure that's in place
4 at a correction facility?
5    A.   Yes.
6    Q.   Would you agree with me that
7 classification is important?
8    A.   Yes.
9    Q.   And classification not only
10 would be considered in a current charge
11 but also prior criminal history as well as
12 any disciplinary history the detainee
13 might have earned while in the
14 correctional facility, right?
15    A.   Yes.
16    Q.   And any other factors such as
17 escape risk would contribute to how a
18 person was classified?
19    A.   Yes.
20    Q.   If the classification was not
21 specifically adhered to, that could lead
22 to a potentially more problematic
23 situations if you mix with people you
24 shouldn't be mixing with, right?

Page 69

1    A.   Yes.
2    Q.   And in many cases you would
3 agree that it is more personality and
4 personal differences that end up leading
5 to issues between detainees and the
6 facility?
7       MR. MORRISSEY: Objection to the
8    form of the question. You can answer.
9    A.   That it's personality problems?
10    Q.   All I'm saying is that
11 individuals that get in fights with other
12 individuals, a lot of the time it has to
13 do with they just don't like each other,
14 they have issues that go beyond the fact
15 that they are both detainees?
16    A.   I believe beyond the fact that
17 they are both in jail and that they don't
18 like each other, yes.
19    Q.   Were you provided with any
20 materials on a pilot program that was
21 implemented in Cook County for detainees
22 going to court in the outlining suburban
23 court houses?
24    A.   Not to my knowledge.

18 (Pages 66 - 69)

Page 70

1    Q.   If there was a program in place
2  that was implemented that provided for the
3  sheriff or civilian acting for the sheriff
4  to call the records department and advise
5  them that someone is a possible discharge
6  in a suburban courthouse to get the
7  process going and if that person meets the
8  criteria of having a ride available from
9  the courthouse and having a change of
10  clothes so that they could be discharged
11  from the courthouse, would you agree with
12  me that that would be a good step in
13  trying to speed up or improve the
14  discharge procedure?
15    A.   Yes.
16    Q.   Are you aware of any standards
17  or requirements that a court documentation
18  be transmitted electronically to the
19  records division rather than the body
20  being brought back to the court and the
21  jail?
22    A.   No.
23    Q.   Based on your review of the
24  documents in this case, are you aware of

Page 71

1  any particular problem that Shultz had
2  with anybody on his living unit?
3    A.   No.
4    Q.   In fact he was there for
5  twenty-plus days without incident. Do you
6  recall that from his deposition?
7    A.   I didn't read Mr. Shultz's
8  deposition.
9    Q.   I stand corrected. Are you
10  familiar with how the dorm to security
11  works, correct?
12    A.   Yes.
13    Q.   That there is an officer who is
14  assigned to that living unit, correct?
15    A.   Yes.
16    Q.   Would you agree with me that the
17  officer who was there on a daily basis
18  would have a better understanding of what
19  is going on the living unit with
20  regards to any issues or problems that may
21  be brewing or occurring between detainees?
22    A.   You are assuming that there is
23  an officer assigned every day to that
24  unit?

Page 72

1    Q.   Yes.
2    A.   Yes.
3    Q.   And that officer who is assigned
4  there would also have a better
5  understanding of any type of issues that
6  may come up that would require
7  intervention by staff or separate housing,
8  correct?
9    A.   Yes.
10    Q.   When you state in your report
11  that based on your experience it's good
12  correctional practice to segregate
13  possible releases from those remanded to a
14  correctional facility -- I'm on page 5.
15    A.   Yes.
16    Q.   And again, that's based on your
17  experience? There are no credences or
18  standards that you are relying on to reach
19  that conclusion, correct?
20    A.   Yes.
21    Q.   Are you aware of any other
22  jurisdictions that actually do separate
23  those being discharged from those not
24  being discharged?

Page 73

1    A.   No.
2    Q.   If a detainee was on a living
3  unit where he had the same officer every
4  day and for several months at a time,
5  would you believe that that detainee would
6  be more likely to confide in that officer
7  if there was a problem, or would they be
8  more likely to disclose in an officer if
9  they needed assistance or some type of
10  relief from something going on the
11  tier?
12    A.   Not necessarily. Simply because
13  an inmate in a particular housing area and
14  steady officers, I don't believe that that
15  in and of itself would create some type of
16  a bond if you will with the officer. You
17  would hope so. It would certainly be to
18  our advantage administratively if that
19  happened, but it doesn't.
20    Q.   In this case you are not aware
21  of any difficulties that Mr. Shultz was
22  having with any of the officers who were
23  assigned to his living unit were you?
24    A.   No.

19 (Pages 70 - 73)

Page 74

1    Q.    When you say good correctional
2 practice, besides your own opinion, is
3 there anything more to that you can
4 explain?
5    A.    That it's in some cases
6 reflected in the American Correctional
7 Association standards that its practices
8 that I was taught at different conferences
9 that were discussed.  That it's something
10 administratively that I saw in action that
11 worked well in situations.
12    Q.    You testified earlier that you
13 didn't cite any American Correctional
14 Associates standards in reaching these
15 conclusions, correct?
16    A.    Yes.
17    Q.    You also stated that detainees
18 who are not segregated are at an increase
19 risk of harm.  Do you remember that from
20 your report?
21    A.    Yes.
22    Q.    What is the basis for that?
23    A.    Based on my experience.
24    Q.    Do you have any evidence that

Page 75

1 Mr. Shultz was at an increased risk of
2 harm when he was brought back to the
3 living unit?
4    A.    Other than the fact that he was
5 a discharge and as such I know from my
6 experience that other inmates know that
7 and because of that in some cases he could
8 have a target on his back as a person who
9 can gain a reputation by beating him up.
10 Or as I said in my report he owes someone
11 commissary and as a result that he cannot
12 pay it back because he wont be there.
13 Those are the types of issues that I've
14 observed in doing an investigation of
15 various incidents in jail that we guard
16 against.  One of the reasons why we went
17 to releasing people as quickly as
18 possible.
19    Q.    Are there any studies or other
20 reports that you used to reach this
21 conclusion or is it solely based on your
22 experience?
23    A.    Solely on my experience.
24    Q.    Mr. Shultz testified that he was

Page 76

1 still wearing his department of
2 corrections uniform.  Would you agree that
3 that would not indicate overtly that he
4 was to be discharged?
5    MR. MORRISSEY:  Are you talking
6 about when he gets back to his living
7 unit?
8    MR. ZECCHIN:  Yes.
9    A.    The fact that he was wearing his
10 uniform when he was placed back in his
11 housing unit, so everyone in the housing
12 unit was wearing uniforms.
13    Q.    In other words, Mr. Shultz would
14 not have stood out because of what he was
15 wearing to indicate that he was going
16 home.  If he was wearing civilian clothes
17 then they would know he was going home.
18 So my question is, if he was wearing his
19 DOC uniform that everyone else was
20 wearing, that would not overtly indicate
21 to anyone that he was being discharged?
22    A.    Correct.
23    Q.    If Mr. Shultz didn't tell anyone
24 that he was being discharge that would

Page 77

1 also mitigate against Claimant being a
2 target?
3    A.    If in fact no one else knew that
4 he was being discharged and he didn't tell
5 anyone.  In my experience inmates talk and
6 they hear what is going on in the
7 courtroom.  I would not take the fact that
8 he was wearing a uniform and he says he
9 didn't tell anyone as proof.
10    Q.    Do you have anything that you
11 reviewed that indicates there was some
12 type of target on him?
13    A.    No, no target.  I am aware of
14 the phone call he made in which he told
15 his grandmother that he was being
16 discharged.  The phones in the dormitory
17 are pretty open and certainly could have
18 been overheard.
19    Q.    So it really wouldn't have
20 mattered what he told his grandmother at
21 that point?
22    A.    Yes.
23    Q.    In this case you have no
24 evidence that Mr. Shultz owed any money

20 (Pages 74 - 77)

Page 78

1  for gambling debts; is that accurate?
2      A.  That is accurate.
3      Q.  If Mr. Shultz didn't expect to
4  be attacked it would also make it more
5  difficult to say that he was a target?
6          MR. MORRISSEY:  Objection to
7  form.
8      A.  Yes.
9      Q.  So was it accurate what you are
10 saying that the possibility of harm if he
11 did owe somebody money or somebody
12 randomly decided to beat him up because of
13 his discharge status?
14     A.  Can you repeat that?
15     Q.  Sure.  Are you saying that the
16 increase risk of harm that's a possibility
17 of beaten up if you owed somebody money or
18 if someone randomly decided to beat him up
19 to increase their status in the jail?
20     A.  Yes.
21     Q.  Then again, there was no
22 evidence that you came across in your
23 review that supports any of those views?
24     A.  Yes, that's correct.

Page 79

1      Q.  When you are talking about
2  holding cells that are used to house
3  detainees who are going or returning from
4  court, can you explain to me what you mean
5  by those holding cells in your report?
6      A.  In my report I referred to the
7  holding cells in the Division 5.  I was
8  also referring to the holding cells -- I
9  believe it's Division 1.  There was a room
10 that I reviewed that had a body scan
11 machine in it and some computers.  There
12 was an expanded metal holding cell in the
13 back of that room.  There were also a lot
14 of plastic benches.  I was told inmates
15 who were going to be staged to go to court
16 or staged to return to the housing areas
17 were placed.
18     Q.  With regards to the cells in
19 Division 5 --
20     A.  Yes.
21     Q.  Do you have any idea what their
22 status was on May 8, 2013 when Mr. Shultz
23 came back from court?
24     A.  No.

Page 80

1      Q.  So it's possible there were no
2  available cells to keep him in at that
3  time?
4      A.  It was possible.
5      Q.  Are you aware of how many
6  detainees were returning to Division 2
7  where Mr. Shultz was housed on that day?
8      A.  No.
9      Q.  I take it you weren't aware of
10 how many other people returned from the
11 Bridgeview Courthouse that day either?
12     A.  No.
13     Q.  The cell that you are referring
14 to in Dorm 1, I believe in Division 2, do
15 you recall if there was a bathroom there?
16     A.  No, there was not to my
17 knowledge.
18     Q.  So if anyone would have to use
19 the bathroom they would have to be removed
20 from this cell to a facility so that they
21 can use the bathroom?
22     A.  Yes.
23     Q.  You also referred in your report
24 to two officers working at a computer

Page 81

1  while you were there.  Do you remember
2  that?
3      A.  Yes.
4      Q.  Do you know what their
5  responsibilities were in that room?
6      A.  No.
7      Q.  Do you know when they were
8  assigned to that room or when they were
9  not assigned to that room?
10     A.  No.
11     Q.  If they were to use that holding
12 cell in that room they would have to have
13 security officers who could observe what
14 was going on in that cell, correct?
15     A.  Yes.
16     Q.  If there were several people in
17 that cell that would require more than one
18 officer to be observing what was going on
19 in that cell, correct?
20     A.  Not to my knowledge.
21     Q.  Would there be any concern for a
22 person to be in the holding cell with
23 someone that he wouldn't get along with
24 regardless of his discharge status?

21 (Pages 78 - 81)



Page 82

1    A.    It would be similar to being put
2  back in his housing area with three other
3  inmates. I don't understand the question.
4    Q.    What I'm saying is, if he was
5  put back in the cell that you were
6  referring to Division 2, Dorm 1 and if he
7  had been in there with someone that he
8  didn't get along with, he would be just as
9  much in harms way as if he was housed
10  anywhere else?
11    A.    In my experience putting two
12  people who were scheduled for discharge in
13  a cell and expect that there might be
14  problems because they don't get along with
15  each other is they both want to get home.
16  I don't see having more than one officer
17  observing what is going on in the cell
18  would have any advantage just having
19  inmates in the cell and having one officer
20  in the line of sight would be sufficient
21  in my opinion.
22    Q.    If those two officers you saw
23  weren't assigned to the room, you would
24  still need at least one officer assigned

Page 83

1  to watch for direct supervision, correct?
2    A.    That is correct.
3    Q.    If Mr. Shultz was held in that
4  cell you were referring to, he would still
5  have to have someone to get his property,
6  correct?
7    A.    Yes -- out of his cell?
8    Q.    Yes.
9    A.    Out of his bed upstairs, yes, if
10  he wanted to, yes.
11    Q.    In this case the sheriff is
12  being sued in an individual capacity.
13  Based in your report would you agree that
14  the sheriff is entitled to delegate
15  certain responsibilities to staff in order
16  to run the jail?
17    A.    Yes.
18    Q.    When you were a deputy chief of
19  the entire department would you delegate
20  responsibilities to your underlings?
21    A.    Yes.
22    Q.    Who is the head of the New York
23  Department of Correction?
24    A.    The commissioner.

Page 84

1    Q.    Is the commissioner an appointed
2  spot or is it elected?
3    A.    Appointed by the mayor.
4    Q.    In New York is there a county
5  that New York is in as well?
6    A.    There are boroughs.
7    Q.    They don't have counties in New
8  York?
9    A.    They do have counties, yes. You
10  have Nassau County and Suffolk County.
11  There are counties. I believe New York
12  City is a county and then all five
13  boroughs.
14    Q.    Is there a county sheriff or is
15  the commissioner the head of the entire
16  department of correction?
17    A.    The commissioner is the head of
18  the department of correction and then you
19  have the police commissioner and the fire
20  commissioner.
21    Q.    Each have different
22  responsibilities, one law enforcement and
23  one corrections?
24    A.    Yes.

Page 85

1    Q.    Are you aware that discharges
2  take place at Cook County Jail twenty-four
3  hours a day seven days a week and that
4  there is no off time for detainees to be
5  discharged?
6    A.    Yes.
7    Q.    Are you familiar with the agreed
8  order between the United States and the
9  County of Cook and Sheriff Dart?
10    A.    No.
11    Q.    You also stated that the
12  discharge procedure should be continually
13  reviewed by senior management. Do you
14  remember that from your report?
15    A.    Yes.
16    Q.    So is it fair to say that that
17  is a responsibility that can be properly
18  delegated to senior management to make
19  sure the procedures are up and running and
20  that if changes need to be made that
21  senior management can make those changes
22  so not necessary to go all the way to the
23  sheriff?
24    A.    To make the changes or to

22 (Pages 82 - 85)

Page 86

1  review?
2  Q.  To review.
3  A.  I think the sheriff would be the
4  one to set the policy and would then
5  delegate it to someone to do.  And make
6  sure that they monitor and that it
7  conforms to the policy he has set.
8  Q.  You will agree that delegating
9  that responsibility to subordinates of the
10 sheriff would be an appropriate delegation
11 of authority?
12 A.  Yes.
13 Q.  Your opinion number 3, "That on
14 the evening of May 8, 2013 the CCDOC staff
15 assigned to supervise Dorm W in Division 2
16 were not diligent in their duties and as a
17 result Edward Shultz was severely beaten
18 and medical treatment was delayed."  Did I
19 state your third opinion correctly?
20 A.  Yes.
21 Q.  What is the basis of this
22 opinion?
23 A.  Mr. Shultz was assaulted.  He
24 made a telephone call to his grandmother

Page 87

1  and after he hung up the phone,
2  approximately ten minutes later the
3  officer who was supervising the dormitory
4  claimed in his report that Shultz came out
5  of the bathroom and that was the first
6  time he had seen him in that state.  Yet
7  the living-area log indicated that the
8  officer made a tour of the inspection of
9  the dormitory.  Tour of inspection in my
10 experience means that the officer walked
11 around the dormitory.
12     According to the log he made a
13 tour of inspection around 8:30 and then
14 again at 9:00.  But at 8:30 or when
15 Mr. Shultz would have been shortly after
16 that on the telephone with his grandmother
17 explaining he was just beaten up and the
18 officer apparently didn't see him.  I find
19 that to be less than diligent to the
20 extent that he was badly beaten within a
21 few feet of the dormitory.
22 Q.  With regard to where he was
23 actually beaten, was it in the bathroom to
24 your knowledge?

Page 88

1  A.  To my knowledge it was in the
2  bathroom.
3  Q.  And you went to the location of
4  Division W Dormitory 2?
5  A.  Yes.
6  Q.  And the bathroom is not visible
7  from the doorway or rather you need to go
8  into the bathroom to see what is going on
9  in the bathroom, correct?
10 A.  Yes.
11 Q.  With the exception of the
12 recorded call placed by Mr. Shultz which
13 is recorded and we have an actual time,
14 would you agree that the times listed
15 could be an estimation made by the
16 officer?
17 A.  No.
18 Q.  So you believe that those are
19 all precise times?
20 A.  They are supposed to be exact.
21 Q.  What are you basing that opinion
22 on?
23 A.  That's correctional practice.
24 When you write a time it should be the

Page 89

1  correct time.  The officer writes that he
2  performs the tour of detention at 8:30.  I
3  expect that either he did it before or
4  after, but at that point in time he was
5  conducting a tour of inspection.
6  Q.  There's no clock or if his watch
7  is off than his time is off?
8  A.  They certainly would.
9  Q.  And if he were to report about
10 the incident, not his times for tour of
11 duty, but rather the incident those would
12 be generated after the incident, after the
13 initial investigation, would you expect
14 that there may be some errors in judgment
15 or mistakes rather than intentional?
16 A.  I don't understand the question.
17 Q.  If he wrote the report about the
18 incident with Mr. Shultz, not regarding
19 his times he did the tours, he wrote the
20 report afterwards, after the incident
21 occurred, after the initial investigation
22 has taken place on the dorm and later that
23 same day, if there were times that were
24 not the same would you say that it could

23 (Pages 86 - 89)

Page 90

1  be an inadvertent mistake rather than an
2  deliberate effort to change times?
3      MR. MORRISSEY: Objection to
4  form.
5      A.  I don't think it was a
6  deliberate effort to change times.  I
7  think the officer wrote the documents in
8  accordance with the time that he believes
9  these things occurred.  That was my
10  experience with corrections officers.
11  That was my experience as a corrections
12  officer.
13      When something happened that's
14  the time that it was reported.  He may not
15  have written the incident report until
16  after a half hour later.  He put down 8:45
17  that he observed Mr. Shultz come out of
18  the bathroom.  I take that as 8:45 is when
19  that happened.
20      Q.  You believe that he honestly
21  believed that he saw Mr. Shultz at 8:45?
22      A.  Yes.
23      Q.  In your report you referenced
24  that Mr. Shultz used the phones that were

Page 91

1  just inside the doorway to Division 2 Dorm
2  2 W house and that if Officer Dominguez
3  had been in the dorm he would have seen
4  Mr. Shultz in that condition?
5      A.  Yes.
6      Q.  Prior to that you also
7  referenced him mark in his logbook his
8  tours of duty.  Do you remember that?
9      A.  Yes, just to clarify, it's not a
10  logbook, it's just a sheet of paper.
11      Q.  Living log?
12      A.  Yes.
13      Q.  You also reference the
14  electronic watch tour system, right?
15      A.  Yes.
16      Q.  You have no idea if that watch
17  was in fact operational, do you?
18      A.  No.
19      Q.  Do you know how Officer
20  Dominguez conducted his rounds in that
21  living unit?
22      A.  No.
23      Q.  Is it fair to say that not only
24  was he responsible for watching Mr. Shultz

Page 92

1  but also the forty other detainees in that
2  room with Mr. Shultz?
3      A.  Yes.
4      Q.  In your experience with the
5  department of correction, have you had
6  occasion to encounter detainees or inmates
7  that would deliberately try to distract or
8  occupy officers while other detainees or
9  prisoners perform nefarious acts?
10      A.  Yes, I am aware of that.
11      Q.  Such as asking more questions
12  than is necessarily normal or maybe they
13  need help with something in order to let
14  someone else get away with something?
15      A.  Yes.
16      Q.  There is no testimony that you
17  reviewed that indicates that Mr. Shultz
18  was assaulted or battered at any time
19  outside of that bathroom, correct?
20      A.  Correct.
21      Q.  There is nothing to indicate
22  whether Dominguez should have noticed
23  anything else outside the bathroom,
24  correct?

Page 93

1      A.  I don't think so he shouldn't
2  have noticed anything else?
3      Q.  You referenced in your report
4  that Officer Dominguez should have noticed
5  something, anything that occurred outside
6  the bathroom.  What I'm saying is that
7  there as nothing that you reviewed that
8  would indicate that anything was going on
9  outside the bathroom that should have
10  alerted Officer Dominguez about anything
11  inside the bathroom.  Is that accurate for
12  you to say?
13      A.  There was nothing happening
14  outside the bathroom that should have
15  alerted him to what was going on inside
16  the bathroom.
17      I'm simply saying that as an
18  officer conducting direct supervision in
19  the housing area the size of that, if
20  there was a disturbance inside the
21  bathroom I would expect him to be aware of
22  it.
23      Q.  For what reason?
24      A.  For the noise.  For the

24 (Pages 90 - 93)

Page 94

1  distraction.  That is what I expect
2  officers who are in fact performing direct
3  supervision to be aware of what's going on
4  the housing unit.
5      Q.   When you say direct supervision,
6  are you referring to the ability to
7  observe the tier or the ability to observe
8  every single component of the tier at the
9  same time?
10      As you know, if you are in the
11  bathroom, you would not be able to see the
12  rest of the tier.  Do you recall that from
13  your report?
14      MR. MORRISSEY:  Objection to
15  form.
16      A.   Certain parts of the bathroom
17  you can see.  The officers are responsible
18  for what's happening in the bathroom.
19      Q.   What I'm saying is that I had
20  asked about and you said should have
21  noticed anything going on, I'm saying --
22      A.   I would have expected the
23  officer would be aware of what's going on
24  in the dormitory while he is standing in

Page 95

1  the dormitory performing direct
2  supervision.  So, yes, while the bathroom
3  itself is visually in its entirety not
4  visible to the officer standing at the
5  door, it is not that far away from him.
6      So in my experience officers are
7  aware of what is going on.  If they
8  encounter or hear strange noises that they
9  will inspect that and follow up to see
10  what is going on.
11      The bathroom is very close to
12  the door.  The officers walking around
13  should be aware of where the inmates are.
14  It's part of their duties and
15  responsibilities.
16      Q.   Did you review anything in the
17  preparation of your reports that indicated
18  there were noises or any commotions going
19  on that would have alerted Officer
20  Dominguez?
21      A.   The fact that Mr. Shultz was
22  being beaten up, yeah, I think that would
23  be a little noisy.
24      Q.   But is there anything that you

Page 96

1  read, any testimony in the transcripts
2  that indicated that that was in fact the
3  case here?
4      A.   No.
5      Q.   Based on your tour, if Officer
6  Dominguez were to see that take place, he
7  would have to have been in the bathroom
8  itself, correct?
9      A.   Correct.
10      Q.   So if he was not in the bathroom
11  and there's not a loud noise, he would not
12  be expected to see what was going on; is
13  that fair to say?
14      A.   Yes.
15      Q.   You also reported and you put in
16  your report that after Officer Dominguez
17  saw Shultz that he didn't promptly notify
18  his supervisor to secure medical treatment
19  for him?
20      A.   I want to see how I said that.
21  (Perusing).  I'm not seeing where I said
22  he didn't promptly notify a supervisor.
23      Q.   Look at number 3 the last part
24  medical treatment was delayed.

Page 97

1      A.   That opinion was based on the
2  fact that Mr. Shultz was beaten up at 8:30
3  approximately and didn't get medical
4  treatment until 8:45.
5      Q.   And that was the time that
6  Officer Dominguez initially saw Mr. Shultz
7  with injuries?
8      A.   Yes.
9      Q.   You are not rendering an opinion
10  that Officer Dominguez did not try to
11  provide medical treatment once he was
12  aware, correct?
13      A.   No, I am not.
14      Q.   Would you, in your experience,
15  would detainees if they were involved in
16  an altercation would they be more likely
17  to try to keep that secret from officers
18  for fear of retribution or would they be
19  more likely to disclose that to an
20  officer?
21      A.   If an inmate had been beaten up
22  would he try to hide that from an officer?
23  Not in my experience if he felt he needed
24  medical attention.

25 (Pages 94 - 97)

Page 98

1   Q.   You are familiar with the term
2 snitch?
3   A.   Yes.
4   Q.   If somebody does something and
5 gets retribution from other inmates, isn't
6 it fair to say that that person is now in
7 an increased likelihood of harm now that
8 he snitched?
9   A.   When you refer to a snitch you
10 refer to someone who is identifying
11 someone who hurt them.  I don't consider a
12 person who is being discharged necessarily
13 afraid of retribution from an inmate
14 because he is leaving.  I do believe that
15 an inmate would not want to hide the fact.
16 He may have misrepresented his injuries,
17 but I don't think he would hide his
18 injuries because he wants to be treated.
19   Q.   In this case your presumption
20 that Officer Dominguez would have seen the
21 injuries also presupposes that phone calls
22 made while Officer Dominguez was sitting
23 in the doorway of the dorm, correct?
24       MR. MORRISSEY: I think that

Page 99

1       mischaracterized Ms. Vaughan's
2 testimony.
3   A.   I don't know where Officer
4 Dominguez was.  But he was somewhere in
5 the dormitory according to his testimony
6 of direct supervision.  When Mr. Shultz
7 came out of the bathroom and made the
8 phone call, I'm assuming that he would
9 have been visible to Officer Dominguez.
10   Q.   But there was no testimony that
11 you have read that indicated that was the
12 case assuming that must have been?
13   A.   Yes.
14   Q.   With regard to the report
15 generations in this case you also reviewed
16 incident reports.  Do you recall that
17 component of your report?
18   A.   Yes.
19   Q.   You said there are 91 pages of
20 incident reports?
21   A.   Yes.
22   Q.   Do you know how many incidents
23 that was?
24   A.   No.

Page 100

1   Q.   Do you know the time frame for
2 those reports?
3   A.   For approximately the year
4 before this incident, but I know three of
5 the incidents came after this particular
6 incident.
7   Q.   That is not mentioned in your
8 report?
9   A.   No, I didn't include those in
10 the statistics.
11   Q.   You also referenced in your
12 report that some of the incident reports
13 you did receive were not for Division 2
14 Dorm 2 W house, correct?
15   A.   Correct.
16   Q.   Do you know how many of those
17 reports did relate to Division 2 Dorm 2 W
18 house?
19   A.   The vast majority.  I believe
20 one or two were from another dormitory,
21 maybe three.
22   Q.   So you don't recall the number
23 of incidents, just that it's 91 pages?
24   A.   Yes.

Page 101

1   Q.   You also say that at least one
2 of the reports that the officer was
3 watching more than one dorm at a time?
4   A.   Yes.
5   Q.   Was it at least one, two, three
6 or just one that you can state?
7   A.   One that I recall specifically
8 said the officer specifically said that he
9 was watching Dorm W and Dorm V.
10   Q.   If there were other reports that
11 did indicate that, that would be important
12 in your conclusion about what is proper
13 supervision, right?
14   A.   Yes.
15   Q.   You have no testimony that you
16 reviewed that would indicate that Mr.
17 Shultz told Officer Dominguez or any
18 correction officer that he was in fear of
19 being returned to his living unit or from
20 anyone on his living unit, are you?
21   A.   No.
22   Q.   Have you read any testimony in
23 this case that indicates that Officer
24 Dominguez was cross watching?

26 (Pages 98 - 101)

Page 102

1    A.   No.
2    Q.   You also referenced that an
3 officer became aware of an incident
4 because it was reported to him or because
5 he heard a noise. Do you remember that?
6    A.   Yes.
7    Q.   And there is nothing in those
8 reports that indicate why the incident was
9 not observed by him, correct?
10    A.   Correct.
11    Q.   So if the incident occurred in
12 the bathroom and the officer was doing his
13 rounds he might not see the bathroom?
14    A.   Yes.
15    Q.   Or if it occurred in the far
16 corner of the dorm and the officer is in
17 the bathroom to check, he would not see
18 what happened over there, correct?
19    A.   Yes.
20    Q.   Sometimes an incident can be
21 quick. It could be a lightening attack
22 where someone gets punched once or twice.
23 He wouldn't stop it because he wasn't
24 watching that specific location for him to

Page 103

1 see the two or five second attack,
2 correct?
3    A.   Right.
4    Q.   There was also a reference to an
5 incident between detainees from Dorm W and
6 Dorm T. That was one incident, correct?
7    A.   Yes.
8    Q.   In your report you state that
9 the door needed to remain open so the
10 officers could maintain both tiers. Is
11 that in your report or is that the
12 conclusion that you reached based on what
13 you read?
14    A.   That's in my report?
15    Q.   Yes.
16    A.   (Perusing). Yes.
17    Q.   Was that a conclusion that you
18 reached or was that stated in the report?
19    A.   That was a conclusion that I
20 reached based on my tour. I was told that
21 the officer had to stand at the door of
22 these dormitories. I'm not referring to
23 cross watching here. I'm referring to the
24 fact that the doors to the dormitories

Page 104

1 stay open and the officers are positioned
2 at the door. I assume, I did not see,
3 that when the officer makes a tour of
4 inspection he closes the door behind him
5 because otherwise there is no one standing
6 at the door to prevent inmates from
7 walking out of the dormitory.
8       My opinion is simply that the
9 dormitories are not secured doors. The
10 only barrier between the outside of the
11 dormitory and the dormitory where the
12 inmates are is standing there.
13    Q.   What I was trying to clarify was
14 whether or not that was something that was
15 stated in the incident like the officer
16 said I had to leave the door open so I
17 could see both sides or if that was a
18 conclusion you reached based on the
19 reading of your report?
20    A.   The conclusion was based on the
21 reading of the report and the tour.
22    Q.   Was there anything in the
23 incident reports that you read that
24 indicated there was an act of violence

Page 105

1 committed on someone who was being
2 discharged or had their case dismissed?
3    A.   I would have no knowledge of
4 that by reading the reports.
5    Q.   So I take it that the answer is
6 that there was nothing in the report
7 stating or indicating that an act of
8 violence was comitted on somebody being
9 discharged?
10    A.   That is correct.
11    Q.   The final opinion that you
12 rendered number 4 was, "Cook County
13 Department of Corrections failed to
14 conduct a prompt investigation into the
15 circumstances surrounding the assault of
16 Mr. Shultz thereby allowing the violent
17 predators to continue to operate freely in
18 a dormitory living space." Did I state
19 your opinion correctly?
20    A.   Yes.
21    Q.   What is the basis of this
22 opinion?
23    A.   The fact that Mr. Shultz was not
24 able to identify his assailant or

27 (Pages 102 - 105)



Page 106

1 assailants. The fact that Cook County now
2 has an inmate beaten up by somebody in the
3 housing area. Therefore, someone in that
4 housing area is a predator and nothing was
5 done.
6        In my opinion from what I read,
7 the reports that were generated that I
8 read, a couple of days later another
9 investigation was conducted using a
10 confidential informant who possibly
11 identified some who may have been
12 involved. I don't know what happened.
13    Q.    Are there any known or accepted
14 correctional standards that you are
15 relying on or is your opinion based on
16 your experience?
17    A.    Based on my experience.
18    Q.    You mentioned that you observed
19 surveillance cameras. Are you aware if
20 those cameras were monitors or if they
21 were actual recording devices?
22    A.    I have no knowledge.
23    Q.    So if they were monitors, it's
24 fair to say they have no value after the

Page 107

1 fact?
2    A.    Because they weren't recording,
3 correct.
4    Q.    When I say monitors, I'm
5 referring to a live feed where someone is
6 observing from another location to see
7 what's going on or real time. So with
8 that being my explanation, would you say
9 that there is no value after the fact if
10 they are not recording?
11    A.    That is correct.
12    Q.    Nothing about the subsequent
13 investigation would have prevented what
14 happened to Mr. Shultz on May 8, 2013;
15 fair to say?
16    A.    No, but it would have identified
17 the assailants who could have been moved
18 out and created a much safer atmosphere
19 for the rest of the detainees.
20    Q.    Were there any video cameras in
21 the bathroom that you observed that would
22 have recorded what happened in there?
23    A.    No, the video camera would have
24 recorded him leaving the bathroom.

Page 108

1    Q.    You are aware that ultimately
2 there were people identified who may have
3 been the offenders in this case?
4    A.    I am aware that the confidential
5 informant gave some names up, yes. I'm
6 not aware of any action taken.
7    Q.    Do you have any idea if those
8 individuals remained in the department of
9 correction beyond that date?
10    A.    No, I don't.
11    Q.    Do you have any knowledge if
12 those individuals had any prior incidences
13 harming any other detainees?
14    A.    I don't.
15    Q.    Would you consider the fact that
16 Mr. Shultz could not identify his
17 offenders would have made it difficult in
18 prosecuting a case against those
19 offenders?
20    A.    Yes.
21    Q.    In identification of those
22 individuals that may have been involved,
23 that wasn't based on a memory that Mr.
24 Shultz gained or rather an investigation

Page 109

1 by the sheriff who were then able to
2 determine who these offenders may have
3 been, right?
4    A.    Yes.
5    Q.    Are you aware if Mr. Shultz ever
6 filed criminal charges against these
7 individuals?
8    A.    I know that Mr. Shultz was
9 interviewed shortly after the incident and
10 he indicated that he did not want to
11 pursue charges against anyone. And that
12 was simply when you were reading the
13 information that I used for the report,
14 that was the thing that occurred to me
15 because I did see the video tape with the
16 captain and he said that he didn't want to
17 pursue charges.
18    Q.    So that was one other thing that
19 you think that you reviewed?
20    A.    Yes.
21    Q.    Are you aware if Mr. Shultz ever
22 tried to file a civil lawsuit against the
23 individuals who actually attacked?
24    A.    I know that Mr. Shultz knows to

28 (Pages 106 - 109)

Page 110

1 this day who attacked him.
2    Q.   Again, I talked about the
3 individuals who may have been involved in
4 the attack, you have no knowledge of any
5 prior attacks or fights with these
6 individuals with any other detainees?
7    A.   Not that I'm aware of.
8    Q.   You have no idea if these
9 individuals did anything subsequent to
10 this to anyone else in the dorm or in the
11 jail?
12    A.   That is correct.
13    Q.   You don't know if these
14 individuals ever intimidated or assaulted
15 any other inmates in the Cook County Jail?
16    A.   When you say intimidated, I
17 would say in my experience the other
18 inmates in the dormitory were most likely
19 aware. In my experience when these things
20 happen and those actions are intimidating
21 to other inmates. I do think they are
22 meant to be intimidating. So while I am
23 not aware, I believe from my experience
24 that those are actions that are used to

Page 111

1 intimidate other inmates to forms of
2 compliance.
3    Q.   You said it's most likely, but
4 there is nothing that you reviewed that
5 would indicate that this pervasiveness
6 continued, correct?
7    A.   Correct.
8    Q.   In your conclusion portion,
9 Roman Numeral IV, you have that you
10 believe putting detainees in holding cells
11 outside of living area could "help ensure
12 the safety of these inmates and speed up
13 the discharge process." How would them
14 being housed in a separate holding cell
15 speed up the discharge process?
16    A.   They are easier to bring to the
17 area where they are going to be
18 discharged. If they are held in Division
19 5 perhaps it is just easily accessible.
20 They won't have to go back to the housing
21 unit in order to bring them down for
22 discharge.
23    Q.   One of the suggestions you had
24 was using that holding cell in Division 2

Page 112

1 Dorm 1 in that exact same building just
2 sort of down from where Mr. Shultz was
3 housed. So that really wouldn't improve
4 discharge with regard to speed would it?
5    A.   In my opinion, it would because
6 the person would be sitting there. And as
7 you mentioned before someone would have to
8 be designated to watch them. So the
9 efforts on the part of Cook County to move
10 this person along as quickly as possible
11 would be facilitated. That is how it
12 worked in my experience. When we have
13 people who we needed to do something with,
14 to put them back in a housing area away
15 from the sight and sound of the officers
16 deployed to do that can't just put them
17 out of their mind for a certain period of
18 time to delay things. So my experience is
19 to keep them right in front of the people
20 and make sure this guy gets moved as
21 quickly as possible. That's what I meant
22 as far as facilitating the discharge
23 process to get them out quicker.
24    Q.   Are you referring to speeding up

Page 113

1 the review of his records or are you
2 referring to his physical location?
3    A.   I am referring to if the guy is
4 sitting in the pen and I have to deploy an
5 officer to sit and watch them, I am more
6 likely to call the receiving room and say
7 what's happening with Mr. Shultz here
8 because I want my officer back and he is
9 going to be sitting here watching him
10 while you guys go through the paperwork.
11    Q.   There is nothing that you
12 reviewed that indicates that the Cook
13 County Department of Corrections
14 intentionally slowed up the process at
15 all? They are not looking at any form of
16 the charges or holding him while they run
17 his prints against some known offender?
18    A.   There is nothing that is
19 unnecessarily being done to delay this,
20 no.
21    Q.   Your final paragraph in your
22 conclusion on page 9 talked about in New
23 York that they prep the night before for
24 inmates whose sentence has expired. Do

29 (Pages 110 - 113)

Page 114

1 you remember that?
2   A.   Yes.
3   Q.   That is completely separate and
4 distinct from what Mr. Shultz's situation
5 was?
6   A.   Yes.
7   Q.   And correct me if I'm wrong,
8 someone who is serving a county sentence
9 and let's say tomorrow is due to be
10 discharged, the department would then
11 prepare their paperwork today to be
12 released tomorrow at midnight or at
13 midnight?
14   A.   Yes, we actually process them
15 for discharge because of the bed space for
16 us.
17   Q.   That process doesn't really
18 factor or enter into your opinion with
19 regard to this case?
20   A.   Correct.
21     MR. ZECCHIN: I'm just going to
22 go over my notes. I think we are
23 pretty much done.
24     MR. MORRISSEY: Sure.

Page 115

1     (A recess was taken.)
2   Q.   I want to go back to some
3 questions about Rikers Island when you
4 were there. How many staff were involved
5 in that review of paperwork prior to the
6 detainee going to court?
7   A.   The routine staffing in the
8 general office for a facility that houses
9 1,500 inmates would be probably two staff
10 members who would then have other duties,
11 so they are not eight hours in that job.
12   Q.   When you said 1,500 detainees,
13 are you saying that those were the ones
14 that just had one pending case?
15   A.   No, that would probably be --
16 facilities that had inmates who probably
17 would have one pending case, those
18 facilities that have low classification
19 rates, mostly dormitories would be
20 facilities that house roughly 2,000 to
21 2,500 inmates. The ones that have 1,500
22 would be a facility that has maximum
23 security so there would be less inmates
24 who have one pending case.

Page 116

1   Q.   So how many overall staff were
2 involved in the review of the facilities?
3   A.   Again, no additional staff was
4 added to do this. The existing staff who
5 -- this was added responsibility when they
6 pulled courts for the next day which was
7 part of what they would do.
8   Q.   How many people would you say
9 they have to review on a daily basis?
10   A.   We would be putting out probably
11 2- to 3,000 inmates for court and of that
12 maybe 1,000 maybe 500. I don't have a
13 number for you.
14   Q.   If a correctional institution
15 implemented additional training to
16 increase the knowledge of the staff to
17 make the process more efficient; that
18 would be a good thing, wouldn't it?
19   A.   Yes.
20   Q.   And if they had individuals who
21 were trained and charged with reviewing
22 discharge documents, that would be a good
23 thing too, wouldn't it?
24   A.   You are saying people whose

Page 117

1 specific function is to review discharge
2 papers?
3   Q.   Yes.
4   A.   Yes.
5   Q.   If Cook County had implemented a
6 system where there are certain experts who
7 would review discharge paperwork to make
8 sure they are looked at properly and as
9 efficiently as possible; that would be a
10 good thing, wouldn't it?
11   A.   Yes.
12   Q.   It would make the system better?
13   A.   Yes, as long as the staff is
14 assigned to do it. What can happen with
15 people who are specially trained is that
16 other people don't attempt to do the job
17 and just leave it for the specially
18 trained people. Then we are in a bind if
19 we limit certain functions to people with
20 special training instead of making sure
21 that we have a sufficient number of people
22 trained who can do that.
23   Q.   What you are saying is
24 essentially hypothetical slackers the work

30 (Pages 114 - 117)

Page 118

1 product will suffer?
2　A.　Yes.
3　Q.　If there are people who are
4 doing their job efficiently, and trying to
5 improve it makes a good thing that it is
6 in fact what you expect a facility to do?
7　A.　Yes.
8　Q.　This case based on your review,
9 you saw no known risk that would have been
10 present for Mr. Shultz specifically
11 Mr. Shultz going back to his living unit,
12 correct?
13　A.　I was not aware of any risks.
14 But I know the state has a responsibility
15 to protect inmates from risk.
16　Q.　My question was specific in
17 formation or knowledge about any problem
18 or risk provided to Mr. Shultz going back
19 to his living unit?
20　A.　Correct.
21　Q.　If Officer Dominguez said he saw
22 Mr. Shultz come out of the bathroom, there
23 is nothing that you read that indicates he
24 is not being honest, is there?

Page 119

1　A.　No.
2　Q.　I have no further questions at
3 this time.
4 EXAMINATION BY
5 MR. MORRISSEY:
6　Q.　Ms. Vaughan, what does direct
7 supervision mean to you?
8　A.　Direct supervision is a term
9 that means that the officer is in constant
10 observation of the inmates without
11 physical barriers between the officer and
12 the inmates.
13　Q.　Under direct supervision would
14 an officer be able to hear what's being
15 supervised?
16　A.　Under direct supervision an
17 officer is supposed to be able to hear and
18 see and communicate with the inmates under
19 his charge. And I took it as special
20 meaning that Officer Dominguez included
21 that in his report. It was new to me to
22 see that he specifically indicated that
23 the dorm was under direct supervision.
24　Q.　I have nothing further.

Page 120

1 FURTHER EXAMINATION BY
2 MR. ZECCHIN:
3　Q.　Just a couple of questions to
4 follow up.
5　　When you say being able to hear.
6 Hearing is subjective, correct? What one
7 person hears may not be heard by another
8 person?
9　A.　Yes.
10　Q.　When you say direct supervision,
11 obviously from your tour you know that the
12 officer sitting in the doorway would not
13 be able to see in the bathroom, correct?
14　A.　Yes.
15　Q.　That doesn't mean that he is in
16 fact using direct supervision, so it's
17 physically impossible to see in the dorm
18 as well as in the bathroom?
19　　[Continued on the next page to
20 allow for signature line and jurat.]
21
22
23
24

Page 121

1　A.　Yes.
2　Q.　No other questions.
3　　MR. MORRISSEY: You have the
4 right to review the transcript or you
5 can waive your right to review it.
6　　THE WITNESS: I waive it.
7　　[TIME NOTED: 2:00 p.m.]
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

31 (Pages 118 - 121)

Page 122

```
 1        I N D E X
 2
    WITNESS     EXAMINATION BY      PAGE
 3
 4  S. Vaughan  Mr. Zecchin        3, 120
 5         Mr. Morrissey        119
 6
 7
 8    E X H I B I T S
 9  DEFENDANT'S     DESCRIPTION      PAGE
10  Exhibit 1    Curriculum Vitae   19
11  Exhibit 2    Report             23
12  Exhibit 3    Document           24
13
    Attorney, Mr. Zecchin from State's
14  Attorney Office Cook County has retained
    all exhibits.
15
16
17
18
19
20
21
22
23
24
```

Page 123

```
 1
 2        CERTIFICATION
 3
 4    I, JACQUELINE GANDOLFO, a Notary
 5  Public for and within the State of New
 6  York, do hereby certify:
 7    That the witness whose testimony as
 8  herein set forth, was duly sworn by me;
 9  and that the within transcript is a true
10  record of the testimony given by said
11  witness.
12    I further certify that I am not
13  related to any of the parties to this
14  action by blood or marriage, and that I am
15  in no way interested in the outcome of
16  this matter.
17    IN WITNESS WHEREOF, I have hereunto
18  set my hand this 19th day of June, 2015.
19
20  Jacquel Gandolfo
21  _____
22  JACQUELINE GANDOLFO
23
24      *    *    *
```

32 (Pages 122 - 123)

| 1 |
|---|
| **1** 20:2,4 79:9 80:14 82:6 112:1 122:10 |
| **1,000** 38:10,14 39:15 40:4 43:24 50:12,20 116:12 |
| **1,500** 38:7 115:9,12 115:21 |
| **10/15/95** 32:10 |
| **10150** 2:4 |
| **11357** 3:11 |
| **1162** 1:9 |
| **119** 122:5 |
| **11:30** 1:14 |
| **120** 122:4 |
| **1250** 1:12 |
| **13** 1:7 |
| **130086405** 32:4 |
| **150** 26:1 |
| **162-21** 3:10 |
| **19** 1:14 122:10 |
| **1978** 8:14 16:13 17:8 |
| **1981** 10:8 |
| **1985** 11:21 |
| **1991** 9:20 |
| **1994** 7:24 |
| **1995** 7:13 |
| **1997** 28:19 |
| **1998** 59:5 |
| **19th** 123:18 |

| 2 |
|---|
| **2** 3:16 23:14,16,20 25:16 32:19,23 44:6 80:6,14 82:6 86:15 88:4 91:1,2 100:13 100:14,17,17 111:24 116:11 122:11 |
| **2,000** 115:20 |
| **2,500** 115:21 |
| **20,000** 17:12 |
| **2001** 13:12 16:14 |

| 2005 28:24 |
|---|
| **2010** 31:12 |
| **2013** 31:12 32:3,6,7 32:13 79:22 86:14 107:14 |
| **2015** 1:14 123:18 |
| **22,000** 17:10,16 |
| **23** 122:11 |
| **24** 122:12 |
| **26** 3:16 |
| **2:00** 24:24 121:7 |

| 3 |
|---|
| **3** 24:10,12 35:12 86:13 96:23 122:4 122:12 |
| **3,000** 116:11 |
| **300** 38:20 44:6 |
| **3641** 1:7 |

| 4 |
|---|
| **4** 58:11 66:16 105:12 |

| 5 |
|---|
| **5** 67:17 72:14 79:7 79:19 111:19 |
| **5,000** 17:9 |
| **500** 2:10 116:12 |

| 6 |
|---|
| **600** 38:8 |
| **60602** 2:11 |
| **60616** 2:5 |
| **66** 2:10 |

| 7 |
|---|
| **7807** 1:9 |

| 8 |
|---|
| **8** 32:3,6,7,13 79:22 86:14 107:14 |

| 9 |
|---|
| **9** 113:22 |
| **9.27** 32:9 |
| **90s** 17:10 |
| **91** 99:19 100:23 |

| 99 59:5 |
|---|
| **9:00** 25:1 87:14 |

| a |
|---|
| **a.m.** 1:14 |
| **ability** 94:6,7 |
| **able** 41:5 94:11 105:24 109:1 119:14,17 120:5,13 |
| **abuse** 22:22 |
| **aca** 31:12 |
| **acceptable** 17:13 |
| **accepted** 35:23 67:20 106:13 |
| **accessible** 111:19 |
| **accident** 67:1 |
| **accompanied** 42:1 |
| **accompanying** 41:24 |
| **accurate** 20:10 21:23 23:3,4 27:14 29:1 56:2 78:1,2,9 93:11 |
| **accurately** 35:17 46:2 |
| **act** 13:6 31:2 104:24 105:7 |
| **acting** 70:3 |
| **action** 1:19 74:10 108:6 123:14 |
| **actions** 110:20,24 |
| **active** 22:6 60:10 61:12 |
| **acts** 92:9 |
| **actual** 11:6 88:13 106:21 |
| **add** 55:18 |
| **added** 116:4,5 |
| **addition** 12:10 51:18 60:24 |
| **additional** 18:18 21:22 27:5 35:7,9 40:8 43:18 46:5 48:22 51:16,17 60:11 65:23 66:2,4 |

| 66:11 116:3,15 |
|---|
| **adhered** 68:21 |
| **adjudicated** 63:22 |
| **administration** 9:16 13:1 |
| **administrative** 22:17 30:13 34:4 35:14 |
| **administratively** 73:18 74:10 |
| **admission** 14:11 |
| **admissions** 18:11 44:8 |
| **admitted** 49:14 |
| **adolescence** 10:3 |
| **advantage** 73:18 82:18 |
| **advise** 70:4 |
| **affect** 46:20 |
| **afraid** 98:13 |
| **agency** 54:23 55:14 |
| **ago** 25:7 |
| **agree** 34:14,22 35:6 40:15 42:22 45:24 50:7 56:10,13,18 57:12,17 68:6 69:3 70:11 71:16 76:2 83:13 86:8 88:14 |
| **agreed** 85:7 |
| **agreement** 1:22 3:23 26:15 |
| **ah** 5:18 |
| **al** 24:3 |
| **alerted** 93:10,15 95:19 |
| **allegations** 29:20 |
| **allow** 120:20 |
| **allowing** 105:16 |
| **altercation** 63:4 97:16 |
| **american** 15:17 31:6 74:6,13 |
| **amount** 37:6 46:10 |
| **anson** 32:17 |

answer 4:21 5:13
6:2,7 38:24 45:6
46:15 48:16,24 69:8
105:5
answered 6:15 41:3
answering 6:6
answers 5:1,17
anther 57:6
anthony 2:12 3:17
3:18
anticipate 6:1
anybody 71:2
apparent 37:18
apparently 12:9
87:18
appear 12:20 56:14
63:16
appearance 35:17
50:24 51:18,21
appearances 2:1
11:4 62:16
appeared 41:10
appearing 51:3 52:4
appears 27:11
appointed 20:24
21:8,16 84:1,3
appropriate 34:9
86:10
appropriately 35:2
approximately 8:15
20:16 43:24 59:3
64:11 87:2 97:3
100:3
area 9:2,3 64:3
73:13 82:2 87:7
93:19 106:3,4
111:11,17 112:14
areas 8:19 9:17 15:1
79:16
arrests 49:15
asked 5:14 6:14
43:16 48:14 94:20
asking 48:11 56:12
57:4 92:11

aspects 8:20
assailant 105:24
assailants 106:1
107:17
assault 105:15
assaulted 86:23
92:18 110:14
assigned 66:3,5
71:14,23 72:3 73:23
81:8,9 82:23,24
86:15 117:14
assignment 12:22
assistance 35:10
73:9
assistant 2:12 3:18
11:10 15:3,4
associates 25:21
74:14
association 15:18,23
31:6 74:7
assume 5:13 104:2
assuming 71:22
99:8,12
atmosphere 107:18
attach 65:20
attached 41:20,23
42:12 60:11,15,19
61:11
attack 102:21 103:1
110:4
attacked 78:4
109:23 110:1
attacks 110:5
attempt 117:16
attention 97:24
attorney 2:9,9,12
3:18,19 12:7 122:13
122:14
attorneys 2:3 27:17
auditor 13:5 21:9
authority 86:11
authorization 11:6
available 62:22
67:17 70:8 80:2

avenue 2:4
average 17:6
aware 29:18 31:10
36:5 38:10 40:4
43:23 44:23 47:10
47:24 49:5 54:15,18
63:8 67:12 68:2
70:16,24 72:21
73:20 77:13 80:5,9
85:1 92:10 93:21
94:3,23 95:7,13
97:12 102:3 106:19
108:1,4,6 109:5,21
110:7,19,23 118:13

**b**

b 122:8
back 26:18 39:9
42:20 43:15 45:23
48:16 49:9 51:20
56:1 61:15 62:8,18
63:1,9,13 64:12,17
64:19,24 67:1,15
70:20 75:2,8,12
76:6,10 79:13,23
82:2,5 111:20
112:14 113:8 115:2
118:11,18
background 7:15
55:19
bad 46:10
badly 87:20
balance 20:18
barges 18:22
barrier 104:10
barriers 119:11
based 10:8 13:15
21:19 45:3 58:16,19
70:23 72:11,16
74:23 75:21 83:13
96:5 97:1 103:12,20
104:18,20 106:15
106:17 108:23
118:8

basing 88:21
basis 11:13 35:20
36:22 38:1,23 39:16
40:6,13 44:2 61:19
67:10 71:17 74:22
86:21 105:21 116:9
batchelor's 7:16
bathroom 80:15,19
80:21 87:5,23 88:2
88:6,8,9 90:18
92:19,23 93:6,9,11
93:14,16,21 94:11
94:16,18 95:2,11
96:7,10 99:7 102:12
102:13,17 107:21
107:24 118:22
120:13,18
battered 92:18
beat 78:12,18
beaten 78:17 86:17
87:17,20,23 95:22
97:2,21 106:2
beating 75:9
bed 14:10 83:9
114:15
believe 9:20 17:22
28:16 36:21 43:16
47:12 48:8,14 58:21
67:18 69:16 73:5,14
79:9 80:14 84:11
88:18 90:20 98:14
100:19 110:23
111:10
believed 90:21
believes 90:8
belong 15:16,17
belongings 64:8
benches 79:14
benefit 5:21
benefits 66:10
best 58:12
better 71:18 72:4
117:12
beyond 26:16,21
34:18 69:14,16

108:9
**big** 41:12
**bind** 117:18
**bit** 19:24
**blood** 123:14
**board** 9:7 15:20
**body** 21:1,13 55:7
  70:19 79:10
**bond** 44:11 73:16
**bonus** 26:7
**borough** 9:19 16:20
  17:16
**boroughs** 18:10
  84:6,13
**boulevard** 3:10
**box** 64:10
**break** 6:11,13,15
  42:15
**brewing** 71:21
**bridgeview** 44:21
  80:11
**briefly** 8:9
**bring** 24:18 61:14
  111:16,21
**broadway** 1:12
**bronx** 16:23 17:20
  17:21 41:22
**brooklyn** 16:22
  17:20,24 19:3 41:22
**brought** 21:7 24:20
  62:7,18 63:13 70:20
  75:2
**bruce** 1:9
**building** 112:1
**buildings** 18:9
**bullets** 29:5
**bullock** 28:10,21
  29:10,23,24 30:4,6
**burdensome** 41:11
  42:24
**business** 26:16

        **c**

**c** 7:2

**call** 32:12,15 60:9,9
  63:11 70:4 77:14
  86:24 88:12 99:8
  113:6
**called** 22:5
**calls** 9:4 98:21
**camera** 107:23
**cameras** 106:19,20
  107:20
**capacity** 17:13 19:9
  19:14,19 20:19 21:4
  21:14,18 83:12
**captain** 8:16,23 10:9
  10:24 12:5 15:7,9
  15:13 19:15 109:16
**captains** 15:1,3
**car** 64:15 67:1
**card** 41:24 42:12,12
**care** 65:1
**career** 12:2
**case** 12:16 19:17
  22:9,10 25:22 26:8
  26:12,17 27:2 28:14
  28:21 29:11 30:12
  34:1 36:13 39:4
  41:4,7 42:7,21 43:7
  43:8,10,13 44:20
  45:1,4 46:8 47:13
  50:10,19,22 51:2,3
  51:6,7,11 52:4,5,12
  52:18 55:7 58:20
  59:6,14,18,21,23,24
  63:22 67:5 70:24
  73:20 77:23 83:11
  96:3 98:19 99:12,15
  101:23 105:2 108:3
  108:18 114:19
  115:14,17,24 118:8
**cases** 12:10 22:8,16
  22:18 26:19,21 27:6
  27:18,24 28:4,8
  29:4,14,15,16 37:7
  41:2,21,22,22 42:5
  49:11,18 51:16,17
  52:10 58:2 60:8

62:10 67:24 69:2
  74:5 75:7
**cause** 46:1
**ccdoc** 86:14
**cell** 63:14 64:2 65:5
  79:12 80:13,20
  81:12,14,17,19,22
  82:5,13,17,19 83:4
  83:7 111:14,24
**cells** 79:2,5,7,8,18
  80:2 111:10
**center** 2:10
**certain** 17:1 22:20
  36:1 45:18 48:10
  83:15 94:16 112:17
  117:6,19
**certainly** 73:17
  77:17 89:8
**certification** 123:2
**certified** 13:3 21:9
  21:17 31:11,16,17
**certify** 31:7 123:6
  123:12
**certifying** 65:21
**chance** 38:17
**change** 12:9 66:18
  70:9 90:2,6
**changes** 85:20,21,24
**charge** 9:15 12:24
  14:17 68:10 119:19
**charged** 116:21
**charges** 109:6,11,17
  113:16
**check** 47:1,11 48:3
  48:15 49:11,12,18
  49:21,24 50:14,18
  50:20,23 51:5,6,15
  51:22,23 52:21
  54:12 55:21 59:20
  60:1,2,7 61:4
  102:17
**checked** 50:3,4 52:6
  59:23
**chicago** 2:5,11 22:10

**chief** 11:10,11,11,14
  14:2,7,15 15:4,5
  83:18
**choose** 64:16
**choppy** 6:3
**ciid** 32:6
**circum** 21:20
**circumstances**
  105:15
**cite** 74:13
**city** 8:5,11 9:8,13,23
  10:5 16:16,17 22:19
  35:22 37:2,8 38:23
  39:6 41:18 50:2
  60:16 84:12
**civil** 3:16 4:1 109:22
**civilian** 37:15 70:3
  76:16
**civilians** 65:16
**claim** 29:19
**claimant** 77:1
**claimed** 87:4
**clarify** 11:8 13:1
  18:2 21:15 91:9
  104:13
**clarifying** 13:9
**classification** 17:2
  61:23 68:3,7,9,20
  115:18
**classified** 68:18
**clean** 56:9 58:1
**clear** 4:15
**clearly** 5:12
**clerk** 42:11 63:19
**clock** 89:6
**clocks** 14:12
**close** 18:8 95:11
**closed** 17:22,23,24
  18:6
**closes** 104:4
**clothes** 64:10 70:10
  76:16
**cnr** 64:6
**code** 30:17

**codes** 30:14
**college** 7:19
**come** 43:15 51:19
  52:22 64:12 72:6
  90:17 118:22
**comes** 45:23 55:24
**coming** 42:19 46:11
**comitted** 105:1,8
**commissary** 75:11
**commissioner** 66:21
  83:24 84:1,15,17,19
  84:20
**commitment** 60:18
  61:8,11,13,15
**commitments** 37:12
  40:22 41:19 60:10
  60:10
**commotions** 95:18
**communicate**
  119:18
**company** 7:9
**compensation** 26:6
**complete** 24:6 33:7
**completed** 35:16
**completely** 6:8
  114:3
**compliance** 9:5,7
  11:23 111:2
**complies** 33:5 58:15
**component** 94:8
  99:17
**comprise** 9:23
**computer** 50:1 53:3
  53:4,6,8 54:20 60:2
  60:7,20 61:5 80:24
**computers** 54:4
  79:11
**concern** 81:21
**concerning** 22:9,11
**conclusion** 72:19
  75:21 101:12
  103:12,17,19
  104:18,20 111:8
  113:22

**conclusions** 74:15
**condition** 35:9 91:4
**conduct** 105:14
**conducted** 91:20
  106:9
**conducting** 89:5
  93:18
**conferences** 74:8
**confide** 73:6
**confidential** 106:10
  108:4
**conflicting** 45:20
**conforms** 86:7
**connected** 18:8
**connection** 24:2
  25:22 26:7 27:10,12
  27:18 29:15 33:15
  33:20
**consent** 9:9 30:20
**consider** 39:22 40:2
  46:12 98:11 108:15
**considered** 32:2
  44:18,23 62:5,12,13
  68:10
**consist** 61:8
**constant** 119:9
**consult** 30:13
**consultants** 6:24 7:4
  7:12 8:2,3
**consultation** 20:14
**consulted** 47:22
**consulting** 13:16
  16:6
**consumes** 65:9,14
**contain** 26:24 42:21
**contained** 20:11
**contents** 49:6
**context** 48:6,12,19
**continually** 85:12
**continue** 105:17
**continued** 111:6
  120:19
**contract** 26:14
**contribute** 68:17

**control** 12:23 34:19
**cook** 1:8,8 2:9 27:13
  28:5,11 29:10 31:10
  31:15,17 32:8 38:9
  39:13,21 42:20 44:3
  50:13 56:1,4 58:23
  67:6,11,15 69:21
  85:2,9 105:12 106:1
  110:15 112:9
  113:12 117:5
  122:14
**copies** 30:2
**copy** 24:22,23
**corner** 102:16
**correct** 11:21 12:6
  25:5,10,22,23 26:2
  26:3 28:12 43:22
  46:18,19 50:16
  52:19 58:4,5 66:13
  71:11,14 72:8,19
  74:15 76:22 78:24
  81:14,19 83:1,2,6
  88:9 89:1 92:19,20
  92:24 96:8,9 97:12
  98:23 100:14,15
  102:9,10,18 103:2,6
  105:10 107:3,11
  110:12 111:6,7
  114:7,20 118:12,20
  120:6,13
**corrected** 27:4 71:9
**correction** 8:6,12,24
  9:4,7,24 13:11,18
  13:21,24 16:2 19:20
  22:20 34:20 37:13
  38:2 41:14 49:15
  50:3 53:2,13,19,23
  54:3 55:3,9 59:7
  63:21 67:6 68:4
  83:23 84:16,18 92:5
  101:18 108:9
**correctional** 1:8
  10:13 15:8,18,22
  16:7 21:14 22:22
  30:9 31:6,7 33:18

33:19 35:24 67:21
  68:14 72:12,14 74:1
  74:6,13 88:23
  106:14 116:14
**corrections** 8:14,14
  8:17 10:7,11,18
  12:3 16:1,12 19:10
  27:13 28:18 30:22
  31:11 32:9 34:6
  39:14 66:22 76:2
  84:23 90:10,11
  105:13 113:13
**correctly** 86:19
  105:19
**counsel** 1:23
**counties** 84:7,9,11
**counts** 45:22
**county** 1:8,8 2:9
  8:21 17:4 27:13
  28:5,12 29:10 30:14
  30:22 31:1,10,16,17
  32:8 38:9 39:14,21
  42:20 44:3 50:13
  56:1,4 58:7,23 67:6
  67:12,15 69:21 84:4
  84:10,12,14 85:2
  85:9 105:12 106:1
  110:15 112:9
  113:13 114:8 117:5
  122:14
**couple** 18:24 106:8
  120:3
**course** 6:7 16:5
  20:13
**court** 1:1,22 3:21,24
  5:20 11:4 16:14
  18:9,12,14 35:16,17
  36:2,22 37:21,23
  38:1,8,11,16,21,22
  39:2,3,8,16,18,19
  40:5 41:7 42:8,9,11
  42:20 43:3,4,7,11
  43:14,20 44:1,16,17
  45:11,13 50:5,13,19
  50:21,23 51:2,3,4

**[court - discharged]**

51:11,14,18,20,24
52:5,14,17 55:24
57:24 58:1 59:13
60:7,17,21 61:3,7
61:14,19 62:3,15
63:11 64:5,7,16
65:3 69:22,23 70:17
70:20 79:4,15,23
115:6 116:11
**courthouse** 44:21
70:6,9,11 80:11
**courtroom** 45:18,19
45:23 46:6,11 62:8
62:9,11,17,19 63:1
63:5,14,19,20 77:7
**courtrooms** 19:5
**courts** 116:6
**cove** 3:10
**create** 73:15
**created** 107:18
**credences** 33:19
72:17
**criminal** 7:17 16:15
18:9 68:11 109:6
**criteria** 61:20 70:8
**cross** 101:24 103:23
**curnyn** 6:24 7:1,3
7:11 8:2,2
**current** 68:10
**currently** 6:21
**curriculum** 12:8,19
20:7 26:22 122:10
**custody** 34:11,12
37:7 38:18 43:15
53:21 56:20
**cut** 37:21 43:12
51:14
**cv** 1:7 13:2 21:22
25:5

**d**

**d** 122:1
**daily** 36:22 38:1,5
38:23 39:16 40:13
44:2 61:19 71:17

116:9
**daley** 2:10
**dart** 1:8 24:3 32:16
85:9
**database** 47:21
52:23 53:16 56:16
**date** 13:15 20:5
23:17 24:13 43:3,4
43:11,14 55:22
108:9
**dated** 32:9
**dates** 65:3
**daubert** 23:10
**day** 11:13,13 13:22
13:22 14:17,17 25:7
34:16 38:10,18
39:19 40:6 41:8
44:1 45:3 51:12,19
51:24 57:24 58:3,13
59:13 60:18 62:16
63:12,16 64:17
71:23 73:4 80:7,11
85:3 89:23 110:1
116:6 123:18
**days** 43:14 64:11
71:5 85:3 106:8
**deal** 19:3 39:11
**debts** 78:1
**decide** 13:13
**decided** 78:12,18
**decides** 39:4
**decrees** 9:9 30:20
**defendant** 20:19,24
21:17
**defendant's** 122:9
**defendants** 1:10 2:9
20:4 23:16 24:12
**degree** 7:16,23
**delay** 58:22 112:18
113:19
**delayed** 86:18 96:24
**delegate** 83:14,19
86:5
**delegated** 85:18

**delegating** 86:8
**delegation** 86:10
**deliberate** 90:2,6
**deliberately** 92:7
**department** 8:5,11
8:13 9:4,24 11:11
13:4,11,18,21,24
16:11 19:10,19 21:8
22:19 27:13 28:17
30:22 31:11 32:8
34:6,20 38:2 39:14
41:13 48:1 49:14
50:3 53:1,12,19,22
53:24,24 54:3,14
55:8 59:7 63:21
64:20 70:4 76:1
83:19,23 84:16,18
92:5 105:13 108:8
113:13 114:10
**depending** 38:3
61:22 62:22
**deploy** 113:4
**deployed** 112:16
**deposed** 4:5 22:3
24:4
**deposition** 3:13,22
4:14 24:19 32:15
33:10 48:9,10 71:6
71:8
**deputy** 9:11,12,14
11:10,11,14 12:5
14:7,15 15:3,4,5
19:15 45:19,23 46:6
46:11 83:18
**description** 122:9
**designated** 3:14
9:15 52:8 112:8
**detainee** 34:23
35:15 36:2,3 39:1
42:9 62:2 63:3
68:12 73:2,5 115:6
**dctainees** 17:1,3
18:7,16 28:11 34:5
34:17 39:8,15 59:2
62:14 63:15 65:3

67:22 69:5,15,21
71:21 74:17 79:3
80:6 85:4 92:1,6,8
97:15 103:5 107:19
108:13 110:6
111:10 115:12
**detention** 8:20 89:2
**determine** 35:15
38:16 46:6 48:21
50:14 54:24 109:2
**determined** 39:18
**devices** 106:21
**dictate** 35:24 67:21
**differences** 69:4
**different** 10:1 21:12
40:17 61:22 74:8
84:21
**difficult** 55:3 78:5
108:17
**difficulties** 73:21
**difficulty** 55:18
**diligent** 86:16 87:19
**direct** 83:1 93:18
94:2,5 95:1 99:6
119:6,8,13,16,23
120:10,16
**director** 33:9
**discharge** 10:13,19
13:23 14:5,9 15:12
30:8 34:11 35:1,1,7
36:16 41:6 43:9
45:3 49:16 56:8,11
60:22 61:16 62:3
70:5,14 75:5 76:24
78:13 81:24 82:12
85:12 111:13,15,22
112:4,22 114:15
116:22 117:1,7
**discharged** 11:3
35:10 36:4,24 37:22
43:7,12,14 44:2 45:15
51:24 57:21 70:10
72:23,24 76:4,21
77:4,16 85:5 98:12
105:2,9 111:18

114:10
**discharges** 14:6
52:9 65:19 67:8,23
85:1
**discharging** 9:1
28:11 34:5 36:9
61:4
**disciplinary** 68:12
**disciplines** 9:13
**disclose** 73:8 97:19
**discussed** 19:24
74:9
**dismiss** 39:4
**dismissed** 36:13
105:2
**disposed** 45:22
**disqualified** 23:5
**distinct** 114:4
**distract** 92:7
**distraction** 94:1
**district** 1:1,2 4:2
**disturbance** 93:20
**division** 1:3 14:1
32:19 67:17 70:19
79:7,9,19 80:6,14
82:6 86:15 88:4
91:1 100:13,17
111:18,24
**doc** 76:19
**document** 20:3
23:15,23 24:11,15
24:17 41:15,21 42:7
57:2 122:12
**documentation**
30:11 43:1 45:18
70:17
**documents** 24:18
25:3 40:9,13 52:16
63:20 70:24 90:7
116:22
**doing** 8:24 12:3,4
13:16 55:21 59:1,3
75:14 102:12 118:4
**dominguez** 1:9
32:18 91:2,20 92:22

93:4,10 95:20 96:6
96:16 97:6,10 98:20
98:22 99:4,9 101:17
101:24 118:21
119:20
**door** 64:23 95:5,12
103:9,21 104:2,4,6
104:16
**doors** 103:24 104:9
**doorway** 88:7 91:1
98:23 120:12
**dorm** 32:19 71:10
80:14 82:6 86:15
89:22 91:1,3 98:23
100:14,17 101:3,9,9
102:16 103:5,6
110:10 112:1
119:23 120:17
**dormitories** 103:22
103:24 104:9
115:19
**dormitory** 67:18,19
77:16 87:3,9,11,21
88:4 94:24 95:1
99:5 100:20 104:7
104:11,11 105:18
110:18
**dovetails** 5:23
**dress** 32:10
**due** 114:9
**duly** 3:2 123:8
**duration** 32:14
**duties** 12:18 86:16
95:14 115:10
**duty** 89:11 91:8

**e**

**e** 2:12 3:1 122:1,8
**earlier** 20:1 21:20
36:6 59:6 65:1
74:12
**early** 28:16
**earned** 68:13
**easier** 25:18 111:16

**easily** 111:19
**east** 18:23
**eastern** 1:3
**easy** 46:21
**educational** 7:14
**edward** 1:5 3:15
32:12 86:17
**effectively** 46:2
**efficient** 39:10,23
116:17
**efficiently** 117:9
118:4
**effort** 90:2,6
**efforts** 112:9
**eight** 20:16 115:11
**eighteen** 10:4
**either** 29:13,23
80:11 89:3
**elected** 84:2
**electronic** 91:14
**electronically** 70:18
**elimination** 13:5
**email** 53:22
**emailed** 25:8
**employed** 6:21,23
8:1
**employees** 7:6
**employment** 8:3
22:19
**encounter** 92:6 95:8
**enforce** 54:9 55:8
**enforcement** 16:7
84:22
**ensure** 14:10 56:6
111:11
**enter** 114:18
**entire** 41:24 83:19
84:15
**entirety** 95:3
**entitled** 1:18 55:4
58:4 83:14
**equivalent** 47:7
**erica** 32:16 48:9
**errors** 89:14

**escape** 68:17
**esq** 2:6
**essentially** 117:24
**estimate** 40:11
**estimation** 88:15
**et** 24:3
**evening** 86:14
**event** 36:23 39:3
66:6
**eventually** 64:5
**evidence** 74:24
77:24 78:22
**exact** 88:20 112:1
**examination** 1:16
3:5 119:4 120:1
122:2
**examined** 3:3
**example** 20:22 21:7
63:4
**exception** 88:11
**executed** 14:20
**execution** 15:12
**exhausted** 41:9
**exhibit** 20:2,4 23:14
23:16,20 24:10,12
25:16 122:10,11,12
**exhibits** 122:14
**existing** 116:4
**exit** 11:7
**exited** 63:5
**expanded** 79:12
**expect** 78:3 82:13
89:3,13 93:21 94:1
118:6
**expected** 94:22
96:12
**experience** 35:22
37:1 58:17,19 72:11
72:17 74:23 75:6,22
75:23 77:5 82:11
87:10 90:10,11 92:4
95:6 97:14,23
106:16,17 110:17
110:19,23 112:12
112:18



**experienced** 56:23
**expert** 1:17 12:11,15 20:14 21:3 23:6,8 24:1 26:12 29:22 30:3,8
**experts** 117:6
**expired** 113:24
**explain** 65:13 74:4 79:4
**explaining** 87:17
**explanation** 107:8
**explosion** 18:21 19:4
**extent** 61:17 87:20
**extra** 59:21

**f**

**facilitated** 112:11
**facilitating** 112:22
**facilities** 8:20 9:6,18 9:19,21,23 10:1 15:2 18:7 19:1 31:8 61:24 62:1 67:12 115:16,18,20 116:2
**facility** 8:21 10:6 11:7 17:16,17,18,20 18:3,12,14 29:10 30:9 37:23 38:7,20 55:3,24 60:22 61:2 61:3,22 64:6,14,16 68:4,14 69:6 72:14 80:20 115:8,22 118:6
**fact** 14:20 18:5 29:8 31:1,17 34:3,24 51:12 54:5 58:6 60:16 69:14,16 71:4 75:4 76:9 77:3,7 91:17 94:2 95:21 96:2 97:2 98:15 103:24 105:23 106:1 107:1,9 108:15 118:6 120:16

**factor** 42:23 114:18
**factors** 34:15,18 68:16
**failed** 105:13
**fair** 12:12 45:1,4 57:23 85:16 91:23 96:13 98:6 106:24 107:15
**familiar** 4:13 30:19 41:12 47:18 71:10 85:7 98:1
**family** 63:6
**far** 43:4 95:5 102:15 112:22
**fare** 64:15
**fear** 97:18 101:18
**feasibility** 55:19
**feasible** 39:23 40:2 46:21
**federal** 3:15 4:1 9:9
**fee** 26:1,4
**feed** 107:5
**feel** 31:23
**feet** 87:21
**felt** 97:23
**female** 22:11
**fights** 69:11 110:5
**file** 109:22
**filed** 54:5 66:17 109:6
**fill** 65:19
**final** 105:11 113:21
**find** 58:7 87:18
**finish** 6:2,5,7
**fire** 84:19
**first** 3:2 15:9 35:13 49:14 67:18 87:5
**fit** 61:20
**five** 16:23 84:12 103:1
**flaksman** 27:23
**flight** 25:1
**floor** 67:18
**folder** 54:5

**follow** 36:6 95:9 120:4
**followed** 57:1
**following** 32:2
**follows** 3:4
**form** 21:6 27:20 32:11 45:6 46:15 65:20 69:8 78:7 90:4 94:15 113:15
**formation** 118:17
**forms** 22:11 111:1
**forth** 123:8
**forty** 92:1
**found** 39:5,10 44:17 53:20 63:3
**four** 9:10 10:1 18:17 21:22 85:2
**frame** 16:12 100:1
**free** 31:23 63:23
**freely** 105:17
**front** 22:16 25:16 112:19
**function** 117:1
**functions** 117:19
**further** 119:2,24 120:1 123:12

**g**

**g** 2:3 3:1
**gain** 75:9
**gained** 108:24
**gambling** 78:1
**gandolfo** 1:20 123:4 123:22
**general** 32:9 34:2 37:15 65:16 115:8
**generated** 42:8 89:12 106:7
**generating** 33:15,20
**generations** 99:15
**given** 24:22,23 25:7 34:15 36:17 40:4 44:22 57:7 64:15,18 123:10

**giving** 4:24
**go** 4:14 14:23 17:11 31:19 37:24 38:16 43:24 44:16,17 52:14 54:11 55:15 62:11 63:9,23 64:16 69:14 79:15 85:22 88:7 111:20 113:10 114:22 115:2
**goes** 43:7 45:13 57:24
**going** 6:1 16:10,13 19:22 20:1 23:18 36:2,22 39:1,3,16 39:17 40:17,18 43:13,19 44:10 45:2 49:9 50:5,12,21 51:11,12 52:17 59:12 61:19 69:22 70:7 71:19 73:10 76:15,17 77:6 79:3 79:15 81:14,18 82:17 88:8 93:8,15 94:3,21,23 95:7,10 95:18 96:12 107:7 111:17 113:9 114:21 115:6 118:11,18
**good** 61:24 70:12 72:11 74:1 116:18 116:22 117:10 118:5
**governed** 3:24
**governmental** 21:1
**grand** 57:5
**grandmother** 77:15 77:20 86:24 87:16
**guard** 75:15
**guesstimate** 44:5
**guideline** 58:18
**guilty** 39:5 44:17 62:6,13 63:3
**guy** 112:20 113:3
**guys** 113:10

[h - inmate]

**h**

h  3:1,1 122:8
hahs  5:18
half  90:16
hand  123:18
happen  46:8 60:24
  63:17 110:20
  117:14
happened  5:24
  73:19 90:13,19
  102:18 106:12
  107:14,22
happening  93:13
  94:18 113:7
happens  39:19
harm  74:19 75:2
  78:10,16 98:7
harming  108:13
harms  82:9
head  5:19,20 83:22
  84:15,17
hear  16:15 77:6 95:8
  119:14,17 120:5
heard  102:5 120:7
hearing  22:14,15,21
  23:9 41:16 120:6
hears  120:7
height  18:20
held  1:19 8:10 18:7
  37:6 42:1 43:15
  50:9 62:4 64:24
  65:5 83:3 111:18
help  92:13 111:11
hereunto  123:17
hide  97:22 98:15,17
higher  11:14,18
  46:17
hire  7:7
history  40:24 49:15
  68:11,12
hold  37:11 49:22
  51:1 52:15 53:1,2
  53:10,11 55:1 56:5
  56:17 59:8 64:20

67:7
holding  55:14 62:8
  62:15,19 63:14
  67:13,16 79:2,5,7,8
  79:12 81:11,22
  111:10,14,24
  113:16
holds  35:16 37:17
  37:18 47:15 48:22
  49:7,8 50:15 52:7
  52:22 54:19 55:17
  56:10,13 57:19
  65:22
holmes  32:16 33:10
home  25:1 76:16,17
  82:15
homeless  19:1
honest  118:24
honestly  4:22 90:20
hope  73:17
hospital  42:3
hour  26:1 90:16
hours  29:9 85:3
  115:11
house  14:13 16:24
  17:3,19 18:10 79:2
  91:2 100:14,18
  115:20
housed  18:17,22
  64:4 65:2 80:7 82:9
  111:14 112:3
houses  16:14 69:23
  115:8
housing  8:19 61:1
  64:3,6 72:7 73:13
  76:11,11 79:16 82:2
  93:19 94:4 106:3,4
  111:20 112:14
huhs  5:19
hundred  44:6
hung  87:1
hurt  98:11
hypothetical  117:24

**i**

idea  79:21 91:16
  108:7 110:8
identification  20:5
  23:17,20 24:13
  108:21
identified  41:5
  106:11 107:16
  108:2
identify  37:20
  105:24 108:16
identifying  98:10
illegible  45:20
illinois  1:2,8 2:5,9
  2:11 4:3 30:13,21
  31:1 47:11,14 49:3
  54:16 55:11
illness  34:23 35:8
implement  65:24
  66:22
implementation
  15:11
implemented  30:21
  66:7 69:21 70:2
  116:15 117:5
implications  31:2
important  14:10
  50:8 68:7 101:11
impossible  120:17
improve  70:13
  112:3 118:5
inadvertent  90:1
incidences  108:12
incident  32:4,5,6,6
  32:18 67:2 71:5
  89:10,11,12,18,20
  90:15 99:16,20
  100:4,6,12 102:3,8
  102:11,20 103:5,6
  104:15,23 109:9
incidents  75:15
  99:22 100:5,23
include  44:10,14
  57:18 100:9

included  119:20
includes  17:16
including  12:21
inclusive  37:11
incorrect  31:23
increase  74:18
  78:16,19 116:16
increased  75:1 98:7
incumbent  54:8
indicate  37:16 76:3
  76:15,20 92:21 93:8
  101:11,16 102:8
  111:5
indicated  87:7 95:17
  96:2 99:11 104:24
  109:10 119:22
indicates  77:11
  92:17 101:23
  113:12 118:23
indicating  105:7
indirectly  28:1
individual  19:9,18
  33:24 83:12
individually  19:13
individuals  69:11,12
  108:8,12,22 109:7
  109:23 110:3,6,9,14
  116:20
informant  106:10
  108:5
information  40:7
  45:21 46:10 109:13
infractions  40:23
initial  37:14 89:13
  89:21
initially  97:6
injuries  97:7 98:16
  98:18,21
inmate  37:9,10,12
  41:20 42:1,2,3 43:6
  43:9 50:5 61:23
  64:4,11 66:24 67:14
  73:13 97:21 98:13
  98:15 106:2

inmates  8:18,22 9:1
  10:19,20 11:2 14:13
  17:4 18:10 29:8
  37:3 38:7,21 53:8
  62:21 64:18 67:7,24
  75:6 77:5 79:14
  82:3,19 92:6 95:13
  98:5 104:6,12
  110:15,18,21 111:1
  111:12 113:24
  115:9,16,21,23
  116:11 118:15
  119:10,12,18
input  53:16,18
  54:10
inside  91:1 93:11,15
  93:20
inspect  95:9
inspecting  9:6
inspection  87:8,9,13
  89:5 104:4
instances  21:11
institution  116:14
insuring  57:18
intake  8:19 9:2
  10:18 11:1 15:1
intentional  58:22
  89:15
intentionally  113:14
interested  123:15
internal  53:6
international  15:22
intervention  72:7
interviewed  109:9
intimidate  111:1
intimidated  110:14
  110:16
intimidating  110:20
  110:22
inventory  64:8
invested  46:5
investigation  12:22
  75:14 89:13,21
  105:14 106:9
  107:13 108:24

involve  29:19
involved  10:12
  13:22 14:2,16 21:13
  23:2 26:20 28:5,11
  29:14 66:24 97:15
  106:12 108:22
  110:3 115:4 116:2
involving  27:12
ipea  15:23
island  9:18,22 11:13
  14:9 16:20,24 17:7
  17:14 18:14,17 19:2
  19:6 38:20 39:9
  67:2 115:3
issue  34:3 46:1
  56:17
issued  49:22 57:6
  58:2
issues  14:8 23:2
  25:12 34:24 63:2
  69:5,14 71:20 72:5
  75:13
iv  111:9

j

jacqueline  1:20
  123:4,22
jail  28:12 30:14,17
  31:1 36:8 58:23
  69:17 70:21 75:15
  78:19 83:16 85:2
  110:11,15
jails  18:19
jay  7:19
job  115:11 117:16
  118:4
john  7:19
judge  39:4 46:7 57:6
  62:5 63:12
judgment  89:14
june  1:14 123:18
jurat  120:20
jurisdiction  49:23
  51:8 54:9 55:13
  56:15,19,20,23 57:5

57:7,10
jurisdictions  51:9
  72:22
jury  57:5
justice  7:17 13:4
  21:9,17

k

keep  80:2 97:17
  112:19
kind  18:18
knew  77:3
know  5:11 13:2
  16:17 23:11,22 29:5
  29:24 30:5,24 31:2
  31:7,15,16 45:2,14
  50:8 52:14 55:4,17
  57:10 59:9 61:17
  65:10 75:5,6 76:17
  81:4,7 91:19 94:10
  99:3,22 100:1,4,16
  106:12 109:8,24
  110:13 118:14
  120:11
knowledge  23:12
  44:9,13,15 50:1
  53:7 54:13 66:20
  68:1 69:24 80:17
  81:20 87:24 88:1
  105:3 106:22
  108:11 110:4
  116:16 118:17
known  35:23 67:20
  106:13 113:17
  118:9
knows  109:24

l

l  3:1
labor  23:2
language  65:8
law  16:3,7 57:1
  84:22
lawsuit  19:11 24:3
  109:22

lawsuits  23:1 27:12
  66:17
layers  14:22
lead  68:21
leading  69:4
leads  47:1,4,11 48:3
  48:15 49:2,6 50:14
  50:18,22 51:5,15,22
  54:16,18 55:21 56:4
  56:9,16 57:9 58:13
leave  13:10,13 22:23
  25:16 104:16
  117:17
leaving  98:14
  107:24
left  17:11,17 28:17
  47:24 54:13 59:4
legal  53:24
legitimate  51:1
  52:15
levels  22:20
liability  39:7 66:15
  66:19
lightening  102:21
likelihood  98:7
likewise  6:6
limit  117:19
limited  52:18
line  11:21 12:3,20
  15:10 82:20 120:20
list  33:6,7
listed  12:19 13:3
  26:22 88:14
literally  59:11,23
litigation  21:13
little  19:24 95:23
live  107:5
lived  67:19
living  18:16 32:3
  67:8,16 71:2,14,19
  73:2,23 75:3 76:6
  87:7 91:11,21
  101:19,20 105:18
  111:11 118:11,19

local  4:2
location  88:3 102:24
  107:6 113:2
locations  18:18
lock  22:9
lodged  57:19
log  32:3,13 87:7,12
  91:11
logbook  91:7,10
long  7:11 8:7 40:12
  43:20 48:15 49:1
  59:1 64:20 117:13
longer  34:24 56:24
look  23:19 33:2
  52:11 58:14 96:23
looked  66:22 117:8
looking  12:18 39:22
  59:14 113:15
looks  27:5 52:11
loose  51:14
lose  37:21 43:12
loses  56:21
lot  69:12 79:13
loud  5:18 96:11
low  115:18

**m**

machine  79:11
mail  16:3
maintain  37:8
  103:10
maintains  54:15
majority  12:1
  100:19
making  117:20
management  85:13
  85:18,21
manhattan  16:21
  17:18,19 18:24
  41:23
manner  57:14
manually  55:15
mark  24:9 91:7
marked  20:1,3
  23:15,19 24:11

marriage  123:14
materials  69:20
matter  123:16
mattered  77:20
matters  16:15 64:24
maximum  10:5 62:1
  115:22
mayor  84:3
mean  18:3 53:9 60:1
  65:13 66:18 79:4
  119:7 120:15
meaning  119:20
means  87:10 119:9
meant  10:17 18:4
  46:6,7 110:22
  112:21
medical  8:19 34:23
  35:8 40:24 86:18
  96:18,24 97:3,11,24
medication  5:3
meeting  25:11
meets  70:7
member  15:19,21
  31:5
members  115:10
memory  108:23
men's  10:5
mental  34:23 35:8
mentioned  22:4
  41:18 65:17 100:7
  106:18 112:7
met  63:6
metal  79:12
michael  32:16 33:9
midnight  114:12,13
milliseconds  48:3,17
  48:23
mind  41:9 112:17
mini  18:18
minimize  37:3,5
  39:7
minimum  9:8 61:23
minutes  87:2
mischaracterization
  10:16

mischaracterized
  99:1
mischaracterizing
  52:2
misrepresented
  98:16
missing  33:3
mistake  90:1
mistakes  89:15
mitigate  77:1
mittimus  45:22 60:9
mittimuses  60:6
mix  68:23
mixing  68:24
moment  56:8,11
money  64:14 77:24
  78:11,17
monitor  86:6
monitors  106:20,23
  107:4
months  73:4
morrissey  2:3,3,6
  3:19 10:15 21:5
  23:11 25:6,9,10,21
  26:15,20 27:16,19
  28:2,6 32:20,23
  42:14 45:5,10 46:14
  52:1 59:16 69:7
  76:5 78:6 90:3
  94:14 98:24 114:24
  119:5 121:3 122:5
motion  36:12 42:22
move  6:8 67:4 112:9
moved  11:22 107:17
  112:20

**n**

n  3:1 7:2,2 47:9,9
  122:1
name  3:7 19:11
  33:10 53:4,7 55:16
  58:9
names  108:5
nassau  84:10

national  47:21
ncia  47:19
ncis  47:18
necessarily  73:12
  92:12 98:12
necessary  35:14
  49:17 85:22
need  6:11 7:7 82:24
  85:20 88:7 92:13
needed  37:4 53:20
  73:9 97:23 103:9
  112:13
needs  55:22
nefarious  92:9
neutral  21:3
new  1:13,13,21 3:11
  7:20 8:5,11 9:8,13
  9:23 10:4 13:10,23
  14:12 16:11,15,16
  18:11 21:22 22:10
  22:19 25:5 30:16
  35:22 37:1,8 38:23
  39:6 41:13,18 44:7
  47:4,7 49:10,20
  50:2 52:21 55:9
  59:1 60:16 65:8
  83:22 84:4,5,7,11
  113:22 119:21
  123:5
night  25:2 55:22
  61:2 113:23
nodding  5:19
noise  93:24 96:11
  102:5
noises  95:8,18
noisy  95:23
non  1:17
normal  92:12
northern  1:2 4:2
notary  1:20 3:3
  123:4
notation  41:14
note  32:7
noted  121:7



[notes - pending]                                        Page 11

**notes** 24:20 25:4
 114:22
**noticed** 92:22 93:2,4
 94:21
**notified** 62:10,24
 64:5
**notifies** 64:6
**notify** 56:16 58:7
 96:17,22
**number** 32:4 34:16
 34:17 37:3 46:17
 55:17 62:1 86:13
 96:23 100:22
 105:12 116:13
 117:21
**numbers** 10:8 38:22
**numeral** 111:9
**nursing** 32:7
**nyspin** 47:9 49:12
 49:13

**o**

**oath** 4:17
**objection** 21:5 27:19
 45:5 46:14 59:16
 69:7 78:6 90:3
 94:14
**objectionable** 25:13
**obligation** 56:5
**observation** 119:10
**observe** 81:13 94:7
 94:7
**observed** 75:14
 90:17 102:9 106:18
 107:21
**observing** 81:18
 82:17 107:6
**obviously** 16:12
 19:14 57:23 120:11
**occasion** 92:6
**occupation** 4:10
**occupy** 92:8
**occurred** 67:3 89:21
 90:9 93:5 102:11,15
 109:14

**occurring** 71:21
**offender** 113:17
**offenders** 108:3,17
 108:19 109:2
**offense** 32:5
**offered** 26:11
**office** 37:15 65:17
 115:8 122:14
**officer** 1:8 8:15,17
 10:7,12,14,19,24
 11:1 12:3 15:8
 32:17,18 37:13 42:1
 64:3,7 71:13,17,23
 72:3 73:3,6,8,16
 81:18 82:16,19,24
 87:3,8,10,18 88:16
 89:1 90:7,12 91:2
 91:19 93:4,10,18
 94:23 95:4,19 96:5
 96:16 97:6,10,20,22
 98:20,22 99:3,9
 101:2,8,17,18,23
 102:3,12,16 103:21
 104:3,15 113:5,8
 118:21 119:9,11,14
 119:17,20 120:12
**officer's** 32:2
**officers** 8:24 12:23
 22:21,22 65:16
 73:14,22 80:24
 81:13 82:22 90:10
 92:8 94:2,17 95:6
 95:12 97:17 103:10
 104:1 112:15
**official** 19:14
**okay** 4:15 5:15 6:16
 6:17 16:18 25:18
 31:23
**ombudsman** 21:2
**once** 41:6,11 49:19
 52:11 53:23 56:3
 64:5 97:11 102:22
**ones** 61:12 65:18
 115:13,21

**open** 77:17 103:9
 104:1,16
**opened** 18:1
**operate** 105:17
**operates** 50:2
**operating** 17:18,19
 18:3
**operational** 39:23
 91:17
**operations** 11:12
 13:23 14:18
**opinion** 23:8 35:13
 35:21 40:1 43:17
 67:5,10 74:2 82:21
 86:13,19,22 88:21
 97:1,9 104:8 105:11
 105:19,22 106:6,15
 112:5 114:18
**opinions** 27:1 33:24
**order** 1:22 3:24
 14:18 32:9 37:3
 39:18 50:6,14 56:1
 83:15 85:8 92:13
 111:21
**ordered** 62:3
**organizations** 15:15
**outcome** 123:15
**outlining** 69:22
**outside** 63:7 67:8
 92:19,23 93:5,9,14
 104:10 111:11
**outstanding** 37:11
 40:22 41:2,19 42:5
 43:3 47:13
**overall** 116:1
**overcrowding** 14:8
**overheard** 77:18
**oversaw** 11:12
**overseeing** 14:1
**overtime** 12:23
 66:10
**overtly** 76:3,20
**owe** 78:11
**owed** 77:24 78:17

**owes** 75:10

**p**

**p** 47:9
**p.m.** 121:7
**pack** 40:16,20 41:24
 64:7
**packs** 39:17
**page** 32:23 35:12
 58:11 66:16 72:14
 113:22 120:19
 122:2,9
**pages** 99:19 100:23
**paper** 91:10
**papers** 61:9,11
 117:2
**paperwork** 36:15,23
 37:19 38:15 39:2
 42:9,13,19 43:20
 45:17 46:2,22 52:12
 54:7 59:13,22 60:12
 60:19 65:21 113:10
 114:11 115:5 117:7
**paragraph** 113:21
**part** 48:4 50:4 65:10
 95:14 96:23 112:9
 116:7
**particular** 29:4
 37:12 41:20 42:6
 50:19 51:12,19 71:1
 73:13 100:5
**particulars** 29:12
**parties** 1:23 3:23
 123:13
**parts** 94:16
**party** 1:17 21:12
**patrick** 2:3,6 3:19
**pay** 75:12
**peak** 17:9
**pedigree** 11:6
**pen** 62:15,20 113:4
**pending** 37:22 50:10
 60:8 67:24 115:14
 115:17,24



pens 62:8,19 67:13
67:16
people 7:7 34:10,16
37:6,19,24 38:10,14
40:5 43:24 44:10,14
44:16,17 50:12,18
50:20 51:17,23 52:3
52:6,8,10 57:14
59:17 61:18 68:23
75:17 80:10 81:16
82:12 108:2 112:13
112:19 116:8,24
117:15,16,18,19,21
118:3
percent 38:4 46:12
perform 92:9
performing 94:2
95:1
performs 89:2
period 112:17
periodically 56:7
permissible 35:6
permitted 65:4
person 22:17 36:11
36:14,21 37:16,20
41:4,8 43:19 47:16
48:21 49:11,13,17
50:9,21 51:1,4,10
51:14 52:15,17,21
52:24 53:21 54:1
55:1,4,14,24 56:5
56:20,21 57:1,16,20
58:3 59:12,20 60:17
61:12,15 62:10,12
63:10,11,13,23 65:2
68:18 70:7 75:8
81:22 98:6,12 112:6
112:10 120:7,8
person's 40:16
55:16 58:8 63:22
64:1
personal 53:15 64:1
69:4
personality 69:3,9

personnel 36:8 45:9
persons 40:8 43:18
perusing 96:21
103:16
pervasiveness 111:5
philadelphia 53:11
phone 77:14 87:1
98:21 99:8
phones 77:16 90:24
phonetic 27:23
physical 113:2
119:11
physically 120:17
pilot 69:20
ping 55:12
place 1:19 14:20
66:8 68:3 70:1 85:2
89:22 96:6
placed 54:20 62:20
76:10 79:17 88:12
plaintiff 1:6,18 2:3
3:15,20 20:15,23
32:10,12
plastic 79:14
please 58:13
plus 71:5
point 10:2 13:6
17:10 31:18 77:21
89:4
pointed 60:23
police 84:19
policy 34:10 86:4,7
population 17:6
18:21 19:3 38:3,5
39:11
portion 111:8
position 36:14 38:13
39:13 42:6 43:2
positioned 104:1
possibility 78:10,16
possible 36:16 37:20
41:6 52:9 61:16
65:19 67:7,22 70:5
72:13 75:18 80:1,4
112:10,21 117:9

possibly 106:10
potential 43:8 66:23
potentially 68:22
powells 3:10
practice 34:10 58:12
72:12 74:2 88:23
practices 33:20 74:7
prea 13:4,5 21:9
precise 88:19
predator 106:4
predators 105:17
prep 113:23
preparation 95:17
prepare 11:2 36:3
114:11
prepared 4:21
preparing 10:19
prescreening 59:2
66:7
present 3:17 26:19
118:10
president 7:5
presumption 98:19
presupposes 98:21
pretrial 36:12 42:22
43:5 44:11
pretty 30:1 77:17
114:23
prevent 5:5 104:6
prevented 107:13
preventing 4:23 5:2
principle 7:8
prints 113:17
prior 8:1,4 36:2
39:3 50:5 52:16
57:20 60:5,22 61:2
61:7 67:13 68:11
91:6 108:12 110:5
115:5
prison 10:2 13:5
15:22 18:22
prisoners 18:22
92:9
probably 6:13 38:22
44:6 46:1 115:9,15

115:16 116:10
problem 36:7 41:12
71:1 73:7 118:17
problematic 68:22
problems 14:4 69:9
71:20 82:14
procedure 3:16 4:1
10:13 14:5,9 30:9
66:15,18 68:3 70:14
85:12
procedures 15:12
22:10 85:19
proceeded 39:12
process 34:5 46:22
65:7,9 70:7 111:13
111:15 112:23
113:14 114:14,17
116:17
processed 34:16
62:23
processing 46:1
produce 38:4,8 54:1
produced 60:17
produces 38:20
product 118:1
profession 4:11
professional 15:15
26:16
program 9:16 44:12
65:24 69:20 70:1
progress 47:24
promised 26:11
promoted 8:16 9:11
9:19 10:9 11:10,22
prompt 105:14
promptly 96:17,22
proof 77:9
proper 101:12
properly 14:20 35:1
85:17 117:8
property 64:1,9,13
64:19,21 83:5
prosecuting 108:18
protect 118:15



[provide - report]                                                    Page 13

**provide** 16:6 54:18
 66:8 97:11
**provided** 12:7 19:23
 20:8 21:23 24:2,7
 30:12 45:19 66:11
 69:19 70:2 118:18
**providing** 26:11
**public** 1:21 3:3
 123:5
**publications** 16:1
**pulled** 116:6
**punched** 102:22
**pursuant** 1:21 3:23
 23:9 24:17
**pursue** 109:11,17
**pushed** 52:13
**put** 29:5 38:21
 61:13 66:2,4 82:1,5
 90:16 96:15 112:14
 112:16
**puts** 55:13 56:3
**putting** 82:11
 111:10 116:10

**q**

**queen** 32:16
**queen's** 48:9
**queeus** 16:22 17:21
 17:23
**question** 5:10,13 6:1
 6:5,9,14,14 20:21
 21:6 35:4 36:7,19
 45:6,7,16 48:14
 49:1 55:6 69:8
 76:18 82:3 89:16
 118:16
**questions** 4:22,24
 5:7 6:18 16:11 34:2
 47:1 92:11 115:3
 119:2 120:3 121:2
**quick** 23:21 37:13
 42:15 58:14 102:21
**quicker** 112:23
**quickly** 14:12 75:17
 112:10,21

**r**

**r** 7:2
**randomly** 78:12,18
**rank** 9:14 15:7
**rap** 49:16
**rape** 13:5
**rates** 115:19
**reach** 72:18 75:20
**reached** 17:9 35:13
 103:12,18,20
 104:18
**reaching** 74:14
**read** 15:24 16:2
 23:21 33:9 35:18
 71:7 96:1 99:11
 101:22 103:13
 104:23 106:6,8
 118:23
**readily** 37:18
**reading** 32:21
 104:19,21 105:4
 109:12
**real** 54:19,23 107:7
**realized** 33:9
**really** 57:4 77:19
 112:3 114:17
**rear** 2:4
**reason** 6:12 33:8
 50:9,22 58:21 93:23
**reasons** 75:16
**recall** 6:13 22:12
 28:22 29:7,11,16
 33:17 71:6 80:15
 94:12 99:16 100:22
 101:7
**receipt** 64:19
**receipts** 64:18
**receive** 7:22 26:7
 100:13
**received** 67:14
**receiving** 113:6
**recess** 42:17 115:1
**recognize** 23:22

**recollect** 21:18 48:8
**recollection** 49:4
**recommend** 36:1
 67:22
**record** 4:15 12:15
 25:6 32:20 48:4
 58:1 123:10
**recorded** 88:12,13
 107:22,24
**recording** 32:11
 106:21 107:2,10
**records** 36:8 37:9,10
 53:8 60:21 61:1
 70:4,19 113:1
**recreation** 8:19
**recruitment** 12:22
**reduce** 18:13
**reduces** 66:15,19
**refer** 28:23 98:9,10
**reference** 91:13
 103:4
**referenced** 28:9
 90:23 91:7 93:3
 100:11 102:2
**referred** 79:6 80:23
**referring** 21:10
 25:17 45:8 53:17
 58:18 79:8 80:13
 82:6 83:4 94:6
 103:22,23 107:5
 112:24 113:2,3
**reflected** 32:14 74:6
**regard** 87:22 99:14
 112:4 114:19
**regarding** 30:17,21
 45:16 89:18
**regardless** 81:24
**regards** 71:20 79:18
**registering** 54:6
**relate** 100:17
**related** 123:13
**relating** 32:5,19
**relation** 4:10
**release** 32:11 39:20
 55:5 57:14,15 58:4

 62:23
**released** 29:8 35:3
 38:17,18 39:19
 44:11 57:1 114:12
**releases** 72:13
**releasing** 58:22
 75:17
**relied** 31:21
**relief** 73:10
**rely** 14:18
**relying** 72:18
 106:15
**remain** 63:15 103:9
**remained** 108:8
**remains** 12:14
**remanned** 72:13
**remember** 19:12
 28:14 29:3,13 48:4
 48:6,12,18 74:19
 81:1 85:14 91:8
 102:5 114:1
**removed** 80:19
**rendered** 27:1 33:24
 67:5 105:12
**rendering** 97:9
**repeat** 78:14
**rephrase** 5:12 20:21
 35:5 36:18
**report** 24:1,6 25:24
 26:24 29:23 31:21
 32:1,4,5,7,21,24
 33:16,21 35:12 48:2
 49:3,6 50:7 58:11
 65:9,11 66:14 72:10
 74:20 75:10 79:5,6
 80:23 83:13 85:14
 87:4 89:9,17,20
 90:15,23 93:3 94:13
 96:16 99:14,17
 100:8,12 103:8,11
 103:14,18 104:19
 104:21 105:6
 109:13 119:21
 122:11

| | | | |
|---|---|---|---|
| **reported** 90:14 96:15 102:4 | **retribution** 97:18 98:5,13 | **roman** 111:9 | **secure** 19:1 96:18 |
| **reporter** 3:21 16:3 | **retrieved** 60:6 | **room** 79:9,13 81:5,8 81:9,12 82:23 92:2 113:6 | **secured** 104:9 |
| **reporter's** 5:20 | **return** 37:4 64:7 79:16 | **roughly** 115:20 | **security** 9:16 10:5 55:16 61:24 71:10 81:13 115:23 |
| **reports** 30:3 32:18 75:20 95:17 99:16 99:20 100:2,12,17 101:2,10 102:8 104:23 105:4 106:7 | **returned** 29:9 34:17 80:10 101:19 | **rouuds** 91:20 102:13 | **see** 12:9 14:12 41:6 52:6,18 54:5,9 59:13 60:13 61:5 82:16 87:18 88:8 94:11,17 95:9 96:6 96:12,20 102:13,17 103:1 104:2,17 107:6 109:15 119:18,22 120:13 120:17 |
| **represent** 42:19 54:22 | **returning** 79:3 80:6 | **routine** 115:7 | |
| **reputation** 75:9 | **review** 33:12,18 37:14,22 39:15 40:9 40:12,21 41:9 42:24 43:19,20 48:21 52:16 54:4 59:11,22 60:5,11,20 61:7 70:23 78:23 86:1,2 95:16 113:1 115:5 116:2,9 117:1,7 118:8 121:4,5 | **rule** 3:16 | |
| **require** 35:9 46:4 60:11 72:6 81:17 | | **rules** 4:1,2,14 | |
| **required** 40:9 43:19 65:24 66:11 | | **run** 49:12 50:6,14 50:17 51:5,22 55:1 55:15 58:8 83:16 113:16 | |
| **requirements** 70:17 | | **running** 50:7 55:19 85:19 | **seeing** 96:21 |
| **requires** 43:4 | | | **seeking** 54:24 55:8 |
| **reside** 3:9 | **reviewed** 33:15 36:15,23 38:15 39:2 39:17 41:1 45:17 61:1,19 77:11 79:10 85:13 92:17 93:7 99:15 101:16 109:19 111:4 113:12 | **s** | **seen** 24:14 49:2 87:6 91:3 98:20 |
| **resources** 65:10,14 66:12 | | **s** 3:1 47:9 122:4,8 | **segregate** 72:12 |
| **response** 24:19 25:4 36:17 48:20 | | **safer** 107:18 | **segregated** 67:23 74:18 |
| **responsibilities** 12:21 66:2,4 81:5 83:15,20 84:22 95:15 | | **safety** 111:12 | **send** 38:10 61:14 |
| | | **sake** 31:20 | **senior** 85:13,18,21 |
| | **reviewing** 30:11 36:8 61:8 116:21 | **salary** 66:9 | **sent** 40:5 |
| | **ride** 70:8 | **saw** 74:10 82:22 90:21 96:17 97:6 118:9,21 | **sentence** 8:21 44:22 51:13 113:24 114:8 |
| **responsibility** 10:22 54:1 57:13 85:17 86:9 116:5 118:14 | **right** 4:19 27:8,15 28:19 60:12 68:14 68:24 91:14 101:13 103:3 109:3 112:19 121:4,5 | | **sentenced** 8:22 17:4 |
| | | **saying** 20:22 40:21 40:23 43:6 52:3 55:11 56:2 63:21 66:1 69:10 78:10,15 82:4 93:6,17 94:19 94:21 115:13 116:24 117:23 | **separate** 65:5,18 72:7,22 111:14 114:3 |
| **responsible** 8:18 14:4 56:6,24 91:24 94:17 | | | **separated** 62:14 |
| **rest** 94:12 107:19 | **rikers** 9:18,22 11:12 14:8 16:24 17:7,14 18:14,17 19:6 37:4 38:20 39:9 64:17 67:1 115:3 | | **sergeant** 1:9 32:17 |
| **result** 36:13 42:23 75:11 86:17 | | **says** 28:24 62:5 63:12 77:8 | **serve** 53:11,20 54:10 54:14 55:8 56:18 |
| **resume** 24:21 28:23 29:6 | | **scan** 23:21 79:10 | **served** 44:18,23 51:13 53:1,9,23 54:2 56:22 59:8 60:15 62:5,13 63:12 |
| | **risk** 68:17 74:19 75:1 78:16 118:9,15 118:18 | **schedule** 56:15 | |
| **retained** 12:11 20:23 21:3,21 25:20 27:8,17,22 28:3,6 28:15 30:8 122:14 | | **scheduled** 50:24 82:12 | **service** 26:16 53:16 |
| | **risks** 118:13 | **schultz** 3:15 24:3 | **serving** 21:18 114:8 |
| **retired** 13:14 | **role** 12:5 | **search** 11:2 29:20 | **set** 36:11,12 41:15 41:16 42:21 44:11 56:14 86:4,7 123:8 123:18 |
| **retirement** 13:15 | | **searches** 29:15 | |
| | | **second** 67:4 103:1 | |
| | | **secret** 97:17 | |

settle 25:11
seven 22:2 85:3
severely 86:17
shaking 5:19
sheahan 28:9,10
sheet 49:16 91:10
sheila 1:16 3:8,13
shelters 19:1
sheriff 1:8 32:16
  34:9,19 57:13 70:3
  70:3 83:11,14 84:14
  85:9,23 86:3,10
  109:1
sheriff's 45:9
shortly 87:15 109:9
show 19:22
shultz 1:5 32:8
  44:20 58:20 71:1
  73:21 75:1,24 76:13
  76:23 77:24 78:3
  79:22 80:7 83:3
  86:17,23 87:4,15
  88:12 89:18 90:17
  90:21,24 91:4,24
  92:2,17 95:21 96:17
  97:2,6 99:6 101:17
  105:16,23 107:14
  108:16,24 109:5,8
  109:21,24 112:2
  113:7 118:10,11,18
  118:22
shultz's 29:18 32:10
  32:12 71:7 114:4
sick 22:23
side 18:23,23 52:13
sides 104:17
sight 82:20 112:15
sign 10:20 11:5
signature 120:20
  123:20
similar 29:11 38:22
  82:1
simple 37:7
simplicity 31:20

simply 40:21 41:1
  43:2,6 52:3 73:12
  93:17 104:8 109:12
single 59:12 94:8
sit 21:1 113:5
sitting 24:24 98:22
  112:6 113:4,9
  120:12
situation 114:4
situations 68:23
  74:11
six 27:7,11,11 28:4
sixteen 10:3,4
size 93:19
slackers 117:24
slowed 113:14
small 40:18
snitch 98:2,9
snitched 98:8
social 55:16
solely 75:21,23
somebody 55:14
  61:4 78:11,11,17
  98:4 105:8 106:2
someone's 46:22
sort 41:17 112:2
sound 27:8 28:19
  112:15
sounds 27:15
south 2:4
space 14:11 62:22
  65:4 67:7 105:18
  114:15
speaking 15:6 16:13
special 117:20
  119:19
specially 117:15,17
specific 48:24
  102:24 117:1
  118:16
specifically 68:21
  101:7,8 118:10
  119:22
speed 70:13 111:12
  111:15 112:4

speeding 112:24
spell 7:1
spot 84:2
spurred 66:17
staff 16:7 40:8 41:11
  43:18 65:23 66:3,5
  72:7 83:15 86:14
  115:4,9 116:1,3,4
  116:16 117:13
staffing 115:7
staged 79:15,16
stand 27:4 71:9
  103:21
standard 26:4 58:17
standards 9:8 30:14
  30:17 31:1 33:19
  35:24 67:21 70:16
  72:18 74:7,14
  106:14
standing 94:24 95:4
  104:5,12
star 1:9,9
start 6:2,6
started 8:13 17:8
  41:10
starting 8:2 17:11
state 1:21 9:8 16:16
  47:14 48:2 58:12
  72:10 86:19 87:6
  101:6 103:8 105:18
  118:14 123:5
state's 2:9,12 3:18
  122:13
stated 25:24 48:13
  61:20 65:7 66:14
  74:17 85:11 103:18
  104:15
statement 19:23
  48:7
staten 16:20
states 1:1 32:1 35:13
  64:20 85:8
stating 105:7
statistics 100:10

stature 30:16
status 42:6 45:4
  67:9 78:13,19 79:22
  81:24
stay 104:1
steady 73:14
step 59:22 65:15
  70:12
steps 11:18 35:7,14
  36:1
stipulations 1:23
stone 3:11
stood 76:14
stop 31:23 102:23
stopped 11:9
stored 64:10
strange 95:8
strip 29:14,19
studies 75:19
stuff 12:3
subject 23:9
subjective 120:6
submit 29:22 56:16
subordinates 14:16
  86:9
subscribe 15:24
subsequent 12:10
  50:23 107:12 110:9
subsequently 11:9
  56:22 64:17
substance 5:4
substantial 46:13,18
suburban 69:22
  70:6
sued 19:8,13,18
  66:24 83:12
suffer 118:1
sufficient 82:20
  117:21
suffolk 84:10
suggestions 111:23
suite 2:4
suited 35:3
supervise 86:15

supervised  15:2
  119:15
supervising  8:18
  87:3
supervision  83:1
  93:18 94:3,5 95:2
  99:6 101:13 119:7,8
  119:13,16,23
  120:10,16
supervisor  8:24 9:3
  11:4 12:2 15:10
  37:23 61:3 62:9,24
  96:18,22
supervisor's  10:21
  12:21
supervisory  12:4
supports  78:23
supposed  88:20
  119:17
sure  14:19 17:22,23
  30:1 33:3 35:2 38:9
  42:16 57:15 59:20
  63:9 78:15 85:19
  86:6 112:20 114:24
  117:8,20
surprised  33:11
surrounding  105:15
surveillance  106:19
sworn  3:2 4:17
  123:8
system  14:19 50:2
  53:3,5,7,8 54:11,20
  56:4,9 58:6 91:14
  117:6,12

**t**

t  103:6 122:8
take  6:11,13,15
  23:19,21 25:14
  26:18 34:3,10,14,24
  40:12 42:14 43:21
  48:15 54:4 58:14
  66:7 77:7 80:9 85:2
  90:18 96:6 105:5

taken  1:20 3:22 35:7
  42:17 65:1 89:22
  108:6 115:1
takes  48:3
talk  77:5
talked  110:2 113:22
talking  18:5 49:10
  76:5 79:1
tape  109:15
target  51:5 75:8
  77:2,12,13 78:5
tasked  9:5
taught  74:8
telephone  86:24
  87:16
tell  4:18 8:9 17:15
  61:21 76:23 77:4,9
telling  5:5 38:19
ten  4:8,9 22:4 87:2
term  98:1 119:8
testified  3:4 11:17
  20:15 22:13 23:1
  30:7 74:12 75:24
testify  19:17 22:6,21
  40:7
testimony  10:16
  26:12 32:15 52:2
  66:9 92:16 96:1
  99:2,5,10 101:15,22
  123:7,10
thank  13:9
thing  13:2 109:14
  109:18 116:18,23
  117:10 118:5
things  9:1 90:9
  110:19 112:18
think  10:15 22:4
  39:1,21 57:12 65:1
  86:3 90:5,7 93:1
  95:22 98:17,24
  109:19 110:21
  114:22
third  63:11 86:19
thirteen  9:22

thirty  46:12,17
  64:11
thomas  1:8 2:3 25:9
  25:20
thought  18:5
three  8:15 9:17
  21:21 27:5 40:19
  43:14 59:4 82:2
  100:4,21 101:5
tier  73:11 94:7,8,12
tiers  103:10
time  1:19 11:21
  13:16,20 14:7 15:6
  16:12 17:4,17 18:15
  21:24 25:15 26:19
  29:12 32:14 34:15
  34:18 37:6 38:15
  44:18,22 46:5 51:13
  54:2,19,23 56:14
  57:3,7 60:24 62:5
  62:13 63:12 69:12
  73:4 80:3 85:4 87:6
  88:13,24 89:1,4,7
  90:8,14 92:18 94:9
  97:5 100:1 101:3
  107:7 112:18 119:3
  121:7
timely  14:5 57:14
times  4:7,9 5:8
  10:20 19:13 20:14
  20:17 21:19,21 22:2
  22:3,13,24 27:7,11
  88:14,19 89:10,19
  89:23 90:2,6
title  7:3
titles  8:10
today  4:22 5:8 12:7
  19:24 20:8 21:23
  24:4 37:21 43:13
  51:4 114:11
told  77:14,20 79:14
  101:17 103:20
tomorrow  114:9,12
total  27:6

tour  87:8,9,13 89:2
  89:5,10 91:14 96:5
  103:20 104:3,21
  120:11
tours  89:19 91:8
trade  16:1
trained  116:21
  117:15,18,22
training  16:6 21:16
  116:15 117:20
transcript  6:4 121:4
  123:9
transcripts  96:1
transmitted  70:18
transport  39:9
transportation
  18:13
transported  37:9
transporting  39:8
travel  67:14
treated  98:18
treatment  86:18
  96:18,24 97:4,11
trial  1:16 18:11 22:6
  22:14 36:11 41:16
  42:21 43:5
tried  109:22
true  20:11 123:9
truth  4:18 5:5
truthful  5:1
truthfully  4:22
try  5:11 6:4,7 92:7
  97:10,17,22
trying  11:20 70:13
  104:13 118:4
turn  60:18
turned  18:24
twenty  8:8 10:3
  21:21 22:2 27:7,11
  38:4 71:5 85:2
twice  102:22
two  8:8 11:18 22:13
  22:24 25:7 28:8
  59:4 80:24 82:11,22
  100:20 101:5 103:1



[two - york]                                                                                       Page 17

115:9

**type** 5:4 21:14 22:14 29:19 52:23 72:5 73:9,15 77:12

**types** 75:13

**u**

**u** 3:1 7:2

**uh** 5:19

**ultimately** 13:10 46:7,20 108:1

**underlings** 83:20

**understand** 4:18 5:9 5:10,22 6:9 35:4 55:6,20 82:3 89:16

**understanding** 4:24 29:6 44:7 71:18 72:5

**understood** 5:14 63:10

**underwent** 21:15

**uni** 22:11

**uniform** 76:2,10,19 77:8

**uniforms** 76:12

**unit** 9:5 11:23 32:3 67:16 71:2,14,19,24 73:3,23 75:3 76:7 76:11,12 91:21 94:4 101:19,20 111:21 118:11,19

**united** 1:1 85:8

**units** 67:8

**unnecessarily** 113:19

**update** 54:23

**updated** 12:8 20:6 56:7

**updates** 54:19

**upstairs** 83:9

**use** 80:18,21 81:11

**utilized** 30:20

**v**

**v** 3:1 101:9

**valuable** 64:13

**value** 106:24 107:9

**various** 9:13,18 67:13 75:15

**vast** 100:19

**vaughan** 1:17 3:8,13 3:20 4:4 20:6 23:18 24:14 27:4 33:2 42:18 119:6 122:4

**vaughan's** 99:1

**verbal** 5:18

**verified** 67:9

**verify** 56:8

**version** 20:7

**versus** 19:14 24:3 28:9,10

**victim** 63:5

**victim's** 63:6

**video** 107:20,23 109:15

**view** 37:13

**views** 78:23

**villanova** 1:9 32:17

**violence** 104:24 105:8

**violent** 105:16

**visible** 88:6 95:4 99:9

**visually** 95:3

**vitae** 12:8,19 19:23 20:7 21:20 26:22 122:10

**voluminous** 40:20

**w**

**w** 32:19 86:15 88:4 91:2 100:14,17 101:9 103:5

**wait** 6:4

**waive** 121:5,6

**walk** 62:3 63:1,18 67:11

**walked** 87:10

**walking** 64:23 95:12 104:7

**wallet** 64:13

**want** 6:12 11:8 13:1 31:19 51:15 82:15 96:20 98:15 109:10 109:16 113:8 115:2

**wanted** 13:6 37:5 39:7 83:10

**wants** 64:12 98:18

**warden** 9:12,12,14 9:14,20,21 11:9,15 11:18 12:5 15:3 19:15

**wardens** 15:4,4

**wards** 19:2

**warrant** 49:21 51:23 52:24 53:2,12 54:6,10,24 55:13 56:3,17,19,21 57:6 58:2 59:8 60:14,16

**warrants** 47:13 49:7 49:8 50:15 51:8 52:21 54:19 56:13 57:19

**washington** 2:10

**watch** 83:1 89:6 91:14,16 112:8 113:5

**watching** 91:24 101:3,9,24 102:24 103:23 113:9

**watson** 28:9,14 29:7 29:23 30:1,4,7

**way** 5:9 15:13 39:10 39:12 52:20 58:7 67:1 82:9 85:22 123:15

**wearing** 76:1,9,12 76:15,16,18,20 77:8

**wednesday** 25:9

**week** 25:11 40:18 85:3

**welcome** 33:2

**went** 9:3 15:12 42:2 42:3,3 44:20 45:10 59:21 75:16 88:3

**west** 2:10 18:23

**western** 2:4

**whereof** 123:17

**white** 3:11

**witness** 1:17 3:1,14 22:6 33:5 58:15 121:6 122:2 123:7 123:11,17

**women's** 10:2

**words** 34:8 76:13

**work** 117:24

**worked** 8:23 9:12 9:17,24 10:18 11:1 19:9 74:11 112:12

**working** 9:2 13:17 80:24

**works** 71:11

**write** 42:11 88:24

**writes** 89:1

**written** 29:22 31:20 42:7 90:15

**wrong** 57:16 114:7

**wrote** 89:17,19 90:7

**x**

**x** 1:4,11 122:1,8

**y**

**y** 7:2 47:9

**yeah** 95:22

**year** 17:5 28:15 100:3

**years** 8:8,15 9:10 31:15 40:19 59:4

**yesterday** 16:4 24:24

**york** 1:13,13,21 3:11 7:20 8:5,11 9:8 9:13,23 10:5 13:10 13:23 14:12 16:11 16:15,16 22:11,19 30:16 35:22 37:2,8

**[york - zecchin]**                                        Page 18

38:23 39:6 41:13,18
47:4,8 49:10,20
50:2 52:21 55:9
59:1 60:16 65:8
83:22 84:4,5,8,11
113:23 123:6

**z**

**zecchin** 2:12 3:6,12
3:19 23:13 24:9
25:8,14 32:22 33:1
42:16 45:12 76:8
114:21 120:2 122:4
122:13