UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| EDWARD SHULTZ, | ) | |
| | ) | |
| Plaintiff, | ) | 13 C 3641 |
| | ) | |
| vs. | ) | Judge Feinerman |
| | ) | |
| THOMAS DART, STEVEN DOMINGUEZ, and COOK COUNTY, ILLINOIS, | ) ) ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

In this suit under 42 U.S.C. § 1983, Edward Shultz alleged that Cook County, Illinois, Cook County Sheriff Thomas Dart (in his individual and official capacities), and correctional officers Steven Dominguez and Bruce Villanova violated his constitutional rights by continuing to detain him at Cook County Jail after a court-ordered discharge and by failing to protect him from an assault by other detainees. Doc. 73. With discovery completed and a jury trial set for February 8, 2016, Doc. 107, Defendants moved for summary judgment, Doc. 163. In his response, Shultz abandoned his claims against Villanova, his individual capacity claims against Dart, and his post-discharge detention claims, Doc. 179 at 17, and summary judgment accordingly has been granted on those claims, Doc. 191. For the following reasons, summary judgment otherwise is denied.

**Background**

The following facts are set forth as favorably to Shultz as the record and Local Rule 56.1 permit. *See Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012). On summary judgment, the court must assume the truth of those facts, but does not vouch for them. *See Arroyo v. Volvo Grp. N. Am.*, 805 F.3d 278, 281 (7th Cir. 2015).

Shultz was a pretrial detainee at Cook County Jail from April 17, 2013 through May 8, 2013.  Doc. 178 at ¶ 1.  Shultz lived in W House, a dorm designated for "psych inmates" located on the third floor of Division 2, Dorm 2.  *Id*. at ¶ 2; Doc. 185 at ¶ 6.  The third floor has two other dorms for psych inmates, called T House and U House, and a dorm for medical inmates, called V House.  Doc. 185 at ¶ 6.  Each dorm (also called a tier) has an assigned dorm officer (also called a tier officer) stationed at a desk in the hallway outside the dorm.  *Id*. at ¶ 8.  That desk has four chairs, one for each dorm officer, and the desk closest to the W House is bolted down approximately ten feet from W House's entrance.  *Id*. at ¶ 12.  Here is a picture of the desk on the third floor of Division 2, Dorm 2:



Doc. 178-2 at 4, ¶ 8.  A security officer is stationed on the third floor as well.  Doc. 185 at ¶ 12.  The security officer's responsibilities include processing inmates as they return from court, answering phones, and providing relief for the dorm officers during their one-hour lunch breaks.  *Id*. at ¶¶ 13-16.

The door connecting the third-floor hallway to the W House is always kept open.  Doc. 178 at ¶ 16.  The dorm itself is an open area, except for the bathroom.  *Ibid*.  A person standing

in the entrance doorway cannot see into the bathroom, *id*. at ¶ 15, but can observe prisoners entering and leaving the bathroom, Doc. 185 at ¶ 28. The inmate telephones are within eight feet of the entrance door. *Id*. at ¶ 24. Below is a picture depicting the entrance doorway to W House, the inmate telephones, and the entrance to the bathroom:



Doc. 178-2 at 3, ¶ 7.

The morning of May 8, 2013, Shultz appeared in court, pleaded guilty to a misdemeanor offense, and was sentenced to time served. Doc. 185 at ¶ 1. Although the judge ordered him released, Shultz was transported back to the jail. *Id*. at ¶ 3. When Shultz returned to W House at 7:20 p.m., Dominguez was the security officer on duty for the third floor and Officer Frank Anson was the dorm officer assigned to W House. *Id*. at ¶¶ 5, 7, 12. Per jail policy, Dominguez took over supervision of W House while Anson had a lunch break from 8 p.m. to 9 p.m. *Id*. at ¶ 17. During that time, Shultz went into the W House bathroom and was followed by six to eight fellow inmates, who assaulted him from behind. Doc. 178 at ¶ 12. Shultz later woke up on the bathroom floor. *Ibid*.

The parties dispute where Dominguez was when the inmates attacked Shultz and what occurred after the attack. Defendants' version of the events is as follows. Dominguez sat in a chair in the doorway of W House to ensure that the living area was under direct supervision. *Id*. at ¶¶ 20-21. Dominguez saw Shultz walk out of the bathroom with a bloody nose and immediately checked the bathroom but found nobody inside. *Id*. at ¶¶ 20, 22. Dominguez then ordered all the inmates to get on their beds and called the sergeant and medical staff. *Id*. at ¶ 24. Dominguez saw Shultz standing by the W House telephones while this happened. *Ibid*.

Shultz recalls events differently. He says that from the time he returned from court until after the incident, there was no officer stationed in the W House doorway. *Id*. at ¶ 20; Doc. 185 at ¶ 25. With no officer present after he left the bathroom, Shultz immediately called his grandmother on the W House telephones. Doc. 178 at ¶ 13; Doc. 185 at ¶ 38. He then walked out into the third floor hallway to find a guard, and the next thing he remembers is waking up in a wheelchair. Doc. 178 at ¶ 24; Doc. 185 at ¶ 25. Shultz does not remember what he discussed with his grandmother because "he was in and out of consciousness." Doc. 178 at ¶ 13. Jail records show that Shultz's call to his grandmother lasted from 8:33 p.m. to 8:36 p.m. Doc. 185 at ¶ 38. At a hearing on the present motion, both parties acknowledged that a recording of the call shows that Shultz discussed the attack with his grandmother; it necessarily follows that the attack preceded the phone call.

Dominguez filed an incident report stating that at 8:45 p.m., Shultz, "while under direct supervision … came out of the bathroom and stated that he was struck from behind, and did not know who was responsible." Doc. 185 at ¶ 26. "Direct supervision" means that the officer is "on the dorm in the doorway … watching at all times." Doc. 164-5 at 42; Doc. 185 at ¶ 27. Shultz was escorted to the Cermak Infirmary at 9:16 p.m. Doc. 185 at ¶ 5.

4

On summary judgment, the court must credit Shultz's account of what transpired. Accordingly, the court accepts as true that Dominguez was not stationed in a chair in the W House doorway when Shultz emerged from the bathroom; that Dominguez did not immediately walk up to Shultz when he exited the bathroom; and that nobody came to Shultz's aid until after he entered the hallway to find a guard. A consequence of accepting Shultz's account is that Dominguez's incident report—to the extent it states that Dominguez saw Shultz exit the bathroom and that he was in the W House doorway directly supervising the living area—is deemed false for summary judgment purposes.

The parties agree that "it was obvious [Shultz] was preparing to be released because he started to gather personal belongings, and gave away some personal property to other inmates assigned to the dorm." *Id*. at ¶ 11. While Shultz admits that he "never complained to any of the guards about any other inmates on his tier from April to May of 2013 and he never told anyone that he was afraid," Doc. 178 at ¶ 5, the parties dispute whether Dominguez nevertheless was aware that Shultz was in danger of being assaulted, *id*. at ¶ 6. Shultz submits that it "was common knowledge when an inmate returned to the dorm following a court ordered release [it] would cause jealousy with other inmates, some who participated in 'gang banging.'" *Ibid*. In support, Shultz cites his deposition testimony that inmates "don't want to see people come back from court and being released. There's jealousy. You know, there's gang-banging going on." Doc. 164-2 at 38. A reasonable jury could (though need not) conclude from Shultz's testimony that it was common knowledge that inmates scheduled for release were at a particular risk of assault. Although Shultz's testimony explicitly indicates only his own awareness that inmates scheduled for release face that particular danger, it is a reasonable inference that this was common knowledge among inmates and custodial staff.

5

Contrary to Defendants' submission, Doc. 184 at 3, it is appropriate on summary judgment to make this inference. Witnesses may testify as to common knowledge. *See United States v. Szymuszkiewicz*, 622 F.3d 701, 703 (7th Cir. 2010) (considering testimony that it was common knowledge among employees that the IRS's email client could be programmed to automatically forward all messages received). As an inmate, Shultz has a foundation to testify as to what was commonly known among those who lived and worked in the jail. *See Ajala v. West*, 106 F. Supp. 3d 976, 986 (W.D. Wis. 2015) (allowing the plaintiff to testify that prisoners know each other's religious affiliation, reasoning that, as an inmate, he "ha[d] foundation to testify regarding information that is common knowledge among prisoners").

Shultz's claims against Dart and Cook County focus on two aspects of the jail's policies and practices regarding inmate supervision: (1) the policy requiring the floor security officer assume responsibility for inmate supervision when a dorm officer takes a lunch break; and (2) the practice of dorm officers stationing themselves in the hallway out of sight and hearing of inmates. Doc. 179 at 7-8. As to the first policy, the following facts are not in dispute: (1) for a certain period in 2013, a single tier officer was assigned to two dorms on the third floor of Division 2, Dorm 3, which serves a general population, Doc. 185 at ¶¶ 19-20; (2) unlike Dorm 3, Dorm 2 generally has one officer assigned solely to W House because "it's a psychiatric tier" that had direct supervision, Doc. 164-4 at 87; Doc. 185 at ¶ 23; and (3) the Department of Justice issued a letter to Dart in 2008 stating that Cook County Jail "is not providing adequate supervision of the inmate housing areas" due to "the practice of having one correctional officer simultaneously supervise two tiers of cells as opposed to one," Doc. 178-3 at 118-19; Doc. 185 at ¶ 33. The letter states that this practice, known as "cross-watching," "is highly utilized during lunch periods" and also occurs throughout the day. Doc. 178-3 at 119; Doc. 185 at ¶ 33. Dart

received this letter but does not recall reading the portion that addresses cross-watching. Doc. 185 at ¶ 34. Still, Dart is aware of the dangers inherent in assigning a correctional officer to cross-watch a tier. *Id*. at ¶ 35.

The parties dispute the scope of the security officer's responsibilities while performing relief duty. According to Defendants, when the security officer relieves a tier officer during the tier officer's lunch break, the security officer's sole responsibility is to supervise the inmates from inside the tier. Doc. 178 at ¶¶ 18, 21. According to Shultz, however, the security officer continues to perform all of his other duties, such as processing inmates as they return from court and answering phones, while stationed at his hallway desk. *Ibid*. Each side offers testimony to support its position.

Dominguez testified that his only duty as a relief officer was to supervise inmates; that there was no security officer dedicated to performing security officer functions during the time that he covered for a tier officer; and that if an inmate returned from court during that time, the tier officers would log him back in. Doc. 164-3 at 63. Dominguez also testified that on the day of the attack on Shultz, he was present in W House at all times. *Id*. at 94-95. Shultz does not present any evidence expressly rebutting Dominguez's assertion that his only duty as a relief officer is to supervise inmates. But the court has already accepted Shultz's account that no officer was directly supervising W House from the time he returned from court until he sought help in the hallway. But viewing the facts in the light most favorable to Shultz, it is reasonable to infer that Dominguez was not present in W House because he was attending to his security officer responsibilities while stationed at his hallway desk. The record therefore would allow a reasonable jury to find that, as a matter of practice, the security officer continued to conduct security officer duties while covering for a tier officer during the tier officer's lunch break.

The second supervisory practice challenged by Shultz concerns whether tier officers stay within sight and hearing of inmates while supervising them. As an initial matter, Defendants have admitted for summary judgment purposes that tier officers do not stay within sight and hearing of the inmates in the dorm they are supervising. True, in their Local Rule 56.1(a)(3) statement, Defendants assert that the "officer assigned to Division II, Dorm 2, W tier would sit in a chair right in the doorway of W tier so the tier is under direct supervision." Doc. 178 at ¶ 21. However, Defendants do not dispute Shultz's assertion in his Local 56.1(b)(3)(C) statement of additional facts that the "officer's desk in the hallway … is where the dorm officer assigned to supervise plaintiff's dorm would sit when on duty." Doc. 185 at ¶ 8. It follows that Defendants are deemed to have admitted that assertion for purposes of summary judgment. *See* N.D. Ill. L.R. 56.1(a)(3) ("All material facts set forth in the statement filed pursuant to section (b)(3)(C) will be deemed admitted unless controverted by the statement of the moving party.").

Even if Defendants had properly disputed this point, the court on summary judgment would still credit Shultz's assertion that tier officers sit in the hallway while on duty. Shultz testified that Anson (the W House tier officer) was at a desk in the middle of the hallway when he returned from court and that nobody was stationed in W House. Doc. 164-2 at 13; Doc. 185 at ¶ 8. In a declaration, Shultz avers that during his "incarceration at the jail, the dorm officer would sit at [the] desk when on duty." Doc. 178-2 at 4, ¶ 9. Shultz further relies on testimony from two depositions in other cases to show that tier officers sit at the desk in the hallway rather than in the dorm's doorway. Doc. 185 at ¶¶ 21-22. One deposition was given by John Givens, the plaintiff in *Givens v. Dart*, 15 C 945 (Doc. 178-3 at 15); the second was given by Officer Jason Staniszewski in *McKinnie v. Dart*, 13 C 1372 (Doc. 178-2 at 14). Like this case, *Givens* and *McKinnie* are § 1983 suits brought by detainees at Cook County Jail.

Staniszewski worked as a tier officer assigned to V House in Division 2, Dorm 2 in 2012 and 2013. Doc. 178-2 at 17. The following testimony concerns the layout of the third floor:

> Q. And the officer's desk is outside the actual tier, correct?
>
> A. Yes.
>
> Q. So you sit out in the hall, correct?
>
> A. Yes. Well, yes, you sit out in the hall.

*Id*. at 19. Givens was an inmate frequently assigned to M and N House in Division 2, Dorm 2 from 2012 through 2014. Doc. 178-3 at 32, 59. He testified as follows:

> Q. And you talked about how officers sit outside of the house, outside of the door. Is that right?
>
> A. They sit in the hallway at a desk.
>
> Q. Now, you mentioned that there's a door to get out to that hallway. Is that right?
>
> A. Yes, sir.
>
> Q. You said that door is always open. Is that right?
>
> A. Until an officer get mad and close it because we're asking too many questions. And they don't feel like answering questions.
>
> Q. When did that happen?
>
> A. Whenever a certain officer—I don't mean to be offensive, but a lot of ladies. You know, guys be swearing. So they don't want to hear it and they'll close the door.
>
> Q. How often would that happen?
>
> A. Probably like once or twice a week.

*Id*. at 59. Earlier in his testimony, Givens explained that when a detainee is injured in the dorm, the tier officers had to be flagged down:

> Q. If [somebody fell down], how do you get [the nurses'] attention?

> A. You've got to go—the inmate got to go run to the police if something happen. And the police will come and look. And then they'll go all the way down the hall and go get the nurse.
>
> Q. Now, are the police in the dorm or are they right outside the bubble?
>
> A. No. They're not at the door. That's where they're supposed to be. But they sit at their desk.
>
> Q. Okay. Can they look into the door?
>
> A. No. They have to get up out of the desk, walk six or seven feet and look in the door.

*Id.* at 32.

Defendants object to the use of these deposition transcripts because neither deposition was tendered in discovery and because Staniszewski was not disclosed as a witness. Doc. 185 at ¶¶ 21-22. Federal Rule of Civil Procedure 32(a)(8) permits a deposition taken in one action to "be used in a later action involving the same subject matter between the same parties." Fed. R. Civ. P. 32(a)(8). It is unnecessary to determine whether the two deposition transcripts fall within the scope of Rule 32(a)(8) because, even if they did not, they still could be used in this case. In *Alexander v. Casino Queen, Inc.*, 739 F.3d 972 (7th Cir. 2014), the Seventh Circuit explained that a deposition from one case may be used in another case at the summary judgment stage:

> [I]n a proper case, depositions from one case may be used at the summary judgment stage of another, even if Rule 32(a)(8)'s requirements are not met. Two conditions must be met for a case to be proper. First, the deposition must satisfy [Federal Rule of Civil Procedure] 56's requirements for an affidavit or declaration—i.e., the testimony is based on personal knowledge and sets out facts that would be admissible at trial, and the deponent is competent to testify on these matters. Fed. R. Civ. P. 56(c)(4). Second, the depositions from the other case must be part of "the record" in the present case, because Rule 56 states that a party must cite to "materials *in the record*." Fed. R. Civ. P. 56(c)(1)(A) (emphasis added). To satisfy the second requirement, the plaintiffs here needed to create a docket entry, with attachments, to ensure that the relevant … materials were part of the record in the plaintiffs' case. The

>plaintiffs did not take this action—they never filed the … depositions as part of the record in this case.

*Id*. at 978. Defendants do not and could not suggest that Givens or Staniszewski lacked foundation for their testimony or that their testimony would be inadmissible, and unlike the plaintiffs in *Alexander*, Shultz has filed the depositions as part of the record in this case. Docs. 178-2, 178-3. The court therefore may consider those depositions here on summary judgment.

## Discussion

Shultz's remaining claims are against Dominguez for failing to protect him from the attack, and against Cook County and Dart (in his official capacity) for instituting a policy or practice of stationing guards out of sight and hearing of inmates.

### I. Failure to Protect Claim Against Dominguez

The parties treat Shultz as a pretrial detainee and thus analyze his deliberate indifference claim under the Fourteenth Amendment's Due Process Clause rather than the Eighth Amendment's Cruel and Unusual Punishment Clause, which applies only to convicted prisoners. As a practical matter, that distinction is of little consequence, as the Seventh Circuit has consistently held in the context of deliberate indifference claims that the two standards are "essentially the same." *Burton v. Downey*, 805 F.3d 776, 784 (7th Cir. 2015); *see also Smego v. Mitchell*, 723 F.3d 752, 756 (7th Cir. 2013); *Rosario v. Brawn*, 670 F.3d 816, 820-21 (7th Cir. 2012). True, the Supreme Court held last year that a pretrial detainee bringing a § 1983 *excessive force* claim under the Due Process Clause need show only that the amount of force used against him was objectively unreasonable, by contrast to an inmate bringing an Eighth Amendment excessive force claim, who must show that a prison official subjectively applied the force to maliciously and sadistically cause harm. *See Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473-75 (2015). But *Burton*, which the Seventh Circuit decided after *Kingsley*, holds that the

11

Due Process Clause and Eighth Amendment standards remain "essentially the same" in the context of deliberate indifference claims. Accordingly, this court will rely on deliberate indifference cases decided under both provisions; even if the Seventh Circuit ultimately decides that the Eighth Amendment deliberate indifference standard is more difficult to meet, the difference does not matter because Shultz's claim survives summary judgment even under the Eighth Amendment standard. *Cf. Guzman v. Sheahan*, 495 F.3d 852, 856 (7th Cir. 2007) ("The protections for pre-trial inmates under the Due Process Clause are at least as great as those afforded inmates under the Eighth Amendment ….").

The Constitution requires prison officials to protect detainees and inmates from violence inflicted by other detainees and inmates. *See Rosario*, 670 F.3d at 820-21; *Dale v. Poston*, 548 F.3d 563, 569 (7th Cir. 2008) ("Because officials have taken away virtually all of a prisoner's ability to protect himself, the Constitution imposes on officials the duty to protect those in their charge from harm from other prisoners."); *Guzman*, 495 F.3d at 856-57. But not every act of detainee-on-detainee violence results in a constitutional violation. *See Dale*, 548 F.3d at 569; *Borello v. Allison*, 446 F.3d 742, 747 (7th Cir. 2006). "A prison official is liable for failing to protect an inmate from another prisoner only if the official 'knows of and disregards an excessive risk to inmate health or safety[.]'" *Gevas v. McLaughlin*, 798 F.3d 475, 480 (7th Cir. 2015) (alteration in original) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). To prevail on a deliberate indifference claim, a plaintiff must show that (1) he was exposed to a grave risk while detained and (2) the defendant was "aware of a substantial risk of serious injury to the detainee but nevertheless failed to take appropriate steps to protect him." *Weiss v. Cooley*, 230 F.3d 1027, 1032 (7th Cir. 2000); *see also Gevas*, 798 F.3d at 480; *Rosario*, 670 F.3d at 821; *Santiago v. Walls*, 599 F.3d 749, 756 (7th Cir. 2010); *Guzman*, 495 F.3d at 857.

As to the grave risk requirement, the plaintiff must show that (1) "he suffered an objectively sufficiently serious injury" and (2) "he was incarcerated under conditions posing a substantial risk of serious harm." *Borello*, 446 F.3d at 747 (internal quotation marks omitted) (citing *Farmer*, 511 U.S. at 834). The assault on Shultz indisputably constitutes a sufficiently serious injury. *See Gevas*, 798 F.3d at 480; *Brown v. Budz*, 398 F.3d 904, 910-11 (7th Cir. 2005) ("[A] beating suffered at the hands of a fellow detainee … clearly constitutes serious harm, as [b]eing violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society.") (internal quotation marks omitted). And the conditions of Shultz's detention on the day in question certainly posed a substantial risk of attack, as it was common knowledge that inmates slated for release are frequent targets of assault. Doc. 185 at ¶ 11. A reasonable jury could find the grave risk requirement satisfied in this case.

As to the deliberate indifference requirement, the plaintiff "must show actual knowledge by the officials and guards of the existence of the substantial risk." *Washington v. LaPorte Cnty. Sheriff's Dep't*, 306 F.3d 515, 518 (7th Cir. 2002); *see also Gevas*, 798 F.3d at 480 ("[T]he subjective prong of the deliberate indifference claim … requires that the official must have actual, and not merely constructive, knowledge of the risk in order to be held liable …."). In failure to protect cases, a detainee "normally proves actual knowledge of impending harm by showing that he complained to prison officials about a specific threat to his safety." *Gevas*, 798 F.3d at 480. But that is not the only way to prove actual knowledge, as "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Mayoral v. Sheahan*, 245 F.3d 934, 938 (7th Cir. 2001) (quoting *Farmer*, 511 U.S. at 842). Moreover, a plaintiff "need not present direct evidence of the official's state of mind: 'Whether a prison official had the requisite knowledge of a substantial risk is a question of fact

subject to demonstration in the usual ways, including inference from circumstantial evidence.'" *Gevas*, 798 F.3d at 480 (quoting *Farmer*, 511 U.S. at 842); *see also Borello*, 446 F.3d at 747-48; *Fisher v. Lovejoy*, 414 F.3d 659, 662 (7th Cir. 2005). And while it "is certainly true that a deliberate indifference claim cannot be predicated merely on knowledge of general risks of violence in prison," the guard need not have "advance knowledge of every detail of a future assault" for a plaintiff to prevail. *Weiss*, 230 F.3d at 1032. As the Seventh Circuit has explained:

> The official cannot escape liability by showing that he did not know that a plaintiff was especially likely to be assaulted by the specific prisoner who eventually committed the assault. It does not matter whether the risk comes from multiple sources or from one source, and it does not matter whether the prisoner is at risk for reasons personal to him or because all the prisoners face the risk. Referring to *Hutto v. Finney*, [437 U.S. 678, 681-82 n.3 (1978),] the Court said that if rape were so common that "some potential victims dared not sleep [but] instead … would leave their beds and spend the night clinging to the bars nearest the guards' station," it would obviously be irrelevant to liability that the officials could not guess beforehand precisely who would attack whom. *Farmer*, [511 U.S.] at 843-44 ….

*Mayoral*, 245 F.3d at 939. Put another way: "Just because it is possible to state a claim on the basis of a guard's knowledge that a particular inmate poses a heightened risk of assault to the plaintiff does not mean that this is the only way to state a claim. Sometimes the heightened risk of which the guards were aware comes about because of their knowledge of the victim's characteristics, not the assailant's." *Weiss*, 230 F.3d at 1032 (internal citation omitted).

Defendants incorrectly argue that "there is no evidence that Dominguez had any specific knowledge of a substantial risk of serious harm to Plaintiff." Doc. 165 at 6. Although Shultz never alerted prison staff to any danger, he was not required to do so. *See Vinning-El v. Long*, 482 F.3d 923, 924-25 (7th Cir. 2007) ("Given the conditions Vinning-El describes—a floor covered with water, a broken toilet, feces and blood smeared along the wall, and no mattress to sleep on—a reasonable jury could infer that prison guards working in the vicinity necessarily would have known about the condition of the segregation cells" even though Vinning-El had not

directly informed the guards of his cell's condition). First, the inference from Shultz's testimony that it was common knowledge that detainees about to be discharged were at a particular risk of assault would allow a reasonable jury to find that the risk was so obvious that Dominguez must have been aware of it. Second, Dominguez's incident report states that "while under direct supervision [Shultz] came out of the bathroom and stated that he was struck from behind," Doc. 185 at ¶ 26, but Shultz testified that when he exited the bathroom, nobody helped him until he entered the hallway, *id*. at ¶ 25. As noted, the court must credit Shultz's version and thus must disbelieve Dominguez's report, and a reasonable jury could find that Dominguez falsified his report because he knew that he should have been (but was not) directly supervising W House given Shultz's impending release.

Accordingly, Shultz's failure to protect claim against Dominguez survives summary judgment. The court notes that because Dominguez (unlike Dart in his individual capacity, Doc. 165 at 30-31) does not argue for qualified immunity, any such argument is forfeited. *See Costello v. Grundon*, 651 F.3d 614, 635 (7th Cir. 2011) ("As the moving party, the [defendant] had the initial burden of identifying the basis for seeking summary judgment."); *Titran v. Ackman*, 893 F.2d 145, 148 (7th Cir. 1990) ("[w]hen a party moves for summary judgment on ground A, the opposing party need not address grounds B, C, and so on").

## II. *Monell* Claim Against Dart and Cook County

Shultz's claim against Cook County arises under the municipal liability doctrine of *Monell v. Department of Social Services*, 436 U.S. 658 (1978). His official capacity claim against Dart is treated as a *Monell* claim as well. *See Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) ("Official-capacity suits … generally represent only another way of pleading an action against an entity of which an officer is an agent. As long as the government entity receives

notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.") (internal citation and quotation marks omitted); *Sow v. Fortville Police Dep't*, 636 F.3d 293, 300 (7th Cir. 2011) ("an official capacity suit is another way of pleading an action against an entity of which the officer is an agent"); *Estate of Sims ex rel. Sims v. Cnty. of Bureau*, 506 F.3d 509, 514 (7th Cir. 2007).

Shultz argues that Defendants' summary judgment motion fails to address his *Monell* claim that the Jail has an unconstitutional policy and practice of stationing guards out of sight and hearing of inmates. Doc. 179 at 6-7. Although Defendants' initial brief discusses at great length the merits of Shultz's *Monell* claim regarding his continued detention after his court-ordered release, Doc. 165 at 8-26, it is not until their reply brief that they substantively engage with Shultz's *Monell* claim for inadequate supervision, Doc. 184 at 7-10. Defendants retort that they lacked notice of the *Monell* inadequate supervision claim and that their initial brief was directed only "at the claims raised in Plaintiff's second amended complaint, which did not include any allegations related to cross-watching, and Plaintiff should not be permitted to introduce this theory at this late stage of litigation." *Id.* at 7.

Defendants' position is incorrect. The operative complaint alleges that "[d]uring the attack, plaintiff cried out for help, but no correctional officer came to plaintiff's assistance, since defendant Dominguez, the guard assigned to watch plaintiff's tier, was out of sight and hearing," Doc. 73 at ¶ 14, and references the principle "that it may be a constitutional violation to permit a practice of stationing correctional officers out of sight and hearing," *id.* at ¶ 7. These allegations provide sufficient notice that Shultz's *Monell* claim was at least partly premised on the Jail's (alleged) practice of stationing guards out of the sight and hearing of inmates. And if the second

amended complaint left any doubts on that score, the *Monell* section of this court's opinion denying in part Defendants' Rule 12(b)(6) motion should have put them to rest:

> On the inadequate supervision claim, Dart again argues not that Shultz has failed to allege a policy, but that "[w]hatever Sheriff Dart's practice is regarding the stationing of officers within the tier, [Shultz] makes it clear that the cause of his injuries was not that practice, but a subordinate that disobeyed that practice" by being absent from the tier. Doc. 11 at 8. Dart's reading of Shultz's claim is incorrect. Shultz alleges that "[t]he practice of defendant Dart is to permit tier officers to be stationed in each hallway of Division 2, Dorm 2, out of sight and hearing of detainees," Doc. 5 at ¶ 12; that the officers are "unable to be summoned for help should trouble erupt," *id*. at ¶ 11; that during the attack, Shultz "cried out for help, but no correctional officer came to [his] assistance," *id*. at ¶ 10; and that it was "because" of this policy that "no correctional officer came to his aid," Doc. 17 at 7. Give these allegations, the absence of an assigned guard is irrelevant—at least at this stage of the case, when all inferences must be drawn in Shultz's favor—because even if the guard had been present, he would have been unable to see the attack or hear Shultz's cries for help.

2013 WL 5873325, at *5 (N.D. Ill. Oct. 31, 2013). And because arguments advanced for the first time in a reply brief are forfeited, the court will not consider Defendants' argument for summary judgment on the *Monell* claim. *See Narducci v. Moore*, 572 F.3d 313, 324 (7th Cir. 2009) ("[T]he district court is entitled to find that an argument raised for the first time in a reply brief is forfeited."); *Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 389 (7th Cir. 2003) ("Because Volvo raised the applicability of the Maine statute in its reply brief, the district court was entitled to find that Volvo waived the issue.").

Even if Defendants had not forfeited the point, Shultz's *Monell* claim would still survive summary judgment. To prevail on a *Monell* claim, the plaintiff must point to: "(1) an express [municipal] policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policy-making

authority." *Klebanowski v. Sheahan*, 540 F.3d 633, 637 (7th Cir. 2008); *see also Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2009). In addition to showing that the municipality acted culpably in one of those three ways, the plaintiff must prove causation, demonstrating that the municipality, "through its deliberate conduct, … was the 'moving force' behind the injury alleged." *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997) (emphasis omitted); *see also Connick v. Thompson*, 563 U.S. 51, 84 n.5 (2011); *Gable v. City of Chi.*, 296 F.3d 531, 539 (7th Cir. 2002).

As noted, Shultz's *Monell* claim focuses on two aspects of inmate supervision at the Jail. First, he alleges that the policy of having the floor security officer cover for individual tier officers when they take their lunch breaks creates a "critical security gap." Doc. 179 at 8. According to Shultz, this policy results in security officers assuming dual responsibilities that require them to sit at their post in the third floor hallway, placing them out of sight and hearing of the inmates. Second, Shultz alleges that in practice, and as a general rule, the tier officers themselves sit at the hallway desk rather than in the doorway of the tier, again placing inmates out of their sight and hearing. *Id*. at 11.

Shultz's *Monell* claim is premised in substantial part on *Hart v. Sheahan*, 396 F.3d 887 (7th Cir. 2005), which holds that a jail violates the Constitution by "subjecting [detainees] to a risk of serious harm by an unreasonably protracted detention of them out of sight and hearing of guards." *Id*. at 894. In *Hart*, Cook County Jail detainees alleged that they were confined to their cells once per month to enable guards to search the facility for weapons and contraband. *Id*. at 893. During this time, the detainees were "not under the observation, or even within hailing distance, of the guards." *Ibid*. When one of the plaintiffs was attacked by her cellmate, it took ten minutes for inmates to get a correctional officer's attention. *Id*. at 893-94. The Seventh

Circuit held that the plaintiffs stated a viable inadequate supervision claim. *Id*. at 894. Defendants attempt to distinguish *Hart* on the ground that the lockdown in *Hart* lasted for several days while Shultz was allegedly unsupervised for only several hours. Doc. 184 at 9. But regardless of how long inmates are left unsupervised, the constitutional concern is the same—that for some material period of time, the jail's practice is to leave inmate areas unattended.

As discussed above, Shultz has adduced enough evidence to show that the floor's security officer maintains his other responsibilities while relieving a tier officer of his duties during the tier officer's lunch break. Shultz has also adduced enough evidence to show that the tier officers station themselves in the hallway rather than in the dorm's doorway. These policies and practices would place the guard responsible for supervising inmates out of sight and hearing of those inmates, which a reasonable jury could find violated due process as interpreted by *Hart*. Shultz therefore may survive summary judgment if the record would permit a jury to find that this conduct was "a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law." *Gable*, 296 F.3d at 537.

The Seventh Circuit has declined to "adopt any bright-line rules defining a 'widespread custom or practice.'" *Thomas*, 604 F.3d at 303. "But the plaintiff must demonstrate that there is a policy at issue rather than a random event." *Ibid*. Shultz has done just that. As to his claim that having security officers relieve tier officers creates a dangerous situation, there is a notable gap in the jail's express policies—namely, who performs a security officer's duties for the four hours during which he covers for tier officers out on lunch? Dominguez testified that a tier officer processes returning inmates during the time a security officer is relieving the absent tier officer. Doc. 164-3 at 63. But then who is supervising the first tier officer's inmates while he

performs the security officer's tasks? As to Shultz's claim that the tier officers in practice station themselves outside of the tiers, Shultz's testimony, together with the depositions from the other two cases, give rise to a reasonable inference that the guards' placement on the day of the assault was not an isolated event. The consequence of the jail's policies and practices is that detainees, including particularly vulnerable detainees like Shultz, can go for stretches of time without supervision by tier officers.

Finally, Shultz has adequately established the causal link between the jail's supervision practices and his injury. A reasonable jury could fund that, had an officer been stationed in the doorway of W House instead of sitting out in the hallway, the officer could have seen several detainees follow Shultz into the bathroom and been able to prevent or interrupt the assault. Accordingly, Shultz may proceed to trial on his claims against Dart and Cook County.

## Conclusion

For the foregoing reasons, Defendants' summary judgment motion is denied as to the deliberate indifference/failure-to-protect claim against Dominguez and the *Monell* inadequate supervision claim against Dart and Cook County. In so holding, the court acknowledges that the claim against Dominguez *might* turn out to be inconsistent with the *Monell* claim—for example, perhaps the jail's policy was to station officers in the tier's doorway and Dominguez violated that policy. Whether there is an inconsistency will depend on the evidence introduced at trial and will be left in the first instance to the jury.

January 19, 2016

United States District Judge